# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHN E. TAYLOR, JR.,

        Plaintiff,

        v.

WEXFORD HEALTH SOURCES,
INC., et al.,

        Defendants.

Case No. 16-cv-3464

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff John Taylor, an inmate at Stateville Correctional Center (SCC), sued Defendant Wexford Health Sources, Inc.—the company contracted to provide medical care to Illinois inmates—several Wexford physicians and executives, and several SCC correctional officers under 42 U.S.C. § 1983. Plaintiff alleges that Defendants violated his Eighth Amendment rights by demonstrating deliberate indifference to his hernia, growths in his right arm, and his chronic pain.

Several Defendants moved to dismiss: Dr. Saleh Obaisi[1] and Wexford, [69]; Dr. Michael Warso, [72]; and Dr. Arthur Funk, [85]. Defendants Tarry Williams and Randy Pfister (the SCC Defendants) moved for judgment on the pleadings. [77]. Defendants Darius Holmes, Elaine Gedman, and Diana Malloy (the Executive Defendants) moved for summary judgment, [90], shortly after Plaintiff moved for an entry of default against them, [87]. This Court addresses each category of motion in

---

[1] Obaisi died in December 2017, after the parties fully briefed his motion. [147]. His counsel filed a Suggestion of Death, *id.*, but has not yet identified the executor of his estate.

turn.  For the reasons explained below, this Court denies Obaisi and Wexford's motion to dismiss, grants Warso's motion to dismiss, denies Funk's motion to dismiss, denies the SCC Defendant's motion for judgment on the pleadings, denies the Executive Defendants' motion for summary judgment, and denies as moot Plaintiff's motion for entry of default.

## I.    Motions to Dismiss

Obaisi, Wexford, Warso, and Funk all moved to dismiss Plaintiff's second amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  [69, 72, 85].

### A.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).  Thus, "threadbare recitals of the elements of a cause of action" and mere conclusory statements "do not suffice." *Limestone Dev. Corp. v. Vill. of*

*Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).

In evaluating a complaint under Rule 12(b)(6), this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. This Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Rule 12(b)(6) limits this Court to considering the complaint, documents attached to the complaint, documents central to the complaint (to which the complaint refers), and information properly subject to judicial notice. *Williamson*, 714 F.3d at 436.

### B. The Complaint's Allegations

Plaintiff has been in the custody of the Illinois Department of Corrections (IDOC) since 2007. [32] ¶ 35. IDOC contracts with Wexford for medical services at its facilities. *Id.* ¶ 36. The contract obligates Wexford to, among other things, ensure a "timely and efficient response to all inmates' health needs." *Id.* ¶ 40. At all relevant times, Obaisi worked for Wexford and served as SCC's medical director, while Funk worked for Wexford and supervised medical care in a region that included SCC. *Id.* ¶¶ 12, 15. Warso "worked with Wexford to treat inmate patients" at various times. *Id.* ¶ 33.

### 1. Plaintiff's Hernia

In April 2014, Warso performed "major reconstructive surgery" on Plaintiff to remove a large mass from Plaintiff's stomach. *Id.* ¶ 42. During a follow-up appointment about a month later, Plaintiff asked Warso about swelling he experienced in his groin and abdomen; Warso told Plaintiff that the swelling was

normal post-surgery. *Id.* ¶ 43. Throughout the rest of 2014, however, Plaintiff experienced "increasing pain" in his abdomen, and he complained to various Defendants about the pain, including Obaisi, Funk, and Williams (SCC's then-warden). *Id.* ¶¶ 12, 15, 23, 44–45.

After "months of complaints," Plaintiff saw Warso again in November 2014. *Id.* ¶ 46. Warso diagnosed Plaintiff with a ventral hernia that developed from his surgery; Warso "requested that Plaintiff be seen by a colorectal surgeon." *Id.* ¶ 47. Plaintiff saw a colorectal surgeon in February 2015, who then referred Plaintiff to a general surgeon for hernia repair. *Id.* ¶ 48. In July 2015, Plaintiff saw a general surgeon who told Plaintiff that his "large" hernia needed surgical repair. *Id.* ¶ 49. Despite the general surgeon's recommendation and Plaintiff's severe pain, Obaisi—SCC's medical director—did not order any treatment or surgery. *Id.* ¶ 50. When Plaintiff saw Obaisi for another ailment, Obaisi "merely glanced at Plaintiff's hernia" and told him that the hernia "did not need any additional attention." *Id.* ¶ 51. Plaintiff alleges that Obaisi and Funk denied him the hernia repair surgery because of Wexford's policy and custom of turning "a blind eye" to inmates' medical needs and delaying or denying necessary treatment. *Id.* ¶¶ 53, 55.

### 2. Growths on Plaintiff's Right Arm

In April 2013, Plaintiff told Obaisi about two growths on his right arm between his shoulder and elbow. *Id.* ¶ 68. Obaisi told Plaintiff to tell an oncologist about the growths during his next scheduled appointment. *Id.* Around two months later, Plaintiff told Warso and another doctor about the growths and the resulting

pain, but "nothing was done about these masses." *Id.* ¶ 69. Plaintiff filed grievances about the growths in July, September, and November of that year before finally seeing Warso again in November for an examination. *Id.* ¶ 70. Plaintiff says that "MRIs were recommended"—presumably by Warso—"to evaluate these masses." *Id.*

Despite Warso's recommendation, Plaintiff never had any MRIs for the growths. *Id.* ¶ 83. In February 2015, Plaintiff filed multiple grievances about the lack of MRIs before he got to see Obaisi, who examined the growths and referred Plaintiff back to Warso. *Id.* ¶ 72. But Plaintiff still did not receive an MRI and did not get to see Warso. *Id.* As he did in 2014, Plaintiff filed grievances over the next several months, asking to have the growths evaluated and his pain treated. *Id.* But Obaisi "took no corrective action" to address Plaintiff's pain or evaluate the growths. *Id.* ¶ 73. Plaintiff also wrote letters to the Executive Defendants informing them of the growths and his medical needs. *Id.* ¶ 74. Again, Plaintiff alleges that Wexford's physician employees followed Wexford's policies of ignoring inmates' pain and "delaying medical treatment involving pain." *Id.* ¶ 75.

### 3. Chronic Neck and Back Pain

Plaintiff has suffered decades of chronic neck and back pain stemming from a car accident in the 1980s. *Id.* ¶ 85. In 2010, Plaintiff saw a pain specialist at the University of Illinois at Chicago (UIC) Pain Clinic, who treated Plaintiff with epidural injections in his neck and back. *Id.* ¶ 87. Plaintiff received twice-yearly injections and oral pain medication until 2012. *Id.* But since 2012, Plaintiff has not

received the injections or pain medication, despite experiencing intense pain. *Id.*

Beginning in April 2013 and continuing through at least February 2015, Plaintiff complained to Obaisi about his pain. *Id.* ¶ 86. Obaisi responded: "I am more concerned about the mass you have . . . I understand you have chronic neck and back pain, but once we deal with what might be cancer, I will send you to the pain clinic." *Id.* From September 2014 through October 2015, Plaintiff filed five grievances about the denial of medical treatment for his pain. *Id.* ¶ 88. During the period when Plaintiff did not receive epidural injections, he "suffered significant pain." *Id.* ¶ 92. Once again, Plaintiff alleges that Wexford and its physicians turned a blind eye to his pain because of their practice of cutting costs by limiting the number of inmates who could receive treatment at the UIC Pain Clinic. *Id.* ¶ 93

At some point, Obaisi referred Plaintiff back to the UIC Pain Clinic. *Id.* ¶ 89. Plaintiff met with a specialist there in February 2016[2] and received an epidural injection in his neck. *Id.* ¶ 90. Prior to receiving that injection, Plaintiff could not hold his head up without experiencing pain and had been confined to a wheelchair. *Id.* ¶ 91. The specialist recommended a follow-up visit in two months and suggested that Plaintiff could receive another injection then. *Id.* ¶ 90. The second amended complaint does not specify whether Plaintiff had a follow-up visit.

**C.    Analysis**

To state a claim under § 1983, Plaintiff must show that someone acting under the color of state law deprived him of a constitutional right. *Rodriguez v. Plymouth*

---

[2] The second amended complaint says February 2015, but that appears to be a typo, given the dates that Plaintiff filed grievances about not receiving pain treatment.

*Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009). To state a claim of deliberate indifference to a medical condition, Plaintiff must allege: (1) an objectively serious medical condition; and (2) an official's subjectively deliberate indifference to that condition. *Gonzales v. Feinerman*, 663 F.3d 311, 313 (7th Cir. 2011). Finally, Plaintiff must show that each defendant "personally participated in or caused the unconstitutional actions." *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008).

### 1.    **Wexford and Obaisi**

Wexford and Obaisi first argue that Plaintiff released his claims in this case through a settlement agreement that resolved two earlier cases between the parties. [69] at 3. Alternatively, they argue that Plaintiff fails to show that Obaisi exhibited deliberate indifference, and that he insufficiently pleads a "policy and practice claim" against Wexford. *Id.* This Court addresses each argument in turn.

### a)    **Release of Claims**

As a preliminary matter, this Court first determines whether it may consider the settlement agreement at all. Ordinarily, when a motion to dismiss relies upon material outside the pleadings, such as the settlement agreement, Rule 12(d) requires that a court—if it decides to consider the material—treat the motion as one for summary judgment and give the parties "a reasonable opportunity to present" all pertinent material. *See United States v. Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015). Here, however, Defendants' motion presents a purely legal question of contract interpretation that the parties fully briefed, thus presenting all pertinent material. Plaintiff does not object to this Court considering the

7

settlement agreement, and no outside evidence would bear on the motion, so this Court may consider the agreement and address the motion under Rule 12(c). *See id.*; *see also Woods v. City of Chicago*, 234 F.3d 979, 991 (7th Cir. 2000). Rule 12(c) motions for judgment on the pleadings provide the proper vehicle for raising affirmative defenses, such as the release of a claim, *Rogers Cartage*, 794 F.3d at 860, and the same legal standards govern Rule 12(b)(6) and Rule 12(c) motions, *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015).

In 2011 and 2013, Plaintiff sued Wexford, Obaisi, and others for alleged constitutional violations stemming from, respectively, the defendants' failure to provide Plaintiff with pain medication for chronic neck, back, and hip pain, and their failure to get Plaintiff treatment for a cancerous mass in his stomach. *See generally Taylor v. Wexford Health Sources*, No. 11-cv-7386 (N.D. Ill. 2011); *Taylor v. Wexford Health Sources*, No. 13-cv-7501 (N.D. Ill. 2013). Plaintiff entered a settlement agreement with Wexford in March 2016 that provided, in pertinent part:

> The Plaintiff, his heirs, successors and assigns, agrees [sic] to release, and hereby releases and forever discharges the Defendant, and all of its principals, agents, former and present employees (including, but not limited to, Saleh Obaisi, M.D., and Cynthia Garcia, R.N.), attorneys, successors, heirs and assigns and all other persons (hereinafter collectively referred to as "Releasees") from all actions, claims, demands, setoffs, suits, causes of action, controversies, disputes, equitable relief, compensatory and punitive damages, costs and expenses which arose or could have arisen *from the facts alleged or claims made in the Actions*, which the Plaintiff owns, has or may have against the Releasees, whether known or unknown, from the beginning of time until the effective date of this Agreement.

[69-2] § 3 (emphasis added). The settlement agreement defines "the Actions" as 11-cv-7386 and 13-cv-7501. *Id.* (Recitals).

8

The parties agree that Illinois law governs the settlement agreement. *See* [69] at 9; [80] at 7. Under Illinois law, this Court must interpret unambiguous contract language according to its "plain, obvious, and generally accepted meaning." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009) (citing *Krilich v. Nat'l Bank & Trust Co. of Chi.*, 778 N.E.2d 1153, 1164 (Ill. App. Ct. 2002)). Specifically, when confronted with a clear and explicit contractual release, this Court must enforce the release as written. *Id.* (citing *Farmers Auto. Ins. Ass'n v. Wroblewski*, 887 N.E.2d 916, 923 (Ill. App. Ct. 2008)). This Court finds the release unambiguous, and so enforces it as written. *Id.*

Wexford and Obaisi argue that the release bars Plaintiff's claims because he knew about all three of his current medical conditions when he executed the release, and so "could and should have" included those claims in his earlier lawsuits against Wexford and its employees. [69] at 9. Based upon the closely analogous case of *Heard v. Tilden*, 809 F.3d 974, 979 (7th Cir. 2016), this Court disagrees.

In *Heard*, the plaintiff sued Wexford under § 1983, alleging that it violated the Eighth Amendment by delaying surgery for the third in a series of hernias he suffered. *Id.* at 976. Like Plaintiff, the *Heard* plaintiff had settled two prior lawsuits against Wexford (concerning delayed medical treatment for the two earlier hernias) through a settlement agreement with similar release language. *See id.* at 977. The *Heard* plaintiff agreed to release Wexford and its doctors

> from and for any and all actions, causes of action, claims, demands, damages, costs, loss of services, expense and compensation, including attorney's fees, on account of or in any way arising out of, any and all known and unknown personal injuries resulting or which may

> result from the incidents or events involving DELBERT HEARD, while
> he was incarcerated in the Illinois Department of Corrections that
> Heard claims violated his constitutional rights, including without
> limitation his inguinal hernias, which are the subject matter of cases
> 06 C 644 . . . and 09 CV 00449.

*Id.* (On the original document, the plaintiff drew a line through "or which may result from," but the court did not indicate that the purported deletion affected its analysis in any way. *Id.)* Even though the plaintiff knew at least 17 months before executing the release[3] that he needed surgery on his third hernia, the Seventh Circuit held that the release did not bar his claim regarding delayed treatment for the third hernia. *Id.* at 978, 980.

The court explained that, under Illinois law, the release's specific language referring to the plaintiff's earlier suits against Wexford controlled over its broader language elsewhere. *Id.* at 979. Thus, "the references to the 2006 and 2009 lawsuits" limited the release's scope "to claims arising in those actions, i.e., that Wexford and its employees had been deliberately indifferent in delaying the *first* surgery for the bilateral hernias that were finally repaired in 2007." *Id.* (emphasis added). The court held that Heard's third lawsuit stated a new and distinct Eighth Amendment claim, not a repeat of his claims in the earlier lawsuits, because "every day that the defendants improperly refused to treat Heard's condition potentially constituted a new act of deliberate indifference." *Id.* Consequently, "Heard's

---

[3] Wexford and Obaisi erroneously argue that *Heard* does not control here because that plaintiff's third hernia "did not exist at the time the agreement was executed" and so "could not have been subject to the release." [69] at 10. Not so. *Heard* clearly states that: (1) the plaintiff executed the settlement agreement in September 2012, 809 F.3d at 977; (2) he told a surgeon "that he had known about the [third hernia] since his 2007 surgery," *id.* at 977–78; and (3) his complaint in the post-release lawsuit showed that "he knew in April 2011" that he needed surgery to address the third hernia, *id.* at 978.

allegation that the defendants *once again* displayed deliberate indifference to his recurrent hernia in no way" arose from the operative facts of the previous suits. *Id.*

Here, as in *Heard*, Plaintiff executed a release that included broad language about future claims, but also contained *specific* provisions releasing claims arising out of "the Actions," defined as 11-cv-7386 and 13-cv-7501. [69-2] § 3. Under Illinois law, the specific language controls; it limits the release to claims arising from the facts in the specified actions. *See, e.g.*, *Heard*, 809 F.3d at 979 (collecting cases); *Capocy v. Kirtadze*, 183 F.3d 629, 632 (7th Cir. 1999); *Carona v. Ill. Cent. Gulf. R.R. Co.*, 561 N.E.2d 239, 242 (Ill. App. Ct. 1990). So here, rather than executing a general release, Plaintiff released only claims arising out of: (1) the defendants' failure to provide him with a prescription pain medication and allow him to see a pain specialist between 2009 and 2011, *see Taylor v. Wexford Health Sources*, No. 11-cv-7386 (N.D. Ill. 2011); and (2) the defendants' failure to treat a cancerous mass on Plaintiff's stomach in 2013, *see Taylor v. Wexford Health Sources*, No. 13-cv-7501 (N.D. Ill. 2013).

In this case, Plaintiff asserts claims based upon different facts than his earlier cases. Plainly, the earlier cases did not concern a hernia or growths on Plaintiff's arm. And although the 2011 case related to Defendants' failure to treat Plaintiff's chronic neck and back pain, Plaintiff now asserts a new claim involving a *different* failure to treat that chronic pain from 2012 through 2016. *See, e.g.*, [32] ¶ 87. Thus, the release's unambiguous language does not bar Plaintiff's present claims. *See Heard*, 809 F.3d at 979 (Plaintiff's allegation "that the defendants *once*

*again* displayed deliberate indifference" to the same condition "in no way" arose from the operative facts of the prior suits.); *cf. Fair v. Int'l Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1114, 1116 (7th Cir. 1990) (broad release barred the plaintiff's claim against her former employer because she agreed "never to institute" any "suit or action at law" involving "any claim of any kind" against the employer).

Finally, to the extent that Wexford and Obaisi suggest that the release bars Plaintiff from seeking any equitable relief that would result in treatment for his conditions, they misinterpret the release, and they do so in a manner that would also clearly violate public policy. *See Heard*, 809 F.3d at 980. Under their interpretation, "they could have refused indefinitely—with impunity—to arrange for" future treatment for Plaintiff, "even if the untreated hernia eventually endangered his life." *Id.*

Accordingly, this Court denies the portion of Wexford and Obaisi's motion to dismiss that relies upon the prior settlement agreement.

### b)      Failure to State a Claim

### (1)      Obaisi

Obaisi argues that Plaintiff fails to allege that he exhibited deliberate indifference to any of Plaintiff's medical conditions. [69] at 11. For the purposes of this motion, Obaisi and Wexford concede that all three of Plaintiff's medical conditions qualify as "objectively serious." *Id.* This Court finds that Plaintiff sufficiently pleads Obaisi's deliberate indifference.

First, this Court notes that Obaisi's motion relies upon hundreds of pages of

exhibits, such as clinical summaries and notes from outside surgeons, that Plaintiff neither attached to his complaint nor refers to in his complaint. *See generally* [69-3]. On a motion to dismiss, this Court generally may only consider the complaint, documents attached to the complaint, documents central to the complaint (to which the complaint refers), and information properly subject to judicial notice. *Williamson*, 714 F.3d at 436. Obaisi makes no effort to argue that this Court can take judicial notice of the exhibits, so this Court declines to consider any of his improper exhibits. *Id.* As always, a motion to dismiss tests the sufficiency of a complaint, not the merits of a case. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). Unlike the settlement agreement that this Court considered earlier, these clinical exhibits raise factual questions and belong in a summary judgment motion.

As for Plaintiff's hernia, he alleges that Warso first diagnosed it in November 2014 and referred him to a colorectal surgeon, who in turn referred Plaintiff to a general surgeon. [32] ¶¶ 46, 48. The general surgeon told Plaintiff in July 2015 that his hernia needed surgical correction. *Id.* ¶ 49. Despite multiple surgeons recommending surgical repair, and despite Plaintiff's "severe pain," Obaisi "told Plaintiff that his hernia was fine and did not need any additional attention." *Id.* ¶ 51. By the time Plaintiff filed his complaint in November 2016—*two years* after Warso referred Plaintiff to a colorectal surgeon—Obaisi still had not facilitated any surgery for Plaintiff's hernia. *Id.* ¶ 58. Given those allegations, Plaintiff sufficiently pleads that Obaisi exhibited deliberate indifference to his hernia. *See,*

*e.g.*, *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (plaintiff stated a claim by alleging that he had "a serious, readily treatable condition" that prison officials ignored "for almost a week"); *Grieveson*, 538 F.3d at 779 (plaintiff stated a claim by alleging that guards delayed treating his broken nose for a day and a half); *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2012) (plaintiff stated a claim by alleging a needless two-day delay in treating a "painfully dislocated" finger).

Likewise, Plaintiff sufficiently pleads deliberate indifference to the growths on his right arm and his chronic pain. He alleges that Obaisi knew about the painful growths since April 2013, that Warso recommended MRIs for the growths in November 2014, that he filed five grievances in 2015 because he had not received MRIs, and that Obaisi—who treated him throughout this time—"took no corrective action" for the growths. [32] ¶¶ 68–73. Plaintiff also alleges that he complained to Obaisi for several years about his chronic pain after he stopped receiving epidural injections at the UIC Pain Clinic in 2012, but that Obaisi refused to refer Plaintiff to the Pain Clinic until late 2015 or early 2016. *Id.* ¶¶ 86–90. At this early stage, those allegations state a viable claim for deliberate indifference. *See, e.g.*, *Smith*, 666 F.3d at 1040; *Grieveson*, 538 F.3d at 779; *Edwards*, 478 F.3d at 831.

### *(2)* **Wexford**

Wexford argues that Plaintiff's claims fail because he insufficiently pleads that it has a policy or practice of denying care to inmates. [69] at 14. Alternatively, Wexford argues that Plaintiff fails to properly allege that its policies or customs led to the alleged violations of his Eighth Amendment rights. *Id.* This Court disagrees.

Wexford cannot face liability under a respondeat superior theory; instead, Plaintiff must allege that Wexford's policy, practice, or custom caused the violation of his constitutional rights. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 786 (7th Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). He does so. Plaintiff alleges that Obaisi, over a number of years, repeatedly delayed treatment for Plaintiff's various conditions (thus violating Plaintiff's Eighth Amendment rights) pursuant to Wexford's practice of delaying necessary medical treatment for inmates experiencing pain. *See, e.g.*, [32] ¶¶ 55, 57, 75, 93. Although Plaintiff's assertions appear conclusory at first glance, the detailed allegations here of "a pattern or a series of incidents of unconstitutional conduct" raise an inference of a policy sufficient to survive a motion to dismiss. *See Powe v. City of Chicago*, 664 F.2d 639, 650–51 (7th Cir. 1981) (collecting cases). Thus, this Court denies Wexford's motion to dismiss.

### 2. Warso

#### a) Under Color of State Law

Warso first argues that Plaintiff fails to plead that Warso acted under color of state law. [73] at 2. Plaintiff alleges that Warso "worked with Wexford to treat inmate patients," [32] ¶ 33, but he does not allege that Wexford employed Warso or had a contractual relationship with him. Wexford's doctors undoubtedly act under color of state law, *see Shields*, 746 F.3d at 797, but other doctors who sometimes treat inmates do not automatically qualify as state actors, *see Manzanales v. Krishna*, 113 F. Supp. 3d 972, 980 (N.D. Ill. 2015). Assessing whether a doctor in

the latter category qualifies as a state actor requires "a functional inquiry that focuses on the relationship between the state, the medical provider, and the inmate." *Id.* (citing *Rodriguez*, 577 F.3d at 826–27).

From the second amended complaint alone, this Court does not have enough information to conduct the functional inquiry that *Rodriguez* requires. Ordinarily, this Court would allow Plaintiff to conduct limited discovery on the nature of Warso's relationship with Wexford. *See Rodriguez*, 577 F.3d at 830; *see also Manzanales*, 113 F. Supp. 3d at 981. But because Plaintiff fails to allege that Warso exhibited any deliberate indifference to his medical needs, as discussed below, this Court need not allow such discovery. *Cf. Rodriguez*, 577 F.3d at 830 (allowing limited discovery on the state-actor question because the plaintiff stated a claim).

### b)      Deliberate Indifference

Warso next argues that Plaintiff fails to allege that he acted with deliberate indifference towards Plaintiff's medical needs. [73] at 4. Indeed, Warso argues that Plaintiff fails to allege any wrongdoing on his part. *Id.* This Court agrees that Plaintiff fails to state a claim for deliberate indifference against Warso.

State-actor physicians face liability under the Eighth Amendment if they "intentionally disregard a known, objectively serious medical condition that poses an excessive risk to an inmate's health." *Gonzales*, 663 F.3d at 313. Deliberate indifference requires that an official exhibit "reckless" conduct "in the criminal sense," not merely negligent or even grossly negligent conduct. *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 836–37

(1994)).  A hernia like Plaintiff's can be an objectively serious medical problem.  *See Gonzales*, 663 F.3d at 314 (collecting cases).  In fact, any condition that a physician diagnoses "as mandating treatment" or for which "even a lay person would perceive the need for a doctor's attention" qualifies as a serious medical condition.  *Lee*, 533 F.3d at 509.  But Plaintiff fails to allege that Warso intentionally disregarded his hernia or the growths on his arm.

Regarding the hernia, Plaintiff alleges that Warso told him four weeks after surgery that swelling around his abdomen was normal.  [32] ¶ 43.  After Plaintiff complained for months to *other* Defendants, including Obaisi, about abdominal pain, he saw Warso for a follow-up appointment; Warso diagnosed Plaintiff with a ventral hernia.  *Id.*  ¶¶ 44–47.  Warso immediately referred Plaintiff to a colorectal surgeon to repair the hernia.  *Id.*

Even drawing inferences in Plaintiff's favor, *Iqbal*, 556 U.S. at 678, the complaint shows that Warso worked as a doctor outside the prison system and that Plaintiff wanted to visit Warso, but other Defendants failed to permit such appointments.  Warso's initial assessment that Plaintiff exhibited normal post-surgery swelling provides a "classic example of a matter for medical judgment," and this Court must defer to that treatment decision "unless no minimally competent professional would have" responded similarly in that circumstance.  *Jackson v. Kotter*, 541 F.3d 688, 697–98 (7th Cir. 2008) (internal quotation marks omitted).  When Plaintiff saw Warso for another follow-up appointment—again, after complaining to other Defendants about his pain—Warso promptly diagnosed him

with a hernia and referred him to a colorectal surgeon for treatment. [32] ¶¶ 44–47. These allegations fail to show any indifference to Plaintiff's hernia, let alone criminally reckless indifference. *Cf. Gonzales*, 663 F.3d at 314 (plaintiff stated a claim by alleging that two prison physicians who treated him multiple times "refused to authorize surgical repair" for his painful hernia).

Regarding the growths, Plaintiff alleges that he told Warso about them during an appointment, but that "nothing was done about these masses." [32] ¶ 69. After Plaintiff filed multiple grievances—directed at prison officials and other Defendants besides Warso—Plaintiff saw Warso again; Warso recommended MRIs. *Id.* ¶ 70. Plaintiff then filed multiple grievances throughout 2014 and 2015 because he did not receive MRIs and did not get to see Warso again after Obaisi referred him back to Warso. *See id.* ¶ 72. Plaintiff's allegations do not show that Warso demonstrated deliberate indifference to Plaintiff's medical needs; instead they show that Obaisi did not facilitate Plaintiff seeing Warso, and that Obaisi did not act upon Warso's recommendation that Plaintiff should undergo MRIs to assess the growths. *Cf. McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (plaintiff stated a claim by alleging that the prison dentist knew about pain he experienced from a botched tooth extraction, but forced him to wait months to see an oral surgeon).

Plaintiff responds that his broad allegations against "Defendants" establish deliberate indifference "against each 'Defendant,' which defined term includes Dr. Warso," on each count of his complaint. [81] at 9. But Plaintiff's group pleading implicates nine Defendants, from Wexford down to Warso. *See, e.g.*, [32] ¶ 104 ("As

a direct consequence of the conduct of the Defendants, Mr. Taylor's pain worsened considerably."). Such conclusory and generalized pleading fails to show the requisite personal responsibility for Warso. *See Grieveson*, 538 F.3d at 776. And Plaintiff's argument borders upon the frivolous regarding his chronic pain; he never alleges that he told Warso about the pain or that Warso had any connection to the UIC Pain Clinic or its pain specialists. Because Plaintiff fails to adequately allege that Warso exhibited deliberate indifference to his medical needs (or indeed, did anything wrong at all), this Court grants Warso's motion to dismiss.

### 3. Funk

Funk first "adopts and incorporates" the portion of Wexford and Obaisi's motion to dismiss that argues that Plaintiff released his claims in this suit through a 2016 settlement agreement. [85] at 4. For the reasons stated above, this Court denies that portion of Funk's motion.

Conceding (for purposes of this motion) that Plaintiff's medical conditions qualify as objectively serious, Funk next argues that Plaintiff fails to allege that he exhibited deliberate indifference to any of Plaintiff's conditions. *Id.* at 7. This Court disagrees.

Plaintiff alleges that he "had conversations with Dr. Funk complaining about his medical condition," and that he wrote grievances to Funk between July and November 2014 about not seeing Warso for a follow-up visit. [32] ¶¶ 15, 45. Plaintiff also alleges that Funk knew about his need to see a specialist at the UIC Pain Clinic. *Id.* ¶ 95. In short, Plaintiff contends that he had multiple objectively

serious medical conditions and that Funk—who, as Wexford's Regional Medical Director, could have intervened—knew of Plaintiff's specific pleas for assistance and deliberately ignored them. At this stage, such allegations suffice to survive a motion to dismiss. *See Young v. Wexford Health Sources*, No. 10-cv-8220, 2012 WL 621358, at *7 (N.D. Ill. Feb. 14, 2012) (The defendant's "participation in daily health care decisions, his supervision of prison physicians, and his role in implementing Wexford policies and practices are all matters for summary judgment."); *Reliford v. Ghosh*, No. 10-cv-3555, 2011 WL 3704747, at *4 (N.D. Ill. Aug. 19, 2011).

Further factual development at summary judgment or trial might show that Funk played no role in making decisions about Plaintiff's care or in establishing Wexford's alleged policy of delaying necessary medical care, but at this stage, Plaintiff sufficiently pleads a deliberate-indifference claim against Funk. This Court denies Funk's motion to dismiss.

## II.    SCC Defendants' Motion for Judgment on the Pleadings

### A.    Legal Standard

The SCC Defendants moved for judgment on the pleadings under Rule 12(c); they argue that a settlement agreement that Plaintiff executed in a prior case against similar defendants bars his claims in this case. *See generally* [77]. Courts decide Rule 12(c) motions under the same legal standards that govern Rule 12(b)(6) motions. *BBL*, 809 F.3d at 325. Rule 12(c) motions provide the proper vehicle for challenging a complaint based upon an affirmative defense, such as the release of a claim. *See Rogers*, 794 F.3d at 860.

That said, when a Rule 12(c) motion relies upon material outside the pleadings—such as the settlement agreement at issue here—Rule 12(d) generally requires that a court treat the motion as one for summary judgment and give the parties "a reasonable opportunity to present" all pertinent material. *See id.* Here, however, Defendants' motion presents a purely legal question of contract interpretation. As noted previously, the parties have already fully briefed the legal question and no outside evidence would have "any bearing on the motion," so this Court may rule on the motion under Rule 12(c). *See id.*

### B.    Analysis

As discussed above, in 2013, Plaintiff sued Wexford, Obaisi, IDOC, and IDOC officials for alleged constitutional violations stemming from their failure to get Plaintiff treatment for a cancerous mass in his stomach. *See generally Taylor v. Wexford Health Sources*, No. 13-cv-7501 (N.D. Ill. 2013). Plaintiff entered a settlement agreement with IDOC and its officials in April 2016 that provided, in pertinent part:

> The Plaintiff, his heirs, successors and assigns, agrees [sic] to release, and hereby releases and forever discharges the Defendants in their individual and official capacities, the IDOC, the State of Illinois, their agents, former and present employees, successors, heirs and assigns and all other persons . . . from all actions, claims, demands, setoffs, suits, causes of action, controversies, disputes, equitable relief, compensatory and punitive damages, costs and expenses which arose or could have arisen *from the facts alleged or claims made in the Action*, which the Plaintiff owns, has or may have against the Releasees, whether known or unknown, from the beginning of time until the effective date of this Agreement.

[77-1] ¶ 4 (emphasis added). The settlement agreement defines "the Action" as

"Taylor v. Wexford, et al., Number 13-cv-7501." *Id.* ¶ 1.

The SCC Defendants argue that Plaintiff released "any causes of action" he had against current and former IDOC employees through the settlement agreement, and thus released his present claims because he filed this case before entering the agreement. [77] at 2. Plaintiff argues that he only released claims related to the specific facts of his 2013 case. [83] at 4. This Court agrees.

The parties agree that Illinois law governs the settlement agreement. *See id.* at 7; [77] at 4. Under Illinois law, this Court must interpret unambiguous contract language according to its "plain, obvious, and generally accepted meaning." *Hampton*, 561 F.3d at 714 (citing *Krilich*, 778 N.E.2d at 1164). Specifically, when confronted with a clear and explicit contractual release, this Court must enforce the release as written. *Id.* (citing *Farmers Auto*, 887 N.E.2d at 923). This Court finds the release unambiguous and so enforces it as written. *Id.*

Plaintiff agreed to release all claims arising "from the facts alleged or claims made" in the 2013 case. [77-1] ¶ 4. Thus, he released all claims arising out of the defendants' alleged failure to treat a cancerous mass in his stomach, not all claims he might ever have against IDOC defendants. *See Heard*, 809 F.3d at 979 ("When a release that includes broad language also refers specifically to particular claims, Illinois courts limit the scope of the release to the claims arising from those specific references."). In this case, Plaintiff asserts claims based upon completely different facts than the 2013 case; he alleges that Defendants failed to treat various conditions unrelated to the mass, including a hernia and chronic neck and back

pain.  *See generally* [32].

Contrary to the SCC Defendants' argument, the fact that Plaintiff had already filed this case when he settled the 2013 case has no bearing upon the release, which unambiguously limited Plaintiff to releasing claims arising out of the specific facts of his 2013 case.  *See Capocy*, 183 F.3d at 632 (When parties "use specific language in addition to words of general release in a release, courts limit the more general words to the particular claim arising out of the more specific reference.").  Like Wexford, Funk, and Obaisi, the SCC Defendants misinterpret the release, and they do so in a manner that clearly violates public policy.  *See Heard*, 809 F.3d at 980.  Under their interpretation, "they could have refused indefinitely— with impunity—to arrange for" future treatment for Plaintiff, "even if the untreated hernia eventually endangered his life."  *Id.*

Accordingly, this Court denies the SCC Defendants' motion for judgment on the pleadings.

## III.    Executive Defendants' Motion for Summary Judgment

### A.    Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party.  *Anderson*, 477 U.S. at 248.  To

show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

Courts must evaluate evidence in the light most favorable to the non-moving party and must refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## B. Analysis

The Executive Defendants—Wexford's owners and/or executives—argue that they merit summary judgment because they had no personal responsibility for any decisions concerning Plaintiff's medical care and never received any of the letters that Plaintiff sent them about his medical conditions. [90] at 6. In support, they offer their own declarations and a declaration from Joseph Ebbitt, Wexford's Director of Risk Management. [91-2, 91-3, 91-4, 91-5]. Because the Executive Defendants neither signed nor dated their own declarations, this Court cannot consider those declarations as evidence. *See* 28 U.S.C. § 1746; *Sheikh v. Grant Reg'l Health Ctr.*, 769 F.3d 549, 551 (7th Cir. 2014). Ebbitt's signed and dated declaration states that he reviews all inmate mail, and that any inmate mail sent to the Executive Defendants "would have been routed to me for review and dissemination to the appropriate medical staff." [91-5] ¶¶ 3, 6.

As the Executive Defendants note, courts have granted summary judgment to high-level Wexford defendants based upon similar evidence. *See, e.g.*, *Wilder v. Wexford Health Sources, Inc.*, No. 11-cv-4109, 2015 WL 2208440, at *12 (granting summary judgment to Wexford administrators who "did not know about, approve, condone, or turn a blind eye towards any of the misconduct"). Here, however, Plaintiff submitted a Rule 56(d) declaration explaining that he lacks facts to respond to the summary judgment motion because the Executive Defendants moved for summary judgment before any discovery took place. [100-1] at 2.

Rule 56(d) acts "as a safeguard against a premature grant of summary judgment." *King v. Cooke*, 26 F.3d 720, 726 (7th Cir. 1994). To invoke Rule 56(d)'s protections, Plaintiff must explain why he cannot adequately respond to the summary judgment motion without further discovery, and the evidence he seeks must be relevant to his case. *See OneBeacon Ins. Co. v. U.S. Foods, Inc.*, 304 F.R.D. 536, 539–40 (N.D. Ill. 2014); *see also Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 628 (7th Cir. 2014).

Here, Plaintiff satisfies those conditions. His Rule 56(d) declaration identifies nine areas of discovery that he needs to explore to respond to the motion, including whether Ebbitt ever shares the contents of inmate letters with the Executive Defendants and whether the Executive Defendants ever communicated with other Wexford employees about Plaintiff. [100-1] at 3. Evidence on those issues could create a genuine dispute of material fact as to whether the Executive Defendants played a role in delaying or denying medical care to Plaintiff. Thus,

based upon Plaintiff's Rule 56(d) declaration, this Court denies the Executive Defendants' motion for summary judgment without prejudice. *See OneBeacon*, 304 F.R.D. at 541.

## IV.   Plaintiff's Motion for Entry of Default

Federal Rule of Civil Procedure 55(a) provides for entry of default against a party who fails "to plead or otherwise defend."  Plaintiff moved for entry of default against the Executive Defendants when they failed to answer or otherwise plead by the April 28, 2017 deadline.  [87] at 1.  The Executive Defendants defended by moving for summary judgment on May 2, 2017—the same day that Plaintiff moved for entry of default.  [90].  Given the relatively short delay in defending, and the fact that the parties actively litigated the summary judgment motion, this Court denies as moot Plaintiff's motion for entry of default.

## V.     Conclusion

This Court denies Obaisi and Wexford's motion to dismiss [69], grants Warso's motion to dismiss [72] without prejudice, denies Funk's motion to dismiss [85], denies the SCC Defendant's motion for judgment on the pleadings [77], denies the Executive Defendants' motion for summary judgment [90] without prejudice, and denies as moot Plaintiff's motion for entry of default [87].

Because this is the first time this Court has dismissed any of Plaintiff's claims, Plaintiff may replead his claims against Warso if he can do so consistent with his obligations under Federal Rule of Civil Procedure 11.  The status hearing set for March 8, 2018, at 9:45 a.m. in Courtroom 1203 stands.

Dated: March 6, 2018

Entered:

John Robert Blakey
United States District Judge