## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| JOHN E. TAYLOR, JR., | |
| Plaintiff, | Case No. 16-cv-3464 |
| v. | |
| WEXFORD HEALTH SOURCES, INC., et al., | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Taylor, an inmate at Stateville Correctional Center ("Stateville"), has suffered from numerous chronic medical conditions for years. In this action brought pursuant to 42 U.S.C. § 1983, he alleges that Stateville's medical provider, Wexford Health Sources, Inc. ("Wexford'), several Wexford physicians and executives (collectively the "Wexford Defendants"), and several Stateville employees (collectively, the "IDOC Defendants") showed deliberate indifference to his medical conditions in violation of his Eighth Amendment rights. The Defendants have all moved for summary judgment, *see* [375], [379], [383], [387], [391], [394], [398]. For the reasons explained below, the Court grants the motions by Defendants Gedman, Holmes, Malloy and Wexford, [375], [379], [383], [394]; and grants in part, and denies in part, the motions by Defendants Obaisi, Funk, Shicker, Williams and Pfister, [391], [387], [398].

1

## I.     Background

The Court takes the following facts from the Defendants' statements of fact, [382], [386], [390], [393], [397], [400]; Plaintiff's responses thereto, [411], [412], [414], [416], [418], [420]; Plaintiff's consolidated statement of additional facts [421]; and Defendants' joint responses thereto, [434], [447].  Where the parties dispute a fact, the Court also draws from the parties' cited exhibits.

### A.     Preliminary Matters

Before summarizing the evidence, the Court briefly addresses several arguments the parties raise about the form and substance of the evidence offered. Plaintiff offers his own testimony and an affidavit to substantiate some of his factual assertions, particularly relating to the pain he suffered and conversations he recalls having with various Defendants and non-party physicians.  In response, the Wexford Defendants complain that Plaintiff cannot create a disputed issue of fact through his own "self-serving" testimony or affidavit statements.  *See* [434].  Not so.  While such evidence may qualify as "self-serving," the Seventh Circuit has emphasized time and again that it "long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'"  *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010); *see also Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (finding that it was error for the district court to discredit Plaintiff's testimony because it was "self-serving"); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed

material facts"). While the Court will "not vouch" for the "truth" of Plaintiff's self-serving testimony, *see Pauley*, 337 F.3d at 773, it also will not disregard that testimony merely because it comes from Plaintiff.

Second, both sides fault the other for asserting improper legal arguments in their statements of fact. *See generally* [411], [412], [414], [416], [418], [420], [434], [447]. Indeed, the Court agrees that nearly every party repeatedly interjected legal assertions and non-factual arguments in their statements of fact and responses thereto.[1] This unfortunate tactic runs squarely against Local Rule 56.1 and required this Court to parse the language to determine whether the opposing party disputed facts or merely disputed improper legal conclusions. This morass, of the parties' own making, proved particularly problematic since the parties' statements of fact collectively comprise over 600 paragraphs, with each paragraph including multiple assertions. Although the Court did not reject the parties' statements for their failure to comply with Rule 56.1, the parties bear collective responsibility for any uncertainties their improper tactics created in the record.

## B. The Parties

Plaintiff is an inmate at the Illinois Department of Corrections' (IDOC) Stateville prison. [420] ¶ 1. Defendant Wexford is a for-profit corporation that

---

[1] By way of example, Plaintiff's statement of additional fact No. 16, which relates to Plaintiff's hernia and spans nearly a full page, concludes by stating that the "pain Taylor was forced to incur for years throughout Defendants' delay in treating his hernia and pain caused by it constitutes cruel and unusual punishment in violation of the Eight Amendment." [421] ¶ 16. Similarly, Dr. Obaisi's lengthy statement of fact regarding Plaintiff's alleged right arm mass asserts that "Mr. Taylor at all times received adequate and reasonable evaluation and treatment for his right arm mass." [392] ¶ 6. Tellingly, neither party cites record evidence to support these assertions—that is because they constitute legal conclusions about what each party believes the facts will show. These are but two examples of a consistent theme for every party.

contracts with IDOC to provide healthcare services to inmates at correctional facilities, including Stateville. *Id.* ¶ 2. Dr. Saleh Obaisi, a Wexford employee, served as Stateville's medical director from at least 2012 until his death in December 2017.[2] [434] ¶ 6; [447] ¶ 6. Defendant Dr. Arthur Funk, another Wexford employee, has been Wexford's regional medical director for the northern region of Illinois, which includes Stateville, since at least 2005. [434] ¶ 7; [447] ¶ 7. Defendants Elaine Gedman, Darius Holmes and Diana Malloy are Wexford executives who work at Wexford's corporate office. [434] ¶¶ 8, 10–11; [447] ¶¶ 8, 10–11.

Defendant Louis Shicker served as the IDOC's Agency Medical Director from November 2009 to June 15, 2016. [416] ¶ 4. Defendant Tarry Williams worked for IDOC as Stateville's warden from April 1, 2014 to July 2015, and Defendant Pfister worked for IDOC as Stateville's warden from November 12, 2015 to January 31, 2018 and again from August 1, 2019 to January 2020. *Id.* ¶¶ 2–3.

### C.   Overview of Plaintiff's Relevant Medical Conditions

In 2014, Plaintiff developed a very large ventral hernia that, according to him, caused him considerable abdominal pain and discomfort and left him confined to a wheelchair. [434] ¶¶ 31–32. Four years later, on May 14, 2018, Plaintiff underwent surgery to repair his hernia, at which time most of Plaintiff's intestines were outside his abdominal cavity in the abdominal sac. [397] at 24:23–25:2. The hernia repair

---

[2] On April 23, 2018, this Court substituted Ghaliah Obaisi, independent executor of the estate of Dr. Obaisi, in place of Defendant Obaisi. [169]. For ease of reference, however, the Court continues to refer to "Defendant Obaisi".

took seven hours to complete and required another surgeon to remove his appendix and fix a lacerated bowel. [420] ¶ 26.

In addition, in 2009, Plaintiff was diagnosed with degenerative disc disease, severe stenosis, and osteophytes in his cervical and lumbar spine that, according to him, caused him chronic neck and back pain. [434] ¶¶ 78–79. Finally, in April 2013, Plaintiff began complaining to Defendant Obaisi about significant pain from a suspected mass in his right arm. [418] ¶ 18; [434] ¶ 80.

Plaintiff alleges that the Defendants all showed deliberate indifference to these medical issues by failing to provide him with adequate and timely specialist visits and treatment or adequately address his pain. These medical issues span many years and involve a rather complicated, and sometimes disputed, timeline of treatment and progression, which the Court details below for each alleged ailment.

### 1. Plaintiff's Hernia

#### a) Hernia Development, Progression, and Treatment

In 1992, while incarcerated in Virginia, Plaintiff was diagnosed with cancer and underwent multiple operations and regional radiotherapy on his abdomen to treat locally invasive cancerous growths. [418] ¶ 4. In 2013, while incarcerated at Stateville, Plaintiff began experiencing swelling in his groin, and doctors discovered an additional growth involving his right abdomen, right iliac crest (*i.e.*, upper part of the pelvic bone), and right gluteal muscles. *Id.* Doctors feared cancerous tumors so, on April 23, 2014, two UIC surgeons—oncologist Michael Warso and plastic surgeon Anjua Antony—performed surgery to remove these growths. *Id.*; [434] ¶ 22. Dr.

Warso also removed portions of Plaintiff's right lateral oblique muscles, inguinal ligament, rectus abdominus muscle, and iliac bone. [418] ¶ 4.

Two days after the surgery, a CT scan of Plaintiff's right abdominal wall showed that he had developed a hernia on the right side of his abdomen. [434] ¶ 24. It remains unclear who reviewed the CT scan, but the parties agree that Plaintiff's first documented hernia diagnosis came on November 25, 2014 when Dr. Warso diagnosed him with a large ventral hernia and referred him to a urology and colorectal surgeon for evaluation and colonoscopy. [420] ¶ 12; [434] ¶ 31.

Plaintiff claims, however, that between his April 2014 surgery and November 25, 2014 hernia diagnosis, he complained to Dr. Warso, Dr. Obaisi, Dr. Funk, and others about "substantial swelling" in his abdomen and groin, as well as abdominal pain and pain while defecating, laughing, talking loudly, or sneezing. [434] ¶¶ 27–28. He largely relies on his own statements, which Defendants dispute, *id*, but the parties agree that Plaintiff sent a letter to Wexford's corporate address on September 14, 2014 complaining about a lack of medical treatment and that Dr. Funk responded on October 10, 2014, instructing Plaintiff to "ask questions and discuss your concerns with Dr. Obaisi." [390-6] at 119.

Following Plaintiff's November 25, 2014 hernia diagnosis, Plaintiff returned to UIC on February 9, 2015 to see a colorectal surgeon who noted that Plaintiff complained of groin and abdomen pain with defecation and bloody stool. The surgeon recommended a colonoscopy and CT scan of Plaintiff's abdomen and pelvis, and referred him to general surgery for possible hernia repair. [422-5] at 5. Plaintiff also

6

saw a UIC urologist on May 27, 2015, who requested that Plaintiff return to UIC for a CT urogram and cystoscopy, [397-13] at 6.

On April 7, 2015, and again on June 5, 2015, Plaintiff filed grievances complaining that he had not received the recommended colonoscopy or CT scan and continued to wait for a follow-up on a possible hernia surgery and pain management. [422-14]; [422-39] at 29 (Ex. 39J). On July 22, 2015, he saw a UIC general surgeon, Dr. Masrur. [397-13] at 6. Dr. Masrur's notes document that Plaintiff had a "big hernia" with "70% of the bowel contained in the hernia sac." *Id*. Based on these notes, the previously recommended colonoscopy, CT urogram, and cystoscopy still had not been performed, and Dr. Masrur wrote that those procedures needed "to be addressed before we can proceed with the partial hernia repair." *Id*. Dr. Masrur also recommended that Plaintiff lose weight and noted that he wanted to review Plaintiff's case with UIC's chief of surgery, Dr. Giulianotti. *Id*.

From the current records, it appears that Plaintiff finally had a colonoscopy in August 2015, [397-13] at 19, and a cystoscopy in October 2015, [423] ¶19, but it remains unclear when he had a CT urogram. On October 14, 2015, he had a follow-up with Dr. Masrur, who again noted that Plaintiff had a large hernia "with at least 70% of the bowel contained in the hernia sac" and again recommended that Plaintiff lose weight. [397-13] at 12. Dr. Masrur noted that "Patient is very symptomatic and would like to have hernia fixed," and he indicated an intention to review Plaintiff's case with Dr. Giullianotti "to determine with him whether patient is a candidate for surgery." *Id*.

7

Then, on January 15, 2016, Plaintiff saw a UIC plastic surgeon, Dr. David Morris, for evaluation of his hernia. Dr. Morris recommended that Plaintiff "follow up with General Surgery for discussion of possible hernia repair." *Id.* at 14. He also noted that, "if repair planned, plastic surgery will be available to assist as needed." *Id.* On February 17, 2016, Plaintiff returned to Dr. Masrur, whose notes indicate that he planned to review Plaintiff's case with Dr. Giulianotti "to determine with him whether patient is a candidate for surgery." [397-13] at 17.

Over the next two months, Plaintiff filed five grievances complaining about the continued delay in getting treatment for his hernia and the attendant pain. *See* [422-39] at 42–52 (Exs. 39O–39S). Finally, on April 28, 2016, Dr. Obaisi signed a referral to UIC's chief of surgery, Dr. Giulianotti, [422-18] at 2, and Plaintiff saw Dr. Giulianotti on May 2, 2016 to discuss "possible surgical treatment" for his hernia, [397-13] at 19. Dr. Giulianotti noted that Plaintiff complained of sporadic pain that "has progressively worsened over time," with pain that "radiates to his back and around his side" and "intermittent nausea and vomiting." *Id.* Dr. Giulianotti also discussed with Plaintiff risks and complications with surgery on a hernia this size, including a high rate of recurrence, "abdominal compartment syndrome," bleeding, post-operative infections, scarring, and bowel resection. *Id.* at 21. Dr. Giulianotti advised that surgery may not resolve Plaintiff's symptoms but provided "some chance for some improvement." *Id.* Dr. Giulianotti indicated that he wanted Plaintiff to

8

"follow up with plastic surgery to discuss the possibility of a muscle flap" to repair the hernia.[3] *Id.*

On May 11, 2016, Dr. Obaisi approved Plaintiff for referral to a plastic surgeon, [422-19], and Plaintiff saw UIC's chief plastic surgeon, Dr. Cohen, on May 17, 2016, [397-13] at 22. Dr. Cohen referred Plaintiff for a CT scan of his abdomen and pelvis; noted that he would need "to coordinate with Dr. Giulianotti for timing after CT;" and instructed Plaintiff to follow up with him "for scheduling" and pre-admission testing once Plaintiff had the CT scan and insurance approval. [397-13] at 23–24. On July 26, 2016, Plaintiff returned to see Dr. Cohen, whose notes indicate: "Plan for combined R lumbar hernia repair with General Surgery Dr. Giulianotti and Dr. Cohen," "general surgery primary service," and "awaiting insurance and scheduling." *Id.* at 26.

Plaintiff, however, did not have surgery. Instead, while the records confirm that Dr. Obaisi signed a Referral Form to Dr. Giulianotti on July 28, 2016, [422-23], Plaintiff did not return to Dr. Giulianotti until January 9, 2017, more than five months later, [434] ¶¶ 57–58; [422-23] at 2; [397-13] at 28. In the interim, Plaintiff filed grievances on August 17, 2016, September 11, 2016, and December 21, 2016, complaining about the delay and Dr. Obaisi's apparent failure to follow up with UIC. *See* [422-39] at 63–79 (Exs. 39W, 39Z, 39BB).

When Dr. Giulianotti finally saw Plaintiff on January 9, 2017, he noted significant surgical risk because of possible "loss of domain" in Plaintiff abdominal

---

[3] The term "flap" refers to skin and/or muscle taken from another part of the patient's body. [393-5] at 40:19–21.

wall.[4] [397-13] at 30. Dr. Giulianotti noted "very limited surgical options" with "no guarantee of resolving the problem." [397-13] at 30. But "due to the patient's symptoms," Dr. Giulianotti offered Plaintiff a secondary consultation with another plastic surgeon, Dr. Marco Ellis, to determine the feasibility of a "free flap" to close the hernia.[5] The notes continue that, if Dr. Ellis does not believe that a "free flap is possible then there is no surgical intervention and conservative management is recommended." *Id.*

Plaintiff saw Dr. Ellis on March 2, 2017 who, after examining Plaintiff, stated that he needed to consult with other doctors given the unique and significant nature of Plaintiff's hernia. [393-5] at 30:1–7. Plaintiff returned to Dr. Ellis on March 16, 2017, where Ellis noted "no well-documented role for intervention" and that the "hernia and soft tissue defect is massive and I have no personal experience managing this problem." [397-13] at 34. Instead, Dr. Ellis recommended nonsurgical management and a thoracic lumbosacral orthopedic brace to keep Plaintiff's "abdomen more stably contained." *Id.*; *see also* [393-5] at 35:5–21.

According to Plaintiff, however, Dr. Obaisi did not order him the recommended abdominal brace. [434] ¶ 65. By this time, Plaintiff had filed this lawsuit, and, on August 1, 2017, he filed a preliminary injunction motion requesting an order: (1) for

---

[4] "Loss of domain" refers to when the abdominal wall shrinks after abdominal contents (such as intestine and bowel, as in Plaintiff's case) remain outside the abdominal wall over time. [397-8] at 85:7–22; [397-15] at 137:13–138:1. If loss of domain occurs, then when the abdominal contents are returned to the abdominal cavity, it can restrict breathing and blood flow to organs that, in turn, may lead to organ failure and death. *Id.*

[5] It remains unclear from the record why Dr. Giulianotti referred Plaintiff to Dr. Ellis rather than back to Dr. Cohen.

a second medical opinion about hernia surgery and (2) requiring Wexford to provide him with the abdominal brace that Dr. Ellis prescribed him in March 2017. [108]. The Court partially granted his motion on October 2, 2017 and ordered the Defendants to facilitate a second medical opinion and provide Plaintiff with the abdominal brace that Dr. Ellis prescribed. [135].

Accordingly, Plaintiff received a "TLSO Back Support – Abd. Binder" on October 16, 2017. [397-14] (Taylor (77700-027) 05982). In addition, Plaintiff saw Northwestern plastic surgeon, Dr. Dumanian, regarding surgery. [434] ¶ 70. Initially, Dr. Dumanian declined to perform surgery, but he eventually agreed in the hopes that he could relieve Plaintiff's symptoms and improve his quality of life. [420] ¶ 24; [434] ¶ 70. He cautioned, however, that Plaintiff had an extremely complicated hernia, the repair of which posed multiple challenges and risks. [418] ¶ 24.

Dr. Dumanian performed Plaintiff's hernia surgery on May 15, 2018. [434] ¶ 71. The procedure took seven hours—one of Dr. Dumanian's longest hernia surgeries—and required another surgeon to remove Plaintiff's appendix and fix his bowel, which broke in two during the surgery. [397-8] at 12–13; [434] ¶ 71. According to Plaintiff, the surgery significantly improved (although did not eliminate) his pain, discomfort, and other symptoms. [434] ¶¶ 73–76. Specifically, he claims that before the surgery he remained confined to a wheelchair because he had difficulty sitting and walking. He also claims that he could not stand long enough to shower or brush his teeth, had difficulty sleeping because of pain, and could not push himself in his

wheelchair. [434] ¶ 73. Following the surgery, he claims that his pain decreased, and he could walk more easily and sleep better. *Id.* ¶ 74.

### b) Expert Opinions Regarding Plaintiff's Hernia

Plaintiff and the Wexford Defendants each retained experts to opine on Plaintiff's hernia and the treatment he received. Plaintiff retained Dr. Karol Gutowski, a board-certified plastic surgeon. [398-10]. The Wexford Defendants retained Dr. Reed, a board-certified general surgeon. [393-1].

Dr. Gutowski opines that Plaintiff's hernia enlarged, and the amount of intestines in the hernia sac increased, between the time it developed in 2014 and his surgery in May 2018. [396-18] at 168:22–169:11, 195:12–22, 211:14–24, 201:22–202:5. He also opines that domain loss (*i.e.*, where the space in the abdominal cavity shrinks) progresses over time as intestines remain outside of the abdominal cavity and this, in turn, makes hernia surgery more complicated and riskier. *Id.* at 168:22–169:11. Overall, Dr. Gutowski opines that, with a hernia such as Plaintiff's, he would expect specialist referrals and repair within a few months, and that a typical patient would not tolerate a wait of more than one year. [389-10] ¶ 3. According to Dr. Gutowksi, Plaintiff's hernia should have been repaired as soon as possible to reduce risks and avoid the risk it would worsen and become inoperable. *Id.* ¶ 11. He also opines that it remains inexcusable that Plaintiff waited four years for treatment and that this delay more likely than not rendered the hernia more difficult and riskier to repair, and caused Plaintiff to suffer unnecessary pain, loss of function, and diminished quality of life. [398-10] ¶ 4.

Dr. Reed, for his part, opines that Plaintiff's hernia was "completely unique" and "the defect in the abdominal wall was more extensive than any" he had "ever seen before." [393-1] at 12. In contrast to Dr. Gutowski's opinion, Dr. Reed opines that the size of Plaintiff's abdominal defect (*i.e.*, the hole in Plaintiff's abdominal wall) remained unchanged from diagnosis to surgery, but he agrees that "more viscera" (*i.e.* intestines and bowel) exited the abdominal cavity over time. [393-1] at 16; [393-3] at 31:4–32:24. He also agrees that, if the herniated viscera "is enlarging, then that means that it is going to probably continue to enlarge, which will mean that it can become more difficult to repair." [393-3] at 48:14–24. Overall, however, Dr. Reed opines that he found "no verifiable medical evidence that there was any delay, denial or withholding of adequate, reasonable, or necessary medical care to [Plaintiff] for his massive right-sided flank hernia." [393-1] at 13. He also opines that he did not believe that Plaintiff's hernia, despite its size, would cause "any exacerbation or increase restrictions in" Plaintiff's "activities of daily living or ability to ambulate or engage in recreation," notwithstanding Plaintiff's claims to the contrary. *Id.* at 17.

### 2. Neck/Back Conditions

#### a) History of Condition and Treatment

In 2009 or earlier, Plaintiff was also diagnosed with degenerative disc disease, foraminal stenosis, and ostephytes in his cervical and lumbar spine. [434] ¶ 78. Through August 2012, Plaintiff periodically visited the UIC Pain Clinic for epidural injections. *Id.* ¶ 82. In August 2013, he began complaining to Dr. Obaisi about constant neck and back pain. [434] ¶ 83. In response, Dr. Obaisi referred Plaintiff to

Dr. Ombaba at UIC's Pain Clinic in October 2013, but, according to Plaintiff, Dr. Ombaba told Plaintiff that he needed to have his abdominal surgery with Dr. Warso before UIC could treat his neck and back pain. *Id*. Plaintiff claims that Dr. Ombaba recommended that he return to the Pain Clinic after his surgery.[6] *Id*.

On September 28, 2014, Plaintiff filed a grievance complaining that, even though he had abdominal surgery in April 2014 and still had neck and back pain, Dr. Obaisi and Wexford had not sent him back to the UIC Pain Clinic. *Id*. ¶ 85. IDOC denied his request for a referral to UIC Pain Clinic, responding that "the offender's pain is being managed by the providers here at Stateville" as Plaintiff received "a narcotic twice a day as well as three other pain medications." [422-28] at 3. Plaintiff filed another grievance on November 2, 2014. [434] ¶ 87.

On February 10, 2015, Plaintiff finally visited UIC's Pain Clinic. [434] ¶¶ 91, 95. A doctor gave him a lumbar epidural injection and recommended that he return in two months for a possible cervical epidural injection. *Id*. He did not return to the UIC Pain Clinic in two months, however, instead returning nearly six months later on July 31, 2015, when doctors gave him a cervical epidural injection, instructing him to return in one month for another lumbar epidural injection. *Id*. ¶¶ 92, 94. This same process endured through 2019: Plaintiff visited the UIC pain clinic, where doctors gave him an epidural and instructed him to return in one to two months, but

---

[6] The Wexford Defendants dispute Plaintiff's claim of what Dr. Ombaba told him, *see* [434] ¶ 83 (Response). Yet, they do not explain what they believe Dr. Ombaba said and only cite to an exhibit that does not exist in the record. *Id* (citing Ex. 20 to Wexford's SOF, [396]). In contrast, while Plaintiff does not cite to Dr. Ombaba's visit notes, he cites an October 2013 grievance in which he summarized his understanding of Dr. Ombaba's recommendation. [434] ¶ 83 (citing [422-39] (Ex. 34)).

14

he would not return until many months later. *See* ¶¶ 94–97. During this time, Plaintiff filed many grievances and wrote to Stateville's warden complaining about the delays and his pain, and he also complained to Dr. Obaisi. *See e.g.*, [422-39] at 31, 33 (Exs. 39K, L) (June 5, 2015 and July 25, 2015 grievances); [422-39] at 57 (Ex. 39U) (June 23, 2016 grievance); [434] ¶ 89.

### b) Expert Opinions on Neck/Back Pain Management

Plaintiff and the Wexford Defendants each retained medical experts to opine on pain management for Plaintiff's back and neck condition. [397-16] at 132. Plaintiff's expert, Dr. Kenneth Candido, is a pain management physician and clinical professor of surgery and anesthesia. [397-16]. The Wexford Defendants' expert, Dr. Narayan Tata, is a physician board-certified in pain management, physical medicine, and rehabilitation. [393-2].

Dr. Candido's report charts Plaintiff's lumbar and cervical spine epidural injections through 2019 and notes that, on average, Plaintiff received cervical epidurals every nineteen months and lumbar injections every seven months. *See* [397-16] at 133. Dr. Candido opines that, based upon Plaintiff's complaints of chronic pain and radicular pain, "he was under treated using interventional pain management, and the records reflect long delays interspersed between his respective procedures." *Id.* Overall, Dr. Candido opines that there existed "delays in providing timely pain management interventions" to Plaintiff, which he believes "caused or contributed to a perpetuation and worsening of his symptoms related to degenerative spondylosis of the cervical and lumbar spines, respectively." *Id.*

Dr. Tata disagrees. Among other things, he opines that, although Plaintiff's MRIs show progression of degenerative disc disease, foraminal stenosis, and osteophyte development in his cervical and lumbar spine from 2009 to 2016, this constitutes a natural progression that was not "a result of any action or inaction taken by his medical providers." [393-2] at 22. He further opines that he saw "no urgency" in referring Plaintiff for epidurals since "epidurals are elective," and Plaintiff's chronic pain cannot be cured. *Id.* He acknowledges that epidurals may have temporarily improved Plaintiff's pain but opines that Plaintiff's pain was already "being effectively managed" with oral medications. *Id.* Overall, Dr. Tata opines that Plaintiff "received adequate and reasonable pain control from 2014 to current" and, "unfortunately, our society has been led to believe that all pain is curable and/or controllable." *Id.* at 25.

### 3.    Plaintiff's Right Arm Mass

In April 2013, Plaintiff also claims that he began experiencing pain in his right arm from what he believed was a mass or knot. [434] ¶ 80. Plaintiff told a UIC oncologist, Dr. Ho, about right arm pain on November 18, 2013. [420] ¶ 41. Dr. Ho's notes indicate "R anterior bicep tenderness" and "no masses palpitated" but he did not recommend any follow-up. [397-13] at 46–48.

On December 22, 2013, July 9, 2014, September 28, 2014, and November 2, 2014, Plaintiff filed grievances with IDOC about his continued right arm pain, complaining that he had not received adequate treatment. [422-30]–[422-33]. On November 25, 2014, during a visit with Dr. Warso about his abdomen, Plaintiff

16

reported his right arm pain and suspected mass and Dr. Warso ordered an MRI. [420] ¶ 42. On February 26, 2015, Plaintiff had an MRI, which did not show any masses. *Id*. ¶ 43. Dr. Warso also confirmed no arm masses during follow-up visits. *Id*. ¶ 44. Still, Plaintiff complained of arm pain, so he saw an orthopedic oncologist on December 31, 2015, who also found no arm mass. *Id*. ¶ 45. Plaintiff also had an x-ray on May 12, 2016, and another MRI on May 24, 2016, which again showed no abnormalities in his arm. *Id*. ¶¶ 46–47. On December 9, 2016, Plaintiff saw another UIC doctor, Dr. Mekhail, who agreed Plaintiff had no arm mass and found his complaints more consistent with a muscle spasm. *Id*. ¶ 48.

### D.  Communications with IDOC Medical Director Dr. Shicker

Defendant Dr. Shicker served as IDOC's Agency Medical Director from November 2009 to June 15, 2016. [416] ¶ 4. Dr. Shicker has never treated Plaintiff or spoken to him in person. *Id*. ¶ 42. Plaintiff claims, however, that he wrote letters to Dr. Shicker between February 2014 and February 2018 complaining about his medical conditions. *Id*. ¶ 43. The record includes one of these letters, dated October 22, 2015, in which Plaintiff complains about the lumps on his right arm and delays in referrals to UIC for his back/neck pain and hernia. [1] at 111–13. Dr. Shicker does not recall any correspondence from Plaintiff and the record does not show any response to Plaintiff's October 22, 2015 letter, but, as a general practice, Dr. Shicker reviewed inmate letters that he received and would "investigate further if it was a significant matter." [416] ¶¶ 52, 57. Dr. Shicker's emails, however, show that he emailed Dr. Obaisi and Dr. Funk (among others) about Plaintiff at least three times: (1) on June 23, 2014, to inquire about Plaintiff's abdominal surgery; (2) on November

13, 2014, seeking an update on Plaintiff's hernia and arm mass; and (3) on December 30, 2014, inquiring about a possible problem with Plaintiff "getting his Elavil (or equivalent)." *Id.* ¶¶ 60–66.

### E. Communications with Wardens Williams and Pfister

Defendant Terry Williams served as Stateville's warden from April 1, 2014 to July 2015. [415] ¶ 1. Plaintiff sent letters to Williams on November 26, 2014 and December 30, 2014 complaining about delays in receiving an MRI and about Dr. Obaisi's refusal to send him to the UIC pain clinic. [415] ¶ 30; *see also* [1] at 106–07. Plaintiff received a response signed by Williams that Plaintiff's "concerns are being reviewed and referred if necessary to the appropriate individual for resolution." [415] ¶ 30; *see also* [1] at 108–09. Williams' signature also appears on responses to other grievances and emergency grievances that Plaintiff filed in 2014 and 2015. [415] ¶ 37. Williams did not personally review or sign inmate grievances, however; rather, he appointed a designee to review them and respond on his behalf. [415] ¶¶ 36–37.

Plaintiff claims that he also spoke to Williams multiple times about his medical issues and delayed visits to UIC, to which Williams allegedly responded, "we know about the problem getting you fellows out to UIC and we are working on it." *Id.* ¶¶ 26, 29; [400-2] at 185:17–19. According to Plaintiff, Williams also told him to write letters, which Plaintiff claims he did. [447] ¶ 29. Williams does not recall receiving any letters or talking to Plaintiff about his medical conditions. [415] ¶¶ 28, 31.

Defendant Randy Pfister served as Stateville's warden from November 12, 2015 to January 31, 2018 and from August 1, 2019 to January 2020. [415] ¶ 2. Plaintiff claims that he spoke to Pfister multiple times about his medical complaints,

18

and Pfister told him to write letters. *Id.* ¶¶ 13 (response), 22–23. Plaintiff alleges that he did, receiving responses to some but not others. *Id.* ¶¶ 13 (response), 21. Like Williams, Pfister has no independent recollection of Plaintiff's medical issues. *Id.* ¶ 16. Pfister also deferred to facility medical staff on inmate medical issues and did not personally review or sign inmate grievances but appointed a designee to respond on his behalf. *Id.* ¶¶ 14–15.

### F. Communications with Wexford Executives Gedman, Holmes and Malloy

Defendant Gedman is Wexford's executive vice president and chief administrative officer responsible for human resources, staffing, employee relations, human resource information systems, training, payroll, risk management, credentialing, providing contracting, utilization management, pharmacy, tele-health, and quality. [413] ¶ 4. She has no medical training. *Id.* ¶ 28.

Defendant Darius Holmes is Wexford's senior vice president of strategic development and responsible for developing new business and maintaining current business including involvement with legislation that may affect Wexford's contracts. [411] ¶¶ 4–5. He also has no medical training. *Id.* ¶ *25*.

Defendant Diana Malloy was Wexford's vice president of operations from 2005 to October 2017 and now serves as its vice president of clinical services, electronic health records, and transition. [412] ¶ 4. In her current role, she provides administrative oversight of the utilizations management department, pharmacy department, electronic health records, and policies, procedures, and transition. *Id.* She has no responsibility, however, for the clinical aspect of Wexford's medical

19

policies and procedures or the terms and conditions of Wexford's policies. *Id.* ¶ 5. Although she is a registered nurse, she has not practiced for over 30 years. *Id.* ¶ 4.

On September 3, 2015, Plaintiff sent letters to Defendants Gedman and Holmes complaining that, given his hernia, Dr. Obaisi should allow him to have leather restraints rather than a waist chain for medical visit transports. [422-7]; [422-9]. On September 7, 2015, he sent Defendants Gedman and Malloy letters complaining about the suspected mass in his right arm and his hernia, asking them for assistance in getting medical treatment. [422-8]; [422-11]. He sent the same letter to Defendant Holmes, although the letter was undated. [422-10]. Further, Plaintiff's aunt sent Defendant Malloy a letter on September 15, 2017 complaining that Plaintiff had not received adequate treatment for his hernia. [422-12].

Defendants Gedman and Holmes do not recall if they received Plaintiff's letters. [413] ¶ 12; [434] ¶ 35 (response); [411] ¶¶ 6, 15–16. Generally, however, when they receive an inmate letter, they do not read it but forward it to Joseph Ebbitt, Wexford's Director of Risk Management and Legal Affairs. [411] ¶¶ 9–10; [413] ¶¶ 14–15. Wexford has assigned to Ebbitt—a lawyer who reports to Defendant Gedman—responsibility for addressing letters that inmates send to Wexford's corporate employees. [413] ¶¶ 13, 18. Similarly, although Defendant Malloy recalls receiving the September 2017 letter from Plaintiff's aunt (but not Plaintiff's September 2015 letter), she only skimmed it and then gave it to Mr. Ebbitt, consistent with her practice for any inmate letter that she receives. [412] ¶¶ 8–10. Defendants

Gedman, Holmes, and Malloy do not know what action, if any, Mr. Ebbitt took in response to any letter they forwarded. [411] ¶¶ 70–71; [412] ¶¶ 56, 65; [413] ¶ 57.

## II.  Legal Standard

A party seeking summary judgment must show that there exists no genuine "dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323.

In evaluating a motion for summary judgment, the Court must "construe all facts and reasonable inferences in the light most favorable to the nonmoving party," but a mere "scintilla of evidence" supporting the non-movant's position does not suffice. *Anderson*, 477 U.S. at 248. Instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id*. at 252.

## III.  Analysis

The Eighth Amendment requires prison officials to provide healthcare to incarcerated inmates who cannot obtain healthcare on their own, *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021), and imposes liability on those who act with deliberate indifference to a substantial risk of serious harm to inmates, *Eagan v. Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021). To show deliberate indifference,

a plaintiff must show both: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition. *See Eagan*, 987 F.3d at 693.

Here, the parties do not dispute that Plaintiff suffers from objectively serious medical conditions. Instead, they focus upon the subjective element of the analysis, which requires proof that each Defendant acted "with a 'sufficiently culpable state of mind.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This standard remains a "high hurdle" for a plaintiff to overcome. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotation marks omitted). "Negligence—even gross negligence—is insufficient"; instead a plaintiff must demonstrate "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Farmer*, 511 U.S. at 836.

### A. Dr. Obaisi

The Court begins with Dr. Obaisi's motion for summary judgment. [391]. As to Plaintiff's care prior to December 23, 2017,[7] Dr. Obaisi argues that he did not show deliberate indifference to Plaintiff's medical conditions. Dr. Obaisi insists that, to the contrary, he repeatedly referred Plaintiff to specialists when medically warranted and relied upon those specialists' recommendations, along with his own medical judgment, in any decisions he made with respect to Plaintiff. [401] at 5–15.

---

[7] Dr. Obaisi died on December 23, 2017, and Plaintiff agrees, as he must, that Dr. Obaisi has no liability for Plaintiff's care after that date. [418] at 4 n.3. Plaintiff also agrees that he cannot pursue injunctive relief against Dr. Obaisi's estate, *id.*, which, as Dr. Obaisi points out, [401] at 4, (and Plaintiff does not dispute) moots any official capacity claim against Dr. Obaisi for injunctive relief.

Medical professionals generally enjoy discretion in treatment decisions because the "permissible bounds of competent medical judgment" can be unclear. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc). Accordingly, mere disagreement about a course of treatment generally does not suffice to establish an Eight Amendment violation. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Nor does proof of negligence or mistake. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Instead, a plaintiff must establish that the medical professional's acts constitute "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Donald*, 982 F.3d at 458.

Such evidence may "include the obviousness of the risk from a particular course of medical treatment"; "the medical defendant's persistence 'in a course of treatment known to be ineffective'"; or "proof that the defendant's treatment decision departed so radically from 'accepted professional judgment, practice, or standards' that a jury may reasonably infer that the decision was not based on professional judgment." *Id.* at 662–63 (quoting *Petties*, 836 F.3d at 729–30, *as amended* (Aug. 25, 2016)). A plaintiff may also meet its burden through evidence that the medical provider did not follow the advice of specialists, failed to treat pain, or delayed in providing treatment. *See, e.g., Gil v. Reed*, 381 F.3d 649, 663 (7th Cir. 2004); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (holding that delays "in treating a

23

condition that is painful even if not life-threating may well constitute deliberate indifference."). To establish deliberate indifference based upon treatment delays, however, a plaintiff must present "verifying medical evidence" that the delay, rather than the underlying condition, actually caused "some harm." *Walker*, 940 F.3d at 964 (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)).

### 1. Plaintiff's Hernia Treatment

There exists no dispute that Plaintiff had a complex hernia and saw many specialists about it over the years. Dr. Obaisi argues that Plaintiff cannot establish deliberate indifference because: he repeatedly referred Plaintiff to specialists, relied upon and followed those specialists' recommendations, no specialist ever recommended surgery, and nothing suggested to Dr. Obaisi that Plaintiff faced a substantial risk of harm from his hernia. Dr. Obaisi also argues that, to the extent there existed any deficiency in Plaintiff's hernia treatment, that fault lies with the UIC specialists upon whose expert judgment Dr. Obaisi relied. [401] at 5–9.

Contrary to Dr. Obaisi's contention, however, Plaintiff has identified numerous instances where Dr. Obaisi apparently delayed carrying out specialists' recommendations. First, Plaintiff claims that he repeatedly complained to Dr. Obaisi about worsening abdominal pain and gastrointestinal issues after his April 2014 surgery. Yet, besides the May and June 2014 post-operative follow-ups with Drs. Warso and Antony, it appears Dr. Obaisi did not schedule a follow-up for Plaintiff's pain until late November 2014.

Second, when Dr. Warso diagnosed Plaintiff's hernia in November 2014, he recommended that Plaintiff receive a colonoscopy and CT scan. Yet, Plaintiff did not receive a colonoscopy until August 2015, and it remains unclear if he ever received the recommended CT scan. Dr. Obaisi does not explain (or even acknowledge) this 10-month delay. Yet, the record indicates that Plaintiff filed numerous grievances on the issue and claims that he complained to Dr. Obaisi to no avail. Further, the delays in these procedures delayed Plaintiff's hernia treatment because, as UIC general surgeon Dr. Masrur found, these procedures needed to be completed "before we can proceed with the partial hernia repair." [397-13] at 6.

Third, after Plaintiff finally saw UIC's chief of surgery, Dr. Giulianotti, in April/May 2016 and then Dr. Cohen in May/July 2016, Dr. Cohen instructed Plaintiff to return to see Dr. Giulianotti to finalize plans for surgery.[8] Dr. Obaisi signed a referral on July 28, 2016, yet Plaintiff did not return to Dr. Giulianotti until January 2017, over five months later. During this delay, Plaintiff filed more grievances and complained to Dr. Obaisi about the delay.

The parties dispute the reasons for this delay, with Plaintiff presenting testimony from Dr. Funk, Wexford's medical director, that such a delay is not typical, [434] ¶ 59. Plaintiff also claims that Dr. Obaisi may have purposely delayed to avoid the cost of surgery; he also points to some records that suggest the referral was "lost" (though it does not specify who "lost" it). [434] ¶¶ 50–60. Dr. Obaisi counters that

---

[8] The parties argue at length over whether Dr. Cohen agreed to perform Plaintiff's hernia surgery at the July 2016 visit, [343] ¶¶ 50–57, but they do not dispute that Dr. Cohen instructed Plaintiff to return to see Dr. Giulianotti before possible surgery could move forward.

there exist many possible reasons for the delay, speculating that Dr. Giulianotti may have been on sabbatical or otherwise unavailable. *Id.* ¶¶ 59–60 (response). He also argues that, even if someone "lost" the referral, there exists no evidence that Dr. Obaisi or any other Defendant bears responsibility for any such loss. *Id.* Based on this record, Plaintiff has not definitively established that Dr. Obaisi bore responsibility for this delay. Yet, the evidence he presents—namely Dr. Funk's testimony and his grievances to show Dr. Obaisi's knowledge of the delay—at least suffices to demonstrate the existence of a material factual dispute that a jury, not the Court, must determine.

Fourth, there remains the "thoracic lumbosacral orthopedic brace" that Dr. Ellis recommended in March 2017 to reduce Plaintiff's pain and discomfort. Plaintiff claims that Dr. Obaisi did not provide it until October 2017 and only after this Court issued a preliminary injunction ordering him to do so. [434] ¶ 65. The parties dispute whether Plaintiff received it earlier, *id.* (Response), but numerous grievances and the preliminary injunction motion, as well as some of the medical records, plausibly support Plaintiff's claim. *See* [418] Exs. 16I, 16J (grievances in June and July 2017 complaining that Dr. Obaisi had not ordered recommended brace); [108] (August 2017 preliminary injunction motion); [397-14] (Taylor (77700-027) 05982) (October 16, 2017 medical receipt record for "TLSO Back Support – Abd. Binder.")

Overall, the record contradicts Dr. Obaisi's contention that there exists insufficient evidence of treatment delays to support a deliberate indifference claim.

Next, Dr. Obaisi argues that, even if delays existed, those delays did not cause Plaintiff harm.  [401] at 6–9.  True, to show deliberate indifference based on delayed medical treatment, an inmate must present "verifying medical evidence" that delays, rather than the underlying condition, caused him "some harm," *Walker,* 940 F.3d at 964.  But cognizable harm exists where an inmate presents "independent evidence that the delay exacerbated the injury *or* unnecessarily prolonged pain," *Thomas v. Martija*, 991 F.3d 763, 770–71 (7th Cir. 2021) (emphasis in original) (quoting *Petties*, 836 F.3d at 730–31).  Plaintiff offers evidence of both.

First, Plaintiff presents evidence that the delays exacerbated his condition. Plaintiff's expert, Dr. Gutowski, opines that Plaintiff's hernia worsened over time which, in turn, made surgery riskier and more difficult.  While the Wexford Defendants' expert, Dr. Reed, disagrees to an extent—opining that the defect in Plaintiff's abdominal wall did not increase over time—he agrees that the amount of Plaintiff's intestines outside the abdominal wall likely increased.  In turn, both experts seem to agree that, when abdominal contents remain outside the abdominal cavity (and more contents leave the abdominal cavity), this can cause loss of domain over time, which makes hernia surgery riskier and more complicated.  Dr. Dumanian, who ultimately performed surgery on Plaintiff's hernia, also agreed.  [397-8] at 84:24–86:8 ("would a surgery earlier on in 2014 have been less complicated than the surgery you performed. . .A:  In terms of loss of domain. . .yes.").  Further, Dr. Dumanian testified that Plaintiff's bowel broke in two during the surgery because it had become entrenched in hernia sac scar tissue.  *Id.* at 48:18–49:5. This evidence creates a

disputed issue of fact regarding whether delays worsened Plaintiff's hernia and made surgery riskier and more difficult. *See Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007) (noting that expert testimony that Plaintiff suffered because of a delay constitutes verifying medical evidence).

Second, Plaintiff also presented evidence that he suffered pain and discomfort during these periods of delay that, according to him, worsened over time. The UIC medical records also consistently note that Plaintiff complained of pain and was "symptomatic." Notably, Dr. Ellis prescribed the abdominal brace at issue to help alleviate this pain. Further, Plaintiff claims that, since his 2018 hernia repair, he "does not suffer from as much pain as he previously endured." [434] ¶ 102. Overall, there exists at least a triable issue of fact regarding whether these delays exacerbated Plaintiff's pain.

Finally, Dr. Obaisi argues that Plaintiff also cannot show that Dr. Obaisi knew of any substantial risk of harm. [401] at 5–8. Again, while Dr. Obaisi is correct that the subjective element of deliberate indifference requires Plaintiff to show that Dr. Obaisi knew of a substantial risk of harm, *see Petties*, 836 F.3d at 728, Plaintiff has offered sufficient evidence to create a disputed issue of fact as to Dr. Obaisi's knowledge. First, the specialists' recommendations and treatment notes— which Dr. Obaisi insists he relied upon—frequently mention "loss of domain" and other risks. Second, Plaintiff filed numerous grievances and claims that he frequently complained to Dr. Obaisi about the delays and worsening pain, giving him at least notice of Plaintiff's pain. Third, a medical provider's decisions may constitute deliberate

indifference if there existed "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Donald*, 982 F.3d at 458. Plaintiff's expert, Dr. Gutowski, opines that the delays Plaintiff experienced fell far outside acceptable medical standards. Defendant Funk also agreed that inmates usually get referrals within a few weeks of specialist recommendations and multi-month delays is atypical. [434] ¶ 59. While Wexford Defendants' expert, Dr. Reed, disagrees with Dr. Gutowski, his disagreement merely creates another disputed issue of fact for the jury to resolve.

Of course, it remains possible that Dr. Obaisi had good reasons for the delays or that responsibility for the delays does not lie with him. It also remains possible that, even if Dr. Obaisi bore some responsibility for the delays, a jury could find that his conduct constitutes mere mistake or negligence rather than deliberate indifference. But viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that these delays caused Plaintiff harm, that Dr. Obaisi knew there existed a substantial risk of harm, and that he exhibited deliberate indifference by failing to promptly follow specialist recommendations, get Plaintiff timely follow-up visits, or provide Plaintiff with the prescribed abdominal brace. Accordingly, Dr. Obaisi has not shown that he is entitled to summary judgment on Plaintiff's deliberate indifference claim as to his hernia condition.

### 2. Plaintiff's Neck/Back Conditions

The Court next considers Dr. Obaisi's motion with respect to Plaintiff's neck and back condition. Plaintiff claims that Dr. Obaisi showed deliberate indifference by failing to timely send him to the UIC pain clinic for epidural injections, and for undertreating him with pain medications despite his repeated complaints of ongoing pain and referral requests. As previously stated, "delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate-indifference claim." *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). Failure to follow advice of specialists and to properly treat pain may also establish deliberate indifference. *See, e.g., Gil*, 381 F.3d at 663; *Walker*, 940 F.3d at 964.

In moving for summary judgment, Dr. Obaisi argues that he properly managed Plaintiff's neck and back pain with oral medications and referred him to specialists for epidurals "when clinically warranted." [401] at 14. In support, Dr. Obaisi offers the Wexford Defendants' pain management expert, Dr. Tata, who opines that Dr. Obaisi properly managed Plaintiff's pain through various oral medications. As discussed above, Dr. Tata also opines that, while epidurals can provide temporary pain relief, they cannot cure Plaintiff's neck/back pain, remain "elective," and carry their own risks.

The Court finds there exist several material factual disputes, however, regarding Dr. Obaisi's contentions. First, while Dr. Tata opines that epidurals remain elective and have risks, Dr. Obaisi does not point to any contemporaneous

30

medical records to suggest that he deviated from the UIC specialists' recommendations because of these concerns. Second, even if epidurals would not "cure" Plaintiff's conditions, they, by design, alleviate pain, and this fact thus fails to shield Dr. Obaisi from liability since failure to properly treat pain can itself support a deliberate indifference claim. *Grieveson*, 538 F.3d at 779. Third, Plaintiff presented his own pain management expert, Dr. Candido, who disagrees with Dr. Tata. Dr. Candido opines that Dr. Obaisi consistently "under-treated" Plaintiff "using non-steroidal anti-inflammatory type drugs, among others," which worsened Plaintiff's symptoms. [397-16] at 133. This competing expert testimony presents factual disputes that a jury, not the Court, must resolve. Accordingly, the Court denies Dr. Obaisi's motion for summary judgment as to Plaintiff's back/neck conditions.

### 3. Plaintiff's Suspected Arm Mass

Finally, the Court turns to Dr. Obaisi motion as to Plaintiff's suspected arm "mass." Again, Dr. Obaisi argues that Plaintiff cannot offer evidence that Dr. Obaisi was deliberately indifferent to this condition. [401] at 9. Here, the Court agrees.

First, as Dr. Obaisi points out, [436] at 9–10, Plaintiff fails to respond to Dr. Obaisi's arguments, *see* [417]. In fact, Plaintiff's response brief does not even mention Plaintiff's arm "mass." *Id.* Although Plaintiff responds to Dr. Obaisi's statements of fact regarding the suspected arm mass, the Court need not "fill the void by crafting arguments and performing the necessary research" to rebut Dr. Obaisi's legal arguments. *Martin v. Jones*, 752 F. App'x. 368, 369 (7th Cir. 2019), *reh'g denied* (Mar. 5, 2019). By failing to respond, Plaintiff waived any claim against Dr. Obaisi based

on his alleged arm "mass." *See Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017) (holding that underdeveloped arguments in response to a summary judgment motion constitute waiver); *Martin*, 752 F. App'x. 369 (holding failure to respond to an argument constitutes waiver).

Even if Plaintiff's failure to respond did not constitute waiver, however, the evidence he submits also fails to support his claim that Dr. Obaisi was deliberately indifferent about his suspected arm "mass." In fact, his evidence does not suffice to show that Plaintiff suffered inadequate medical treatment for his arm at all, thus foreclosing claims against all Defendants based on his right arm "mass."

First, Plaintiff admits that he saw multiple specialists for his suspected arm mass. [418] ¶¶ 5–6, 16. While he complains about delays in referrals, *id.*, he does not identify any "verifying medical evidence" to suggest that delays caused him "some harm," *Walker*, 940 F.3d at 964. To the contrary, he admits that, when he had MRIs and other diagnostic tests, none of them showed a "mass." [418] ¶¶ 6, 16, 48–49 (response). Second, Plaintiff claims that he suffered pain that went under-treated, but he acknowledges that he received medication for the arm pain. [420] ¶ 38. While a plaintiff may establish deliberate indifference by showing that a medical defendant persisted "in a course of treatment known to be ineffective," Plaintiff does not point to any alternative treatments that Dr. Obaisi or anyone else should have provided for this alleged condition. Further, despite seeing multiple specialists for his arm over the years, Plaintiff does not point to any specialist who recommended alternative pain medications or treatment. Pain medication is not "ineffective" merely because it does

not completely alleviate pain.[9]  Overall, even if he suffered ongoing arm pain, without some evidence of alternative treatment denied to him, he cannot establish that he received inadequate medical care in violation of the Eighth Amendment.  And without evidence to show such a violation, his § 1983 claim based on his alleged arm "mass" fails as to all Defendants.

### 4.    Punitive Damages against Dr. Obaisi's Estate

Finally, Dr. Obaisi moves for summary judgment on Plaintiff's request for punitive damages, arguing that, because Dr. Obaisi is deceased, such damages cannot achieve their intended purposes of deterrence and punishment.  [391] at 6–7.  In support, Obaisi relies on *Kahlily v. Francis*, 08-C-1515, 2008 WL 5244596 (N.D. Ill. Dec. 16, 2008), a § 1983 action where the court held that the plaintiff could not pursue punitive damages against a deceased defendant.  In so holding, the *Kahlily* court noted that punitive damages serve three purposes: (1) to punish; (2) to deter a defendant's "outrageous conduct"; and (3) to generally deter others from engaging in similar conduct. *Id.* at *12.  Overall, the *Kahlily* court acknowledged that punitive damages against a deceased defendant may serve the third purpose but held that the other two purposes "would not be served at all" and, therefore, cannot "serve the overall policies behind punitive damages." *Id.*

---

[9] In one SOF response, Plaintiff asserts that his "pain medication was changed" recently, "which has resulted in" him "experiencing no pain in his right arm." [420] ¶ 43 (Response).  Yet, he does not provide any evidence or documentation showing how his pain medication recently changed. *Id.* While he cites his SOAF [421] ¶ 102, [421], in support, this paragraph only discusses pain medications changes in 2015 and 2016 that did *not* alleviate his pain.  Changed prescriptions, unlike subjective feelings of pain, can be established with verified medical evidence and the Court will not accept as true Plaintiff's unsupported assertions about medication changes to try to save his otherwise unsupported claim of ineffective pain treatment.

Plaintiff disagrees, arguing that this Court should allow punitive damages against Dr. Obaisi's estate because "the deterrence objective is broader than Obaisi alone." [417] at 4. In support, he cites two district court cases that allowed punitive damages against deceased defendants. *Id*. (citing *Javier v. City of Milwaukee*, No. 07-cv-0204, 2009 WL 10663364, at *8–9 (E.D. Wis. Dec. 23, 2009); *Estate of Arana v. City of Chi.*, No. 89-CV-4179, 1992 WL 162965, at *2 (N.D. Ill. July 2, 1992)).

The Court agrees with Dr. Obaisi. Although the Seventh Circuit has not ruled on whether plaintiffs may seek punitive damages against a deceased defendant, recent district court decisions in this circuit have held convincingly that they may not. *See Zavala v. Obaisi*, 17-cv-3042, 2021 WL 1172774 (N.D. Ill. Mar. 2021); *Heidelberg v. Manias*, 18-cv-1161, 2020 WL 7034315, at *25 (C.D. Ill. Nov. 30, 2020; *Flournoy v. Estate of Obaisi*, 17-cv-7994, 2020 WL 5593284, at *14 (N.D. Ill. Sept. 18, 2020); *Kahlily*, 2008 WL 5244596, at *6.

The two district court cases that Plaintiff relies on—*Javier* and *Estate of Arana*—based their decisions on *Graham v. Sauk Prairie Police Commission*, 915 F.2d 1085 (7th Cir. 1990). In *Graham*, a widow brought a § 1983 claim against a police officer who fatally shot her husband. 915 F.2d at 1088. The officer died while the case remained pending, but the Seventh Circuit held that the widow could still seek loss-of-life damages against his estate. *Id*. It emphasized that the "fundamental policies underlying § 1983 are compensation for, and deterrence of, constitutional acts" and the "deterrence objective of § 1983 damages is directed at a broader category of persons than the individual perpetrator alone." *Id*. at 1104–05. Drawing on

34

*Graham*'s language as to loss-of-life damages, *Javier* and *Estate of Arana* held that plaintiffs also may seek punitive damages against deceased defendants' estates. *See Javier*, 2009 WL 10663364, at *8–9; *Estate of Arana*, 1992 WL 162965, at *2.

Nevertheless, *Javier* and *Estate of Arana* fail to acknowledge, much less consider, that punitive damages serve a different purpose than loss-of-life damages. As *Graham* emphasized, loss-of-life damages aim to compensate the victim and provide specific and general deterrence. *See* 915 F.2d at 1106. In contrast, the Supreme Court has emphasized that "punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor." *Zavala*, 2021 WL 1172774, at *13 (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266 (1981)). In fact, while generalized deterrence may remain a goal of punitive damages, the Supreme Court's description of punitive damages indicates that the primary goals remain punishment and specific deterrence. Punitive damages awarded against a deceased wrongdoer cannot serve these central goals. Accordingly, the Court agrees with the recent decisions in this circuit and finds that Plaintiff may not pursue punitive damages against Dr. Obaisi's estate.

### B. Dr. Funk

The Court now turns to Dr. Funk's motion for summary judgment. [387]. Since 2005, Dr. Funk has served as Wexford's regional medical director responsible for medical services at correctional facilities in the northern district of Illinois, including Stateville. [434] ¶ 7. This includes clinical responsibility for "the provision and supervision of medical care to inmates at Stateville." *Id.*

Dr. Funk argues that Plaintiff's deliberate indifference claim fails as to him because he only had isolated interactions with Plaintiff involving unrelated medical conditions, and Plaintiff cannot establish that Dr. Funk knew enough about the medical conditions at issue here. [388]. Specifically, Dr. Funk claims that he only treated Plaintiff one time on September 30, 2015, after Plaintiff returned from an unrelated visit to UIC's urology clinic. [424] ¶¶ 19–21. Dr. Funk also recalls that he once passed Plaintiff in the infirmary and Plaintiff lifted his shirt to show his hernia, but Dr. Funk maintains that he did not interact with Plaintiff. *Id*. ¶¶ 22–24; [397-11] at 79:5–80:22.

As to Plaintiff's hernia treatment, the Court finds that Plaintiff presented enough evidence to create a triable issue of fact about the level of Dr. Funk's involvement and knowledge. First, Plaintiff maintains that he specifically complained to Dr. Funk about his hernia: (1) during the September 30, 2015 appointment; (2) in other passing interactions in the infirmary; and (3) when Dr Funk examined him in Stateville's infirmary in October 2015. [424] 7–11, 18–21 (responses).

Second, even putting aside the substance of their personal interactions—which remains in dispute—there exists other evidence from which a reasonable jury could find that Dr. Funk knew about Plaintiff's hernia condition and his complaints about it. Specifically, in October 2014, Dr. Funk responded to a letter Plaintiff sent about his medical treatment. [424] ¶ 17. In late 2014, Dr. Funk also emailed with Dr. Shicker about Plaintiff and wrote: "I know this patient's medical history" and then

described Plaintiff's abdominal surgery and some of Plaintiff's ongoing complaints. *Id*. [415] ¶¶ 60–66. In addition, Plaintiff claims he wrote four to six letters to Dr. Funk between 2014 and 2018. [424] ¶ 36; [434] ¶ 116. While Dr. Funk does not recall these letters, this evidence raises a triable issue of fact regarding how much Dr. Funk knew about Plaintiff's hernia conditions and complaints.

Overall, although Dr. Funk may not have provided Plaintiff's primary care at Stateville, there exists disputed facts as to whether and how much Dr. Funk knew of Plaintiff's hernia condition and treatment. In turn, given Dr. Funk's responsibility over inmate medical treatment, his knowledge is material to whether he showed deliberate indifferent by failing to address Plaintiff's complaints regarding delay in hernia treatment and the attendant pain.

The same, however, cannot be said about Plaintiff's complained of neck/back condition. Plaintiff does not allege that he complained in person to Dr. Funk about neck/back pain, nor does he point to any other evidence that Dr. Funk knew about it. Instead, he argues that Dr. Funk must have known because: (1) he participated in Wexford's "annual quality initiative where inmate grievances are reviewed," and (2) he supervised Dr. Obaisi who knew about Plaintiff's back/neck condition and failed to properly treat it. [423] at 13; [424] ¶ 16 (response).

These speculative arguments fail. First, even if Dr. Funk participated in "annual quality initiative" meetings, this does not mean that he learned of Plaintiff's neck/back complaints there. At most, it raises the possibility that he could have learned of them there. Such a "mere scintilla" of evidence does not create a material

issue of fact. *Anderson*, 477 U.S. at 248. Second, although Dr. Funk supervised Dr. Obaisi, to hold a supervisor liable under § 1983 for a subordinate's acts, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Chavez v. Ill. State Police*, 251 F.3d 612, 650 (7th Cir. 2001. Because Plaintiff has not presented evidence that Dr. Funk knew of the alleged "conduct," he necessarily cannot show that Dr. Funk bears supervisory responsibility under § 1983. Accordingly, Plaintiff may proceed on his deliberate indifference claim against Dr. Funk as to his hernia treatment, but not as to his neck/back pain.

### C.    IDOC Defendant Dr. Shicker

The Court also finds that there exists a genuine issue of material fact regarding what Dr. Shicker knew about Plaintiff's conditions and complaints. As discussed, Dr. Shicker served as IDOC's Agency Medical Director from November 2009 to June 15, 2016. [415] ¶ 4. Emails show that Dr. Shicker discussed some of Plaintiff's complaints with Dr. Funk and Dr. Obaisi in late 2014. In addition, Plaintiff claims that he wrote letters to Dr. Shicker complaining about his medical conditions and the record includes an October 22, 2015 letter from Plaintiff to Dr. Shicker complaining about delays in referrals to UIC for his back/neck pain and hernia. [1] at 111–13; [415] ¶ 43. This evidence creates a material issue of fact as to whether Dr. Shicker knew of Plaintiff's conditions and complaints and exhibited deliberate indifference by failing to take action with respect to them.[10] Further, because Plaintiff's October 22,

---

[10] Dr. Shicker cannot be held liable for any alleged misconduct after he left his role on June 15, 2016.

38

2015 letter specifically complains of both his neck/back pain and his hernia, the record as a whole suffices to create a material issue of fact for Dr. Shicker with respect to both conditions.

### D.     Nonmedical IDOC Defendants Williams and Pfister

The Court now turns to Plaintiff's claims of deliberate indifference against Stateville's former wardens, Williams and Pfister.  Plaintiff claims that he sent letters to the wardens and spoke to them on multiple occasions about insufficient and delayed medical treatment, but they ignored his pleas for assistance.

Williams and Pfister do not dispute that Plaintiff sent them some letters and grievances complaining of his medical issues. Instead, they argue that Plaintiff cannot show deliberate indifference on their part because:  (1) there exists no evidence that Plaintiff received inadequate medical care for his conditions; (2) they did not personally review any of Plaintiff's grievances but delegated that duty to others; and (3) they were not *personally* involved in or aware of Plaintiff's medical conditions or treatment and, as non-medical professionals, they deferred to medical professionals' judgment about how to treat Plaintiff.  [399] at 6–9.

Initially, the Court discussed above how various delays related to Plaintiff's hernia and back/neck conditions create a triable issue of fact as to whether Plaintiff received constitutionally inadequate medical care.  Additionally, although the Court agrees that Plaintiff can only hold Williams and Pfister liable under § 1983 for their personal involvement in an alleged constitutional deprivation, *see Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017), wardens "cannot simply use their proxies to

avoid personal liability," *Snow v. Obaisi*, 17-CV-4015, 2021 WL 4439421, at *8 (N.D. Ill. Sept. 28, 2021). Here, Williams and Pfister agree that they had responsibility for inmate grievances and Plaintiff presented evidence that he filed grievances with them and that he spoke to both of them about his conditions. While both remained free to delegate grievance reviews to others, the record contains triable issues as to their knowledge of Plaintiff's complaints and "the buck still stops at the warden." *Snow*, 2021 WL 4439421, at *8 (quoting *Drapes v. Hardy*, 14 C 9850, 2019 WL 1425733, at *6 (N.D. Ill. Mar. 29, 2019)); *see also Dixon v. Brown,* 3:16-cv-1222-GCS, 2021 WL 1171657, at *8 (S.D. Ill. Mar. 29, 2021) (holding that, by "delegating responsibility to review grievances, a warden may effectively consent to and approve of how those grievances are handled."). Accordingly, Williams and Pfister may not avoid individual liability simply because others reviewed or responded to Plaintiff's grievances.

Finally, regarding Defendants' argument that they deferred to the medical judgment of Plaintiff's treating physicians, [399] at 6–9, the Seventh Circuit has emphasized that nonmedical professionals may "defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care," and do not act with deliberate indifference if they so rely, *Eagan*, 987 F.3d 694 (quoting *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) and *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018)). But neither Williams nor Pfister provides any evidence that they deferred to any medical professionals about Plaintiff's care. As this Court held in *Snow* when rejecting the same argument by Pfister and another warden, the

40

"wardens cannot defend themselves at summary judgment by claiming 'deference to medical professionals' when there is no evidence in the record that they exercised such deference." 2021 WL 4439421, at *8.

Overall, Plaintiff has offered evidence (including numerous grievances, letters, and his own testimony) from which a reasonable jury could find that Williams and Pfister knew about Plaintiff's serious medical conditions and took no action besides offering platitudes or form responses through their delegates. This evidence suffices to create a triable issue of deliberate indifference as to Williams and Pfister.[11] *See, e.g., Arnett*, 658 F.3d 755–56 (holding that nonmedical prison official may face liability where a "communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" (quoting *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996))); *see also Diggs v. Ghosh*, 850 F.3d 905, 911 (7th Cir. 2017) (finding that plaintiff's sworn testimony that he told a warden about delays in surgery sufficed to create a triable issue as to the warden's deliberate indifference); *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) ("prisoner requests for relief that fall on 'deaf ears' may evidence deliberate indifference."). Accordingly, the Court denies Defendant Williams and Pfister's motion for summary judgment as to Plaintiff's hernia and neck/back condition.

---

[11] Williams and Pfister, however, can each only face potential liability for alleged violations that occurred during the periods they served as Stateville's wardens.

### E. Wexford Corporate Employee Defendants Gedman, Holmes, and Malloy

The Court now turns to the motions for summary judgment filed by Wexford's corporate executives Gedman, Holmes, and Malloy. [375]; [379]; [383]. To hold supervisors liable for constitutional deprivations, they "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001).

Plaintiff argues that Gedman, Holmes, and Malloy showed deliberate indifference to his medical needs because he sent them letters in September 2015, and his aunt sent a letter to Malloy in September 2017, but they ignored him. He insists that, as Wexford executives, they "had the wherewithal to help" in response to these letters, but "chose to do nothing." [410] at 4; [413] at 4. As to Defendant Gedman, Plaintiff also argues that she had final authority over Wexford's policies with third-party service providers and its off-site scheduling process that, according to Plaintiff, contributed to his referral delays. [413] at 4.

Here, the Court finds that Plaintiff has failed to present a triable issue of fact. As a preliminary point, the parties dispute whether any of these three individuals received proper notice of Plaintiff's alleged mistreatment (neither Gedman nor Holmes remembers receiving any letters and Malloy only recalls receiving the September 2017 letter from Plaintiff's aunt), but even assuming they received the letters, supervisors "do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks;

42

no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen." *Wilder v. Wexford Health Sources, Inc.*, 11-CV-4109, 2015 WL 2208440, at *10–11 (N.D. Ill. May 8, 2015) (quoting *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)).

Although Plaintiff insists that all three Defendants had the "wherewithal to help" him, he does not present any evidence to support this assertion. They did not have responsibility for inmate medical care like Drs. Obaisi, Funk, and Shicker; nor did they have responsibility for Stateville inmates' general welfare like Williams and Pfister. Indeed, Holmes is not involved in "operations of any of Wexford's facilities," Wexford's medical policies or procedures, or "the supervision and/or delivery of medical care to inmates." [411] ¶¶ 11, 56, 69. Although Malloy oversees some administrative aspects of Wexford's clinical services and records management, she "is not responsible for the clinical aspect of the Wexford policies and procedures" and is not involved in "determining what proper medical care involves" or when inmates receive "specialty consults or surgery." [412] ¶¶ 4–5, 12, 20–22. Gedman also does not determine or oversee inmate medical treatment [414] ¶ 34.[12]

---

[12] Gedman has some responsibility for third-party provider contracting (although the parties dispute the extent of her involvement) and supervises Joe Ebbitt, but, as the Court discusses below with respect to the *Monell* claim against Wexford, Plaintiff has not presented evidence to link these policies or practices with any delays in Plaintiff's medical treatment. Accordingly, her involvement in these policies cannot form the basis for any individual liability.

Further, all three testified that Wexford had a system in place to address inmate letters like the one Plaintiff sent: Joe Ebbitt, Wexford's Director of Risk Management and Legal Affairs, reviews and responds to them. All three testified that, in accordance with this system, they forward to Joe Ebbitt any inmate letters they receive, and nothing in the record suggests that they deviated from this system in this case. Their use of this system shows that they did not turn a "blind eye" to inmate complaints generally, or to Plaintiff's complaints specifically. Of course, Plaintiff attacks Ebbitt's process, calling it "an empty and tautological policy" to "insulate the executives from liability for deliberate indifference" without providing any actual redress for constitutional violations, [410] at 3. As discussed below, however, Plaintiff has not presented evidence to substantiate these accusations.

Overall, the evidence shows that, even assuming Gedman, Holmes, and Malloy received Plaintiff's letters, they followed Wexford's system for addressing these letters and believed Plaintiff's complaints would be addressed through that system. Plaintiff cannot hold them responsible for "for not being ombudsmen." *Burks*, 555 F.3d at 595. Accordingly, the Court grants summary judgment in Defendants' favor on Plaintiff's deliberate indifference claims against Gedman, Holmes, and Malloy.

## F.    Defendant Wexford

Finally, the Court turns to Plaintiff's *Monell* claim against Wexford. [394]. A corporate entity violates an inmate's constitutional rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Estate of Novack ex rel. v. Cnty. of Wood*, 226

F.3d 525, 530 (7th Cir. 2000). A plaintiff may offer evidence of an "an express policy," "widespread practice that is so well-settled as to amount to a policy" or that someone with "final policymaking authority for decisions regarding" the plaintiff's medical treatment caused his injury. *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). Causation remains a crucial element of this inquiry since an entity only faces liability under § 1983 if "execution" of that entity's "policy or custom inflicts the injury." *Grieveson*, 538 F.3d at 773 (quoting *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)).

First, Plaintiff argues that Wexford had an express policy regarding hernia surgery that led Wexford and Dr. Obaisi to defer his hernia treatment. [419] at 2–3, 13. Wexford agrees that it has a written policy for treating typical hernias but argues that that there exists no evidence that this policy guided any medical decisions about Plaintiff's medically complex hernia. [395] at 3–6. The record supports Wexford.

The hernia policy that Plaintiff relies on states, in relevant part: (1) "Patients with stable abdominal wall hernias are not, in general, candidates for herniorrhaphy [hernia surgery] and will be monitored and treated with appropriate non-surgical therapy" and (2) "Hernias which do not impact on an inmate's ADLs ['Activities of Daily Living'] in this setting would not be consider[ed] for repair." The policy further states that decisions on surgery "must be made on a case-by-case basis," and the policy serves "only as a guide for the site physician" and is "not intended to replace hands-on clinical judgment." [434] ¶ 26.

Although this policy exists, Plaintiff does not identify any medical record that indicates Dr. Obaisi or any other physician denied him surgery based upon it. Nor does Plaintiff claim that Dr. Obaisi or anyone else told him he could not get surgery because of it. Instead, Plaintiff argues that Wexford failed to present evidence that a treating physician "did not act in accordance with the policy." [419] at 6. Not so. Wexford did present evidence—including testimony from Plaintiff's own expert, Dr. Gutowski—that Plaintiff did not have the type of hernia (*i.e.*, "stable abdominal wall hernias") to which the policy expressly applies. [420] ¶ 29. More importantly, Plaintiff, not the Defendants, bears the burden of proving that this express policy caused his injury, *Perkins*, 312 F.3d at 875. Plaintiff's attempts at burden-shifting, and the mere existence of a policy that discusses hernias, do not suffice.[13]

Next, Plaintiff points to a purported "unwritten but express policy" that gives Joe Ebbitt responsibility to respond to inmate letters sent to Wexford's corporate office employees. [419] at 8. Plaintiff complains that Ebbitt always responds to letters about medical issues by directing the inmate to the medical grievance process without first speaking "to *any* medical professional about the inmate's concerns." [419] at 8 (emphasis in original). He argues that such a policy is grossly deficient because Ebbitt is a lawyer, not a doctor, and should not refer inmates back to the process about which they complain. *Id.*

---

[13] In some other deliberate indifference cases involving hernia treatment, district courts (including this one) have allowed a plaintiff to proceed to trial against Wexford based upon this hernia policy. *See, e.g., Wilder*, 2015 WL 2208440, at *10–11 (denying Wexford's motion for summary judgment because of this policy); *Heard v. Ill. Dept. of Corr.*, No. 06-C-644, 2012 WL 832566, at *8 (N.D. Ill. Mar. 12, 2012) (same). In those cases, however, the plaintiff presented evidence that Wexford's physicians did not approve hernia surgery *because of this policy*. *See Wilder*, 2015 WL 2208440, at *11; *Heard*, 2012 WL 832566, at *8. Here, Plaintiff offers no such evidence.

Here, Plaintiff calls this practice an "unwritten express policy," but no such concept exists—*Monell* makes clear that, at least in the § 1983 context, an "express policy" must be a policy "authorized by written law." 436 U.S. at 691. Instead, Plaintiff's allegations relate to an unwritten but "widespread practice that is so well-settled as to amount to a policy." *Grieveson*, 538 F.3d at 773. To establish *Monell* liability based on a widespread practice, a plaintiff must demonstrate "systemic and gross deficiencies" in the alleged practice and that policymakers knew of the deficiencies and failed to correct them. *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). Theoretically a plaintiff may meet this burden through evidence of his own experience alone, but it is "necessarily more difficult" because the law requires evidence of a "true municipal policy at issue, not a random event." *Grieveson*, 538 F.3d at 774.

Here, Wexford does not dispute that, as an unofficial practice, it gives Joe Ebbitt responsibility for responding to inmate letters sent to its corporate employees. But Plaintiff has not presented evidence of "systemic or gross deficiencies" related to this practice. First, there exists nothing per se deficient about giving a lawyer initial responsibility for reviewing such letters, particularly since the letters can relate to any number of issues including active litigation. [414] ¶ 41. Further, while Ebbitt stated that, in response to inmate medical complaints, he often directs the inmate to use the established medical grievance process and does not routinely reach out to medical professionals, he said that he decides what to do on a "case-by-case basis" and there "have been times" where he contacted medical professionals. [390-6] at

19:11–20:2. In fact, when Wexford's corporate office received a letter from Plaintiff in 2014, Ebbitt reached out to Dr. Funk about it. [390-6] at 15:23–16:1. Simply put, there exists nothing facially deficient about a process that provides for a lawyer to determine, on a case-by-case basis, how to address inmate letters sent to corporate officers.

To show a "grossly deficient" process in practice, Plaintiff argues that Ebbitt did not adequately address or respond to the letters he sent to Gedman, Holmes, and Malloy. Plaintiff's isolated experiences, however, do not suffice to show systemic or gross deficiencies under *Monell*. *See Hildreth*, 960 F.3d at 427–28 & n.6 (holding that four instances that the plaintiff experienced does not suffice to create "a genuine issue of material fact that the practice was widespread."). Instead, he must present a "pattern or series of incidents of unconstitutional conduct" related to the alleged custom or practice. *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993). He fails to do so.

Next, Plaintiff argues that Wexford had deficient practices and customs for scheduling specialist consultations and evaluations. Specifically, Plaintiff alleges that Wexford and IDOC bear responsibility for scheduling prisoners for outside specialist consultations and asserts that the "failure to schedule prisoners for consultations and evaluations with outside physicians is not uncommon with IDOC and Wexford." [419] at 10. In support, he points to his own experience and argues that Dr. Funk and Ms. Gedman acknowledged "various occasions within the last five years" where other prisoners experienced delays. *Id.*; [434] ¶ 110. Finally, he cites

48

to two expert reports in another case (the *Lippert* Reports) that, in his view, show "systemic problems with the process for obtaining offsite diagnostic tests and offsite care." [419] at 10. Plaintiff argues that these reports are admissible here to show Wexford's notice about ongoing scheduling problems. *Id*. at 11.

First, while Plaintiff insists that Dr. Funk and Gedman acknowledged delays for other inmates, his claim does not accurately reflect the evidence in the record. Rather, Dr. Funk testified that he met with UIC after IDOC and Wexford had to send inmates to "another provider" outside UIC because of scheduling issues with UIC. [397-11] at 60:14–61:11. Gedman also testified that Dr. Funk informed her of problems with UIC's scheduler, which Dr. Funk and Wexford worked to resolve. [396-15] at 41:22–42:19. While this evidence suggests some scheduling issues with UIC, it does not show treatment delays for other inmates or indicate Wexford's deliberate indifference to delays. In fact, it suggests the opposite—that when Wexford encountered scheduling issues with UIC, it worked to address them.

That leaves only Plaintiff's own experiences and his reliance on the *Lippert* Reports to establish notice. As Wexford correctly notes, however, the Seventh Circuit recently considered and rejected just such evidence to support a *Monell* claim against Wexford. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214 (7th Cir. 2021). In *Dean*, an inmate brought deliberate indifference claims against physicians and Wexford for allegedly failing to timely diagnose and treat his kidney cancer, which became terminal. *Id*. at 221. The inmate claimed that Wexford's "collegial review" practice, which required multi-level approval for offsite care, caused these delays. In

49

support, he pointed to his own treatment delays and the *Lippert* Reports. As *Dean* describes, the *Lippert R*eports come from a class action against IDOC and Wexford alleging systemic deficiencies in inmate medical care across facilities. 18 F.4th at 225–26 (discussing *Lippert v. Ghosh*, 10-CV-4603 (N.D. Ill. July 23, 2010)). In 2014, an expert had submitted a report that examined inmate medical treatment in eight IDOC facilities and found, among other things, delays in identifying needs for offsite services, obtaining authorization, scheduling appointments, and follow-up. *See Dean*, 18 F.4th at 225. In 2018, another expert submitted a follow-up report examining whether the previously-identified "systemic deficiencies" still existed, and he opined that they did. *Id.* at 226.

The *Dean* case went to trial and the district court allowed the inmate to use the *Lippert* Reports to show that Wexford had notice of problems with specialist referral. The jury found for Plaintiff. On appeal, however, the Seventh Circuit reversed as to Wexford, finding that the plaintiff had not presented sufficient evidence to support the verdict. *Id.* First, the court found that the 2018 *Lippert* Report could not establish notice because it came after the alleged constitutional deprivations. *Id.* at 233. Second, as to the 2014 *Lippert* Report, the court found that, even if the district court did not abuse its discretion in admitting it to show notice, the plaintiff failed to prove his claim against Wexford. *Id.* at 234. Specifically, it held that the 2014 *Lippert* Report could not establish deliberate indifference "unless the plaintiff also has substantive proof that the 'noticed' problems actually existed." *Id.* at 238. It held that plaintiff's personal experiences, without more, did not provide

this "substantive proof." *Id.* Finally, it also held that the plaintiff's own experiences did not suffice to show that a Wexford policy "itself—not simply the actions of the employees administering it—directly caused his constitutional deprivation." *Id.* at 239.

Thus, *Dean* addressed, and soundly rejected as insufficient, the evidence that Plaintiff offers against Wexford here—his own experience and the *Lippert* Reports. That is, even if the 2014 *Lippert* Report is theoretically admissible to help show "notice", his own experiences do not suffice to show that any relevant "noticed problems" described in the 2014 *Lippert* Report "actually existed" for the purposes of the *Monell* claim. *Dean*, 18 F.4th at 225. Similarly, like the plaintiff in *Dean*, his own alleged referral delays fail to establish that some Wexford referral policy (as opposed to "the actions of the employees administering it") caused the delays. *Dean*, 18 F.4th at 239. Simply put, Plaintiff may suspect that a Wexford policy or practice caused the delays, but he does not offer sufficient evidence to proceed to trial against Wexford on this theory.

Finally, Plaintiff argues that Wexford may be held liable because employees with final policymaking authority—namely Gedman, Holmes, Malloy, and Dr. Funk—showed deliberate indifference to his constitutional injuries. To hold Wexford liable under this theory, Plaintiff must establish that these individuals "had the final policymaking authority for the decisions regarding the medical treatment he received" and they, in fact, made the final decisions that caused Plaintiff's constitutional injury. *Perkins*, 312 F.3d at 875.

Once again, Plaintiff fails to meet his burden. Namely, as to Gedman, Holmes, and Malloy, Plaintiff failed to establish that they acted with deliberate indifference toward Plaintiff or that any policies or practices for which they had responsibility caused his alleged constitutional injuries. Thus, even if they had some final policymaking authority, Plaintiff fails to show that any decision they made caused his alleged juries. Further, as to Dr. Funk, although there exists a disputed issue of fact regarding his individual liability, Plaintiff has not presented evidence that Dr. Funk had final policymaking authority over Plaintiff's medical treatment. The Court therefore grants summary judgment to Wexford.

## IV. Conclusion

For the reasons stated above, the Court grants the motions for summary judgment filed by Gedman [375], Holmes [379], Malloy [383], and Wexford [394] and grants in part, and denies in part, the motions filed by Defendants Obaisi [391], Funk [387], and Shicker, Williams, and Pfister [398]. Namely, Plaintiff may proceed to trial on his deliberate indifference claims against Defendants Obaisi, Shicker, Williams and Pfister regarding his hernia (Count I) and neck/back pain (Count III) and against Defendant Funk as to his hernia (Count I), only. He may not seek punitive damages or injunctive relief, however, against Defendant Obaisi's estate.

Dated: September 19, 2022

Entered:

John Robert Blakey
United States District Court Judge

52