935

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   JOHN E. TAYLOR, JR.,          )   Docket No. 16 CV 3464
                    Plaintiff,     )
 4                                 )
                                   )
 5           -vs-                  )
                                   )
 6   GHALIAH OBAISI, M.D., ARTHUR  )   Chicago, Illinois
     FUNK, M.D., LOUIS SHICKER,    )   March 26, 2024
 7   M.D., TARRY WILLIAMS and RANDY)   9:15 o'clock a.m.
     PFISTER,                      )
 8                  Defendants.    )

 9                         VOLUME 5A
               TRANSCRIPT OF PROCEEDINGS - Trial,
10      BEFORE THE HONORABLE JOHN ROBERT BLAKEY, and a Jury

11   APPEARANCES:
     For the Plaintiff:        DUANE MORRIS LLP
12                             BY:  MR. RICHARD P. DARKE
                                    MS. ROSANNE CIAMBRONE
13                             190 South LaSalle Street
                               Suite 3700
14                             Chicago, Illinois 60603

15   For Defendants Ghaliah    CONNELLY KRAUSE LLC
     Obaisi, M.D.and,          BY:  MR. ROBERT S. TENGESDAL
16   Arthur Funk, M.D.:             MS. CORINNE M. CUNDIFF
                               500 West Madison Street
17                             Suite 3900
                               Chicago, Illinois 60661
18
     For Defendants Louis      ILLINOIS ATTORNEY GENERAL'S OFFICE
19   Shicker, M.D., Tarry      BY:  MR. KEVIN J. FITZGERALD
     Williams and Randy             MR. THOMAS PIETRYLA
20   Pfister:                  115 South LaSalle Street
                               28th Floor
21                             Chicago, Illinois 60603

22   Also Present:  Mr. Kyle Dingus, paralegal

23
                  Laura LaCien, CSR, RMR, F/CRR
24                    Official Court Reporter
            219 South Dearborn Street, Room 1212
25                   Chicago, Illinois 60604
                        (312) 408-5032
```

I N D E X

PAGE

MIMIS COHEN,

Direct Examination By Ms. Cundiff                    939

MICHAEL WARSO,

Direct Examination By Mr. Tengesdal                  948
Cross Examination By Mr. Darke                       986
Redirect Examination By Mr. Tengesdal                989

NARAYAN S. TATA,

Direct Examination By Mr. Tengesdal                  990

INDEX OF EXHIBITS

Description                              Received

Exhibit No. DX-232                          952

Exhibit No. DX-233                          964

Exhibit No. DX-348                          974

Exhibit No. DX-237                          978

Exhibit No. DX-242                          985

Exhibit No. JX-94                           991

Exhibit No. DX-272                         1017

1    (Proceedings heard in open court; jury out.)

2    COURTROOM DEPUTY:  16 CV 3464, Taylor versus

3    Wexford Health Sources, Inc.

4    THE COURT:  Good morning, counsel.  Appearances.

5    MS. CIAMBRONE:  Good morning, your Honor.  Rosanne

6    Ciambrone -- and Richard Darke and Kyle Dingus will be

7    here -- on behalf of the plaintiff Mr. John Taylor.

8    THE COURT:  And it's okay to proceed without him at

9    least for our initial conversation?

10   MS. CIAMBRONE:  Yes, your Honor.

11   THE COURT:  On behalf of the defendants?

12   MR. TENGESDAL:  Good morning, your Honor.  Robert

13   Tengesdal for the estate of Dr. Obaisi and Dr. Arthur Funk.

14   MS. CUNDIFF:  Corinne Cundiff also on behalf of the

15   estate of Dr. Obaisi and Dr. Funk.

16   MR. PIETRYLA:  Thomas Pietryla on behalf of

17   defendants Randy Pfister, Tarry Williams, and Louis Shicker.

18   MR. FITZGERALD:  Kevin Fitzgerald on behalf of

19   defendants Randy Pfister, Tarry Williams, and Dr. Louis

20   Shicker.

21   THE COURT:  All right.  Yesterday, the plaintiffs

22   rested.  My understanding is -- and we, by agreement of the

23   parties, took the directed verdict motions under advisement

24   and reserved argument for a later point in the proceedings.

25   My understanding is both defendants are going to put on some

 1   type of case.  What's the schedule look like for today?

 2          MR. TENGESDAL:  We have Dr. Mimis, your Honor --

 3   sorry, your Honor.  We have Dr. Mimis Cohen.  There will the

 4   deposition read.  Following that, we have Dr. Michael Warso

 5   who is coming live, a treater.  And after that, we have Dr.

 6   Tata, the -- our pain management expert which will probably

 7   take the end of the day.  But if not, we'll have Dr. Reed,

 8   our other expert, available here and we can probably get

 9   through a CV today.

10          THE COURT:  All right.  Great.  Any issues to take

11   up -- all counsel are now present.  Any issues to take up

12   before we bring the jury in at 9:30?

13          MS. CIAMBRONE:  No, your Honor.

14          MR. TENGESDAL:  No, your Honor.

15          MR. FITZGERALD:  No.

16          THE COURT:  All right.  Enjoy your coffee.  I'll

17   see you at 9:30.  Court's in recess.

18      (Recess taken.)

19      (Proceedings heard in open court; jury out.)

20          THE COURT:  Good morning, everyone.  Please be

21   seated.  We're going to continue the proceedings with the

22   defense case.  Counsel, are you ready to proceed?

23          MS. CUNDIFF:  Yes, your Honor.

24          THE COURT:  Call your first witness.

25          MS. CUNDIFF:  We, at this point, are going to have

1  the deposition of Dr. Mimis Cohen read into the record, your

2  Honor.

3           THE COURT:  Ladies and gentlemen, a deposition is

4  the sworn testimony of a witness taken before trial.  The

5  witness is placed under oath to tell the truth and lawyers

6  for each party may ask questions.  The questions and the

7  answers are recorded.  The deposition of Dr. Cohen, which was

8  taken on May 1st, 2019, is about to be presented to you.

9           Deposition testimony is entitled to the same

10  consideration and is to be judged insofar as possible in the

11  same way as if the witness had been present to testify.  Do

12  not place any significance on the behavior or tone of voice

13  of any person reading the questions or answers.

14           Go ahead, counsel.  Whenever you're ready.

15        MIMIS COHEN, DEFENDANT'S WITNESS, VIA DEPOSITION

16                      DIRECT EXAMINATION

17  BY MS. CUNDIFF:

18  Q    Can you please state your name and spell your name for

19  the record?

20  A    My name is Dr. Mimis Cohen.  M-i-m-i-s.  Cohen,

21  C-o-h-e-n.

22  Q    Where do you currently work?

23  A    I'm the chief of plastic surgery at the University of

24  Illinois.

25  Q    And how long have you worked there?

1  A    I was since 1983; and I've been the chief since 1989.

2  Q    Do you specialize in plastic surgery then?

3  A    Exactly.

4  Q    Are you familiar with a former patient of yours named

5  John E. Taylor, Junior?

6  A    I am.

7  Q    And how are you familiar with him?

8  A    He was referred to me by Dr. Giulianotti, who is the

9  chief of general surgery, minimally invasive division of the

10 department of surgery.  And I saw this patient twice in my

11 life.

12 Q    Do you recall when you saw this patient?

13 A    Sure.  It was May 17th; and the second time was July

14 26th of 2016.

15 Q    Had you seen him prior to either of those two times?

16 A    No.

17 Q    Have you seen him since either of those two times?

18 A    Never.

19 Q    For what reason did you see Mr. Taylor?

20 A    He was referred to me by Dr. Giulianotti, who is the

21 chief of general surgery, and the request was to review the

22 patient because he had a massive hernia as a result of

23 multiple previous procedures and constant procedures and

24 radiation.  And he wanted me to see the patient and express

25 my opinion if I could help him in reconstructing and managing

1  his hernia.

2  Q    Okay.  And you were looking at a pamphlet of information

3  of medical records that my office provided to you, correct?

4  A    Correct.

5  Q    And if you could look at Tab 14 of that pile of

6  information.

7  A    Okay.

8  Q    And is this a medical record from the University of

9  Illinois that identifies your examination of Mr. Taylor?

10 A    Yes.

11 Q    And you examined him on or about May 17th, 2016?

12 A    Exactly.

13 Q    And on the second page of this Tab 14 on the bottom, it

14 says "plan."  Do you see that?

15 A    Yes.

16 Q    And what did you plan for Mr. Taylor?

17 A    Well, I think as I've said -- as I said, he had a

18 complex previous history, and I wanted to make sure that I

19 fully understand anatomy before I embark.  I want to make

20 sure that you all understand that I was asked to be the

21 consultant in the case.  So CT scan in order to see the

22 anatomy.  And then, because this was Dr. Giulianotti's

23 patient, I said I'm going to coordinate with him after we

24 have the information for the discount to see what we can do

25 for this man.

1   Q    So at this point in time, you did not plan on performing

2   a surgery on Mr. Taylor?

3   A    Not at all.

4   Q    And now go to Tab 17.

5   A    Okay.

6   Q    Is this a University of Illinois medical record?

7   A    It is.

8   Q    It identifies your examination of Mr. Taylor on July

9   27th, 2016, correct?

10  A    It does.

11  Q    If you can turn to the second page of this medical

12  record on the bottom there, it says "plan." Do you see that?

13  A    Exactly.

14  Q    And this says, "plan for combined right lumbar hernia

15  repair with general surgery, Dr. Giulianotti, and Dr. Cohen,"

16  correct?

17  A    Correct.

18  Q    And that is you, Dr. Cohen, referenced in there?

19  A    Yes.

20  Q    Then it says, "general surgery, primary service." What

21  does that mean?

22  A    That means that the patient belongs to general surgery,

23  and I am helping, assisting.

24  Q    And then does this mean that you and Dr. Giulianotti

25  were planning to perform a surgery to repair Mr. Taylor's

1    hernia as of this date in July 2016?

2    A    Absolutely not.

3    Q    What does that mean?

4    A    That means that we're going to discuss with general

5    surgery; and whenever they have -- whenever they have a plan,

6    they will present this plan to me and then I will decide if I

7    will participate or not.

8    Q    This just means that you wrote down on this piece of

9    paper that you and Dr. Giulianotti were going to plan to

10   discuss sometime in the future whether or not to do this

11   surgery?

12   A    Yes.

13   Q    And did the two of you ever do that?

14   A    I can tell you that we discussed because I see him in

15   the operating room or in the clinic, but there was never a

16   decision from his part saying that we plan to do the surgery

17   X, Y, Z date, and are you going to be available, or is this

18   my part, what do you plan to do?  We never came to any

19   dictated decision of a surgical plan.

20   Q    Were you willing as of July of 2016 to perform the

21   plastic surgery necessary to repair Mr. Taylor's hernia?

22   A    Not exactly because I didn't know what Giulianotti would

23   do.

24   Q    I'm just asking:  Were you capable of performing the

25   surgery on Mr. Taylor?

1  A    I'm returning the question by saying, if I don't hear

2  from the general surgeon what exactly they plan to do, I

3  cannot say what I'm going to do.

4  Q    So your surgical intervention depended upon what Dr.

5  Giulianotti was going to do?

6  A    100 percent.

7  Q    Did you tell Dr. Giulianotti that you were willing and

8  able to perform the plastic surgery necessary to repair

9  Mr. Taylor's hernia depending upon what he says?

10  A    The only thing I said was that no matter what, I will

11  have to use a mesh.  In other words, I will have to use some

12  foreign material in addition to my own surgical techniques of

13  muscles or tissue from the patient because the hernia was

14  massive.

15         In my experience, it was impossible to just put

16  everything together with the patient's own tissues given the

17  fact that he had the massive hernia, he had previous

18  radiation, and he had previous attempt for reconstruction so

19  some bridges were burned already, some tissue.

20  Q    Did you talk to Mr. Taylor about performing the plastic

21  surgery for his hernia?

22  A    I'm not a hernia doctor so this was Dr. Giulianotti's

23  part.  I told him that I will be willing to participate in

24  the reconstruction after Giulianotti takes care of the

25  hernia.

Cohen - via deposition                    945

1   Q    I understand.  Is it your opinion that Mr. Taylor's

2   hernia was fixable and the reconstruction possible as of July

3   2016?

4   A    Everything is possible.  I don't know the success rate,

5   and I didn't and wouldn't know the success rate because, as I

6   mentioned before, this was a complex case.  This was a

7   massive defect.  Almost all of his gut was outside the

8   abdominal cavity and I remember him very well from that

9   point.  There was no support of his own soft tissue in the

10  area, and so there's no guarantee if this was the question

11  that, hey, I have a 95 percent success rate for this case.

12  Q    Do you believe that the delay in performing a hernia

13  surgery -- hernia and reconstructive surgery on Mr. Taylor

14  made it any surgery more difficult?

15  A    I don't have any opinion because I didn't see him

16  afterward so therefore I'm only guessing.

17  Q    Do you know when Mr. Taylor's hernia was first

18  diagnosed?

19  A    Whatever the records say.  It was 2014, 2015.

20  Q    And do you know how large the hernia was at that time?

21  A    Only by reading the record.

22  Q    So if I were to tell you that it was a 10-centimeter

23  hernia in 2014, is that the size of a hernia, knowing

24  everything else you know, that you would have been able to

25  assist Dr. Giulianotti in fixing?

1   A    The size alone is not a guide.  It's a part of the

2   decision, but also it's the quality of the tissues, it's the

3   radiation, and everything else.  And I believe that 2014 was

4   the time that he had already the reconstructive surgery.

5   Q    For the cancer surgery, correct?

6   A    And the reconstructive by Dr. Antony, which the pages

7   are missing here, but I saw the first page.  So he had the

8   reconstruction right there and then.

9   Q    And the point you're making is?

10  A    The point I'm making is that 2014, according to the

11  record that I was privileged, it says that Dr. Antony who was

12  formerly working for the division of plastic surgery here,

13  performed a reconstructive procedure while Warso removed the

14  cancer.  Then he returned in 2016, not 2014.

15  Q    Do you know whether or not Dr. Dumanian of Northwestern

16  Hospital performed the reconstructive surgery for

17  Mr. Taylor's hernia?

18  A    I only found out from this record.

19  Q    Do you know Dr. Dumanian?

20  A    Very well.

21  Q    Did Dr. Giulianotti ever come to you and say that he was

22  ready, willing, and able to perform his aspect of the surgery

23  for Mr. Taylor?

24  A    I don't believe so.

25  Q    General surgery service, Dr. Giulianotti, that would be

1    the primary service; is that correct?

2    A    Yes.

3    Q    Dr. Giulianotti would be the one who would be doing the

4    hernia repair?

5    A    I assume that Dr. Giulianotti with his team.

6    Q    The general surgery team, correct?

7    A    Correct.

8    Q    Were you being consulted whether or not a flap would be

9    viable?

10   A    Well, that was the purpose of their consideration.

11   Q    Would you agree you do not have an opinion that

12   Mr. Taylor could have had surgery earlier than when you first

13   saw him?

14   A    I agree that all I know is what I saw.  What happened

15   before or after, it's just speculation.

16   Q    Okay.  Since then it's speculation, you would have no

17   opinion as to when he was a candidate for surgery for his

18   hernia; is that correct?

19   A    Correct.

20        MS. CUNDIFF:  That concludes the reading of this

21   deposition.

22        THE COURT:  Thank you, counsel.  Call your next

23   witness.

24        MR. TENGESDAL:  Let me get him out of the witness

25   room.

```
 1              THE COURT:  Please raise your right hand.
 2          (Witness sworn.)
 3              THE COURT:  All right.  Have a seat.
 4              Counsel, whenever you're ready.
 5              MR. TENGESDAL:  Thank you, your Honor.
 6      MICHAEL WARSO, DEFENDANT'S WITNESS, FIRST DULY SWORN
 7                    DIRECT EXAMINATION
 8  BY MR. TENGESDAL:
 9  Q    Good morning, Dr. Warso.  Could you please introduce
10  yourself to the jury?
11  A    My name is Michael Warso.  I'm a surgical oncologist and
12  I've been doing that for 35 years now.
13  Q    And are you here today pursuant to our subpoena to have
14  you testify?
15  A    Absolutely.
16  Q    Okay.  And I'd like to ask you a little bit more about
17  your education, training and experience.  Can you tell us
18  where you went to medical school?
19  A    University of Illinois.
20  Q    And then following medical school, did you do an
21  internship?
22  A    There was -- it was a combined residency.  Internship is
23  folded into it.
24  Q    Okay.  And then tell us, did you do a residency then?
25  A    Yes.
```

1   Q    And what was your residency in?

2   A    General surgery.

3   Q    And what is general surgery, can you explain to the jury

4   what that involves?

5   A    General surgery is basically -- when you say surgeon

6   without a name in front of it, that's usually what is

7   included.  So it includes GI, some soft tissue, the usual

8   things you think of as just a surgeon.

9   Q    And then after you -- how long is a general surgery

10  residency?

11  A    Standard residency is five years.

12  Q    Okay.  And what year did you complete your general

13  surgery residency?

14  A    1987.

15            THE COURT:  Sorry for the interruption.  Go ahead.

16            MR. TENGESDAL:  Okay.  No problem.

17  BY MR. TENGESDAL:

18  Q    Doctor, after you completed your general surgery

19  residency, did you do any further medical education?

20  A    I did a fellowship in surgical oncology.

21  Q    And can you tell us, what is a fellowship?

22  A    A fellowship is a further training.  It's very specific.

23  The difference is that at that point, you are already

24  considered fully trained in a general field and this is to

25  learn more about a specific aspect of that field.

1    Q    Okay.  And then are you board certified?

2    A    In what?

3    Q    In any specialty.

4    A    General surgery.

5    Q    Okay.  Thank you.

6         And then do you focus your practice -- since you do

7    general surgery, surgical oncology, do you focus on any

8    particular area?

9    A    I don't do general surgery.  I only do surgical

10   oncology.

11   Q    Okay.  And then surgical oncology, can you explain to

12   the jury what that specialty is?

13   A    That basically is the cancer associated -- I'm sorry,

14   the surgery associated with cancer care.

15   Q    And are you on staff at any hospital?

16   A    Yes.  The University of Illinois.

17        MR. TENGESDAL:  Your Honor, I move to qualify Dr.

18   Warso under Rule 702 as an expert in surgical oncology and

19   general surgery.

20        THE COURT:  Any objection to the qualification of

21   the witness in those areas?

22        MR. DARKE:  No, your Honor.

23        MR. FITZGERALD:  No objection.

24        THE COURT:  You may so inquire.  Go ahead, counsel.

25   BY MR. TENGESDAL:

1    Q    As a surgical oncologist, are you familiar with the

2    medical condition dermatofibrosarcoma protuberans?

3    A    Yes.

4    Q    All right.  Can you please explain what that is?

5    A    It is a cancer but doesn't act like a lot of cancers.

6    It is basically, for the most part, looks like a bunch of

7    scar tissue but it just keeps on growing and it grows into

8    things.  It can sometimes destroy other structures as it

9    grows into them, but it almost never spreads to other parts

10   of the body.

11   Q    And do you recall rendering medical care to Mr. John

12   Taylor who is here today?

13   A    More so after looking at the -- my notes than

14   independently, but yes.

15   Q    Okay.

16             MR. TENGESDAL:  And if we can bring up -- ask that

17   it be admitted into evidence DX-0232, your Honor.

18             THE COURT:  Any objection to the admission of

19   DX-232?

20             MR. DARKE:  No objection.

21             MR. FITZGERALD:  No objection.

22             THE COURT:  It will be admitted without objection.

23   You can publish it.  Can you find your microphone please and

24   make sure you can do that every time?  All right.  DX-232

25   admitted without objection.

 1              (Exhibit No. DX-232 received into evidence.)

 2                  THE COURT:  Go ahead, counsel.

 3     BY MR. TENGESDAL:

 4     Q    Dr. Warso, we have your note here so you're not doing

 5     this by memory so I have some questions.  What is the date of

 6     this service when you saw Mr. Taylor?

 7     A    October 17th, 2013.

 8     Q    And do you recall what the reason was that you were

 9     seeing Mr. Taylor?

10     A    In the note -- and I have no reason not to believe

11     this -- it says "a recurrent DFSP of the area of the right

12     hip."

13     Q    Okay.  And was -- to your memory, was he referred to you

14     by another physician at UIC?

15     A    I thought he was referred by the Department of

16     Corrections.

17     Q    And when you saw Mr. Taylor, did you take a history of

18     him on October 17th, 2013?

19     A    Yes.

20     Q    And can you explain to the jury when you as a physician,

21     a surgical oncologist take a history, what is the purpose of

22     that?

23     A    There's two things:  Number one, you want to get a

24     history of the problem that you are seeing the patient for

25     and, number two, is that it is -- as I've done here -- the

1    plan is to get as much just background information in case I

2    decide that he needs surgery, I've got it in the record.

3    Q    And did you obtain any information from Mr. Taylor

4    regarding his past medical history for the

5    dermatofibrosarcoma?

6    A    Yes, I did.

7    Q    And what did you learn on this date?

8    A    As stated, this is -- I think is his third recurrence.

9    Nope.  No.  This is his fourth.  Third occurrence.  Fourth

10   instance.  So this is originally treated someplace else in

11   1992.  The dermatofibrosarcoma probably started in the skin

12   because that's the usual place.  He had it resected.  That

13   was an incomplete resection which is a common problem with

14   these because they tend to extend further than you think.

15   Had a repeat resection that also had positive margins and

16   then a third resection that was followed by radiation

17   therapy.

18   Q    And if you can just explain for the jury what is -- what

19   is positive margins, negative margins mean when you have a

20   cancer such as dermatofibrosarcoma?

21   A    Can we just call it DFSP?

22   Q    I like it.

23   A    Thank you.  It's too hard to say all that other stuff.

24   The -- these tumors tend to grow beyond what you can see in

25   that.  And I'm going to use what many of my patients said,

1   laymen's, they have fingers.  So the -- we know that if you

2   just take out on the edge, you're probably not going to get

3   all of it and the current recommendation is that you have to

4   take several centimeters of extra tissue around it in order

5   to get it out so that if you try and do a limited resection,

6   they look under the microscope and they see trendrils of this

7   tumor.  That means there's still tumor there.  That's

8   positive.  If you don't see any tumor, that's negative.  So

9   it's positive and negative is -- positive for tumor or

10  negative for tumor at the edges.

11  Q    In your goal as a surgical oncologist, is it to get

12  negative margins?

13  A    Negative margins with a clear area between the tumor and

14  the edge.

15  Q    Okay.  And, Mr. Taylor, did he have -- you said three

16  prior resections of the DFSP.  Excision resection, does that

17  mean that every time the doctor went in there, they would be

18  taking out tissue?

19  A    Absolutely.

20           MR. DARKE:  Objection, leading.

21           THE COURT:  Sustained as to leading.  Don't lead.

22  BY MR. TENGESDAL:

23  Q    Doctor, can you explain when a resection is done for a

24  DFSP, what happens?  What does a doctor such as yourself do?

25  A    Well, I can't say what that doctor did.  I can tell you

1    what I would do.

2    Q    What would typically occur for a doctor who is removing

3    tissue from a DFSP?

4    A    Are you talking about a doctor or a trained surgical

5    oncologist because there's a difference?

6    Q    What would be the difference?  Tell us.

7    A    Many of the patients I've seen who have had a DFSP have

8    gone to a general surgeon or somebody who just took out the

9    lump and they are more prone to positive margins.

10    Q    Okay.  And when you say "take out the lump," that means

11    they take tissue out?

12    A    Correct.

13    Q    And when you take tissue out, would you -- would you

14    leave like a defect area?

15    A    That is not a good thing.  You want to close the tissue

16    defect.

17    Q    Okay.  Would you be removing tissue from the area

18    causing loss of tissue, I guess?

19              MR. DARKE:  Objection, leading.

20              THE COURT:  Overruled.

21              THE WITNESS:  It -- I think that's redundant.  I

22    mean, you have to remove to resect.

23    BY MR. TENGESDAL:

24    Q    Okay.  And then why would you offer radiation therapy?

25    What would be the goal of that?

1   A    Radiation is not always used for DFSP.  It's used in

2   cases where it has come back or where you think that there is

3   a question of did you get enough tissue such that you're

4   worried that there's a higher risk that it's going to come

5   back.

6   Q    Would you offer radiation therapy to a patient who had

7   two prior resections and it had come back?

8   A    If necessary.

9   Q    Okay.  And are there any side effects to offering

10  radiation therapy after you do the surgery?

11  A    Possibly.  The absolute risks and things, you'd have to

12  ask a radiation oncologist about that.

13  Q    If you get radiation therapy, can that affect your skin?

14  A    Absolutely.

15  Q    Okay.  When you saw Mr. Taylor, did he have signs of

16  damage to his skin from the radiation therapy?

17  A    Yes.

18  Q    Okay.  And if you could describe what -- what does that

19  generally look like?

20  A    Well, it can look different.  Can we go down to the next

21  page --

22  Q    Sure.

23  A    -- because I think I wrote it there?

24       Oh.  I can't remember exactly but very often the

25  thin -- the skin will get thick, it will get stiff, and it

1    may get darker.

2    Q    Does that pose any problems if you're going to do

3    another surgery for DFSP?

4    A    It tells me that there has been radiation damage to the

5    skin and therefore I'm worried that there may be problems

6    with healing after surgery.

7    Q    When Mr. Taylor saw you on October 17th, 2013, did he

8    have any complaints of pain in the area?

9    A    I can't remember specifically where the pain was and I

10   don't have it but I can see that he's on -- being treated for

11   pain.

12   Q    And how was he being treated for pain?

13   A    The Tramadol, Neurontin and Elavil.  Do you want me to

14   tell you what those are?

15   Q    That would be great.  Thank you.

16   A    Tramadol is a low-level opioid that is specifically for

17   pain.  Neurontin is a -- it acts on the nerves somehow.  I

18   can't tell you exactly how.  It helps blunt the pain fibers

19   to help with the pain.  And Elavil acts centrally in the

20   brain to somehow help with pain.  And Neurontin and Elavil

21   are, Elavil specifically, is sometimes targeted for

22   nerve-related pain.

23   Q    Did you perform a physical examination of Mr. Taylor on

24   October 17th, 2013?

25   A    Yes.

1    Q    And what did you do?

2    A    The usual thing.  I looked at him sort of starting at

3    the head, checked his mouth, his neck, no nodes, heart and

4    lungs worked, no abdominal mass, his liver was okay, arms and

5    legs moved, and then the description of what I found in the

6    area of his -- sort of in area of his prior -- prior surgery.

7    Q    And was that in the abdominal area?

8    A    It was right around -- I'm struggling to come up with a

9    way to say it in laymen's terms.  If you feel your hip in the

10   front, there's a projection.  That's called the anterior

11   superior iliac spine.  There was a mass right in that area.

12   Q    When you say "there was a mass in that area," so you

13   could feel it with your hand?

14   A    Yes.

15   Q    Okay.  And did you review the MRI on this visit?

16              MR. TENGESDAL:  Blow it up for me.

17              THE WITNESS:  I had the report.  I can't tell you

18   if I specifically had the MRI pictures in front of me at that

19   time, but I did review the note at some point.

20   BY MR. TENGESDAL:

21   Q    And if you had the scans or the report, what did the MRI

22   show?

23   A    The MRI showed a mass that was encasing the -- this part

24   of the hip which is the -- part of the iliac bone, the

25   anterior superior iliac spine, with a central what looked

 1    like to be a dead area of -- an area of dead tissue.

 2    Q    In the area of the dead tissue, was that on the right

 3    iliac crest?

 4    A    It was right in the middle of this thing.

 5    Q    Okay.  And as a result of the MRI findings that you

 6    either saw or looked at the report, what did you as a

 7    surgical oncologist think of that?

 8    A    My initial assumption was that it was a recurrence of

 9    his DFSP.

10    Q    Okay.  And your impression on October 17th, what did you

11    chart, Doctor?

12    A    That the mass is involving the bone and there's skin

13    damage but that you would have to have part of the iliac

14    crest and overlying skin removed that would lead to a hernia,

15    that it would need to be repaired.  I didn't know if he would

16    have permanent functional changes.  And then I wanted him to

17    see plastic surgery because I -- it's not in my expertise to

18    fix a wound like that.

19    Q    Did plastic surgery need to be involved because of the

20    damage to the skin from the radiation?

21    A    It was a combination of that, plus muscle would be

22    removed and other things.  So it was -- I just needed their

23    help in putting him back together.

24    Q    And when you -- when you chart in there that there would

25    be a resultant hernia, can you tell us based on what your

1    plan was for surgery how that would cause a hernia?

2    A    Well, an abdominal hernia is because we have muscle and

3    bone covering everything.  If you take out some of that

4    muscle and bone, you no longer have that structure holding

5    everything in.  And in order to get this out, muscle and bone

6    in that area would need to be removed which would leave a

7    potential gap; by definition, a hernia.

8    Q    And when you formulated your plan, you wrote your note.

9    Is that something you would have discussed with Mr. Taylor?

10   A    Yes.

11   Q    Did you indicate to Mr. Taylor that if we proceed, I

12   need to take out the tissue in these areas, as a result you

13   will get a hernia?

14   A    I assume.  Again, I can't independently recall.

15   Q    Okay.  Now, I mean, let me ask you a better question.

16   Would it be your standard custom and practice when you're

17   going to go do something like this and they're going to

18   result in a hernia that you would tell them?

19   A    Yes.

20   Q    Okay.  And do you have any reason to doubt that you did

21   anything other than your standard custom and practice and

22   inform Mr. Taylor of what you planned to do and what would be

23   the resultant effect?

24              MR. DARKE:  Objection, speculative, foundation.

25              THE COURT:  Let me -- let me see you at sidebar.

1    (Proceedings heard at sidebar.)

2         THE COURT:  When you say there's a "foundation,"

3    what's the foundation that's missing?

4         MR. DARKE:  He's already testified that he doesn't

5    remember.  He doesn't know what he told him.

6         THE COURT:  Yeah.  When people don't remember, they

7    can testify regarding standard custom and practice.  What --

8    what's wrong with that?

9         MR. DARKE:  He already testified to that.  Now

10   counsel is going further to testify -- to try to get him to

11   just state what he just said he couldn't remember and he

12   didn't know so there's no foundation.

13        THE COURT:  Well, both sides have been asking "do

14   you have any reason to doubt," I think that was like one of

15   the questions that the plaintiff used 50, 60 times the other

16   day, so.  If he has a reason to doubt in this particular

17   instance that he followed his custom and practice, that would

18   be a legitimate question because he might not remember but he

19   might have some reason to doubt it so the objection is

20   overruled.

21        MR. DARKE:  Thanks, Judge.

22        (End of sidebar.)

23        THE COURT:  Okay.  Counsel, pose your question.

24   BY MR. TENGESDAL:

25   Q    Doctor, would it be your standard custom and practice to

1    inform the patient we're going to be taking out a large

2    amount of tissue, you're going to get a hernia?

3    A    Yes.

4    Q    Okay.  And can you -- are you familiar with the concept

5    of informed consent?

6    A    Yes.

7    Q    What is that, Doctor?

8    A    Informed consent is the process by which a patient

9    should be told about what the procedure is, the options, and

10    the possible consequences.

11    Q    And in your note in the Plan section where you chart

12    "after discussing this with him, he understood and agreed,"

13    would that be part of the consent procedure?

14    A    Yes.

15    Q    Okay.  So you would have told Mr. Taylor you got this

16    lump, you got -- this is the disease of the tissue that

17    you've expressed to us, I'm going to go take it out, you're

18    going to get a hernia?

19    A    Yes.

20    Q    And Mr. Taylor, once you gave him a proper informed

21    consent, elected to proceed?

22    A    I don't remember if he did at that point or whether he

23    wanted to talk to the plastic surgeons first but he said he

24    understood what I had told him.

25    Q    Was the involvement of plastic surgery to address the

1    resultant hernia from your surgery?

2    A    Yes.

3    Q    And what was your expectation of what plastic surgery

4    would be doing knowing the amount of tissue that you were

5    going to remove?

6    A    That they would take care of it in the way they do.  I

7    have -- would have absolutely no input into what they did.

8    Q    Would you be relying on Dr. Antony at UIC as a plastic

9    surgeon to know how to do the repair?

10   A    Correct.

11   Q    And did Dr. Antony -- did you discuss the surgery with

12   her?

13   A    I told her what I would be taking out and my usual

14   thing.  I can assume that she told me she could take care of

15   it.

16   Q    Okay.  And is that why Dr. Antony was there with you

17   when you were going to operate to do her role in the surgery?

18   A    Yes.

19   Q    In the Plan section, you chart "he is expected to have

20   permanent functional changes that will accompany the

21   resection."  Can you tell us what you meant by that, Doctor?

22   A    Well, there was no way to do this without taking out

23   some muscle.  And once you take out muscle and you have to

24   rebuild the abdominal wall and everything, it was expected

25   that nothing would be exactly the same.

1    Q    And if things aren't exactly the same, when you say

2    "permanent functional changes," are you talking about his

3    ability to engage in activities?

4    A    It may affect his ability to run, his ability to climb

5    stairs.  There's no way to know ahead of time how extensive

6    these are going to be.  You just have to wait and see what

7    you got.

8    Q    Did you say they were going to be permanent functional

9    changes because you were removing all of the tissue and --

10    A    Yeah, and we aren't chameleons.  It doesn't grow back.

11    It's gone once it's gone.

12    Q    Okay.

13           MR. TENGESDAL:  Take this down.  If we can bring up

14    DX-233 and ask to move this into evidence.

15           THE COURT:  Any objection to the admission of

16    DX-233?

17           MR. DARKE:  No objection.

18           MR. FITZGERALD:  No objection.

19           THE COURT:  In without objection.  You may publish.

20       (Exhibit No. DX-233 received into evidence.)

21           THE COURT:  You may publish.

22    BY MR. TENGESDAL:

23    Q    All right.  Doctor, we're showing you Exhibit DX-33

24    (sic).  Can you tell us what this is?

25    A    This is my operative note from 4-23-14.

1   Q    And is an operative note, is that what you write after
2   you complete the surgery?
3   A    Yes.
4   Q    And since we have an operative note, would you
5   have informed -- obtained informed consent prior to going
6   forward?
7   A    Yes.
8   Q    Okay.  And when I say "informed consent," meaning that
9   he was informed of the risk, the benefits, and wished to
10  proceed, Mr. Taylor, with surgery?
11  A    He was spoken to again about everything before we did
12  the operation, immediately before.
13  Q    And what was your preoperative diagnosis before you
14  started on April 23rd, Doctor?
15  A    A recurrent DFSP.
16  Q    And for post-operative diagnosis, did anything change?
17  A    Yes.  It turns out he had radial necrosis of the bone
18  with a sterile abscess.
19  Q    Radial necrosis of the bone, was that of the right iliac
20  crest?
21  A    Yes.
22  Q    And can you explain for us, what he -- when you say
23  "radial necrosis," what does that mean?
24  A    Basically, the toxicity from the radiation caused the
25  bone to die.  As it liquefied it created a -- an inflammatory

1  reaction that caused a large fibrous mass to encase the area

2  of the dead bone.

3  Q    Was that the mass that was visualized on the MRI scan?

4  A    Yes.

5  Q    Okay.  And given those findings, is that something you

6  found once you opened him up and got in there?

7  A    No.  It was something I found out when the pathology

8  came back.

9  Q    And what would you have seen on the pathology that would

10 have indicated that, the radial necrosis?

11 A    The pathology report.  I relied on the pathologist to

12 tell me what it was.

13 Q    And those findings from the pathology report, is that

14 something that needs to be addressed surgically by someone

15 such as yourself?

16 A    The treatment of osteoradionecrosis is --

17 osteoradionecrosis, we can just say dead bone, is resection

18 of the bone.

19 Q    Is that something -- when you saw him, looked at the

20 MRI, got the pathology results -- the dead bone as you called

21 it, is that something that would be expected to continue?

22 A    These -- this situation usually gets worse and worse

23 with time so it starts as a small nitus and, because of the

24 surrounding inflammation, you wind up losing more and more

25 bone and it keeps extending.

1   Q    And the dying dead bone, the mass, is that something
2   that would cause pain?

3   A    I know it can.  I don't know if it always does.

4   Q    Okay.  And, Doctor, what was your procedure that you
5   were planning to do on April 23rd?

6   A    A resection of the mass and the involved bone with
7   the -- which included the surrounding involved muscle that
8   was encased in the process.

9   Q    Since this was DFSP -- let me write that down.  Since
10  this was DFSP, is that a cancer?

11  A    Yes.

12  Q    Did the reason you wanted to do -- and you offered to
13  Mr. Taylor the radical excision of the right iliac crest --
14  was that due to the bone dying liquefying dead bone, or was
15  that also your goal to remove the cancer?

16  A    To remove the cancer.

17  Q    And I don't know if you need to review your document or
18  you just can do it off the top of your head; but can you
19  explain to the jury given what Mr. Taylor had, the findings,
20  how you -- what you did during the procedure, the surgery?

21  A    So I read this previously and I will paraphrase if it's
22  okay for you -- with you.  This mass was encasing the bone;
23  and if you look at the bone, there's a muscle -- there's
24  muscles that sit behind the bone that go into the front of
25  the thigh.  There's muscles also on the back of the bone that

1    go down the back of the leg.  And there's muscles in the

2    anterior abdominal wall that are attached to that part of the

3    bone.  So what is done is to basically, since the skin was

4    involved, we lift the skin up -- I think we did that -- and

5    then you just start going through the muscle into around this

6    mass.

7            In so doing, on the upper side, you wind up

8    basically in -- sort of in the abdomen and on the lower side,

9    in the top of the thigh.  And then you come all the way down

10   to the bone on the lateral side.  On the medial side, you

11   have to be careful because in one of the muscles behind, the

12   femoral nerve runs right through the middle of that.  That

13   nerve goes to the front of your thigh and allows your -- the

14   muscles in your thigh to move.  Immediately towards the

15   middle, medial to that, is the artery and then the vein that

16   go to the leg.

17           So what you do is you go in, we went in and as we

18   cut through the muscle, we found the nerve and the vessels.

19   We made sure that those were not involved, cut those where we

20   did, and then divided the bone underneath the mass.

21   Q    And when you say "divided the bone," you took out the

22   dead parts of the bone?

23   A    Yeah.  We use a centrally -- a surgical chisel.

24   Q    Okay.  And then when you take out the dead bone, the

25   iliac crest, is there any muscles, ligaments that attach to

1   that area that you took out?

2   A    Well, yeah.  The things that were immediately attached

3   that were involved in the inflammatory process, the mass

4   itself came out so portions of several muscles came out.

5   Q    And if you take out portions of the muscle, the

6   ligaments that attach, would that be part of the reason he

7   would have a functional problem going forward?

8   A    That was the assumption.

9   Q    Okay.  And could that affect, once you take those

10  structures out, your ability to ambulate, to walk?

11  A    I did not think it would affect his ability to walk but

12  it -- it was more likely that it would affect more rigorous

13  endeavors such as running, running stairs.  He may have

14  become a single-leg stair walker if you understand what I

15  mean, you know, leading with the same foot every time.

16  Q    Going up with the left leg dragging the right one up?

17  A    Well, no, not dragging it.  It's just not necessarily

18  enough strength to pull his body up so he would pull himself

19  up and then bring the other leg.  So not necessarily dragging

20  it, but.

21  Q    Were you able to achieve your goal in the surgery

22  completion?

23  A    I was able to get the mass out without damaging the

24  nerve or things that would have been truly debilitating.

25  Q    When you had completed your portion of the procedure,

1   was it your intention then to turn it over to Dr. Antony to

2   address the hernia?

3   A    That's what I did.

4   Q    Okay.  And you're both not working at the same time,

5   right?

6   A    Correct.  I left then.

7   Q    Okay.  So you left after you completed yours and then

8   Dr. Antony, as a plastic surgeon, she got in there and it was

9   her -- her role to be there to close the hernia?

10  A    Yes.

11          MR. TENGESDAL:  Okay.  That's all we have with for

12  now.  If we could go to -- I'd like to show the witness and

13  your Honor what's previously been admitted into evidence as

14  JX-134.

15          THE COURT:  JX-134.  Go ahead.  That's in evidence.

16  BY MR. TENGESDAL:

17  Q    Okay.  Dr. Warso, for your testimony today, did you

18  review the CT scan that was done during his admission when

19  you performed surgery?

20  A    No, I did not.

21  Q    Okay.  I didn't see on this form the typical thing you

22  see on CT scans like the ordering doctor.  Do you know if you

23  were the ordering doctor of the CT?

24  A    I don't know, but I can tell you that the University of

25  Illinois does not commonly put them -- put that on the

1    reports.

2    Q    Okay.  So someone, it looks like, ordered a CT scan of

3    Mr. Taylor.  It was actually done on 4-25, 2014, but reported

4    it 12 minutes after by the radiologist.

5            Do you know who would have ordered a CT scan two

6    days after your surgery for the reason to -- complaints of

7    hernia or to rule out hernia?  Excuse me.

8    A    Could have been me.  It could have been the plastic

9    surgeons.

10   Q    Okay.  Would CT scan have been ordered to see if the

11   hernia was fixed or was it because of Mr. Taylor had

12   complaints two days into his post-op recovery?

13           MR. DARKE:  Objection, foundation.

14           THE WITNESS:  Do I answer?

15           THE COURT:  Hang on a second.  Why don't you lay a

16   foundation, counsel?

17   BY MR. TENGESDAL:

18   Q    Doctor, you -- you're the surgical oncologist.  You were

19   not the plastic surgeon fixing the hernia; is that right?

20   A    Correct.

21   Q    Okay.  Do you know whether you would have ordered, since

22   you were the surgical oncologist, the CT to look at a hernia

23   or if that would have been another physician?

24   A    I would not have ordered it to look at the hernia.

25   Q    Okay.  So if this -- this was done to rule out a hernia,

1    it's your -- based on your custom having practiced, it

2    wouldn't have been you that ordered this?

3    A    Correct.

4    Q    Okay.  And can you tell us what does the "impression"

5    say of the CT scan?

6         MR. DARKE:  We're going to object to lack of

7    foundation again, Judge.

8         THE COURT:  He's publishing an exhibit.  It's in

9    evidence.  Overruled.

10        THE WITNESS:  There was extensive post-operative

11   changes and they noticed the absence of the mass.

12   BY MR. TENGESDAL:

13   Q    Would these findings be consistent with performing your

14   surgical procedure two days later that you've described for

15   the jury?

16   A    Yes.

17        MR. TENGESDAL:  Page 2.

18   BY MR. TENGESDAL:

19   Q    If we look at the "impression" number two section, can

20   you tell us what that says?

21   A    It says that there's a large right abdominal and pelvic

22   wall hernia containing abdominal structures and basically it

23   was sitting right on the area of the surgery.

24   Q    And as a general surgeon, you're familiar with the

25   findings --

1    A    Yes.

2    Q    -- on the CT?

3    A    Yes.

4    Q    Would you agree the CT confirmed on April 25th the

5    presence of a large mouth right abdominal and pelvic wall

6    hernia?

7    A    Yes.

8    Q    Okay.  As the surgical oncologist, would you have any

9    involvement in the hernia documented on the CT two days later

10   or would that be Dr. Antony's role?

11   A    I would not address it personally.

12   Q    Okay.  The surgery that you did on April 23rd, would the

13   patient still be laying in bed two days later?

14   A    That would be up to Dr. Antony actually.

15   Q    Okay.

16   A    I don't know in this particular case.

17   Q    Okay.  Do you know if doctor -- have any memory of Dr.

18   Antony ever coming to you during the admission when he was

19   still in the hospital discussing with you that he had a

20   hernia?

21   A    I don't remember anything.

22   Q    Okay.

23        MR. TENGESDAL:  If we could take this down and put

24   up DX-0348.1 and ask to have this admitted into evidence.

25        THE COURT:  Any objection to the admission of

1  DX-348?

2          MR. TENGESDAL:  It's 5-19, 2014, follow-up visit

3  with Dr. Warso.

4          MR. DARKE:  No objection.

5          MR. FITZGERALD:  No objection.

6          THE COURT:  It will be admitted without objection.

7          (Exhibit No. DX-348 received into evidence.)

8          THE COURT:  You may publish.

9  BY MR. TENGESDAL:

10  Q    Doctor, after you do a procedure of the magnitude that

11  you did on Mr. Taylor, is it common that you would see the

12  patient and follow up?

13  A    Yes.

14  Q    And what is the purpose of seeing a patient to follow up

15  after surgery?

16  A    To make sure that they have no big problems with the

17  healing and you can see -- and also to go over the pathology

18  report.

19  Q    And when the -- the subjective area, is that something

20  you would have charted?

21  A    Yes.

22  Q    And where it says "the pathology showed necrotic bone

23  and no evidence of tumor," can you explain that to the jury?

24  A    Basically, that all that fibrous tissue turned out to be

25  all scar tissue and not DFSP.

1    Q    And scar tissue, would that be present from the prior

2    three resections that were done in the 90s?

3    A    My opinion is that it is probably due to the dead bone.

4    Q    Okay.  So when the -- I don't know.  Did you call it

5    liquefying, the dead -- the necrotic, dead bone?  How did you

6    describe it?

7    A    Dead.  Necrotic.

8    Q    Dead.

9    A    That means the same thing.  It's a space.

10   Q    I guess what I'm trying to figure out is just to

11   visualize.  When something -- I know what the bone looks

12   like; but if it dies, does it turn to liquid?  What does it

13   look like?

14   A    I don't know.  I'm not sure.  I didn't cut it open.  I

15   think it can be liquid.  I think it can also be somewhat

16   gelatinous.  It might also just have mushy bone instead of

17   there's no more calcium in it so it may just be mushy tissue

18   but I really don't know.

19   Q    Okay.  You can look it up.

20   A    Good question.

21   Q    Do you -- when you cut it out, do you use like a saw or

22   something?  How do you take out a bone, I guess?

23   A    I told you.  A surgical chisel.

24   Q    Oh, chisel.

25   A    We call it an osteome.

1    THE COURT:  Please don't talk at the same time for

2    the court reporter.  Go ahead.

3    THE WITNESS:  Do you need me to repeat a question?

4    THE COURT:  No.  Just pose a question.

5    BY MR. TENGESDAL:

6    Q    Mr. Taylor reported to you post surgery on May 19th that

7    he was having pain in the area.  Is that what you charted?

8    A    Yes.

9    Q    And can you tell us why he would be having a pain a

10   little less than a month later?

11   A    Because we operated and took out some bone.

12   Q    Did you do a physical -- so that's a standard that he

13   should have pain with the operation you did a month later,

14   that wasn't out of the ordinary for what you would have

15   expected?

16   A    It was not out of the ordinary at all.

17   Q    Okay.  When you say "but otherwise he is doing well,"

18   what does that mean?

19   A    It means he appears to be healing well.  Probably meant,

20   although I didn't write it, that he was able to walk in with

21   some assist.

22   Q    And that was my next question.  Is there anything in

23   there indicating that he, almost a month later, was able to

24   walk on his own?

25   A    No.

1   Q   Okay.  Did you do a physical exam on May 19th?

2   A   Mostly limited to the area of surgery.

3   Q   When you did the physical exam, did you see any evidence

4   that he had a hernia on his right side?

5   A   Could not tell.

6   Q   Okay.  Would Mr. Taylor one month post surgery still

7   have a swelling in the area?

8   A   Not necessarily.  It all depends what the plastic

9   surgeons did to close him.

10  Q   And then if we could look at -- did you do an assessment

11  on May 19th?

12  A   Yeah, with the diagnoses.  Basically, that he had a

13  history of a DSFP and that now we know that it was necrotic

14  bone involving the right hip.

15  Q   When you say "the cause of the necrosis is not clear,"

16  are you saying it could be due to the radiation, it could be

17  due to something else?

18  A   Assuming radiation but you don't like to make a definite

19  diagnosis based on assumption.

20  Q   Okay.

21          MR. TENGESDAL:  If we could take that down.

22  BY MR. TENGESDAL:

23  Q   If Mr. Taylor as evidenced by the CT on 4-25 had a

24  hernia, when he came to see you on follow-up, would you be

25  addressing the hernia or would that be another surgical

1    domain?

2    A    This is not something that I would take care of so I

3    would refer him somewhere else.

4    Q    Okay.

5              MR. TENGESDAL:  Your Honor, permission to show the

6    witness and admit what has been marked as Exhibit DX-0237.

7              THE COURT:  Any objection to the admission of

8    DX-237?

9              MR. DARKE:  I believe this has been admitted.  No

10   objection.

11             MR. FITZGERALD:  No objection.

12             MR. TENGESDAL:  I thought it was read but not

13   admitted but I may be wrong.

14             THE COURT:  Okay.  Well, if it wasn't in before, it

15   is now.

16             MR. TENGESDAL:  Okay.

17        (Exhibit No. DX-237 received into evidence.)

18             THE COURT:  Go ahead, counsel.

19   BY MR. TENGESDAL:

20   Q    Dr. Warso, did you -- it looks like you saw in surgical

21   oncology Mr. Taylor on November 25, 2014; is that right?

22   A    Yes.

23   Q    And in the "subjective" section, how is he doing on that

24   day?

25   A    Well, he's still having pain and I'm going to include

1    the review of systems that shows that he's having some

2    elimination problems.

3    Q    Pain with defecation, is that what you're talking about?

4    A    That, and some blood and also problems with his

5    urination.

6    Q    And "blood per rectum, urinary incontinence," can that

7    be a side effect or a consequence of the surgery done?

8    A    Should not be.

9    Q    Okay.  And could you tell us as a physician, is it

10   concerning that you have blood in your rectum?

11   A    Yes.  Should not be there.

12   Q    Okay.  And what can be some of the potential problems

13   that a person could have if they have blood in the rectum?

14   A    There could be a hemorrhoid.  There could be an

15   irritated tumor; benign or malignant.  There could be --

16   considering that he had radiation, he could have what is

17   known as radiation proctitis.  There are some inflammatory

18   and bacterial, things that can actually cause blood.

19   Q    Urinary incontinence, what are some of the causes of

20   that?

21   A    That usually is due to a problem with the nerves going

22   to the bladder either causing the inability to feel that

23   you're full so you can't go or an inability to actually

24   squeeze the bladder muscle to force anything out or to an

25   obstruction, a blockage, to the urine getting out of the

1    bladder and some overflow.

2    Q    Those findings -- blood per rectum, urinary

3    incontinence -- is that something you as a physician would

4    want Mr. Taylor to follow up with?

5    A    Yes.

6    Q    Okay.  And then it looks like on the "subjective," he

7    was still having some pain on November 25, 2014.  Do you know

8    what would be the cause of the pain at that point?

9    A    No, I don't.

10   Q    Okay.  Do you know if he should still have some pain in

11   the area of your resection as of November 25th?

12   A    My opinion is that it would probably be related to the

13   underlying condition and not the surgery itself.

14   Q    And when you say "the underlying condition," what do you

15   mean by that?

16   A    Prior radiation, scarring.  The only thing in this

17   surgery that possibly could cause a little pain was the

18   necessity to move the femoral nerve over but that usually

19   gets better.

20   Q    We've gone over the report of systems.

21            Did you do an objective examination on Mr. Taylor

22   on November 25?  I'll blow that up for you.  There you go.

23   A    Yes.

24   Q    And what did you -- what did you chart that's of

25   pertinent, Doctor?

1   A     At this point it was obvious that he had a large hernia

2   because it was swollen and there was swelling of the tissue

3   around the lateral part of the right hip, which is right

4   flank.

5   Q     The swelling, would that be caused by the hernia, the

6   large ventral hernia that you found on the right side?

7   A     Could be.

8   Q     What are some of the other possibilities of why it would

9   be swollen?

10  A     It's largely unclear to me, I'll be honest, but anytime

11  that could be dependent if he's -- if he's got tissue damage

12  and a little extra fluid on board, it might just collect

13  there.  Related to something else that happened, he might

14  have some tissue damage in the area where the fluid doesn't

15  drain well.

16  Q     As a consequence of the surgery you did on April 23rd,

17  you've told us -- told the jury -- about all the structures

18  you removed, would this be the area where a hernia would

19  develop as you predicted in your earlier notes?

20  A     It matches.

21  Q     Okay.  What was your -- we'll bring up -- what was your

22  plan on November 25th, Doctor?

23  A     The -- basically send him to urology and colorectal

24  about the urinary and rectal problems.  We would also get --

25  repeat the imaging and then he would follow up with Dr.

1    Obaisi, "Obesi," who was the physician at the institution he

2    was at.

3    Q    Okay.  Was your recommendation then on November 25th

4    that Mr. Taylor should follow up with both colorectal surgery

5    and urology?

6    A    Yes.

7    Q    And urology, would that be for the urinary incontinence?

8    A    Yes.

9    Q    And colorectal surgery, that would be for the blood in

10   the rectum?

11   A    Correct.

12   Q    Okay.  And it was your expectation then that Dr. Obaisi

13   would take care of that and refer the patient for those two?

14   A    I relied on him to do it.

15   Q    Okay.  Did you anywhere on November 25th suggest that

16   Mr. Taylor be sent to see a surgeon that could address the

17   right lower quadrant ventral hernia?

18   A    I don't see it there but he was supposed to come back

19   and see me after he had the imaging.

20   Q    And what imaging did you want?

21   A    I got a CT scan of the area.

22   Q    And when you say "CT scan of the area," are you talking

23   to evaluate the hernia?

24   A    Just -- it will include the hernia.  It was the whole

25   area of the surgery.

1    Q    And was the purpose of the CT to see how your surgery

2    was -- everything was healing?

3    A    You can't really see that.  The question is does

4    everything look like there's no new masses and it will also

5    allow you to see exactly what tissues are where within a

6    certain -- within the extent of the CT to delineate things.

7    Q    Was it your medical judgment on November 25th then that

8    the two things you wanted to have evaluated that was

9    concerning was related to the urinary incontinence and the

10   blood in the rectum?

11   A    Those needed to be evaluated first.

12   Q    Okay.

13           MR. TENGESDAL:  Then if we can bring up what's

14   previously been admitted into evidence, your Honor, DX-0242.

15           THE COURT:  DX-242.  Go ahead.

16           MR. TENGESDAL:  All right.

17   BY MR. TENGESDAL:

18   Q    Showing you, Doctor, a surgical oncology note from

19   August 10, 2015, would you have seen the patient on

20   follow-up?

21   A    Yes.

22   Q    And how was he doing subjective?  Was there any changes

23   on August 10th?

24   A    Basically the same.

25   Q    Still complaining of pain as of August 10th, 2014?

1    A    Yes.

2         MR. TENGESDAL:  Let's go to the part that lists the

3    CT scan.

4    BY MR. TENGESDAL:

5    Q    And does this depict CT abdomen and pelvis July 17th,

6    2015, the CT that you ordered or was this a different CT, do

7    you know?

8    A    I assume this is the one I asked for.

9    Q    Okay.  And what does the CT of the abdomen and pelvis

10   show that was done on July 17th, 2015?

11   A    That the hernia had gotten larger.

12   Q    Was there any findings that you thought pertinent

13   related to anything other than the hernia on the CT?

14   A    Not that I recall.

15   Q    And as of August 10, 2015, what was your plan?

16        MR. TENGESDAL:  Pull that up for you.

17        THE WITNESS:  Well, one thing we haven't talked

18   about.  So if you look, there's a consultation with

19   orthopedics.  That has to do with pain he had in his right

20   arm.  It was unrelated.  No evidence of recurrence.  I was

21   going -- I sent him to general surgery to see someone about

22   the hernia repair.

23   BY MR. TENGESDAL:

24   Q    And would general surgery, would that be the specialty

25   that you would want to send a patient with the findings he

1   had, Mr. Taylor, on a CT to evaluate for a repair?

2   A     They take care of hernias.

3               THE COURT:  Counsel, I don't see DX-242 in my

4   notes.  Any objection to the admission of DX-242?

5               MR. DARKE:  No, your Honor.

6               MR. FITZGERALD:  No objection.

7               THE COURT:  Okay.  Go ahead.

8         (Exhibit No. DX-242 received into evidence.)

9   BY MR. TENGESDAL:

10  Q     Was there any particular general surgeon that you wanted

11  the patient to follow up with at UIC?

12  A     I don't remember.

13  Q     Okay.  Since Dr. Antony, the plastic surgeon, was the

14  one who assisted you on the surgery, did you want Dr. Antony

15  to evaluate the patient or did you think this was more proper

16  for general surgery?

17  A     I thought it was more proper to start with general

18  surgery.

19  Q     Okay.  And since -- I know -- I think I might have asked

20  you something similar.  But you're a surgical oncologist.

21  Would you defer to general surgery then to determine whether

22  or not this hernia was repairable?

23  A     Yes.

24  Q     Do you know a Dr. Giulianotti at UIC?

25  A     Yes, I do.

1    Q    Who is Dr. Giulianotti?

2    A    He's the -- he's a professor of surgery.  He's the head

3    of the division of general and minimally invasive and robotic

4    surgery I think it's called.

5    Q    Thank you for coming in today.

6              MR. TENGESDAL:  I'm done.  I have no further

7    questions.  Thank you.

8              THE COURT:  Cross examination.  Any cross from the

9    co-defendant?

10             MR. DARKE:  I'm sorry, Judge.

11             MR. FITZGERALD:  No.

12             THE COURT:  Go ahead, counsel.

13                        CROSS EXAMINATION

14   BY MR. DARKE:

15   Q    Good morning, Doctor.

16   A    Hi.

17   Q    I just have a few questions for you.  I'm one of the

18   attorneys for Mr. Taylor.

19             You mentioned earlier that Dr. Obaisi was

20   Mr. Taylor's primary care physician.  Do you recall that?

21   A    Yes.

22   Q    And after you would see and evaluate and consult with

23   Mr. Taylor in 2013 and after the surgery and then again after

24   the follow-up in November 2014, would you then communicate

25   your findings to Dr. Obaisi?

1    A    Yes.

2    Q    And do you recall ever talking to Dr. Obaisi on the

3    phone?

4    A    No.  I did not.

5    Q    Would you -- how would you get the medical records and

6    your findings after seeing Mr. Taylor to Dr. Obaisi?

7    A    There is a form that comes from the prison when the

8    patient comes in and on that I write what I found and what I

9    would like to be done.  And then what I routinely do is if

10   there's any special reports or something that I think the

11   prison may not have, I will very often give a copy, give them

12   a copy to send back to the prison's medical record.

13   Q    Okay.  Thank you.

14        And based on your testimony, it appears that you

15   expected Mr. Taylor to have a resultant hernia in your

16   surgery, correct?

17   A    Yes.

18   Q    And then you expected Dr. Antony to fix that hernia

19   after you did your surgery?

20   A    Correct.

21   Q    And we know that did not happen, correct?

22   A    I now know it didn't.

23   Q    And then you're not a hernia specialist, right?

24   A    No.

25   Q    And you're not going to do a reconstruction of the

1    abdominal area?

2    A    No.

3    Q    So you were expecting Dr. Antony to take care of the

4    hernia, fair?

5    A    Yes.

6    Q    And then later on when you reviewed the notes and

7    examined Mr. Taylor and noticed the hernia, you referred that

8    to somebody else as well, correct?

9    A    Correct.

10          MR. DARKE:   I'm just looking at my notes to see if

11   I have more questions.  Just hang tight.

12   BY MR. DARKE:

13   Q    So you talked a little bit earlier about your

14   expectation for Mr. Taylor's ability to climb stairs after

15   your surgery.  Do you recall that?

16   A    Yes.

17   Q    And you're not familiar with Mr. Taylor's activity level

18   or physicality pre-surgery, are you?

19   A    No.

20   Q    And you're not familiar with it after the surgery,

21   correct?

22   A    (Nodding.

23   Q    You testified earlier that based upon your review in

24   August 2015 of the CT scan that Mr. Taylor's hernia had

25   grown.  Do you recall that?

1    A    Yes.

2    Q    And in what ways had it grown?  What do you mean by

3    that?  Is it bulging out more or was there more viscera in

4    the hernia sac or was it the dimensions of the actual defect?

5    A    The review of the -- according to the CT, it -- the

6    space got bigger -- think of it as blowing up a balloon --

7    and there was more stuff inside of it.

8    Q    So more of his intestines and bowel were coming through

9    the hernia?

10   A    Well, in the hernia.  I don't like the idea of coming

11   through because it was still under his skin.

12   Q    Perfect.  Thank you.

13                  MR. DARKE:  I have no further questions.

14                  THE COURT:  Any additional inquiry?

15                      REDIRECT EXAMINATION

16   BY MR. TENGESDAL:

17   Q    When you saw him in follow-up on August 10th, 2014, it

18   was your opinion that it was more important to address the

19   urology and colorectal surgery than the hernia issue,

20   correct?

21   A    Yes.

22   Q    Okay.  Can you tell us why?

23   A    First of all, I needed the imaging to make sure there

24   was no other tumor.  Second of all, it's just the way I was

25   taught; you take care of the urinary tract and the bowel

 1  because if there's anything in there that can cause problems
 2  such as straining and everything, it could interfere with the
 3  ability to do a proper hernia repair.
 4           MR. TENGESDAL:  Thank you so much.
 5           THE COURT:  Any further inquiry from any party?
 6           MR. FITZGERALD:  No.
 7           MR. DARKE:  No questions from --
 8           THE COURT:  Thank you, Doctor.  You may step down.
 9           THE WITNESS:  Thank you.
10      (Witness excused.)
11           THE COURT:  Please call your next witness.
12           Please raise your right hand.
13      (Witness sworn.)
14           THE COURT:  All right.  Counsel, whenever you're
15  ready.
16           MR. TENGESDAL:  Thank you, your Honor.
17    NARAYAN S. TATA, DEFENDANT'S WITNESS, FIRST DULY SWORN
18                     DIRECT EXAMINATION
19  BY MR. TENGESDAL:
20  Q    Good morning, sir.  Can you please introduce yourself to
21  the jury?
22  A    Yeah.  Good morning.  My name is Dr. Narayan Tata.
23  Q    And, Doctor, what is your occupation?
24  A    I'm a medical doctor who specializes in the practice of
25  pain management.

1    Q    In your report that you did serving as an expert, did

2    you provide a current and accurate up-to-date curriculum

3    vitae?

4    A    I did.

5              MR. TENGESDAL:  And, your Honor, we ask that the

6    curriculum vitae, JX-0094, be admitted into evidence.

7              MS. CIAMBRONE:  No objection, your Honor.

8              MR. FITZGERALD:  No objection.

9              THE COURT:  JX-944 will be -- excuse me.  JX-94

10   will be admitted without objection.  Go ahead.

11            (Exhibit No. JX-94 received into evidence.)

12             MR. TENGESDAL:  Thank you.

13   BY MR. TENGESDAL:

14   Q    I want to ask you to start with your education and

15   background, sir.  Could you tell us where you went to

16   undergraduate?

17   A    Sure.  I went to the University of Illinois,

18   Urbana-Champaign.

19   Q    And what was your field of study when you were there?

20   A    I studied electrical engineering.

21   Q    What year did you graduate from the U of I?

22   A    I graduated in 1989.

23   Q    And what did you do after your graduation, sir?

24   A    I actually worked as an international systems engineer

25   for Motorola for five years.

1  Q    Can you briefly tell us what you did for Motorola now?

2  A    Yeah.  As an international systems engineer, I helped

3  design cellular telephone networks mainly in Japan.  I went

4  to Japan some 23 times and basically designed their networks,

5  structure for cellular telephones.

6  Q    At some point in time, did you decide that you wanted to

7  be a medical doctor?

8  A    Absolutely, yes.

9  Q    Okay.  And what year did you decide that you were going

10  to give up the electrical engineering field and do medicine?

11  A    Sure.  I -- sometime I -- 1992, '93 but I was taking

12  prerequisite courses, got into medical school --

13          THE COURT:  Please to slow down.  Okay?

14          THE WITNESS:  I sure can.

15          THE COURT:  There's no rush.  Go ahead.

16          THE WITNESS:  Sometime during my tenure at

17  Motorola, I completed my prerequisites.  I got into medical

18  school and was accepted at Chicago Medical School, or

19  Rosalind Franklin University of Health Sciences, and I did

20  medical school from 1994 and graduated with an M.D. degree in

21  1998.

22  BY MR. TENGESDAL:

23  Q    Why did you decide to make the change to go to medical

24  school after working in the industry?

25  A    Good question.  I've always had an interest in medicine

1   but I actually had a full ride for engineering at the

2   University of Illinois so I completed that, got a full

3   tuition.  And while I was at Motorola, decided to -- at some

4   point while I was there, decided to fulfill that dream of

5   being a doctor and I got accepted into medical school.

6   Q    And what year did you complete medical school?

7   A    1998.

8   Q    And then after completion of medical school, is that

9   four years?

10  A    Medical school is four years.

11  Q    Okay.  And then after you get your M.D. degree from

12  medical school, what did you do after that?

13  A    Yeah.  I actually did my internship and residency.  In

14  my case, it was a combined internship and residency.  It was

15  a four-year program at Northwestern University here in

16  Chicago.

17  Q    And what was your field of study for the -- I guess

18  specialty for residency?

19  A    Sure.  My field of specialty was called PM&R, which

20  stands for Physical Medicine & Rehabilitation.

21  Q    And what year did you complete your Physical Medicine &

22  Rehabilitation residency?

23  A    I was done in 2002.

24  Q    After that, did you do any additional medical training?

25  A    I did.  I did a fellowship in interventional pain

1    management.  That was in Atlanta, Georgia.  It was a combined

2    program called Georgia Pain Physician -- it was a private

3    practice part of it -- along with Emory University.

4    Q    Okay.  And interventional -- was it spine or

5    interventional pain management?

6    A    Interventional spine, interventional pain management;

7    same thing.

8    Q    Okay.  And tell us when you did that fellowship, what

9    are you learning, what are you studying, what can you do

10   after that?

11   A    Sure.  The main thing is when you're calling it

12   interventional, it's all spine procedures.  So anything to do

13   with the neck, cervical spine, thoracic spine, lumbar spine.

14   You've heard of people that have herniated discs.  I do --

15   was trained to do under fluoroscopic guidance epidural

16   steroid injections --

17           THE COURT REPORTER:  I'm sorry.  If you can just

18   slow down for me, please.

19           THE WITNESS:  Okay.  Epidural steroid injections,

20   facet injections, anything to do with neck pain or back pain.

21   I'm also trained in some higher-level procedures such as

22   radiofrequency ablations, spinal cord stimulators.  And in my

23   fellowship, we also learned how to do intrathecal pumps.

24   That's for pain management.  And I also have an interest in

25   sports medicine so anything to do with joints,

1  enthesopathies, tennis elbow, knee injections, shoulder

2  injections, hip injections.

3  BY MR. TENGESDAL:

4  Q    Are you licensed to practice medicine, Doctor?

5  A    I am.

6  Q    What states?

7  A    In Illinois, as well as Indiana.

8  Q    Are you board certified in any medical specialties?

9  A    Yeah.  I have board certifications in two specialties,

10  one is in PM&R, which is Physical Medicine & Rehabilitation,

11  as well as a board certification in pain management.

12  Q    The medical publications, lectures, stuff in your CV, do

13  they have anything to do with interventional spine or pain?

14  A    Yes, they do.

15  Q    And are you currently practicing as a physician?

16  A    I do.  I'm a medical director of my own practice in

17  Naperville called Midwest Sports and Pain Specialists.

18          MR. TENGESDAL:  Your Honor, I move to qualify Dr.

19  Tata under Rule 72 as an expert in the medical specialty

20  field, physical medicine, rehabilitation and interventional

21  spine.

22          THE COURT:  Any objection to the qualification

23  under 702?

24          MR. FITZGERALD:  No objection.

25          MS. CIAMBRONE:  No objection, your Honor.

1     THE COURT:  You may so inquire.  Go ahead.

2     MR. TENGESDAL:  Thank you.

3   BY MR. TENGESDAL:

4   Q    How long have you been practicing doing spine medicine?

5   A    In my practice since 2005.

6   Q    And where is your practice, sir?

7   A    Naperville, Illinois.

8   Q    You rattled off some procedures.  If you could slow

9   down.  Could you tell us what do you do at your practice in

10  Naperville?

11  A    Yeah.  I treat patients in pain.  Pain is a general

12  term, but the majority of what I do in my practice is dealing

13  with spine care.  Specifically, it could be neck pain, it

14  could be back pain, you know, as far as doing the

15  interventions that are associated with it.

16        You know, we do conservative management.  So when

17  patients come in, I get refers -- referred by other doctors.

18  In some instances, they may not have any imaging studies or

19  maybe something that physical therapy would perhaps help.

20        So, you know, you treat patients in pain and take a

21  complete history, do a physical, and then render, you know,

22  appropriate treatment based on what they're coming in with.

23  So it could be a whole slew of pain syndromes.  It could be

24  something that's associated with a spine, it could be neck,

25  back, could be the -- you know, I do other injections, like

1    sacral iliac joint injections, otherwise known as SI joint

2    injections, could be the epidural steroid injections.  And

3    everything that I do is fluoroscopic-guided so it's guided

4    with use of a live x-ray machine.

5              THE COURT:  Doctor, you're about 300 words a minute

6    I'm going to ask you for the third time to maintain a pace

7    that is consistent with our ability to make a complete record

8    so I'm going to ask you and I'm going tell you to slow down.

9    Go ahead, pose a question.

10             THE WITNESS:  Okay.

11   BY MR. TENGESDAL:

12   Q    Doctor, are you on staff at any hospital?

13   A    Yes.  I'm on staff at Edward Elmhurst Hospital, which is

14   now known as Endeavor Health.  I am on staff at CDH

15   Northwestern Hospital.  I'm also on staff at Amita

16   Bolingbrook Hospital and Hinsdale Hospital.

17   Q    And when you're on staff at a hospital, does that mean

18   that you have privileges to do work or procedures at those

19   hospitals?

20   A    Yes.

21   Q    Do you perform what's called epidural steroid

22   injections?

23   A    I do.

24   Q    And as an interventional spine specialist, do you have

25   the education, training, and experience involving the issues

1    in this case of cervical lumbar epidural injections?

2    A    I do.

3    Q    And you're serving here as an expert on behalf of the

4    defendants I represent.  Do you recall when you were first

5    contacted?

6    A    Sometime late in 2018.  Perhaps it could be early 2019.

7    Q    When I contacted you, did you ask for any materials?

8    A    I asked for all the pertinent medical records, specific

9    medical records, depositions, imaging studies, all that --

10   whatever related to the care of Mr. Taylor with regards to

11   his cervical and lumbar spine.

12   Q    And when those were provided to you, do you recall what

13   materials I guess that you reviewed in order to render your

14   opinions in this case, Doctor?

15   A    Yeah.  It was quite a few number of records.  Multiple

16   Bankers boxes.  But what I reviewed were the IDOC records,

17   which is the Illinois Department of Corrections' records, the

18   University of Illinois Pain Clinic records, imaging studies

19   both from I think 2009, 2016 regarding the cervical and

20   lumbar spine, depositions of Mr. Taylor, depositions of Dr.

21   Arthur Funk, depositions from the pain specialist at the

22   University of Illinois, Dr. Votta-Velis, Dr. Beckerly, and

23   also the plaintiff's expert Dr. Candido, his findings.

24   Q    The materials that were provided to you, did you review

25   those?

1   A    I sure did.

2   Q    Okay.  Did you ever speak to Dr. Obaisi?

3   A    Unfortunately, I was unable to.  Dr. Obaisi passed away

4   in 2017.

5   Q    Were you able to find in the records Dr. Obaisi's care

6   and treatment?

7   A    I was.

8   Q    Were you able to determine from your record review the

9   dates that Dr. Obaisi had made referrals of Mr. Taylor to the

10  UIC pain management?

11  A    Yes.

12  Q    Can you tell us a little bit about what is your

13  experience working as an expert reviewing cases?

14  A    Sure.  I've done expert testimony -- this is my first

15  time at trial but from time to time I've been asked to

16  provide my opinions.

17  Q    How many times do you think over your career that you've

18  given a deposition?

19  A    Over my career over some 20-plus years, the main

20  depositions I've done is as a treating provider, specifically

21  in personal injury cases and perhaps workers' comp.  But --

22  so would -- that be a total about a hundred perhaps.  But as

23  an expert, it would be probably like 10, 15.

24  Q    Okay.  And that's 10, 15 over 20 years?

25  A    Correct.

1    Q    And as part of your -- or strike the question.  In this
2    case, did you author any expert reports?
3    A    I did.
4    Q    And as part of your expert reports, did you disclose the
5    past cases you've worked on in the last four years of
6    deposition or trial?
7    A    I did.  There was two cases.  One, I represented the
8    plaintiff.  In another case, I represented the defendant.
9    Q    Okay.  And do you recall the name of -- let's start with
10   the plaintiff first.
11   A    Yeah.  That was Bride Creek versus Dr. Stewart King.
12   And the second one was representing the defendant and that
13   was -- it was a Dr. Wilson and it was Zane versus Wilson, Dr.
14   Wilson.
15   Q    And when you worked on those two cases as an expert, did
16   you ever give a deposition?
17   A    I did.
18   Q    Were they medical malpractice cases, personal injury?
19   What type of cases?
20   A    In both instances, those were medical malpractice cases.
21   Q    Doctor, in taking away from your time being in your
22   office seeing patients, do you have like a fee schedule of
23   what you charge for expert work?
24   A    Sure.  As for preparation or review of medical records,
25   it's $450 per hour.  Preparation for depositions is also $450

1   per hour.  Being present at a deposition physically is $500

2   per hour.  And for time at trial, it's $3,000 for half a day

3   and $5,000 for a full day.

4   Q    Doctor, based on your review of the materials that you

5   discussed today -- your education, your training, your

6   experience -- have you come to any expert opinions in this

7   case?

8   A    I have.

9   Q    What is your understanding -- before I get into those,

10  what is your understanding of what Mr. Taylor's medical

11  conditions are in this case that involve interventional

12  spine?

13  A    It has to do with the treatment regarding his cervical

14  spine and lumbar spine.

15  Q    Okay.  And, Mr. Taylor, are you familiar with any

16  aspects of his past medical history?

17  A    I am.  Mr. Taylor has a very complicated past medical

18  history.  In the 1980s, he was involved in a traumatic motor

19  vehicle collision and he sustained neck trauma and lumbar

20  trauma in which case he had like neck pain and low back pain

21  for which he was treated so that was in the 1980s.  In the

22  1990s, he was diagnosed with a malignant neoplasm, or cancer.

23  The acronym is DFSP, dermatofibrosarcoma protuberans, and he

24  in the 90s had three surgeries for that.

25           Subsequently thereafter in 2014, he had a

1    recurrence of tumor, had another surgery because he had

2    complaints of right hip pain, right iliac crest pain, and had

3    a subsequent surgery for the tumor.  And then thereafter

4    that, he developed a significant ventral hernia which also

5    required surgery.

6    Q    Doctor, are you serving as an expert to provide opinions

7    regarding the hernia or hernia care?

8    A    Not with regards to any type of surgery but with regards

9    to pain management; yes.

10   Q    Okay.  Before we get into the spine conditions, Doctor,

11   would it aid you in explaining your opinions to the jury in

12   this case to use medical illustrations of the human body and

13   spine?

14   A    Yes.

15           MR. TENGESDAL:  Your Honor, ask permission for Dr.

16   Tata to leave the witness stand.

17           THE COURT:  Do you have a demonstrative exhibit you

18   want to move in?

19           MR. TENGESDAL:  Yes, I do.

20           THE COURT:  What's it marked?

21           MR. TENGESDAL:  DX-0341 is one, DX-0342, DX-0341,

22   DX-0343, and DX-0345.  One more.  0344.

23           THE COURT:  All right.  I think you said the

24   "DX-341" on two occasions.  So my understanding is it's

25   DX-341, 342, 343, 344, and 345.  Correct?

1       MR. TENGESDAL:  That would be correct, your Honor.

2           THE COURT:  All right.  Any objection to the

3    admission of those exhibits for demonstrative purposes?

4           MR. FITZGERALD:  No objection.

5           MS. CIAMBRONE:  No objection to admission for

6    demonstrative purposes.

7           THE COURT:  Okay.  Any objection to the witness

8    leaving the witness stand in order to effectuate the

9    testimony?

10          MS. CIAMBRONE:  No, your Honor.

11          MR. FITZGERALD:  No objection.

12          THE COURT:  All right.  Go ahead, counsel.

13          MS. CIAMBRONE:  Your Honor --

14          THE COURT:  Yes?

15          MS. CIAMBRONE:  -- may I sit in the back in the

16   first row so I can see what he's pointing to?

17          THE COURT:  You can sit or stand wherever you need

18   to outside the jury box in order to see.  Go ahead.

19          MS. CIAMBRONE:  Thank you.

20          THE COURT:  If you make an objection, shout it out

21   or find a mic.

22          MS. CIAMBRONE:  Thank you, your Honor.

23   BY MR. TENGESDAL:

24   Q    Dr. Tata, what we have here is a board demonstrative

25   DX-0341.  Can you -- can you tell the jury what is this?

1    A    This is a model, a lateral depiction of the human spine.

2    Q    And are there different areas of the human spine?

3    A    Yes, there are.  We call the first seven segments, or

4    the vertebra in the top region, the cervical spine which is

5    made up of seven vertebra.  Then we have the thoracic spine,

6    which is made up of 12 vertebra.  Then we have the lumbar

7    spine, which is made up of five vertebra.  Then we have a

8    side profile of our coccyx.  And then we end up with our

9    tailbone, which is called a coccyx.  So we have our sacrum

10   and coccyx showing as far as the --

11           THE COURT:  All right.  Counsel -- what I want you

12   to do, Doctor, is I want you to take a deep breath in and

13   then let it out and then I want you to keep your pace slower

14   than you're doing.  Go ahead.

15           THE WITNESS:  Okay.  As I was saying, lumbar spine

16   is made up of five vertebra, L1, 2, 3, 4, and 5, which

17   articulates with the sacrum, which are articulates with our

18   pelvis.  And then we have our coccyx, which is our tailbone.

19   BY MR. TENGESDAL:

20   Q    Doctor, thank you.  That was the side view.  What view

21   do we have here on the right image?

22   A    This is a frontal view.

23   Q    And does this depict the same areas?

24   A    It does.  You can actually see again cervical spine,

25   thoracic spine.  You don't see the ribs that articulate in

1    the thoracic spine.  And you see the lumbar spine, which is

2    made up of five vertebra, and you can see the frontal view of

3    the sacrum and it ends in the coccyx and you can see it.

4    Q    And if I can have you --

5            THE COURT REPORTER:  Mr. Tengesdal, I cannot hear

6    you.

7            THE COURT:  Right up there, or you can go to a

8    podium, you know, if you want to do that also.

9            MR. TENGESDAL:  We'll go to the podium, your Honor.

10   BY MR. TENGESDAL:

11   Q    Doctor, what we have marked as DX-0342, can you explain

12   what that is?

13   A    This is a model of the human spine.

14   Q    And the top portion, it looks like it's --

15   A    This is the base of the cranium --

16   Q    Okay.

17   A    -- and you can see how that articulates with the

18   cervical spine, again showing seven vertebra.  Again, as I

19   mentioned before, the thoracic spine, lumbar spine, and I can

20   see the full hips, the iliac crests, the sacrum ending at the

21   last one called a coccyx.

22   Q    And you used a term vertebra.  Can you show the jury

23   where is the vertebra?

24   A    Sure.  When we think of the human spine, usually we call

25   it the anterior column, the middle column, or the posterior

1    column.  So the anterior column of the human spine is made up

2    vertebra.  This is part of our skeletal system which provides

3    us so that we're erect in shape and so that we're not a blob.

4    We're just basically -- we have some support structure.  So

5    this is the framework of our support structure which is the

6    vertebra.  In between each vertebra, these structures are

7    called discs, intervertebral discs.

8    Q    Okay.  Intervertebral discs, what are they in the body

9    for?  What do they do?

10   A    Yeah.  The discs are sandwiched in between each

11   vertebra.  They provide cushioning.  There is some movement

12   associated with it.  It gives us some height but the main

13   purpose is to provide cushion and space.  When I say "space,"

14   you can see that in between each disc, or the vertebra I

15   should say, there's a disc and if we had that space, it

16   causes space for what we call the neuroforamen.  The

17   neuroforamen is where the exiting nerves, or radiculars, can

18   come out.  And you can imagine if the disc space is narrow to

19   some extent, it could cause some pressure or compression

20   because the height is lost over time.  So the neuroforamen is

21   the -- is what is a hole where the structure or the exiting

22   of the radicular comes out.

23   Q    And the back portion of the spine, can you just explain

24   what's going on there?

25   A    Sure.  As I mentioned to you, we just talked about the

 1    anterior column.  The posterior column is made up of the

 2    spinous processes.  You can see spinous processes.  You can

 3    see transverse processes.  There's even structures called

 4    lamina.  Sometimes if you heard of surgery -- some surgicals

 5    of lumbar procedures, they call it a laminectomy.  That would

 6    be a procedure --

 7              THE COURT:  All right.  Doctor, Doctor -- wait a

 8    minute, wait a minute.

 9              MR. TENGESDAL:  Slow.

10              THE COURT:  Wait a minute.  I don't like

11    interrupting you.  It's not -- it's really not fair to my

12    court reporter; okay.  So this time I actually want you to

13    take a breath.

14              THE WITNESS:  Okay.

15              THE COURT:  Do it right now.

16              THE WITNESS:  Okay.

17              THE COURT:  Okay.  I don't want to interrupt you

18    again.  It's important the jury gets to hear what you have to

19    say.  Slow down.

20              THE WITNESS:  I understand.

21              THE COURT:  Last time.

22              THE WITNESS:  So we talked about the lamina,

23    spinous processes.  That's pretty much.

24    BY MR. TENGESDAL:

25    Q    Where is the spinal canal?

1    A    The spinal canal is a structure that houses the spinal

2    cord.  It's made up of the vertebral body when they're

3    stacked on top of each other like building blocks.  And in

4    this case, you can see the spinal cord here.  The main yellow

5    structure that you see in between is the spinal cord and the

6    vertebral body, actually when they connect with each other,

7    house and protects the spinal cord.

8    Q    You described the discs between the vertebra.  Do they

9    serve a purpose?

10   A    Yes.  As I mentioned to you before, these discs provide

11   cushioning.  Think of it like a jelly-filled doughnut.  The

12   jelly is in the center of the discs, very cushion gelatinous

13   material.  It's actually called a nucleus pulposus.  And

14   surrounding it is the annulus, or annulus fibrosus.  I --

15   again, I tell my patients, it's like a jelly-filled doughnut.

16   Q    Deep breath.  What's the yellow structures coming off

17   the side?

18   A    These yellow structures are called radicular nerves.  An

19   adequate depiction of a radicular nerve as it's coming out,

20   it actually has two twigs.  This is only showing it coming

21   out.  So think of it like a V.  So as it's coming out, one

22   structure is a sensory nerve and one is a motor nerve.

23   Q    And do the nerves that come out the side, those

24   radicular nerves, do they go anywhere in the body or do they

25   end how they are on the spine?

1   A    No.  They go to respective parts of the human body.  For

2   example, in the cervical spine, they form a slew of nerves

3   under the armpit, or axilla.  That's called a brachial

4   plexus.  So you have a sensory component and you have a motor

5   component.  Sensory component just by itself, it means

6   sensation.  That's what provides sensory or sensation in a

7   particular dermatome, upper extremity.

8          When I talk about motor, motor nerves, that's

9   actually providing innervation to various muscles that

10  provide a strength so that's how they're controlled.  So in

11  the cervical spine, it would go in an upper extremity.  And

12  in the lumbar spine, it would go to the lower extremity.

13  Q    Okay.  One last thing on the spine model.  What's this

14  red thing here depicting?

15  A    If you can see it, this red structure on the side of a

16  disc is actually showing a herniated disc.

17  Q    Okay.

18          MR. TENGESDAL:  You can put that down, please.

19  BY MR. TENGESDAL:

20  Q    Showing the next demonstrative DX-0343.  Doctor, what

21  does this diagram depict?

22  A    This is actually showing a dermatomal chart of the human

23  body.

24  Q    And what does that mean?

25  A    As I was telling or explaining before, each radicular

1    nerve has a sensory component and a motor component.  And I
2    like to explain it to my patients like it's the electrical
3    system of the human body where a car, like a wire harness of
4    a car.

5          So as you can see, we have various depictions.  It
6    says C2 through C5.  You can see as we're going in the upper
7    extremity, all of these relate to a various nerve as they're
8    exiting out of the cervical spine.  So it's kind of like
9    doing a Sherlock Holmes.  When I see my patients, I ask them
10   first of all where is your pain, what is your pain --
11   describe your pain and the location of the pain.  So, you
12   know, we're taught in medical school that 80 percent of what
13   we can find is from the history of -- when we talk to our
14   patients.  So I have to ask a detailed question and I get a
15   lot from what they tell me.

16         So if a patient is telling me, hey, doc, I've got
17   not only pain in my neck but I have pain in my arm.  And then
18   I'll ask them what type of pain.  It could be numbness.  It
19   could be tingling.  It could be weakness.  Based on the
20   distribution of what they're telling me, I can deduce where I
21   believe in the neck there could perhaps be some pathology.

22         Likewise as a corollary, similar things can happen
23   in the lumbar spine.  You've probably heard of people that
24   have sciatica.  Well, sciatica is another term for
25   radiculitis or radiculopathy.  So if a patient comes in with

1    back pain and they're saying hey, doc, I have pain that's

2    coming down my leg, the first thing I want to make sure based

3    on the history, I do a complete physical examination.  What

4    am I checking for.  I check to see if their sensory is

5    intact.  That, we can do by light touch.  Pinprick, can they

6    feel it.  And in some instances, patients will tell you that,

7    doc, I feel numb or I have a detriment or a decreased type of

8    sensation when you're comparing one extremity to the other

9    extremity.  Likewise, they may say, doc, I'm having trouble

10   climbing stairs.  I'm having -- I feel like my leg is giving

11   away.  That's weakness.  So you want to corroborate that with

12   perhaps there's something happening in the lumbar spine or

13   cervical spine.

14            Also what's important is if they have any bowel or

15   bladder changes.  Sometimes if a patient comes in and says,

16   doc, I'm either having incontinence or uncontrolled problems

17   with bowel or bladder, that's a red flag I should say.

18   Q    If a patient has say pain in their neck, will they

19   always get pain going down the arm?

20   A    Not necessarily.  As we get older, we get degenerative

21   spine.  As a matter of fact, when I was in medical school, I

22   actually had two herniated discs in two levels of my spine.

23   And in my case, I had pain down my arm.  Why after getting an

24   MRI, I found out I had two herniated discs.  But luckily,

25   that pain has gone away but I have sometimes what we have

1   axial neck pain so that's pain in the neck literally and as

2   we get older, the natural cascade process is to have

3   degeneration.

4           As you recall in the -- before I mentioned the

5   intervertebral disc, it's like a jelly-filled doughnut.  As

6   we get older and unfortunately past our 20s, the natural

7   progression even without any trauma is for that jelly in that

8   doughnut, which is called the nucleus pulposus, it gets dried

9   up or the fancy term is called desiccation.  So when it gets

10  dried up, you actually lose some of the height of what those

11  discs provide.  And as we get older, it's not too uncommon

12  for us to shrink a little bit.  That's why.  One of the

13  reasons.

14  Q    Would radicular pain, would -- could that cause going

15  down the arm?

16  A    Radicular pain, by definition, means it's leaving the

17  axial component of the spine and actually going to an

18  extremity; yes.

19  Q    Okay.  You said the term "axial pain."  Does axial pain

20  in the spine, does that travel down into the body parts?

21  A    It does not.

22  Q    Okay.

23          MR. TENGESDAL:  And then the next one.  I'd like to

24  take this one down and we'll put DX-344 up.

25  BY MR. TENGESDAL:

1    Q    Doctor, if you could just tell the jury what is depicted

2    in DX-344.

3    A    This is actually a side profile, or an axial cut, of a

4    vertebral body complex, one showing on the left side stenosis

5    and one being a normal spine.

6    Q    And you used the term stenosis.  What does stenosis

7    mean, first of all?

8    A    Stenosis, by definition, means narrowing, tightness.

9    But narrowing is the term.

10   Q    Does this diagram, does this depict where the stenosis

11   is as opposed to a normal vertebra?

12   A    It does.  So as you're looking on the normal spine, the

13   structure inside here is an axial or a cross-sectional cut of

14   the spine cord.  You can see that there's white on either

15   side; left here, right here.  As you see on the stenotic

16   side, you don't see as much white.  And you can actually see

17   the spinal cord being more compressed here, here from the

18   disc and not -- and not so on the right profile here.

19             MR. TENGESDAL:  If you can take that down and put

20   the last one up, DX-345.

21   BY MR. TENGESDAL:

22   Q    And, Doctor, could you just explain starting with here,

23   what do we see over here?

24   A    Yeah.  This is actually showing a cross section, an

25   anatomical description of a cross section where you see this

1    is the disc, the spinal cord.  And then in this case, you can

2    see the exiting nerve, which is half of the neural foramen,

3    and you can see it's called -- it's just red, which is

4    showing that it's touching there.

5    Q    When you say "touching there," what is touching there?

6    A    In this particular case, you can see disc material.  So

7    as I mentioned to you before, the disc is like a jelly-filled

8    doughnut.  The confines of the gelatinous material has left

9    the disc itself, has crossed through the annulus fibrosus and

10   now is communicating with an exiting nerve.

11   Q    Did you have the opportunity to review Mr. Taylor's

12   2009, 2016 MRI scans?

13   A    I did.

14   Q    And before I ask you, what is an MRI scan?

15   A    An MRI stands for magnetic resonance imaging and it

16   allows clinicians to get a better view of not only the bony

17   structures but of soft tissues.  So it's a modality that we

18   use as clinicians to get a better picture of the lumbar,

19   cervical, thoracic spine and to see if we get herniated

20   discs, and what have you, pathology.

21   Q    Okay.  Does this show the disc material actually

22   touching the nerve?

23   A    It does, yes.

24   Q    Okay.  And can you see that on an MRI if the disc has

25   come out and is pressing on a nerve root?

1    A    Absolutely, yes.

2    Q    Okay.  And if a disc is pressing on the nerve root, what

3    happens to the nerve root?

4    A    Two things happen to a nerve root.  The nerve can get

5    inflamed and also there can be a compressive phenomena.  So a

6    lot of times what happens is the gelatinous material I spoke

7    of, which is the nucleus pulposus, normally where that's

8    confined in the human body, nothing happens.  It serves its

9    function.  It's cushioning.  It's doing its job.

10   Unfortunately, when you have a herniated disc, that jelly

11   comes out.  And what is the body's function when that

12   material comes out?  To the body, it's foreign.  It -- it

13   necessitates a huge immune response.  The body wants to fight

14   it.  It causes inflammation.  There's a lot of inflammatory

15   mediators.

16           A lot of times what happens is that jelly produces

17   what's called phospholipase A2, arachidonic acid, and

18   the other things are prostaglandins, leukotrienes, all of

19   these provide for inflammation and sometimes the body doesn't

20   know when to stop so that's very painful.

21           A lot of times you may have heard people that have

22   sciatica.  It's not a fun thing to have.  I've had that five

23   years ago.  It causes very burning electrical-type pain down

24   your leg in this case and that can be caused, as I mentioned,

25   not only because of the inflammation, but just from the sheer

1    contact of the exiting nerve.  In this case, the

2    neuroforamen.

3    Q    Based on your review of the two MRI scans of the neck,

4    the cervical spine, did the MRI show any disc pressing on the

5    nerve?

6    A    It did not.

7    Q    Based on your review of the two scans, 2009, 2016 of the

8    lower back lumbar spine, did those MRIs show any pressing of

9    the disc on that nerve coming out?

10   A    There was no pressing or no compression; no.

11   Q    Did the MRIs show a bulge of the discs?

12   A    It did show a bulge of the disc; yes.

13   Q    Okay.  When there's a bulge, does that mean it's

14   pressing on a nerve?

15   A    No.  It does not.

16   Q    Okay.  Thank you.  That's all.

17          MR. TENGESDAL:  If you could please return to the

18   witness stand.

19          (Witness resumes stand.)

20          MR. TENGESDAL:  Your Honor, if we could have as the

21   next Exhibit DX-0272 to be admitted.  It's not previously

22   been admitted.

23          THE COURT:  Any objection to the admission of

24   DX-272?

25          MR. FITZGERALD:  No objection.

1    MS. CIAMBRONE:  No objection, your Honor.

2    THE COURT:  It will be admitted without objection.

3    (Exhibit No. DX-272 received into evidence.)

4    THE COURT:  You may publish.

5  BY MR. TENGESDAL:

6  Q    Doctor, showing you a neurosurgery consult from October

7  19, 2009, did you review this note in preparation for your

8  reports?

9  A    I did.

10  Q    Can you tell us when it says "neurosurgery consult,"

11  what is the specialty of neurosurgery?

12  A    The specialty of neurosurgery is -- it's a surgical

13  subspecialty so it's the treatment when you're a

14  neurosurgeon, you could treat tumors of the brain or you can

15  treat spinal pathology.  It's a surgical specialty.

16  Q    Okay.

17    MR. TENGESDAL:  And if we can highlight the history

18  of Present Illness section.

19  BY MR. TENGESDAL:

20  Q    Did the neurosurgeon document anything about the

21  dermatofibrosarcoma?

22  A    Under the history of Present Illness, it is documented.

23  Q    Okay.  Having a history of the sarcomas, the three

24  you've talked about that were removed, can that have any

25  effect upon Mr. Taylor as it presents to epidural steroid

1   injections?

2   A     It could.  In Mr. Taylor's case in the 1990s, he

3   underwent, it says here, right hip sarcoma resected three

4   times followed by six weeks of radiation therapy.  It further

5   states that the radiation took place 14 years ago -- and, as

6   I said, in the 1990s -- and he was always told that the nerve

7   damage from the radiation -- was from the nerve -- was from

8   the radiation itself, the nerve damage.

9   Q     Okay.  Can you explain to us how radiation can cause

10  damage to a nerve?

11  A     When one undergoes I guess cancer treatment, in this

12  case the sarcoma was resected.  But sometimes when you do a

13  resection or you take the tumor out, you don't get

14  everything.

15        So in this case, he underwent six weeks of

16  radiation.  Unfortunately, when one does radiation treatment,

17  you know, you're trying to get the bad cells or tumor cells

18  destroyed.  But in that same process, the beam is -- you

19  know, you're trying to narrow or focus the beam of radiation

20  to a specific space and unfortunately you're going to, you

21  know, destroy good tissue -- whether it be good cells, good

22  nerves -- so there's going to be something called radiation

23  necrosis that causes permanent nerve damage which can happen.

24  Q     So if you get radiation necrosis to a nerve, what does a

25  human being feel, if anything, from that?

1    A    It could be painful in the sense it could cause sensory
2    disturbances.  What do I mean by that?  You may feel
3    numbness.  It will be a permanent numbness in the extremity
4    involved.  Permanent pain, the type of pain that one feels is
5    what we call -- and the fancy term is called a dysesthetic
6    pain syndrome, electrical-type pain, burning, knife-like,
7    sharp-like and it can be constant in that extremity.

8    Q    Have you ever heard of the term neuropathic pain?
9    A    Yes.

10   Q    What is -- what does neuropathic pain mean?
11   A    As I've discussed with you before, neuropathy or
12   neuropathic pain, patients will tell you that they feel
13   numbness, tingling, burning, electrical-type pains.  People
14   have heard of diabetic neuropathy.  That's a neuropathy.
15   People with diabetes, because of their blood sugars, have
16   damage to their -- some peripheral nerves and that can cause
17   a painful condition called neuropathy.

18   Q    In Mr. Taylor's case given the area where his body was
19   radiated, where would you expect that he would have this
20   neuropathic pain or nerve damage?

21   A    Mr. Taylor underwent radiation along the abdominal
22   region and right hip, right iliac crest area.  In the area of
23   the pelvis, that's where I mentioned to you before it was a
24   fancy term called plexus.  Like in the cervical spine in the
25   arm, it's called the brachial plexus.  In the lumbar spine,

1    it's actually called the lumbar plexus.  So it's not too

2    uncommon for patients that undergo radiation therapy in that

3    area that it could cause damage to those nerves that are in

4    that plexus.

5    Q   Doctor, do you have an opinion as to whether or not his

6    neuropathic pain is from the radiation?

7    A   I do, yes.

8           MS. CIAMBRONE:  Objection.  Beyond the scope of his

9    report.

10          THE COURT:  I was going to take my lunch break

11   anyways so we're going to go ahead and do that.  Ladies and

12   gentlemen, remember my normal reminder regarding your duties

13   of jury service in not discussing the case.

14          And also, just so you know, the Marshals indicate

15   that there's going to be some First Amendment activity

16   outside the front of the building so I recommend that you

17   have lunch on the second floor.  You don't have to, but it's

18   my recommendation because there's going to be some exits that

19   are closed and it might make it more difficult to get in and

20   out of the building.  So we will have you back in your seats

21   listening to evidence at 1:00 o'clock.

22          All rise for the jury.

23       (Proceedings heard in open court; jury out.)

24          THE COURT:  Jury out.  Door closed.

25          Doctor, you can step down.  Thank you so much.

1021

1    For everyone in the room, I also recommend lunch on

2    the second floor.  Make sure you avoid contact with the

3    jurors if, in fact, they have lunch there as well.

4    Do you want to take up the Rule 26 issue or -- not

5    26.  Yeah, go ahead.  Do you have an objection on that

6    particular question?

7    MS. CIAMBRONE:  I do, your Honor.  There's no

8    mention in his report of this conclusion.  The only mention

9    in his report with respect to two thousand --

10   THE COURT:  I'm sorry.  Are you near the

11   microphone?

12   MS. CIAMBRONE:  Yeah.  I'm right here, your Honor.

13   THE COURT:  Okay.  I couldn't hear you.  Go ahead.

14   MS. CIAMBRONE:  There's no mention of this opinion

15   in his report, your Honor.

16   THE COURT:  All right.  Counsel, do you want to go

17   ahead and grab the report or other disclosures so we can sort

18   it out?

19   MR. TENGESDAL:  Sure.

20   (Brief pause.)

21   MS. CIAMBRONE:  Bob, the only -- Mr. Tengesdal --

22   THE COURT:  All right.  You guys want to go off the

23   record to meet and confer?

24   MS. CIAMBRONE:  Sure.

25   THE COURT:  Go ahead.  This is off the record.

1    (Discussion off the record.)

2    THE COURT:  The parties have met and conferred.

3    The objection is withdrawn.  Anything else to take up before

4    you guys have lunch?

5    MS. CUNDIFF:  Your Honor, before the jury comes

6    back, maybe we can after lunch deal with the objections on

7    the other deposition transcript so that we could perhaps get

8    that out of the way this afternoon when Dr. Tata is done.

9    THE COURT:  Have you already done the meet and

10   confer on the designations and the objections?

11   MS. CUNDIFF:  I will, but I just want to see

12   whatever we don't resolve, we can do that before the jury

13   comes back in.

14   THE COURT:  Okay.  Can you guys come back then

15   at -- how long do you think -- I know it's hard to guess how

16   much of a fight you may or may not have, but I want to -- the

17   jury gets an hour and fifteen for lunch.  So do you guys want

18   to come back at 12:45?

19   MS. CIAMBRONE:  That's fine, your Honor.

20   MS. CUNDIFF:  That's fine.

21   THE COURT:  All right.  Go ahead.  Enjoy your

22   lunch.  See you at 12:45.  We'll sort out any deposition

23   issues at that time.  Court's in recess.

24   (Lunch recess taken at 11:48 a.m.)

25

1

2                    C E R T I F I C A T E

3    `      I hereby certify that the foregoing is a complete, true,

4    and accurate transcript of the proceedings had in the

5    above-entitled matter before the Honorable John Robert Blakey

6    at Chicago, Illinois, on March 26, 2024.

7

8    /s/*Laura LaCien*                    March 26, 2024
     Official Court Reporter               DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3   JOHN E. TAYLOR, JR.,              )  Docket No. 16 CV 3464
                                       )
 4                  Plaintiff,         )
                                       )
 5            vs.                      )  Chicago, Illinois
                                       )  March 26, 2024
 6   GHALIAH OBAISI, M.D., ARTHUR      )  12:45 p.m.
     FUNK, M.D., LOUIS SHICKER,        )
 7   M.D., TARRY WILLIAMS AND RANDY    )
     PFISTER,                          )
 8                                     )
                    Defendants.        )
 9
                              VOLUME 5B
10                  TRANSCRIPT OF PROCEEDINGS - Trial,
        BEFORE THE HONORABLE JOHN ROBERT BLAKEY, and a Jury
11
     APPEARANCES:
12   For the Plaintiff:         DUANE MORRIS LLP
                                BY:  MR. RICHARD P. DARKE
13                                   MS. ROSANNE CIAMBRONE
                                190 South LaSalle Street
14                              Suite 3700
                                Chicago, Illinois 60603
15
     For Defendants Ghaliah:    CONNELLY KRAUSE LLC
16   Obaisi, M.D. and           BY:  MR. ROBERT S. TENGESDAL
     Arthur Funk, M.D.:              MS. CORINNE M. CUNDIFF
17                              500 West Madison Street
                                Suite 3900
18                              Chicago, Illinois 60661

19   For Defendants Louis       ILLINOIS ATTORNEY GENERAL'S OFFICE
     Shicker, M.D., Tarry       BY:  MR. KEVIN J. FITZGERALD
20   Williams and Randy              MR. THOMAS PIETRYLA
     Pfister:                   115 South LaSalle Street
21                              28th Floor
                                Chicago, Illinois 60603
22
     Also Present:  Mr. Kyle Dingus, paralegal
23
                     Laura LaCien, CSR, RMR, F/CRR
24                       Official Court Reporter
                  219 South Dearborn Street, Room 1212
25                      Chicago, Illinois 60604
                            (312) 408-5032
```

1024

1        I N D E X

2
                                                    PAGE
3    Narayan S. Tata, M.D.

4    Direct Examination (Cont'd) by Mr. Tengesdal    1027
     Cross-Examination by Ms. Ciambrone              1076
5    Redirect Examination by Mr. Tengesdal           1094
     Recross-Examination by Ms. Ciambrone            1102
6    Redirect Examination by Mr. Tengesdal           1103

7    David E. Morris

8    Via Deposition                                  1106

9    Robert Lawrence Reed, II

10   Direct Examination by Mr. Tengesdal             1116

11

12

13

14             E X H I B I T S

15       Description                              Page

16       Exhibit No. DX-328                       1099
         Exhibit No. DX 0072-A                    1119
17       Exhibits Nos. DX 338, 336, 347,          1139
         337, and JX 0026

18

19

20

21

22

23

24

25

1    (Proceedings in open court.  Jury out)

2        THE COURT:  16 CV 3464.  All parties, all attorneys

3    present.

4        I know the parties were going to meet and confer

5    regarding some upcoming deposition designations.  Are there

6    any outstanding disputes on those or are they agreed?

7        MS. CUNDIFF:  No, Your Honor, we've worked all of

8    those disputes out.  Nothing is remaining.

9        MR. DARKE:  Agreed.

10       THE COURT:  Okay.  I'm going to bring the jury out at

11   1:00, assuming everybody got back from lunch on time.  Any

12   other issues we need to take up before we bring in the jury?

13       MS. CIAMBRONE:  No, Your Honor.

14       THE COURT:  Okay.  How is the schedule for the rest

15   of the day?  I don't know, sometimes things go faster than you

16   think.  What is your thought?

17       MR. TENGESDAL:  So, Your Honor, after Dr. Tata is

18   done, we are going to read in the deposition, which will

19   probably be 20, 30 minutes.  And then Dr. Reed has arrived.

20   He's waiting in the witness room.  So we at least can get

21   through his CV, I imagine, today.

22       THE COURT:  Okay.  And that will take us to the end

23   of the day?

24       MR. TENGESDAL:  I think so.

25       THE COURT:  Okay.

1    MR. TENGESDAL:  Will you take the 3:00 o'clock break
2  that we normally take?
3    THE COURT:  Yeah, we have a 3:00 o'clock break.
4  That's the long afternoon break.  And then you don't think
5  you'll pass that witness until 5:00?
6    MR. TENGESDAL:  No.  I think we'll be on Dr. Reed
7  before we leave today.
8    THE COURT:  On Dr. Reed?
9    MR. TENGESDAL:  Yes.
10    THE COURT:  Okay.  Be done with him for the day?
11    MR. TENGESDAL:  No.  Oh, no, no, no.
12    THE COURT:  All right.  How far are we going to get
13  with Dr. Reed?
14    MR. TENGESDAL:  We're going to get about an hour in.
15  We'll get through his CV and maybe some of his explanation of
16  the anatomy, stuff like that.
17    THE COURT:  Okay.  So a half hour deposition and then
18  you've got testimony all the way to 5:00?
19    MR. TENGESDAL:  Yes.
20    THE COURT:  Okay.  I've gotcha.  Cool.
21    All right.  If the jury is here early, let's go
22  early.
23    (Pause.  Jury in)
24    THE COURT:  Good afternoon, everyone.  Have a seat.
25  We're going to continue with the doctor's testimony.

Tata - direct by Tengesdal

1027

1   Sir, you are still under oath.

2   Counsel, whenever you are ready.

3   MR. TENGESDAL:  Thank you, Your Honor.

4   NARAYAN S. TATA, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

5   DIRECT EXAMINATION (Resumed)

6   BY MR. TENGESDAL:

7   Q.  Good afternoon, Dr. Tata.

8   The neuropathic pain that Mr. Taylor has from

9   radiation, is that a permanent damage to the nerve?

10  A.  Yes, it is.

11  Q.  What are the medications that are used to treat

12  neuropathic pain?

13  A.  Sure.  The class of medications that are used to treat

14  neuropathic pain are membrane stabilizer agents such as

15  Neurontin, otherwise known as gabapentin.  There is a

16  medication Elavil or amitriptyline, Cymbalta or duloxetine; or

17  Lyrica, or which is also known as pregabalin.

18  Q.  Was Mr. Taylor prescribed any neuropathic agents for his

19  pain?

20  A.  Yes, he was.

21  Q.  What were they?

22  A.  Specifically he was on gabapentin and Elavil as well as

23  Cymbalta.

24  Q.  Gabapentin, is that what you said what Neurontin is?

25  A.  Correct.

Tata - direct by Tengesdal

1028

1    Q.   Okay.  And are those medications targeted for nerve pain

2    as opposed to just pain?

3    A.   That is correct.

4    Q.   Okay.  And have you ever heard of the term "radiation

5    necrosis"?

6    A.   Yes, yes.

7    Q.   What is radiation necrosis?

8    A.   "Necrosis" in Latin is "necrose," which means death.  So

9    radiation necrosis by definition is tissue dying, it could be

10   skin, tendons, fascia, muscles, nerves, it's in the area,

11   necrosis is death, dying.

12   Q.   Did Mr. Taylor have any body areas where he had radiation

13   necrosis?

14   A.   Yes, he did.

15   Q.   Where was that?

16   A.   Specifically along the right lower quadrant, abdomen,

17   right iliac crest, that area.

18   Q.   Okay.  And right iliac crest, where is that at?

19   A.   On our body, we have our hips, the top of the bone or your

20   hip bone on the right side would be the iliac crest or the top

21   of the hip area.

22   Q.   How does one get radiation necrosis?  What's the causative

23   agent?

24   A.   In Mr. Taylor's case, he had a malignant neoplasm or

25   tumor.  That was treated not only by multiple surgeries or

Tata - direct by Tengesdal

1029

1    resection, he also underwent six weeks of radiation therapy.

2    So the radiation that is being introduced or targeted in that

3    area, as I mentioned before, it's to help target the bad cells

4    or tumor cells.  But unfortunately it can get, I guess we can

5    call it collateral damage, good cells around the area.

6    Q.  If you have radiation necrosis, the damage, do the

7    neuropathic agent medications you testified to today, do they

8    help with that type of pain?

9    A.  Yes, it can.

10   Q.  Okay.

11           MR. TENGESDAL:  And then, Your Honor, permission to

12   publish to the jury and the witness what has previously been

13   admitted into evidence as Exhibit JT-081.

14           THE COURT:  Go ahead.

15   BY MR. TENGESDAL:

16   Q.  You'll see it on your screen, doctor.

17           Showing you JT-081, doctor, it looks like it's a

18   radiology report from October 4, 2016.  Did you review this as

19   part of your review?

20   A.  I did.

21   Q.  Okay.  And what area of the body was this MRI report for?

22   A.  The lumbar spine.

23   Q.  And was the date in 2016 in October?

24   A.  October 14th -- I'm sorry, October 4th of 2016, yes.

25   Q.  Okay.  Do you know who ordered this MRI?

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 97 of 234 PageID #:22387
Tata - direct by Tengesdal
1030

1  A.   Yes, I do.

2  Q.   Who was it?

3  A.   It was Dr. Obaisi.

4  Q.   Do you know the circumstances of why Dr. Obaisi ordered a

5  lumbar MRI for Mr. Taylor?

6  A.   Yes.  This MRI was done in 2016.  His prior lumbar MRI was

7  done in 2009.  So there had been some quite some time.  So he

8  wanted to check the progression -- bless you -- as far as

9  progression and disease from 2009 'til 2016, and also as per

10 recommendations per the UIC Pain Clinic as well.

11 Q.   When you say pursuant to UIC pain recommendations, in one

12 of Mr. Taylor's visits with the pain service, did they suggest

13 to Dr. Obaisi to get an updated lumbar MRI?

14 A.   Yes, they did.

15 Q.   Okay.  And we see the document here.  Would you agree the

16 MRI, the pain service orders were carried out by Dr. Obaisi?

17 A.   Yes, they were.

18 Q.   And the impression section of an MRI report, what does

19 that typically contain?

20 A.   It is the impression that a radiologist -- it's a summary

21 per se of the actual images that a radiologist dictates.

22 Q.   Okay.  And is it another way of saying when the

23 radiologist looks at it, and he says, oh, this is what's

24 pertinent, puts it in a report for the referring doctor?

25 A.   Yes.

Tata - direct by Tengesdal

1031

1  Q.  And what was the impression number 2?

2  A.  I will read verbatim.  "Increasing L4-L5 degenerative disc

3  disease with loss of T2 signal and disc height with endplate

4  deformities with mild narrowing of the thecal sac without

5  compromise of the neural foramina.  These findings are new

6  from the previous study dated August 2009."

7  Q.  Okay.  Degenerative disc disease, can you explain to the

8  jury, what does that mean?

9  A.  In laymen's terms, degenerative disc disease will be, as I

10  mentioned earlier, there is a progression of disc pathology or

11  disc morphology.  So when I say "degenerative disc disease," I

12  mentioned to you that discs can dehydrate.  They lose water

13  content or they desiccate.  So that's just the natural

14  progression, as we get older, we're all going to get

15  degenerative disc disease at some point.  It just depends on

16  what phase in our life we are, and perhaps sometimes it's

17  accelerated if one undergoes trauma.

18  Q.  And for that impression 2 that you read at L4-5, when it

19  says "without compromise of the neural foramina," what does

20  that denote?

21  A.  That's a key statement.  So when you are saying "without

22  compromise of the neural foramina," it's basically saying that

23  there is no touching of any structures, and it's not

24  encroaching in the neural foramina.  So no compression would

25  be found.

Tata - direct by Tengesdal

1032

1  Q.  And is that what you demonstrated to the jury earlier,

2  that if the disc pushes on the nerve, coming out of that

3  little hole area on the side, that then that could produce the

4  pain down the leg?

5  A.  That is correct.

6  Q.  Okay.  Is there any indication based on this MRI that

7  there is any structure, disc, bone, pressing on his nerve root

8  at that L4-5 level?

9  A.  There is not.

10  Q.  Okay.  And impression number 1, if we could do, is that a

11  different level where it says L5-S1?

12  A.  That is a different level, yes.

13  Q.  Okay.  And what was the impression number 1?

14  A.  So in the lumbar spine, this would be the lowest disc

15  level in the lumbar spine.  And verbatim it says, "Progressive

16  degenerative disc disease at the L5-S1 level with increasing

17  loss of disc height and continued diffuse disc bulge and mild

18  narrowing of the thecal sac without compromise of the neural

19  foramina."

20  Q.  And is this the level that's below on the spine the L4-5

21  level?

22  A.  That is correct.

23  Q.  And without compromise of the neural foramina, would it be

24  the same for this level as what you testified for L4-L5?

25  A.  Yes.

Tata - direct by Tengesdal

1033

1  Q.  And then progressive degenerative disc disease, does that

2  mean that from the prior study in 2009, seven years later

3  there has been a progression?

4  A.  Yes.

5  Q.  And what is the significance of progressive degenerative

6  disc disease?

7  A.  You know, when you are looking at the number of years that

8  have gone by, the fact that there is not any compromise, I

9  would expect that there would be progressive degeneration.

10      And that can mean in laymen's terms just increasing

11  loss of disc height or perhaps increasing loss of water

12  content, which you can see on specific images of an MRI spine,

13  of the lumbar spine.

14  Q.  For an interventional pain management physician reviewing

15  this note, is there any significance to it that would guide

16  treatment?

17  A.  In this case, not really.  The keywords to really look at

18  at both levels, specifically at L4-L5 and L5-S1, is that there

19  is no compromise of the neural foramina.  So I wouldn't expect

20  any type of, as I've mentioned the term before, radicular

21  findings, the fact that there is no neural structure that is

22  being touched on or impinged, I wouldn't expect anything going

23  down the leg per se.

24  Q.  Could the degenerative disc disease, could that cause Mr.

25  Taylor to feel lower back pain?

Tata - direct by Tengesdal

1034

1    A.  By and large it should, yes, it can, and specifically

2    axial low back pain or back pain just across the back.  And

3    what that may feel like is, I feel it everyday, sometimes it's

4    a stiffness, decreased range of motion, and that's pretty much

5    it, just across the back, like a dull achy type pain.

6    Q.  If there is no compromised pressure of the nerve root, and

7    a patient is having complaints of axial back pain, is there an

8    indication for that to do an epidural steroid injection?

9    A.  Not that I can see.  I'm looking for clinical signs and

10   symptoms of inflammation, and specifically on objective

11   findings of any type of radicular symptoms.  So no, I would

12   not see there is an indication for an epidural steroid

13   injection.

14   Q.  Okay.

15           MR. TENGESDAL:  And then if we can bring up, please,

16   JT-079, which has previously been admitted into evidence.

17           THE COURT:  Go ahead, counsel.

18   BY MR. TENGESDAL:

19   Q.  So we're showing you here, doctor, it looks like it's an

20   MRI of August 31, 2016.  Is this different than the one we

21   just looked at?

22   A.  It is.  It's an MRI of the cervical spine.

23   Q.  That's up in the neck?

24   A.  That's in the neck region, yes.

25   Q.  Okay.  And was Dr. Obaisi asked to do this one as well?

1    A.   Yes, he did.  He was.

2    Q.   Okay.  And did you review this as part of your opinions in

3    this case?

4    A.   I did.

5    Q.   And if it was ordered by UIC Pain to do this MRI, since we

6    see that it was done, would you agree that Dr. Obaisi

7    complied?

8    A.   Yes.

9    Q.   So we saw --

10              MR. TENGESDAL:  We're done with this one for the

11   moment.

12   BY MR. TENGESDAL:

13   Q.   If somebody has both cervical and lumbar MRIs in 2009, and

14   the pain service asks to have new ones done in 2016, what are

15   you looking for in Mr. Taylor's case?

16   A.   I would like to see if there is a progression of disease,

17   and if so, if that would change management.

18   Q.   Okay.  And did we see progression of the disease?

19   A.   We did see progression of degenerative disc disease, yes,

20   we did.

21   Q.   Okay.  Was there any progression of the disc to what you

22   described earlier as like a herniation or extrusion?

23   A.   There is no herniated disc.  There is no compression.

24   There is no impingement.

25   Q.   Okay.  In the cervical spine, was there any impingement on

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 103 of 234 PageID #:22393
Tata - direct by Tengesdal
1036

1  the nerve roots?

2  A.   There was documented stenosis at multiple levels.  But as

3  far as impingement, no.

4  Q.   Okay.  And stenosis, can you just educate us again, what

5  does that mean when you see that on the MRI?

6  A.   "Stenosis" means narrowing, as I said before, narrowing.

7  Narrowing can occur in multiple areas.  It can happen in the

8  central canal or it can happen in the neural foramen.

9  Q.   Was there any degenerative disc disease found on this 2016

10  cervical MRI?

11  A.   Yes, there was.

12  Q.   And can you tell us at what levels?

13  A.   It was at C3-4, 4-5, and 5-6.

14  Q.   Had your comparison to 2016, had the disc disease

15  progressed?

16  A.   Yes, it did.

17  Q.   Okay.  And did Mr. Taylor ever have prior trauma?

18  A.   Yes, he did.  As per his deposition, he has a complicated

19  past medical history.  He was involved in a motor vehicle

20  collision in the '80s, which was the start of his neck and low

21  back pain.

22  Q.   And can you get degenerative disc disease in your body

23  years following up a traumatic incident?

24  A.   Yes.

25  Q.   Okay.  Can you get degenerative disc disease absent

Tata - direct by Tengesdal

1037

1    trauma?

2    A.  Absolutely.

3    Q.  Okay.  Do you get degenerative disc disease as we grow

4    older?

5    A.  Unfortunately, we do, yes.

6    Q.  Okay.  And can you explain why that occurs absent even

7    having a trauma?

8    A.  Unfortunately, it's the natural progression of life.  As I

9    stated before, discs have water.  Water has a tendency to

10    desiccate or dry up is the term, and it starts after our 20s.

11    You don't have to do any trauma, and it can still occur.

12         The key is if it becomes symptomatic.  And as we get

13    older in certain individuals, it can be symptomatic.  When I

14    treat older patients in my clinic, they'll come and they'll

15    have MRI findings of stenosis and, you know, we try to treat

16    it as conservative as possible.  And by and large, they come

17    in with axial pain, whether it be neck, only in the neck, or

18    in the back.

19    Q.  When you got the materials that we went over, you reviewed

20    them, did you come to an understanding of when the deceased

21    Dr. Obaisi provided any care to Mr. Taylor for his neck or

22    lower back pain?

23    A.  Yeah, it was from 2012 until his passing in December of

24    2017.

25    Q.  Roughly five, five and a half year period?

Tata - direct by Tengesdal

1038

1   A.   I believe so, yes.

2   Q.   Okay.  And then the Stateville Illinois Department of

3   Corrections records where Dr. Obaisi was practicing at, did

4   you take a look at those in addition to UIC Pain Medicine?

5   A.   I did.

6   Q.   Okay.  Over the course of your review, did you see where

7   Dr. Obaisi had recommended that Mr. Taylor go out to see pain

8   management at UIC for evaluation?

9   A.   I did.

10  Q.   Did Dr. Obaisi send the patient out each and every time

11  Mr. Taylor came in and said, "My neck or lower back hurts"?

12  A.   Not each and every time, no.

13  Q.   Okay.  Why would Dr. Obaisi choose sometimes to send him

14  for pain management and not others when he has his neck or low

15  back pain?

16        MS. CIAMBRONE:  Objection, foundation.

17        THE COURT:  Sustained as to form of the question.

18        MR. TENGESDAL:  Okay.

19  BY MR. TENGESDAL:

20  Q.   Can you tell us the clinical indications of why a

21  physician would send a patient for pain management epidurals

22  based on either neck or lower back pain?

23  A.   If on clinical examination per objective findings, if

24  there is a radicular component of pain, as I mentioned to you

25  before, radicular component meaning in this case if there is

Tata - direct by Tengesdal

1039

any type of pain involving the arms or the legs, and that

would indicate an inflammatory process we would think.  And an

epidural steroid injection is only indicated to help with

inflammation.

Q.  And what you described before, the axial pain, if somebody

comes in and says, "I have neck pain" and the doctor does

whatever tests you do, do the exam and you determine it's

axial back pain, would you then send the patient for either a

cervical or lumbar epidural?

A.  I would not personally, no.

Q.  Okay.  Why not?

A.  It's not clinically indicated.  I have patients that come

and are evaluated all the time in my clinic, and sometimes

they come with neck pain, they come with back pain, they come

with knee pain.  I'll do a complete history.  I'll do a

complete examination.  And it could be from a muscle spasm,

and in which case there is no indication to do an epidural

steroid injection.

      I will do an exam to check muscle strength.  I'll do

an exam to check sensory, sensation.  Is there a decrement in

sensation.  I'll check reflexes.  I'll check for what we call

myelopathic signs, I'll get into that later, but these are

signs that are emergency signs that would perhaps indicate an

intervention such as an epidural steroid injection.

Q.  If you're looking at a note and it says, you know, Mr.

Tata - direct by Tengesdal

1040

1    Taylor presents with 7 out of 10 neck pain, just reading

2    something like that, can you tell whether or not it was either

3    axial or -- what is the one going down your arm?

4    A.   Radicular, radiculopathy.

5    Q.   Radicular.  Can you tell based on that?

6    A.   You cannot, no.

7    Q.   Okay.  Once a patient tells a doctor "I have neck pain,

8    low back pain," do you need to do a physical exam to determine

9    why the pain is there?

10   A.   Yes.

11   Q.   Okay.  If Dr. Obaisi then did an examination in response

12   to Mr. Taylor's complaints of pain, what would be a finding

13   that would say that it's axial as opposed to radicular?

14            MS. CIAMBRONE:  Objection, lack of knowledge,

15   foundation.

16            THE COURT:  Overruled.

17   BY THE WITNESS:

18   A.   To answer your question, when I'm doing a physical

19   examination, you mentioned axial pain, so if we're talking in

20   the cervical region, if I am palpating or touching a patient,

21   and if I am able to reproduce the pain in the cervical or neck

22   region, that would be axial pain.

23            If I'm able to perform certain maneuvers, these

24   maneuvers can perhaps try to exacerbate or impinge a nerve.

25   There are specific terms for these, one is called Spurling

1  sign in the neck, there is a Hoffman sign.  There is different

2  maneuvers you would do, and if they elicit pain that travels

3  down an extremity, that would be something that I would be

4  concerned about that causes radiculopathy.

5       Likewise, in the lumbar spine, when you are looking

6  for nerve impingement, there are called adverse dynamic neural

7  tension signs.  Some of these are if you do a straight leg

8  raise test, something called a seated slump testing, you are

9  basically trying to stretch the nerve in various positions to

10  elicit pain.  And if you do, that corresponds or corroborates

11  that you perhaps have radiculopathy.

12       That in conjunction with other physical findings,

13  along with perhaps imaging findings, would then necessitate a

14  proper course of treatment.

15  BY MR. TENGESDAL:

16  Q.  Based on your review of Dr. Obaisi's records, were there

17  times after Mr. Taylor reported pain that he said:  I'm gonna

18  send you out to UIC for pain management for either the neck or

19  lower back to get an epidural steroid injection?

20  A.  There were times, yes, absolutely.

21  Q.  Okay.  And when you looked at the records, were there also

22  times where Dr. Obaisi saw the patient, and Mr. Taylor said,

23  "Well, I've got neck pain or lower back pain," and Dr. Obaisi

24  didn't refer him out?

25  A.  That is correct.

1           MS. CIAMBRONE:  Objection, foundation.

2  BY THE WITNESS:

3  A.  Yes.

4           THE COURT:  What part of the foundation is missing?

5  He reviewed all the records.

6           MS. CIAMBRONE:  That is fine, Your Honor.

7           THE COURT:  Okay.  Objection withdrawn.  Go ahead.

8  Pose a question.

9  BY MR. TENGESDAL:

10  Q.  Were there times, doctor, when you reviewed the medical

11  records and Mr. Taylor had come in and said, "I've got neck

12  pain, low back pain," Dr. Obaisi evaluated him and did not

13  send him out for epidural steroid injection?

14  A.  Yes, there were, yes.

15  Q.  Okay.  If a patient such as Mr. Taylor with the

16  degenerative disc disease that you described from the MRI

17  studies, would that mean that he always has an inflammatory

18  component?

19  A.  No.

20  Q.  Why not?

21  A.  An inflammatory component could perhaps have it if it's

22  acutely.  Sometimes we may lift something or do something

23  wrong, and maybe that could be a nidus of causing

24  inflammation.  But just because there is pain on every

25  occurrence, does it mean there is an inflammatory component?

Tata - direct by Tengesdal

1043

1   No.

2   Q.   So if a patient has degenerative disc disease such as Mr.

3   Taylor, and they do something, an activity or something, can

4   they irritate the discs?

5   A.   That can happen at times, yes.

6   Q.   Okay.  And if the discs become irritated, can that cause

7   symptoms that would be inflammatory in nature?

8   A.   Sometimes, yes.

9   Q.   Okay.  But if Dr. Obaisi saw that during an exam,

10  correlated that to his pain, would that then be an indication

11  for Dr. Obaisi to say:  I think you could benefit from

12  epidural steroid injections?

13  A.   Yes.

14  Q.   Is chronic degenerative disc disease in either the

15  cervical or lumbar spine that you reviewed, did that ever pose

16  any risk of harm to Mr. Taylor?

17  A.   I don't think so, no, not at all.

18  Q.   All right.  Now, if you can -- you told us you do epidural

19  steroid injections.  Can you just explain for the jury what

20  that means.  How do you do one?

21  A.   It's pretty complex.  But I have patients come in.

22  They're evaluated.  Some get sedation, some don't get

23  sedation, just depends on the patient.

24          They're basically lying on their stomach on an x-ray

25  table.  In my procedure suite I have a fluoroscopy or

Tata - direct by Tengesdal

1044

1    fluoroscopy machine that is live x-ray.

2         Before we begin, patients do get some medication

3    through the IV if they so choose.  That's to just make them

4    feel comfortable.  I call that twilight sedation, so they're

5    not completely knocked out.  That's more from a comfort point

6    of view.

7         The area that we're doing the procedure on is prepped

8    in sterile fashion.  So we want to make sure there is no

9    infection, and we get a sterile field.  And the area is then

10   anesthetized with a local anaesthetic, lidocaine.  And then I

11   use an epidural needle, very gently and in micromovements

12   using the live x-ray to get to the epidural space.  And there

13   is various techniques that we do to confirm that I'm in the

14   epidural space.

15        I do inject contrast, which is able to be seen on

16   x-ray.  That usually outlines the nerve and tells me I'm in

17   the epidural space.  Once I'm there, I then inject steroid.

18   Q.   All right.  It's a new term, "epidural space."  Where is

19   that on the body?

20   A.   That's actually a space, it's a potential space, it's

21   posterior or behind the spinal cord.

22   Q.   Okay.  And steroid, is that a drug?

23   A.   A steroid is a medication.  It is a drug, yes.

24   Q.   Okay.  And what type of drug, I guess, is steroid?

25   A.   Well, it's an anti-inflammatory.  There is anabolic

Tata - direct by Tengesdal

1045

1    steroids and there is steroids that decrease inflammation.

2    The ones that we're using are the ones that decrease

3    inflammation.

4          Specifically in Mr. Taylor's case on review of the

5    records, methylprednisolone or Depo-Medrol was used for his

6    epidural steroid injections.

7    Q.   Okay.  And then injection, are you taking like a needle,

8    almost what you see, and then there is like medicine and you

9    are putting it in close by the spine?

10   A.   Yes, you are.

11   Q.   Okay.  And then once you get it in this epidural space,

12   what do you do?

13   A.   I confirm that I'm in the epidural space, both

14   anatomically with the use of the x-ray machine.  And once I

15   feel comfortable that I'm anatomically in the correct

16   location, I confirm that I'm in that space with contrast or

17   dye.

18         And why that is important to use dye, I mean, these

19   used to be done blindly before the advent of x-rays and what

20   have you, and it was done safely, but in some instances we've

21   had complications.

22         And why using dye is you don't want to have what is

23   called vascular uptake.  In certain areas of the spine, and it

24   can vary from patient to patient, there is vasculars.  What do

25   I mean by "vascular"?  There are structures such as arteries

Tata - direct by Tengesdal

1046

1   and veins that accompany the nerve in the neural foramen,

2   let's say, and you don't want to necessarily be close to a

3   vascular structure, because if you are injecting a steroid in

4   that structure, it could perhaps cause paralysis.

5        So I under live x-ray guidance inject the contrast,

6   make sure that it's in a safe way, safe place.  And then once

7   I've ascertained it is safe, I then inject the steroid around

8   and near the nerve root.

9   Q.   Okay.  When you inject a steroid, you put it in the area,

10  what happens?  Does it go all over the body?

11  A.   No.  It's very localized.  As a matter of fact, when you

12  are injecting the dye, you can actually see the dye spread

13  localized in that area.  And a lot of times it will outline

14  the nerve root and it will only be in that local area.

15  Q.   Okay.  If you are sticking a needle in close to the spine,

16  let's talk about the neck first, is there any risks associated

17  with the procedure?

18  A.   There are a lot of risks that are potentially involved.  I

19  always tell my patients when I give consent, there could be a

20  risk of bleeding, there could be risk of infection, nerve

21  damage, paralysis and death.

22  Q.   And how about for the lower back, is it the same risks or

23  different?

24  A.   It's actually the same thing.  Obviously in the cervical

25  region, there may be more risk involved, and the reason being

Tata - direct by Tengesdal

1  is you don't have as much tolerance.  When you are injecting a

2  needle in the space, the canal diameter in the cervical spine

3  is much less than the diameter in the lumbar spine and,

4  therefore, there is more intricacies involved, but the risks

5  are the same.

6  Q.  Okay.  So the medication is, I take it, delivered locally

7  to the area, whatever area of the spine?

8  A.  Yes.

9  Q.  And how does the steroid work?  What does it do?

10  A.  As I was demonstrating with the models earlier, the disc

11  is like a jelly-filled donut.  That jelly has inflammatory

12  mediators, call it an inflammatory soup.  And why do we call

13  it soup?  It's just a lot of inflammatory mediators.  There is

14  phospholipase A2, there is prostaglandins, leukotrienes.

15       And once the body sees them, let's say -- so in this

16  case the only way a body can see that inflammatory so-called

17  soup is when it's exposed and outside the confines of a disc.

18  And let's say that happens.  Then the body wants to fight it.

19  It sends its arsenal, it's infantry, so to speak, to try and

20  attack that area to try and help the body heal thyself.

21       What a steroid does is it helps to kind of curb it

22  down and decrease the inflammation by stopping arachidonic

23  acid from forming and stopping at that point, and the idea is

24  to decrease the inflammation around that area.

25  Q.  Okay.  The drug, the steroid drug, does it do anything

Tata - direct by Tengesdal

1048

1    other than the goal of reducing inflammation?

2    A.   No, it does not.

3    Q.   Okay.  Is that why you give epidural steroid injections

4    for inflammation?

5    A.   Yes, that is correct.

6    Q.   Okay.  With the conditions that Mr. Taylor has in his

7    cervical spine with the stenosis, the different areas where he

8    has the discs, same thing with the lower disc, is there ever

9    any clinical indication that they have to be put on any type

10   of schedule for when they do it?

11   A.   There can be some instances.  But in Mr. Taylor's case,

12   there is absolutely no indication for a schedule of epidurals,

13   none whatsoever.

14   Q.   Can you explain why?

15   A.   Yeah.  There are associated risks that are associated with

16   epidurals.  It's not a -- it is an elective procedure.  And

17   when I tell my patients, and I ask them and tell them about

18   epidurals, I do it when it's clinically warranted.  And as I

19   mentioned to you before, the clinical indications of doing

20   epidurals is when you suspect inflammation.

21          When you suspect an impingement of a nerve, when you

22   are able to see objectively and from perhaps imaging if there

23   is impingement on a nerve, that would be the indication of

24   doing an epidural steroid injection.

25   Q.   You mentioned the term "acute injury," what does "acute

Tata - direct by Tengesdal

1049

1  injury" mean?

2  A.  Acute, acute is sudden.  You had mentioned or I had

3  mentioned earlier before, perhaps in the cervical spine,

4  because of stenosis, there is narrowing, the tolerance is not

5  as much.  So perhaps if you do something, you wake up in the

6  morning, you lift something wrong, could that perhaps cause

7  inflammation?  It could in the absence of having a herniated

8  disc.

9  Q.  You've used earlier the term that he has chronic

10 degenerative disc disease.  How is chronic different from what

11 you just described as acute?

12 A.  Well, "acute" means it just happened.  I mean, could it be

13 10 days?  It could be a day, it could be a week, it could be

14 two weeks.  Chronic means chronic, lifelong.  It's going to be

15 there.  It's not going to get any better.  If anything, it

16 could progressively get worse.

17 Q.  If a patient doesn't have radicular pain or any signs of

18 inflammation, either their neck or their lower back from these

19 disc problems, do they need to get an epidural injection?

20 A.  I see no reason why they would, no.

21 Q.  Okay.  Would that be because the steroid can't affect if

22 there is no inflammation?

23 A.  If there is no inflammation, the steroid would do nothing.

24 Q.  Okay.  So if there is just some problems with the bone,

25 like stenosis, you're saying the steroid wouldn't affect that

Tata - direct by Tengesdal

1050

1 condition?

2 A. That is correct.

3 Q. Okay. Will epidural steroid injections, can they cure the

4 conditions Mr. Taylor has in his cervical or lumbar spine?

5 A. No.

6 Q. Why not?

7 A. As we stated before, as I stated, it's a chronic

8 degenerative condition. And without having any inflammation,

9 it's not chronic inflammation or a chronic inflammatory

10 process, so there would be no role for a schedule of epidurals

11 in perpetuity, not at all.

12 Q. For Mr. Taylor's degenerative spinal condition, if he had

13 inflammation going on, and an epidural steroid injection was

14 performed, is there any expectation of what would be the

15 result?

16 A. Yeah. If there was acute inflammation, and an epidural

17 steroid injection is performed, the hope would be that he

18 would get some relief, yes.

19 Q. Okay. And when you say the hope is that he gets some

20 relief, is there patient variability?

21 A. Absolutely.

22 Q. Okay. So is there any like charts you can go to that

23 says, oh, cervical or lumbar epidural steroid, here is the

24 schedule?

25 A. There is none. It's not standard of care, and I don't

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 118 of 234 PageID #:22408
Tata - direct by Tengesdal
1051

1  practice that way.  No.

2  Q.  Okay.  Do you have patients similarly situated to Mr.

3  Taylor with his conditions where you do an epidural injection

4  and they don't require any further therapy?

5  A.  Absolutely.

6  Q.  Okay.  Do you have patients like Mr. Taylor that the

7  epidural doesn't work and you try multiple times?

8  A.  Occasionally.  I usually do up to two.  And if they don't

9  work, we kind of stop it there and do more conservative

10  measures.

11  Q.  So if you stop and you do more conservative measures, what

12  would those be?

13  A.  Physical therapy, topical analgesics and oral medications.

14  Q.  Do you understand the concept of efficacy I believe is the

15  word?

16  A.  I do.

17  Q.  Okay.  What is your knowledge/review of the efficacy of

18  epidural steroid injections?

19  A.  Well, sure.  There has been a lot written about this

20  obviously.  Most recently in 2022, Yang, et al. published a

21  meta-analysis.  What that basically means is they looked at

22  all the available literature, multiple studies, randomized

23  control studies, and specifically in this case it was

24  randomized control studies looking at lumbar radicular pain.

25          So they took patients with lumbar radicular pain.

Tata - direct by Tengesdal

1052

1  They split them up in two.  So 50 percent were treated with

2  conservative measures, maybe oral analgesics and therapy, 50

3  percent were treated about epidural steroid injections.  And

4  it was shown that there is only short-term improvement with

5  the use of epidural steroid injections.

6          When you looked long term, there was no significant

7  improvement whatsoever.

8  Q.  Short term, they may work?

9  A.  Short term, it may work.

10 Q.  Okay.  If a patient had a schedule to go for, let's say

11 they got two week out appointment, supposed to go April 1 to

12 get an epidural injection, and they showed up and they either

13 didn't have pain or any signs for the physician of an

14 inflammatory process, would an epidural steroid injection be

15 given by a doctor such as yourself?

16 A.  No, it would not.

17 Q.  I'm going to switch topics now and ask you about what you

18 discussed in your report about immunocompromised.

19          Can you explain to the jury when you say

20 "immunocompromised," big word, what does that mean?

21 A.  Immunocompromised means you're susceptible to infections.

22 Basically it means that.  So when you say "susceptible," are

23 you susceptible to the common cold more so?  Sure.  Are you

24 susceptible to getting more pneumonia, meningitis?  So you are

25 just susceptible to develop infections.

Tata - direct by Tengesdal

1053

1  Q.  Does Mr. Taylor have any conditions that would render him

2  immunocompromised?

3  A.  He does.  His history of the DFSP, dermatofibrosarcoma

4  protuberans, which is a malignant tumor, puts him at an

5  immunocompromised state, yes, it does.

6  Q.  Okay.  And you're aware, I think you testified earlier

7  that he had three of these occurrences?

8  A.  He did, yes.

9  Q.  Okay.  How does immunocompromise, is that bad for the

10 body?

11 A.  You have to be careful, absolutely.  It can be bad, yes.

12 Q.  Does steroids have any effect adverse on a patient who is

13 immunocompromised?

14 A.  I tell patients it can be fuel to the fire.  If you are

15 already immunocompromised, use of steroids, whether it be oral

16 or local in the case of an epidural steroid injection can

17 actually make your immunosuppression worse.  It's temporary,

18 but it can make it worse.

19 Q.  Okay.  And if you get a steroid, you are

20 immunocompromised, and it makes it worse in some way, what are

21 the potential ramifications of that?

22 A.  You are more susceptible for infection, that's why.  I

23 mean, you can cause adrenal insufficiency.  But mainly you

24 don't have want to have a recurrence of perhaps cancer.

25 Q.  Okay.  Are there any, I guess, published papers or

Tata - direct by Tengesdal

1054

1    standard of care on how you treat patients who are

2    immunocompromised with epidural steroid injections?

3    A.    Yeah.  When I was in medical school, it's common knowledge

4    just in medical school, I didn't have to even do a residency,

5    in medical school we're taught that immunosuppression, use of

6    steroids, cancer, you are more susceptible and to be in an

7    immunocompromised state with the mere fact that you've had

8    cancer.  You have to be more judicious, be very careful.

9            It's not to say you can't have epidural steroid

10   injections.  But you have to be very, very careful and prudent

11   when thinking of that modality.  It has risks.  You don't want

12   to just put people on a schedule and do them lifelong.  It

13   makes no sense to me whatsoever.

14   Q.    When you used the words "judicious, careful and prudent,"

15   what would an interventional pain medicine doctor do for a

16   patient immunocompromised consistent with those words?

17   A.    I mean, first and foremost, you want to do no harm as a

18   physician.  So I would want to make sure that all conservative

19   measures have been exhausted first before putting a needle in

20   someone's body.  So whether it be with physical therapy, oral

21   analgesics, topicals, you want to make sure that everything

22   and no stone has been unturned before you progress to more,

23   you know, more methods.

24           And if a patient has inflammation or you suspect an

25   inflammatory process or radicular symptoms, then you have to

1  weigh the risks and consequences and the amount of pain an

2  individual is, and you can perhaps try epidurals and hoping

3  they will work.

4  Q.  Okay.  And I guess I should ask you, when you do a steroid

5  injection, how much steroid is in there, like the amount or

6  volume?

7  A.  It varies.  I use a different medication steroid in my

8  practice.  But in University of Illinois they use Depo-Medrol,

9  methylprednisolone.  And in each injection that they did they

10  used 80 milligrams.

11  Q.  Okay.  And 80 milligrams, is that a lot, average, a

12  little?  How much steroid is that per shot?

13  A.  Yeah, I mean, Depo-Medrol or methylprednisolone is a

14  long-acting steroid.  And it is how much you want to do.  We

15  don't use more than that.  And the way to judge is on a yearly

16  perspective, so 12 months, we kind of as a rule of thumb will

17  say anywhere between 200, 200 max, 200 milligrams per year

18  total dosage.

19  Q.  How many epidural steroid injections can an

20  immunocompromised patient get if it's 80 milligrams per

21  injection if you're supposed to go up to 200 then?

22  A.  It would be less than 3, because 80 times 3 is 240.  So it

23  would be less than 3.  And then that would even be in a normal

24  individual that is not in an immunocompromised state, we say 3

25  to 4.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 123 of 234 PageID #:22413
Tata - direct by Tengesdal
1056

1    So when I said judicious, prudent and careful, I
2    meant that I would perhaps want to do less than three per year
3    and very carefully.
4    Q.   Okay.  So if Mr. Taylor presents to Dr. Obaisi, Dr. Obaisi
5    evaluates him, says there is some inflammation here, I think
6    you could benefit by getting epidural steroid injections, can
7    he go out three times a year?
8    A.   He could, yes.
9    Q.   Okay.  And the goal is get the inflammation down, help the
10   man to relieve his pain?
11   A.   I would hope so, yes.
12   Q.   And the three per year for immunocompromised, is that
13   something that's taught in medical school?
14   A.   The magic number three, four, you know, it is taught.  And
15   it is also taught in an immunocompromised state to hopefully
16   do less.  I mean, I like to err on the side of caution.  I'm
17   not faulting anyone for saying they are going to do three or
18   four.  I personally would have done maybe two or no more than
19   three.
20   Q.   Okay.  When you say you wouldn't do no more than three or
21   three I believe you said, is that three per each area or three
22   total?
23   A.   It's actually three total.
24   Q.   Okay.  So you could do two here, one here, or three here
25   and zero here (indicating)?

Tata - direct by Tengesdal

1057

1    A.  And that's it in a 12-month period, yes.

2    Q.  Okay.  And did you evaluate the medical records of Dr.

3    Obaisi, the pain management records to see I guess the

4    frequency of how often Mr. Taylor went back for steroid

5    injections?

6    A.  I did.

7    Q.  Okay.

8        MR. TENGESDAL:  And if we could please bring up for

9    demonstrative purposes DX-0346.

10       THE COURT:  Any objection to the admission of DX-346?

11       MS. CIAMBRONE:  Not as a demonstrative, Your Honor.

12       MR. FITZGERALD:  No.

13       THE COURT:  It's admitted for demonstrative purposes

14   only.  You may publish.

15   BY MR. TENGESDAL:

16   Q.  Okay.  Dr. Tata, do you see on here we have a diagram with

17   some dates that correspond, and then in the middle there is

18   whether it's an MRI or a neurosurgical consultation, et

19   cetera.  Do you see that?

20   A.  I do.

21   Q.  Okay.  I want to look at first the date February 10, 2015.

22   Do you see that?

23   A.  I do.

24   Q.  And what is listed for what Mr. Taylor had done on that

25   date?

Tata - direct by Tengesdal

1058

1   A.   He had a lumbar epidural steroid injection.

2   Q.   Okay.  July 31, 2015, what was done on that date?

3   A.   He had a cervical epidural steroid injection.

4   Q.   Okay.  February 1, 2016, what did Mr. Taylor have done on

5   that date?

6   A.   A lumbar epidural steroid injection.

7   Q.   Okay.  So if we look at those, that's one, two, three,

8   were three of them done within a calendar year?

9   A.   Yes.

10  Q.   Okay.  So then if we look at 7/31/15, 2/1/16, the third

11  one after that would be July 18, 2016.  What was done on that

12  day?

13  A.   Let's see.  Can you say that again, please?

14  Q.   Sure.  July 18, 2016, what was done on that date?

15  A.   He had a lumbar epidural.

16  Q.   Okay.  If we look at 7/31/15, 2/1/16, 7/18/16, is that

17  three injections within a 365 day year period of time?

18  A.   Yes.

19  Q.   Okay.  If we look at 2/1/16, 7/18/16 and 12/30/16, does

20  that show three injections within a 365 day period of time?

21  A.   Yes.

22  Q.   Okay.  July 18, '16, 12/30/16, 4/7/17, does that show

23  three injections within 365 days?

24  A.   Yes.

25  Q.   Okay.  And then 12/30/16, 4/7/17, 10/18/17, is that also

Tata - direct by Tengesdal

1059

1   three injections within 365 days?

2   A.  Yes.

3   Q.  All right.  And the final group I want to ask you about is

4   April 7, '17, 10/18/17, 11/17/17, does that also show three

5   epidural steroid injections given within 365 days?

6   A.  Yes.

7   Q.  Okay.  And is that consistent with what an

8   immunocompromised patient can get if they have symptoms that

9   require an epidural?

10  A.  Yes.

11  Q.  Okay.  And in this case you reviewed the UIC Pain Medicine

12  notes?

13  A.  I did.

14  Q.  Does your report in this case contain the results of your

15  review of the MRIs?

16  A.  Correct.

17  Q.  These showing on this diagram are procedures that were

18  done.  Did you review the procedural note?

19  A.  I did.

20  Q.  Did you ever see anywhere in the procedural note where the

21  doctor giving the injection said that Mr. Taylor should have

22  came back earlier?

23  A.  I never did see that, no.

24  Q.  Okay.  In addition to the procedure note, did you also

25  look at the clinical notes of UIC Pain Management?

Tata - direct by Tengesdal

1060

1   A.  I did.

2   Q.  Okay.  And procedure, that's when the actual injection is

3   done?

4   A.  Correct.

5   Q.  What is the difference, what is a clinical note with pain

6   management?

7   A.  So before a patient is actually going to go to the

8   procedure room, they're evaluated.  So they take a history,

9   they do a physical examination.  So the history and physical

10  examination point or process would be the clinical note.

11  Q.  Okay.  And is that where a physician evaluates the patient

12  to see if they're a candidate for injection?

13  A.  Yes.

14  Q.  Okay.  Looks at risks and complications?

15  A.  Yes.

16  Q.  Makes the offer of procedure, then gets consent?

17  A.  Yes.

18  Q.  Okay.  So if we could look at -- do you see that there was

19  an epidural steroid injection done on August 28, 2012 of the

20  lumbar spine?

21  A.  Yes.

22  Q.  Okay.  I want to ask you about, it looks like there was a

23  pain service visit on October 1, 2013.  Did you review that

24  note?

25  A.  I did.

Tata - direct by Tengesdal

1061

1    Q.  Okay.

2           MR. TENGESDAL:  And if we could have, that was

3    previously admitted into evidence, Your Honor, as DX-0276

4    brought up.

5           THE COURT:  DX-276, in evidence.  Go ahead.

6    BY MR. TENGESDAL:

7    Q.  Okay.  Is this a pain service note when Mr. Taylor was

8    brought from Stateville down to UIC?

9    A.  Yes.

10   Q.  Okay.  And it's a note as opposed to a procedure, is that

11   right?

12   A.  That is correct.

13   Q.  Okay.  And in the HPI -- when we say HPI, what is your

14   understanding of what that means?

15   A.  HPI stands for history of present illness.

16   Q.  Okay.  And is that when the doctor asked the patient

17   questions about how he's doing?

18   A.  Yes.

19   Q.  All right.  And then in the HPI section, do you see the

20   sentence that starts with "He states"?

21   A.  Yes.

22   Q.  All right.  What does that say?

23   A.  I'll read verbatim.  "He states his low back pain and neck

24   pain relieved with heat and cold packs and special cervical

25   pillows, but the corrections center took that away from him."

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 129 of 234 PageID #:22419
Tata - direct by Tengesdal
1062

1   Q.  So the prior visit we saw was a little over a year

2   earlier, August 28, 2012 when he got the injection, right?

3   A.  Correct.

4   Q.  And did you see any indication between the time of that

5   injection and August of 2012 in this visit, October 1, 2013,

6   where Mr. Taylor came back and told his pain doctors, "I've

7   had pain in either my neck or lower back"?

8   A.  I did not.

9   Q.  Okay.  And in this note he actually, did he say his low

10  back and his neck pain were relieved, not with steroid

11  injections, but with pillows and cold packs?

12  A.  Yes.

13  Q.  When the patient comes in and sees Dr. Votta-Velis October

14  1, 2013, based on what that doctor charted in the history of

15  present illness, would there be any indication for her to say:

16  Let's do a procedure today?

17  A.  Not that I can see, no.

18  Q.  Okay.

19          MR. TENGESDAL:  If we can go to the plan section,

20  please, of this October 1st note.

21  BY MR. TENGESDAL:

22  Q.  All right.  What does Dr. Votta-Velis chart for the

23  assessment and plan?

24  A.  I'll read verbatim.  "Recommend heat and cold packs as

25  needed.  Recommend cervical special pillow for comfort.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 130 of 234 PageID #:22420
Tata - direct by Tengesdal
1063

1  Recommend tramadol, 50 milligrams, TID PRN," which means three

2  times a day as needed, "and to continue current pain regimen.

3  Recommend follow-up with Dr. Warso" -- who is a surgical

4  oncologist -- "for evaluation and treatment of sarcoma.  May

5  return to clinic later for repeat epidural steroid injection."

6  Q.  Okay.  And the current pain regimen was that medications

7  and epidural steroids were clinically indicated?

8  A.  Yes.

9  Q.  Okay.  So is Dr. Votta-Velis conveying in this assessment

10 and plan section that he may return in the future for epidural

11 steroids if clinically warranted?

12 A.  Yes.

13        MS. CIAMBRONE:  Objection, leading.

14        THE COURT:  Sustained as to leading.

15 BY MR. TENGESDAL:

16 Q.  Okay.  Doctor, does Dr. Votta-Velis convey in this note,

17 would it go to Dr. Obaisi?

18 A.  Yes, it would.

19 Q.  Okay.  Does this note say that he may not ever return for

20 epidural steroids?

21        MS. CIAMBRONE:  Objection, leading.

22        THE COURT:  Overruled.

23 BY THE WITNESS:

24 A.  It does not say that.

25 BY MR. TENGESDAL:

Tata - direct by Tengesdal

1064

1  Q.  Okay.  Does this note of Dr. Votta-Velis indicate that Mr.

2  Taylor can come back for epidural steroids?

3  A.  Yes.

4  Q.  Okay.  But despite him going to the pain service, was it

5  determined that on this date he wasn't a candidate for an

6  injection?

7  A.  That is correct.

8  Q.  Okay.  And then tramadol 50 milligrams, we haven't talked

9  about medications, what is that?

10  A.  Tramadol is a synthetic narcotic for pain.

11  Q.  A patient such as Mr. Taylor that has pain in his neck and

12  lower back, can you prescribe tramadol?

13  A.  Absolutely.

14  Q.  Okay.  And how would you expect tramadol can work to help

15  a patient like Mr. Taylor?

16  A.  Sure.  Tramadol, we don't know how it fully fully works,

17  but we do know it works on mu opioid receptors.  We also know

18  that it works on neurotransmitters such as serotonin and

19  norepinephrine.  And by re-uptaking those neurotransmitters,

20  that's how it is perceived how it helps for pain.

21  Q.  And when Dr. Votta-Velis says "Recommend follow-up with

22  Dr. Warso for evaluation and treatment of a sarcoma," that's

23  separate and apart from the neck and lower back?

24  A.  Yes.

25  Q.  Okay.  In your review of the records that you got from

Tata - direct by Tengesdal

1   IDOC, UIC, did you see any records of Dr. Warso?

2   A.  I did not.

3   Q.  Okay.  Do you know if Mr. Taylor received any surgery by

4   Dr. Warso?

5   A.  I do, yes.

6   Q.  Okay.  Do you know what the surgery was?

7   A.  There was concern because of Mr. Taylor's right hip, right

8   flank or hip pain that there perhaps would be a recurrence of

9   the sarcoma that he had in the '90s, and that's why it was

10  prudent for him to get evaluated and see Dr. Warso.  And he

11  ended up having surgery again in April of 2014.

12  Q.  When you looked at the records, did you see any record

13  that from October 1, 2013, when he went to the pain service

14  note, that he went and saw Dr. Warso on April 24th, 2014, that

15  Mr. Taylor had ever made complaints in his neck or lower back?

16  A.  I did not.

17  Q.  Okay.  Did you see any indication by Dr. Obaisi in his

18  notes that it looks like he has some type of radicular

19  complaints, let's send him for UIC pain?

20  A.  I did not.

21  Q.  Okay.  Was Mr. Taylor complaining of pain related to the

22  surgery that Dr. Warso was going to do?

23  A.  In the area, yes.

24  Q.  In your review, did it start, the IDOC records, 2008 to, I

25  think it ended 2020 or 2021?

Tata - direct by Tengesdal

1066

1  A.  Yes.

2  Q.  And did you review all those records?

3  A.  I did.

4  Q.  When you reviewed those records, did you see any

5  indication that there was ever a delay in either cervical or

6  lumbar epidural steroid injections when they were clinically

7  warranted?

8  A.  Not by Dr. Obaisi, not at all.

9  Q.  And the ones we just showed you on the demonstrative

10 exhibit, were those times that Dr. Obaisi made his medical

11 judgment and said I think he can benefit and, in fact, sent

12 the patient?

13 A.  Yes, that is correct.

14 Q.  Doctor, are you familiar with the term "standard of care"?

15 A.  I am.

16 Q.  What is that?

17 A.  It means what a reasonably well-qualified physician if

18 given the same set of criteria, same situation, what would

19 they do as far as recommendations and treatment.

20 Q.  Okay.  And based on your review of the IDOC Stateville

21 records, UIC Pain Management records, did you come to an

22 opinion as to whether or not Dr. Obaisi complied with the

23 standard of care?

24 A.  I did, yes.

25 Q.  And what is your opinion?

Tata - direct by Tengesdal

1067

1    A.   That he did above and beyond comply with the standard of

2    care.

3    Q.   Okay.  How so?

4    A.   Well, on multiple, multiple times he prescribed powerful

5    oral analgesics that are systemic, meaning it affects the

6    entire body.  He looked at pain.  He did a clinical

7    examination.  He treated not only what I called no susceptive

8    pain, but he treated the neuropathic pain, and rightfully so,

9    by prescribing the medications that we spoke about before,

10   specifically the gabapentin or Neurontin, the Elavil or

11   amitriptyline and Cymbalta.  Tramadol was prescribed.

12        After the surgery or hernia surgery or for the

13   recurrence of cancer, he was prescribed Tylenol 3 as well as

14   hydrocodone.

15        So from an oral analgesic point of view, it was above

16   and beyond the standard of care, and he performed within the

17   CDC guidelines that is there for opioid analgesic regimen as

18   well.

19        We are living in a time when we have an opioid

20   epidemic.  So we can't just prescribe opioids willy-nilly, and

21   we have to be very careful.  So I feel he performed well

22   within the standard of care using powerful analgesics and

23   using clinical judgment and referred out to the UIC Pain

24   Clinic when he thought there was inflammation or any type of

25   radicular components that perhaps necessitated perhaps an

Tata - direct by Tengesdal

1068

1    epidural steroid injection.

2    Q.   Okay.  And I heard you mention Tylenol 3.  That's the

3    first time you've brought that drug up.  What is that drug?

4    A.   That's also, it's a powerful opioid analgesic.  When we

5    say Tylenol 3, it has acetaminophen mixed with codeine.  And

6    codeine in the body metabolizes to morphine, which is the gold

7    standard we all compare pain to.  So it works on pain,

8    specifically in the central nervous system on mu opioid

9    receptors.

10   Q.   On what receptors?

11   A.   I'm sorry, mu, mu opioid receptors.  The Greek symbol mu.

12   Q.   Is that something in the brain?

13   A.   It's in the brain.  It's in the spinal cord region.  So

14   it's in the central nervous system, yes.

15   Q.   Okay.  And you had earlier describe for the jury how the

16   neuropathic agents work for nerve pain.  Tylenol 3 and

17   tramadol, do they work differently for pain than neuropathic

18   agents?

19   A.   They do.  Specifically, Tylenol 3 doesn't really work on

20   neuropathic pain.  It works on pain in general.  The type of

21   pain I used the term before was no susceptive.

22            Tramadol also works on no susceptive pain.  But to a

23   certain degree it can also work on neuropathic pain.  And the

24   way tramadol works on neuropathic pain is because it has that

25   norepinephrine serotonin re-uptake.  So it can do work both.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 136 of 234 PageID #:22426
Tata - direct by Tengesdal
1069

1    It has a dual mode of action.

2    Q.   Okay.  And when you saw the UIC pain records, did you ever

3    see anywhere in there where a physician said you should have

4    the patient on different pain medications?

5    A.   I never saw that.  As a matter of fact in some records

6    they were complimentary of the analgesic regimen.

7    Q.   Okay.  Did you ever see in the UIC Pain Management records

8    where the pain doctor said:  Due to their evaluation of Mr.

9    Taylor, he should have been sent back earlier?

10   A.   I never saw that.

11   Q.   Okay.  Are you familiar with the process in this case of

12   how Mr. Taylor got from Stateville to UIC?

13   A.   A little bit, yes.

14   Q.   Okay.  Do you understand that Stateville is a prison and

15   UIC is a medical center?

16   A.   I am well aware of that.

17   Q.   Okay.  In order for Mr. Taylor to see a pain management

18   doctor, could he just show up randomly or does he need an

19   appointment?

20   A.   He needs an appointment.  And from what I read in the IDOC

21   records, a special medical services referral form has to be

22   filled out.  And I believe that they contact a scheduler at

23   UIC and try to make an appointment.

24   Q.   All right.  In your review of all the records, did you

25   ever see anywhere where Mr. Taylor was not brought to UIC Pain

Tata - direct by Tengesdal

1070

1  Management when he was supposed to be there, I guess?

2  A.  I never saw that.

3  Q.  Okay.  Now I want to switch topics if we could.

4       Can patients that have degenerative disc disease,

5  problems in their spine, eventually need surgery?

6  A.  Some do, yes.

7  Q.  Okay.  As part of this case, doctor, did you evaluate Mr.

8  Taylor's records to see if he's ever been a candidate for

9  surgery in either his neck or lower back?

10 A.  I did evaluate that, yes, I did.

11 Q.  Okay.  Do you have an opinion as to whether or not Mr.

12 Taylor has ever been a candidate for surgery to either his

13 neck or lower back?

14 A.  He's never been a candidate for a surgery in the neck or

15 the lumbar spine, and the reason being is he's never had any

16 what we call myelopathic signs.  I kind of alluded to that

17 during the demonstration phase.

18      Specifically, what you are looking for, strength,

19 sensation, reflex changes, perhaps a chronic radiculopathy.

20 You are looking for myelopathic signs both on a clinical exam

21 and on imaging records.  And in any of the records that I've

22 read, in all of the records, I've not seen that, no.

23      And as a matter of fact, he was seen by neurosurgery

24 and by orthopedic spine surgery and at UIC, and they also

25 deemed he was not a surgical candidate for the cervical as

Tata - direct by Tengesdal

1071

1    well as lumbar spine.

2    Q.   Okay.  As a physical medicine rehabilitation physician,

3    are you, I guess, familiar with evaluating patients for their,

4    I guess, what do you call it, activities of daily living or

5    any physical limitations they may have?

6    A.   Absolutely, yes.

7    Q.   Okay.  And in this case, have you looked through the

8    records to see if Mr. Taylor has any limitations in his

9    activities or anything on account of either his cervical or

10   lumbar spine pain?

11   A.   Not from his cervical or lumbar spine, no.

12   Q.   Okay.  Does he have any physical limitations from any

13   medical condition outside of his neck and lower back?

14   A.   Based on the records and his own deposition, I know in

15   2013, when we were looking at the UIC records, he had

16   complaints of right hip pain, pain in the groin, and that was

17   a recurrence of the sarcoma.  So there had been some

18   limitations because of the pain -- bless you -- because of the

19   pain in that area.

20          Subsequently thereafter, the surgery in April of

21   2014, he developed a very, very large ventral hernia, and that

22   could be a nidus for pain as well.

23   Q.   Okay.  And let's talk about complaints of pain then.

24          Has Mr. Taylor over the years, in fact, gone to see

25   Dr. Obaisi and other providers at Stateville and said "I've

Tata - direct by Tengesdal

1072

1      got pain in my neck and lower back"?

2      A.   He has, yes.

3      Q.   Okay.  The pain that Mr. Taylor reported to Dr. Obaisi, is

4      that consistent with what you see on the MRI films, both

5      cervical and lumbar of degenerative disc disease?

6      A.   Yeah.  The complaints of axial neck pain, back pain.  It

7      actually goes for the fact that, you know, a cervical pillow,

8      and if he was able to use that, and cold packs and heat packs,

9      that goes for more axial, you know, component of pain, yes.

10     Q.   Okay.  Have you seen any medical evidence in this case

11     that any action or inaction by Dr. Obaisi caused, contributed,

12     exacerbated the cervical or lumbar spine?

13     A.   Absolutely not.

14     Q.   Okay.  Any medical evidence that any action, inaction by

15     Dr. Obaisi caused, exacerbated or contributed to the amount of

16     pain Mr. Taylor feels?

17     A.   No.

18     Q.   We saw in the UIC records where they say "continue current

19     treatment regimen."  Do you recall that?

20     A.   I do.

21     Q.   Okay.  And during the time Dr. Obaisi saw him, do you have

22     any opinion as to whether or not the treatment regimen was

23     effective for Mr. Taylor?

24     A.   I thought it was very effective, yes.

25     Q.   All right.  Now I want to ask you specifically about pain.

Tata - direct by Tengesdal

1073

1   You mentioned earlier oral pain medicine.  That's stuff you

2   open up a bottle and you eat, right?

3   A.  Yes.

4   Q.  Swallow, I guess?

5   A.  Swallow it, yes.

6   Q.  Okay.  And then when you take an oral pain medication, is

7   that directed at any body part?  Like if I came to you, said

8   "I've got neck pain, give me a neck pill," is there such a

9   thing?

10   A.  There is no such thing, no.

11   Q.  Okay.  You used the term "systemic."  Does that mean when

12   you eat the pill, you feel -- it goes throughout the body?

13   A.  Yeah, it gets metabolized, it goes in our bloodstream and

14   it acts on CNS receptors, yes.  So it's the whole body.

15   Q.  Okay.  And you've told us about some of the medications

16   Dr. Obaisi prescribed?

17   A.  I did.

18   Q.  Okay.  Did you ever see where Dr. Obaisi varied or changed

19   the pain medications?

20   A.  He did from time to time, yes.

21   Q.  Okay.  If a patient comes in and they say they're not

22   being responsive to a certain pain medicine, is it reasonable

23   for a physician to try a different type of pain medication?

24   A.  Absolutely.

25   Q.  And what would be the goal of that?

1  A.  To help with pain.  If you are starting with a particular

2  type of medication, it's not working, you would try to mix it

3  up and maybe start with a different one and with the hope of

4  that helping pain.

5  Q.  Okay.  So Tylenol 3, tramadol, Elavil, Neurontin,

6  Cymbalta, do you have an opinion as to whether or not those

7  are consistent with the standard of care of what a physician

8  would prescribe to a man with the conditions that Mr. Taylor

9  has?

10 A.  Absolutely.

11 Q.  What is your opinion?

12 A.  I think they were very highly effective, powerful

13 analgesics and well within the standard of care.

14 Q.  We discussed just briefly that he was complaining of pain

15 from Dr. Warso's surgery to the hernia.  Do you recall that?

16 A.  I do.

17 Q.  Okay.  If you stick a needle in the neck and spread the

18 steroid there, if a man has pain in his side there, the

19 hernia, is that going to affect that?

20 A.  Not at all.

21 Q.  Okay.  Same question with the lower back.  If you stick

22 the needle in the epidural space, it spreads to the five

23 lumbar vertebrae, is that going to alleviate pain caused by

24 the hernia?

25 A.  Not at all.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 142 of 234 PageID #:22432
Tata - direct by Tengesdal
1075

1  Q.  Okay.  If a patient similar to Mr. Taylor, in fact, Mr.

2  Taylor, if he has complaints of pain that he himself has said

3  is severe in nature -- are you with me?

4  A.  I'm with you.

5  Q.  Okay.  So if he has severe pain in here (indicating), and

6  he had cervical and lumbar epidurals, and he had no pain up in

7  those areas, would his brain still be perceiving pain?

8  A.  Absolutely.

9  Q.  Okay.  Would the systemic oral medications that were

10 prescribed by Dr. Obaisi, Tylenol 3, tramadol, the whole list,

11 would those help to alleviate the pain he had in his hernia?

12 A.  It would, yes.

13 Q.  Would those medications be standard of care what you would

14 expect a physician to give to a man that had the condition

15 with the hernia that Mr. Taylor did?

16 A.  Yes.

17 Q.  Do you have an opinion as to whether or not the pain Mr.

18 Taylor got in his cervical and lumbar spine, did that have

19 anything to do with any of the management by Dr. Obaisi?

20 A.  I don't think so.  It was a chronic degenerative

21 condition.

22       MR. TENGESDAL:  I believe that's all the questions I

23 have.  I pass the witness, Your Honor.

24       THE COURT:  Any cross on behalf of co-defendant?

25       MS. CIAMBRONE:  Yes, Your Honor.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 143 of 234 PageID #:22433
Tata - cross by Ciambrone
1076

1    MR. FITZGERALD:  Co-defendant.

2    THE COURT:  Cross by co-defendant?

3    MR. FITZGERALD:  No questions.

4    THE COURT:  On behalf of the plaintiff?

5    MS. CIAMBRONE:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7    BY MS. CIAMBRONE:

8    Q.  Good afternoon, Dr. Tata.  Good to see you again.

9    A.  Good afternoon.

10    MS. CIAMBRONE:  Mr. Dingus, could you please put up

11   Dr. Tata's resume.

12    THE COURT:  What exhibit is that for the record?

13    MS. CIAMBRONE:  JX-94.

14    THE COURT:  Go ahead.

15    MS. CIAMBRONE:  This has already been admitted.

16    THE COURT:  Yep.  Just wanted to note it for the

17   record.

18   BY MS. CIAMBRONE:

19   Q.  Dr. Tata, if we could --

20    MS. CIAMBRONE:  If we could go down, Mr. Dingus, to

21   where he says he's board certified, the certification.

22   BY MS. CIAMBRONE:

23   Q.  Dr. Tata, when you say board certified in pain management,

24   did you get your board certification from the American Board

25   of Physical Medicine & Rehabilitation?

Tata - cross by Ciambrone

1077

1    A.  I did.

2    Q.  And your primary board certification is in physical

3    medicine and rehabilitation, correct?

4    A.  It's actually primary and then I'm also primary boarded in

5    pain management as well, yes.

6    Q.  Isn't that a subspecialty, pain medicine, for this

7    particular organization?

8    A.  It is.

9    Q.  It's a subspecialty.

10          And you did not sit for the ABA, American Board of

11   Anesthesiology exam, correct?

12   A.  I did not.

13   Q.  And you did not sit for the American Academy of Pain

14   Medicine exam, did you?

15   A.  I did not.

16   Q.  And you did not sit for the World Institute of Pain exam?

17   A.  I did not.

18   Q.  Did you?

19   A.  I did not.

20   Q.  And why did you not sit for the ABA pain boards?

21   A.  As a matter of fact, the physical PM&R boards are a

22   subset.  We have reciprocity.  So I'm not an anesthesiologist.

23   But we through our board certification, it is considered an

24   exact board certification under the auspices of that.

25   Q.  It's not a certification by the ABA, correct?

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 145 of 234 PageID #:22435
Tata - cross by Ciambrone
1078

1    A.   It's not specifically the ABA.  But there are some nuances

2    here.  I'm certified and to practice under the PM&R board,

3    which is another board.  So it's ACG approved.  It's just like

4    any other board you would do.  It's not any different.

5    Q.   It's a different board.

6    A.   It's a different board, yes.

7    Q.   It's a different board.

8    A.   I'll give you that, correct.

9         THE COURT:  Hang on a second.  Don't talk at the same

10   time, please.

11   BY MS. CIAMBRONE:

12   Q.   It's a different --

13        THE COURT:  Wait.  Wait for the answer before you

14   pose another question.  Go ahead.

15   BY MS. CIAMBRONE:

16   Q.   It is a different board though, correct, doctor?

17   A.   Yes.

18   Q.   And primarily you are a physical medicine rehabilitation

19   doctor, correct?

20   A.   I'm primarily.  But what I practice now for the last 20

21   years is pain management.

22        MS. CIAMBRONE:  And if we could go down, Mr. Dingus,

23   to Publications.

24   BY MS. CIAMBRONE:

25   Q.   You only have three publications on your resume and

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 146 of 234 PageID #:22436
Tata - cross by Ciambrone
1079

1   nothing since 2002, is that correct?

2   A.   That is correct.

3   Q.   And if we go down to research, you only -- you don't have

4   any research that has been completed since 2001, is that

5   correct?

6   A.   That is correct.  I'm not an academic physician.

7   Q.   Now, Mr. Taylor was being treated at the University of

8   Illinois by their pain management clinic, correct?

9   A.   Correct.

10  Q.   And his doctors were Dr. Votta-Velis and Dr. Beckerly,

11  correct?

12  A.   Correct.

13  Q.   And you are aware that Dr. Votta-Velis has a Ph.D. in

14  immunology, correct?

15  A.   That is -- if that is the case, that is correct.

16  Q.   And they are both pain management doctors at U of I that

17  were treating Mr. Taylor, correct?

18  A.   Correct.

19  Q.   And you are aware that these physicians recommended that

20  Mr. Taylor as part of his pain management regimen get

21  continual epidurals, are you not?

22  A.   That's their recommendations.

23  Q.   It was their recommendation as Mr. Taylor's specialist

24  that he go back for repeated CESIs and LESIs to address their

25  diagnosed back pain, correct?

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 147 of 234 PageID #:22437
Tata - cross by Ciambrone
1080

1    A.  You know, the interesting thing is coming on a schedule --

2          MS. CIAMBRONE:  I'm going to --

3          THE COURT:  Don't interrupt the witness.

4    BY THE WITNESS:

5    A.  You know, the interesting --

6          THE COURT:  And please just answer the question

7    asked.

8          Go.  Pose the question again.

9    BY MS. CIAMBRONE:

10   Q.  You're aware that Dr. Votta-Velis and Dr. Beckerly

11   recommended as part of their pain management regimen for Mr.

12   Taylor that he return to the U of I pain clinic for epidurals

13   over, numerous times over a course of numerous years, is that

14   correct?

15   A.  Specifically it says follow up in three months.  It didn't

16   necessarily say specifically for an epidural.  It said follow

17   up for an evaluation.  So yes.

18         MS. CIAMBRONE:  Mr. Dingus, could we please put up

19   JT-94.  And can we go to the first page, Mr. Dingus, please.

20   BY MS. CIAMBRONE:

21   Q.  You looked at this before on your direct exam.  Do you

22   recall, doctor?  And this is Dr. Beckerly's pain service note

23   from July 31st, 2015.  Do you see that?

24   A.  I see nothing, nor the jury is seeing anything.

25         THE COURT:  All right.  JT-94 is already in.  Go

1    ahead.

2    BY MS. CIAMBRONE:

3    Q.  Do you see that this is Dr. Beckerly's July 31st, 2015

4    pain service note?

5    A.  Sure.

6    Q.  And on this day, Mr. Taylor received a CESI, correct?

7    A.  Correct.

8    Q.  And if we could go to the last page.  And in this she

9    returned -- she said specifically for her plan that he return

10   to the clinic in one month for a repeat LESI, correct?

11   A.  That is her recommendation, yes.

12   Q.  And you're aware that Mr. Taylor was not returned in one

13   month for a repeat LESI from your review of the medical

14   records, isn't that right?

15   A.  Yes.

16        MS. CIAMBRONE:  And then if we could go to, let's go

17   to JT-70.

18   BY MS. CIAMBRONE:

19   Q.  And this is again Dr. Beckerly.  Do you recall looking at

20   this in your direct?

21   A.  I do.

22   Q.  And this is her February 1st, 2016 pain service note?

23   A.  Correct.

24        MS. CIAMBRONE:  And we can go to the last page.  Can

25   you pop out on the bottom.

1   BY MS. CIAMBRONE:

2   Q.  "Return in one to two months for cervical epidural steroid

3   injection."  Do you see that?

4   A.  I do.

5   Q.  And do you see also there that she's noting Mr. Taylor's

6   pain relief that he gets from these injections?

7   A.  She's noting that, yes.

8   Q.  And she -- can you read what she concludes in that last

9   parenthetical?

10  A.  It says, "Return to clinic in one to two months for

11  cervical epidural.  Last CESI was 6 to 8 months of 60 percent

12  relief."

13  Q.  So Mr. Taylor is receiving relief from these injections,

14  correct?

15  A.  Perhaps, yes.

16          MS. CIAMBRONE:  And if we could put up, Mr. Dingus,

17  JT-91.  This is also admitted into evidence.

18  BY MS. CIAMBRONE:

19  Q.  And this is the February 19th, 2019 pain service note.  Do

20  you see that?

21  A.  I do.

22  Q.  And this is by Dr. Votta-Velis?

23  A.  Correct.

24          MR. TENGESDAL:  Objection, beyond the scope of the

25  direct.

Tata - cross by Ciambrone

1083

1      THE COURT:  Overruled.

2      MS. CIAMBRONE:  And if we could go to the part,

3  Mr. Dingus, where he talks about his pain relief under the

4  history of present illness.

5  BY THE WITNESS:

6  A.  I do see that, yes.

7  BY MS. CIAMBRONE:

8  Q.  And so Mr. Taylor notes to his doctors that he has had

9  multiple LESIs and CESIs in the past.  Can you read his pain

10  relief?

11  A.  It says "70 percent for months."

12  Q.  Correct.

13      MS. CIAMBRONE:  You can take that down.

14  BY MS. CIAMBRONE:

15  Q.  So his pain doctors that are treating him for his

16  epidurals are making decisions based on their examination of

17  him, correct?

18  A.  I suppose.  I really didn't see much of an examination to

19  be honest with you in their notes.  It just said return and do

20  the procedure.

21  Q.  Do you have any reason to believe that these doctors

22  didn't examine him as part of their treatment of him?

23  A.  I'm just saying I didn't see specific strength testing,

24  signs of radicular, there was never in the record specific

25  note by note that this was done.  But I'm not saying they

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 151 of 234 PageID #:22441
Tata - cross by Ciambrone
1084

1    didn't do an exam.  I'm just saying it wasn't documented.

2    Q.  You don't know one way or another whether they did an

3    exam, correct?

4    A.  That is correct.

5    Q.  Now, I'm going to switch gears for a little bit.

6             MS. CIAMBRONE:  If we could pull up JT-81, please.

7             THE COURT:  Kyle is looking for it.  He found it,

8    okay.

9             MS. CIAMBRONE:  Excellent, success.

10   BY MS. CIAMBRONE:

11   Q.  Do you recall looking at this document on your direct

12   exam, Dr. Tata?

13   A.  I do.

14   Q.  And this is his exam, his MRI from October -- I have

15   trouble reading these.  They're so small I can't even read

16   them with my glasses.  October 4, 2018?

17   A.  Correct.

18   Q.  Or 2016.

19            MS. CIAMBRONE:  And in the bottom, if we could pop

20   that out.

21   BY MS. CIAMBRONE:

22   Q.  And this MRI notes that Mr. Taylor has degenerative disc

23   disease, isn't that correct?

24   A.  Yes.

25   Q.  And you -- there is no mention in this record at all --

Tata - cross by Ciambrone

1085

1     you testified also on direct, Dr. Tata, that Dr. Obaisi

2     ordered this exam, correct?

3     A.  Yes.

4     Q.  And there is no mention on JT-81 at all as to the ordering

5     doctor, isn't that right?

6     A.  There is not.

7          MS. CIAMBRONE:  And if we could pull up JT-79.

8     BY MS. CIAMBRONE:

9     Q.  And this is another one of Mr. Taylor's MRI reports, is

10    that correct?

11    A.  Correct.

12         MS. CIAMBRONE:  And can you pop out the exam date,

13    Mr. Dingus, please.

14    BY MS. CIAMBRONE:

15    Q.  This is also from 8/31/2016?

16    A.  Correct.

17         MS. CIAMBRONE:  And if we could go to the

18    conclusions, Mr. Dingus.

19         MR. DINGUS:  The conclusions or the impression?

20         MS. CIAMBRONE:  The impression.

21    BY MS. CIAMBRONE:

22    Q.  And this also diagnoses Mr. Taylor with multilevel

23    degenerative disc disease, correct?

24    A.  Correct.

25    Q.  And you would agree, would you not, Dr. Tata, that MRIs

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 153 of 234 PageID #:22443
Tata - cross by Ciambrone
1086

1  don't indicate pain?

2  A.  They don't.  Pain is very subjective.

3  Q.  And wouldn't you agree, Dr. Tata, that as part of your

4  treatment of any patient that you consider a patient's pain

5  level?

6  A.  I would.

7  Q.  And wouldn't you agree, Dr. Tata, that even some people

8  that have very severe findings in their MRIs might not

9  experience any pain?

10  A.  That is true.

11  Q.  And is it your job as a physician to also consider very

12  importantly the subjective factors?

13  A.  I do it all the time.

14  Q.  And it's not limited to the objective factor of an MRI?

15  A.  That is correct.

16  Q.  You would never choose to either provide or not provide an

17  epidural injection by only looking at an MRI film, correct?

18  A.  Correct.

19  Q.  Now, I want to switch gears for a little bit.

20        You never spoke to Dr. Obaisi, isn't that correct?

21  A.  Dr. Obaisi passed away in December of 2017.

22  Q.  And you do not know whether Dr. Obaisi ever performed a

23  physical exam on Mr. Taylor with respect to his back pain, do

24  you?

25  A.  I just have his SOAP notes from before.

Tata - cross by Ciambrone

1087

1    Q.  Can you point to me what notes you're specifically

2    referring to?

3    A.  There is a multitude of notes.  So there were SOAP notes

4    in the IDOC records.  So obviously, I mean, if a patient is

5    going to complain of pain, they do a SOAP note.  And there

6    were several SOAP notes in the plethora of records.

7    Q.  And what specific piece of paper did you look at to

8    conclude that the reason Dr. Obaisi, Obaisi did not return Mr.

9    Taylor to the pain clinic was because he thought it wasn't

10   necessary?

11   A.  There wasn't any specific paper that I can recall or point

12   to.

13   Q.  And if he, in fact, made that determination, he would be

14   acting contrary to the recommendations of his specialists that

15   we just went through that recommended that he be returned,

16   correct?

17   A.  Dr. Obaisi as a clinician, any time as far as a protocol

18   or procedural that would be in Stateville, if an inmate is

19   complaining of pain, he would probably go to the infirmary, be

20   evaluated.

21        So from clear -- if there is not a specific paper, in

22   order to be referred to UIC, you would have to be sent out

23   through a medical services request.  And those were all done

24   appropriately every time.

25   Q.  And you sitting here today can't point to a single piece

1    of paper where Dr. Obaisi said, Oh, I'm not going to send him

2    back because he's not -- he does not need an epidural because

3    of my physical exam?

4    A.  No.  Correct.

5    Q.  Now, if you are looking at an MRI report, that does not

6    tell you, that does not indicate inflammation, does it?

7    A.  It does not.

8    Q.  No.  And when you are doing a physical exam on the spine,

9    that doesn't tell you whether or not there is inflammation,

10    correct?

11    A.  There are signs on objective finding that can point to

12    inflammation, but not specifically say that it is inflamed,

13    no.

14    Q.  No.  And at one point in your direct you were talking

15    about other options for Mr. Taylor to address his pain.  Do

16    you recall that?

17    A.  I do.

18    Q.  And you recalled physical therapy.  You stated physical

19    therapy was one option.  Were you aware of the fact, Dr. Tata,

20    that physical therapy was not an option for Mr. Taylor because

21    of his hernia?

22    A.  I was aware of that.  It's actually detailed in one of the

23    orthopedic spine notes, yes.

24    Q.  And you didn't review any of Mr. Taylor's grievances where

25    he was complaining of his lower and upper back pain, did you?

1 A.  Not the grievances, but just what he detailed in his

2 deposition.

3 Q.  Thank you.

4      MS. CIAMBRONE:  Now, if I may get my water, Your

5 Honor, just for a second?

6      THE COURT:  Sure.

7 BY MS. CIAMBRONE:

8 Q.  You went into great detail, Dr. Tata, about Mr. Taylor's

9 supposed immunocompromised state.  Am I saying that correctly?

10 A.  Yes, you are.

11 Q.  There is no medical or clinical evidence that Mr. Taylor

12 was in an immunocompromised state, is there?

13 A.  There are not any specific blood findings.  But the sheer

14 fact of a person having a history of cancer, you have to put

15 that in your diagnosis of when you are thinking of things.

16      So, yeah, any prudent physician would have to think

17 of that in the back of their mind.  If they are not, you're

18 asking for trouble.

19 Q.  But he has never been diagnosed as having an immune

20 compromised state, correct?

21 A.  Not in the records that I've seen.

22 Q.  Correct.

23      Now, we also went through in some great detail about

24 the number of epidurals that are permitted per year.  Do you

25 recall that?

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 157 of 234 PageID #:22447
Tata - cross by Ciambrone
1090

1  A.  I do.

2  Q.  Do you recall having your deposition taken in this case on

3  July 11, 2019?

4  A.  Sure.

5  Q.  Do you recall testifying at your deposition in July of

6  2019 that your own personal limit for epidural injections is

7  three in a --

8          THE COURT:  Do you have page and line?  And question

9  and answer, please.

10          MS. CIAMBRONE:  Sure.  It's July 11, 2019.  It's page

11  82, lines 1 through 6.

12  BY MS. CIAMBRONE:

13  Q.  Do you recall being asked:

14          "Okay.  So you mentioned earlier that it's not a

15  great idea, just to paraphrase, to give multiple steroidal

16  injections, is that correct?"

17  A.  Yes.

18  Q.  And then you answered:

19          "No.  I mean, what I said was you can give multiple

20  ones given the time span in a gap.  In my case, if I see a

21  patient with an acute herniated disc, I may do one injection,

22  I may do two, or I may do three.  My limit is I do three in a

23  six-month period."

24          Was that your testimony?

25  A.  That is correct.  But the steroid that I use is

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 158 of 234 PageID #:22448
Tata - cross by Ciambrone
1091

1  dexamethasone, not methylprednisolone.  I use 10 milligrams.

2         So if you are looking to compare apples to apples,

3  it's not necessarily the 6 versus 3.  It happens to do with

4  the steroid load.  So I use a less amount of steroid.  I use a

5  different steroid.  And I use a more targeted approach.

6         And in some instances in the UIC pain records, the

7  majority of times they did an interlaminar under fluoroscopy.

8  I tend to do transforaminals where you can use less

9  medication.  So I'm able to perhaps do more frequency if

10 that's what you are getting at.

11        MS. CIAMBRONE:  One moment, Your Honor.

12        THE COURT:  Sure.

13        MS. CIAMBRONE:  Mr. Dingus, can you please pull up

14 DX-0283.  Has this been admitted, Mr. Dingus?

15        THE COURT:  Yes.

16        MR. DINGUS:  Yes.

17 BY MS. CIAMBRONE:

18 Q.  Okay.  Do you recognize this, Dr. Tata?

19 A.  I don't see anything yet.

20 Q.  Okay.  This is from 12/9/2016.  Do you see this?

21 A.  I do now, yes.

22 Q.  And do you see in here -- Mr. Dingus is going to pull it

23 up for us -- where it notes that a physical exam was

24 completed?

25 A.  Yes.

Tata - cross by Ciambrone

1092

1    Q.   So a physical exam had been done on Mr. Taylor, correct?

2    A.   Correct.  I'm actually trying to read --

3              THE COURT:  Are you able to read that?

4              THE WITNESS:  It's very small.

5              THE COURT:  Could you blow that up so the witness can

6    evaluate the exhibit.

7              MR. TENGESDAL:  Thank you, Judge.

8              THE WITNESS:  I can read it now.

9              THE COURT:  Is there a question pending?

10   BY MS. CIAMBRONE:

11   Q.   So his records do indicate that he received physical exams

12   at U of I, UIC as a basis for the treatment he was given,

13   correct?

14   A.   I suppose.  But based on the objective exam I see here, I

15   wouldn't have done an epidural steroid injection.

16   Q.   His physicians at UIC came to a different conclusion,

17   correct?

18   A.   That's their prerogative.  But I see no myelopathic signs.

19   Strength is perfect.  Sensation is perfect.  Motor is perfect.

20   Spurling's is negative.

21            I mean, you have to go with objective criteria.  Now,

22   I understand your subjective component of dealing with

23   patients and talking with patients.  But if I were to have

24   this patient come to my office, I respectively would not have

25   done an epidural.  That's my prerogative.

Tata - cross by Ciambrone

1093

1    Q.  Are you suggesting that Dr. Obaisi should have acted

2    contrary to the specialists that were treating Mr. Taylor for

3    his pain?

4    A.  No, I am not saying that.  I am just saying that in

5    perpetuity, getting an epidural every three months makes no

6    sense and is not the standard of care.  That's what I'm

7    saying.  That's all.

8    Q.  And you realize that there are different opinions on the

9    number of steroidal injections a patient can receive over a

10   course of time, correct?

11   A.  There are, yes.

12   Q.  There are.

13          MS. CIAMBRONE:  If I could have one moment, please?

14   I think I'm almost done, Your Honor.

15          THE COURT:  Yeah, sure.

16      (Discussion off the record)

17          THE COURT:  For planning purposes, we are going to

18   have our afternoon break at 3:00.

19          MS. CIAMBRONE:  I think I'm done, Your Honor.  It

20   will only take me 30 seconds.

21      (Pause)

22          MS. CIAMBRONE:  I have no more questions, Your Honor.

23          THE COURT:  Thank you.

24          Redirect?

25          MR. TENGESDAL:  If you can just pull up what was just

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 161 of 234 PageID #:22451
Tata - redirect by Tengesdal
1094

1   used, Exhibit 283.

2           THE COURT:  I'm sorry, what did you say?

3           MR. TENGESDAL:  Exhibit 283.  It's been admitted as

4   the last --

5           THE COURT:  Go ahead.  DX-283.

6           MR. TENGESDAL:  Yes.

7                     REDIRECT EXAMINATION

8   BY MR. TENGESDAL:

9   Q.  Doctor, Ms. Ciambrone just showed you a note from

10  12/9/2016, is that right?

11  A.  She did.  But if you could show it so I can see it.

12          Thank you.

13  Q.  And was it pain management or was it orthopedic clinic on

14  12/9/2016?

15  A.  This was actually Dr. Mekhail, who is an orthopedic spine

16  surgeon.

17  Q.  Okay.  And then what was the chief complaint on December

18  9, 2016?

19  A.  Both neck and low back pain.

20  Q.  Okay.  And you were asked whether or not a physical exam

21  was done, is that right?

22  A.  I was.

23  Q.  Okay.

24          MR. TENGESDAL:  And if we can take that down.  That's

25  12/9/2016, right?  And if we can put up Demonstrative Exhibit

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 162 of 234 PageID #:22452
Tata - redirect by Tengesdal
1095

1    346.

2              THE COURT:  That's DX-346.  Yes, go ahead.

3    BY MR. TENGESDAL:

4    Q.  All right.  Doctor, December 9, 2016, that's when the

5    orthopedic did the physical exam.  And they would have got

6    that note back to Dr. Obaisi, right?

7    A.  Correct.

8    Q.  Okay.  Was there an epidural steroid injection that was

9    done on 12/30/2016?

10   A.  Yes.

11   Q.  Okay.  So 21 days after an orthopedic sees the patient,

12   does the exam for the neck and lower back, he's back at the

13   UIC Pain Management to have an epidural?

14   A.  That is correct.

15   Q.  Okay.  Did Dr. Obaisi ignore the orthopedic note?

16   A.  No.

17   Q.  Did Dr. Obaisi make a request that UIC pain service see

18   the patient and, in fact, stick a needle in his neck and do an

19   injection?

20   A.  He would have to, yes.

21   Q.  Okay.  You were asked some questions whether or not -- the

22   quantity of papers in your CV that you've written?

23   A.  Yes.

24   Q.  Okay.  Are you a writer or are you a doer?

25   A.  I'm a doer.

1   Q.   Okay.  And do you see patients?

2   A.   I do.

3   Q.   Why do you prefer to see patients as opposed to writing

4   articles?

5   A.   Well, I mean, there is a role for both.  It just depends.

6   I'm not -- we learn from reading articles, and it's all

7   evidence-based medicine.  I've chosen to be in the trenches

8   and treat pain patient by patient.

9   Q.   Okay.  And you were asked questions about whether you gave

10  a deposition, whether you remembered a deposition.  Do you

11  recall that?

12  A.   I do.

13  Q.   Okay.  You were asked questions about your answer in a

14  deposition about the frequency of when you do --

15  A.   Correct.

16  Q.   You discussed with Ms. Ciambrone, you know, the difference

17  in the drugs and the amount?

18  A.   Yes.

19  Q.   Okay, all right.  The question when you answered was when

20  you see patients with an acute herniated disc.  Did

21  Ms. Ciambrone ever ask you about what an acute herniated disc

22  is?

23  A.   She never did.

24  Q.   Okay.  Did Ms. Ciambrone ever ask you what's the

25  difference between treating a patient with an acute herniated

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 164 of 234 PageID #:22454
Tata - redirect by Tengesdal
1097

1   disc and a guy who has chronic degenerative disc disease?

2   A.   She did not.

3   Q.   Okay.  Why don't you tell the jury what is the difference

4   in treating an acute herniated disc with epidural steroid

5   injections?

6   A.   Sure.  A person that comes in with an acute herniated disc

7   is going to be in a lot a lot of pain with objective findings.

8   I kind of alluded, I gave myself as an example.  I had an

9   acute herniated lumbar spine disc.  I had significant amount

10  of pain.

11         And when they come in, you are going to have pain 8,

12  9, 10.  And, again, it's subjective, I understand that.  But

13  you are going to have reflex changes, muscle strength

14  weakness, sensory abnormalities.  It's acute.  It is right

15  then and there.  It is not a chronic condition.

16         Whereas a person that comes in with a chronic

17  condition, and in my clinic, most of them are elderly, they'll

18  come in with stenosis, it's chronic, they've been in pain for

19  multiple years.  So there is a chronic disease and there is an

20  acute disease.

21  Q.   Okay.  Are we talking apples to apples or apples to

22  oranges here?

23  A.   I guess we're talking apples to oranges here.

24         MR. TENGESDAL:  Okay.  Can we pull up JT-091 that

25  plaintiff admitted into evidence?

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 165 of 234 PageID #:22455
Tata - redirect by Tengesdal
1098

1      THE COURT:  Go ahead.

2  BY MR. TENGESDAL:

3  Q.  Pain service note, February 19, 2019, is that correct?

4  A.  That is correct.

5  Q.  Okay.  Did Dr. Obaisi complete this referral?

6  A.  He would have had to, yes.

7  Q.  Okay.  Could Dr. Obaisi complete it if he had already

8  passed away?

9  A.  No.

10  Q.  Okay.  So if Dr. Obaisi died in December 2017, do you know

11  what the significance of showing you a note from 2019 is?

12  A.  Good point, I didn't catch that.  But yeah, it's after Dr.

13  Obaisi's passing away.

14  Q.  Okay.  Is there any action or inaction by Dr. Obaisi that

15  would have created the need for additional steroids past when

16  he's dead?

17  A.  It doesn't make any sense to me, no.

18  Q.  Okay.  Did Mr. Taylor have the medical conditions of the

19  chronic degenerative disc disease of both cervical and lumbar

20  spine prior to him ever seeing Dr. Obaisi?

21  A.  Yes.

22  Q.  Okay.  Did Dr. Obaisi do anything during his time frame to

23  make those conditions worse?

24  A.  No.

25  Q.  Okay.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 166 of 234 PageID #:22456
Tata - redirect by Tengesdal
1099

1    MR. TENGESDAL:  If we could then bring up JT-081 that

2    was previously admitted, discussed.

3    BY MR. TENGESDAL:

4    Q.  All right.  Ms. Ciambrone, she said on this MRI there is

5    no, 10/4/2016, lumbar spine, there is no indication that Dr.

6    Obaisi ordered this, right?

7    A.  That is what she said, yes.

8    Q.  All right.  She made a deal about that, that you didn't

9    know that he had ordered this, right?

10   A.  Correct.

11   Q.  When you reviewed the records, did you see that Dr. Obaisi

12   ordered this?

13   A.  I seem to recall, yes.  But she asked me a specific piece

14   of paper.  I can't recall.

15   Q.  All right.  Well, let's take a look then at DX-328.

16        MR. TENGESDAL:  Which we would ask to be admitted

17   into evidence.

18        THE COURT:  Any objection to the admission of DX --

19   what is it?

20        MR. TENGESDAL:  328.

21        THE COURT:  328.

22        MR. DARKE:  No objection.

23        MR. FITZGERALD:  No objection.

24        THE COURT:  Go ahead, counsel.  It's in.

25      (DX-328 was received in evidence)

1    BY MR. TENGESDAL:

2    Q.  All right.  What have we got here, Dr. Tata?

3    A.  It looks like an order for an MRI of the lumbar spine, and

4    it says by -- and pain clinic.

5    Q.  Okay.  And what is that name we see there?

6    A.  It says Dr. Obaisi, S. Obaisi.

7    Q.  Okay.  And if we can go to the middle section, the report

8    of referral.

9    A.  Yeah.  It says "MRI lumbar spine.  No contrast.  Complete

10   results are pending."

11   Q.  Okay.  So the MRI that Ms. Ciambrone said there is no

12   indication Dr. Obaisi had any role in that, do we see now that

13   he actually is the one who ordered that, and it was completed

14   on the date of the report?

15   A.  There is the piece of paper, yes.

16   Q.  Okay.

17          MR. TENGESDAL:  Pull up JT-070.

18          Previously admitted, Your Honor.

19          THE COURT:  Go ahead.

20          MR. TENGESDAL:  If we could blow up the -- go on,

21   next page, the plan section.

22   BY MR. TENGESDAL:

23   Q.  All right.  The last cervical epidural spine injection had

24   6 to 8 months good relief?

25   A.  Yeah.

Tata - redirect by Tengesdal

1101

Q.   Okay.

A.   60 percent.

Q.   Okay.  And 60 percent, would you say that's good relief?

A.   That's good.

Q.   Okay.  Did he need to come back at 3 months if it lasted for 6 to 8 months of good relief?

A.   Makes no sense.  It's based on clinical judgment.  I can't be a soothsayer and say come back at a certain amount of time.  That's what I find hard to believe here.

Q.   All right.  If I had a problem in my back, and I was coming to see you in a month, that's when I'm on your schedule, and I have no pain, no radicular component anywhere, I walked in your office, said, Hello, would you do, would you do the injection?

A.   I would not.

Q.   Okay.  Were you shown any indication that when he was supposed to come back in one month, well, look at this, see what we've got here, he's got a note that he's at Stateville saying, "Oh, I have all this tremendous pain."  Did you ever see that?

A.   No.

Q.   Okay.  Dr. Votta-Velis, she had that come back in one month note.  Did you ever see when he didn't come back in one month that she said:  Where have you been?  Did she call up Dr. Obaisi saying:  Where is he at?

Tata - recross by Ciambrone

1102

1    A.   Not that I can see, no.

2    Q.   Okay.  As a pain management physician, do you expect to

3    see patients when they're in pain?

4    A.   I would hope so, yes.

5    Q.   And if they're not in pain, is there anything that as a

6    pain management physician that you can offer them?

7    A.   No.  They don't come to me, no.

8              MR. TENGESDAL:  That's all I have, Your Honor.  Thank

9    you.

10             THE COURT:  Any further inquiry?

11             MR. FITZGERALD:  None from us.

12             THE COURT:  Anything, counsel?

13             MS. CIAMBRONE:  Just one question.

14             THE COURT:  Okay.

15                        RECROSS-EXAMINATION

16   BY MS. CIAMBRONE:

17   Q.   Dr. Tata, you're not aware of the grievances that Mr.

18   Taylor filed and specific grievances in which he complained of

19   pain and complained of not being sent back to the pain clinic

20   specifically because of that failure to return for the

21   February 1st, 2016 report, are you?

22   A.   Correct.

23             MS. CIAMBRONE:  Thank you.  I have no other

24   questions, Your Honor.

25             THE COURT:  Any further inquiry?

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 170 of 234 PageID #:22460
Tata - redirect by Tengesdal
1103

1                        REDIRECT EXAMINATION

2    BY MR. TENGESDAL:

3    Q.   Did you see any grievance?  Were you just shown a

4    grievance where that occurred?

5    A.   I didn't see any specific grievance, no.  She waved a

6    paper.  But it's probably in the dep.  That deposition was

7    there, yes.

8    Q.   If Mr. Taylor has a complaint, "Why am I not getting back?

9    I'm in pain," should he send it to a counselor or should he go

10   talk to Dr. Obaisi, his treating physician, so that the guy

11   who could return him to pain management could fill out the

12   form?

13   A.   It would be Dr. Obaisi.

14              MR. TENGESDAL:   Okay.  Thank you.

15              THE COURT:   Any additional inquiry?

16              MS. CIAMBRONE:   No, Your Honor.  We have no further

17   inquiry.

18              THE COURT:   Anything?

19              MR. FITZGERALD:   No.

20              THE COURT:   Thank you, doctor.  You can step down.

21        (Witness excused)

22              THE COURT:   Ladies and gentlemen, that's close enough

23   to 3:00 o'clock.  It's your afternoon break.  See you in a

24   half hour.

25              Remember my normal reminder regarding the duties of a

Tata - redirect by Tengesdal

1104

1    jury, including not discussing the case.

2            All rise for the jury.

3        (Jury out)

4            THE COURT:  Jury out.  Door closed.

5            Anything to take up before the afternoon break?

6    Counsel for both sides, any additional thing we need to take

7    up before we take the afternoon break?

8            MS. CUNDIFF:  No, Your Honor.

9            MS. CIAMBRONE:  No, Your Honor.

10           MR. TENGESDAL:  No.

11           THE COURT:  All right.  See you all at 3:25.

12       (Recess at 2:54 p.m. until 3:25 p.m.)

13       (Change of reporters.)

14

15

16

17

18

19

20

21

22

23

24

25

1     (Proceedings heard in open court, jury not present:)

2          THE COURT:  Have a seat, everybody.

3          Anything to take up before we bring in the jury?

4          MR. DARKE:  No.

5          THE COURT:  Okay.  Who's your next witness?

6          MS. CUNDIFF:  We're going to read the deposition of

7   Dr. David Morris.

8          THE COURT:  Dr. David Morris.  And the date?

9          MS. CUNDIFF:  December 13, 2019.

10         THE COURT:  Thank you.  That runs about half hour,

11  right?

12         MS. CUNDIFF:  Yeah, probably.

13         THE COURT:  Gotcha.

14     (Bench conference, not reported.)

15     (Jury enters courtroom.)

16         THE COURT:  Good afternoon, everyone.  Please be

17  seated.  We're going to continue with the defense case.

18         Counsel, whenever you're ready.

19         MS. CUNDIFF:  Yes, your Honor.  We are going to read

20  into the record the deposition of Dr. David Morris.

21         THE COURT:  Ladies and gentlemen, I'm going to give

22  you the same legal instruction regarding the reading of a

23  deposition.

24         A deposition is the sworn testimony of a witness

25  taken before trial.  The witness is placed under oath to tell

Morris - deposition

1106

the truth, and lawyers for each party may ask questions.  The

questions and the answers are recorded.

The deposition of the witness, Dr. Dave Morris, which

was taken on the 13th of December, 2019, is about to be

presented to you.  Deposition testimony is entitled to the

same consideration and is to be judged, insofar as possible,

in the same way as if the witness had been present to testify.

As always, do not place any significance on the

behavior or tone of voice of any person reading the questions

or answers.

Go ahead, counsel.

DAVID E. MORRIS, DEFENDANTS' WITNESS, VIA DEPOSITION.

BY MS. CUNDIFF:

Q.   Good afternoon, Doctor.  Can you please state and spell

your name for the court reporter.

A.   David, D-A-V-I-D, E., Morris, M-O-R-R-I-S.

Q.   Doctor, we're here to get your testimony about some care

and treatment you provided to a gentleman by the name of John

Taylor.  Do you have any independent memory of Mr. Taylor as

you sit here today?

A.   Yes.

Q.   And tell us what you recall of him outside your chart

note.

A.   I recall him being a prisoner and was accompanied by one

or two prison guards.  And I recall him having a history of

Morris - deposition

1107

1   several abdominal procedures and seeking another opinion on

2   that.

3   Q.   Doctor, is this -- that a current and accurate curriculum

4   vitae for you?

5   A.   Yes.

6   Q.   Can you tell us where you went to college?

7   A.   Washington University in St. Louis.

8   Q.   And when did you complete your studies there?

9   A.   1992.

10  Q.   And then following your undergraduate degree, did you

11  attend medical school?

12  A.   Yes, I did.

13  Q.   And where was that at?

14  A.   Northwestern University Medical School.

15  Q.   When did you complete your M.D. degree?

16  A.   1996.

17  Q.   Following medical school, did you do any internships or

18  residencies?

19  A.   I did two residencies.  One was in general surgery in

20  Detroit, Michigan, at Henry Ford Hospital, and one was in

21  plastic surgery at University of Illinois.

22  Q.   And then the general surgery residency, how long was that?

23  A.   That was five years, plus one year of research.

24  Q.   And what year did you complete your general surgery

25  residency?

Morris - deposition

1108

1  A.  2002.

2  Q.  And then the plastic surgery residency, where was that

3  done at?

4  A.  The University of Illinois at Chicago.

5  Q.  How long is a plastic surgery residency?

6  A.  Three years.

7  Q.  Are you board-certified in general surgery?

8  A.  No.

9  Q.  Are you board-certified in plastic surgery?

10  A.  Yes.

11  Q.  Do you practice as a general surgeon?

12  A.  No.

13  Q.  Do you practice exclusively, then, as a plastic surgeon?

14  A.  Yes.

15  Q.  You have training, completed a residency in general

16  surgery, correct?

17  A.  Yes.

18  Q.  Are you familiar as a general surgeon with how to perform

19  hernia surgeries?

20  A.  Basic hernia surgeries, yes.

21  Q.  Would you agree Mr. Taylor's condition would not be a

22  basic hernia surgery?

23  A.  Yes.

24  Q.  During the course of your career as a physician, how many,

25  as you say, basic hernia surgeries would you say you've

Morris - deposition

1109

1  performed?

2  A.  Are you talking about in independent practice or --

3  Q.  During your -- to become -- to complete your residency,

4  yes.

5  A.  I would estimate in the hundreds.

6  Q.  As a trained general surgeon and plastic surgeon, are you

7  familiar with the anatomy of the abdominal cavity?

8  A.  Yes.

9  Q.  And tell us about -- did you do a fellowship?

10  A.  I did.

11  Q.  And what was your fellowship in, Doctor?

12  A.  Pediatric plastic surgery and craniofacial surgery.

13  Q.  And are you on staff at any hospitals, Doctor?

14  A.  Yes.

15  Q.  Which ones?

16  A.  University of Illinois Medical Center, Shriners Hospital

17  For Children, Mount Sinai Hospital, Weiss Hospital, Christ

18  Hospital.

19  Q.  Have you authored any publications on hernia surgeries?

20  A.  No.

21  Q.  Doctor, this is a chart note that we see that has your

22  name on it.  Doctor, is it your understanding that you saw

23  Mr. Taylor in consultation on one occasion?

24  A.  Yes.

25  Q.  And what date was that?

Morris - deposition

1110

1    A.   It appears August 30th of 2019.

2    Q.   Did you chart that anywhere that Dr. Dumanian wanted to

3    see him or what Mr. Taylor related to you?

4    A.   The only charting I would have done is what's in this note

5    that he provided.  I can read that if you'd like.

6    Q.   Sure.

7    A.   Yeah.  The portion of my addendum that alludes to that

8    states, "Patient with complex abdominal" -- I'm sorry,

9    "Patient with complex anatomy and multiple previous operations

10   in terms of abdominal wall reconstructions, the most recent

11   being at Northwestern with Dr. Dumanian.  He has intermittent

12   abdominal discomfort in the region of previous operations.  On

13   my exam, no open wound or sign of infection.

14        "Given his complex anatomy, further reconstruction is

15   outside the scope of my practice.  I feel that he would be

16   best served with return visit to Northwestern, where his last

17   operation was done, or by a surgeon who has similar expertise

18   in that field."

19   Q.   And what is charted for the HPI, the history of present

20   illness, in the August 30th note, Doctor, if you could just

21   read that word-for-word for us.

22   A.   "A 57-year-old male with history of dermatofibrosarcoma

23   status post multiple resections in 1992, 1993, 1994, and a

24   history of radiation treatment, status post resection TFL flap

25   and split-thickness skin graft in 2014 at UIC with Dr. Warso

Morris - deposition

1111

1   and Dr. Antony.

2           "Status post hernia repair, lysis of adhesions and

3   small bowel resection, parenthesis, inadvertent bowel injury,

4   parenthesis, abdominal wall reconstruction with pedicled right

5   ALT flap with TFL pedicled flap with strattice mesh bridging

6   fascia, parenthesis, loss of domain, end of parenthesis,

7   excuse me, parenthesis, with split-thickness skin graft at

8   donor sites, parenthesis, Northwestern 5/2018, end of

9   parenthesis.  Currently endorsing severe 10 out of 10 pain

10  intermittently.  No obstructive symptoms.  In other words, no

11  nausea, vomiting, constipation, obstipation."

12  Q.   The Northwestern surgery that was done by Dr. Dumanian, do

13  you know if you had access to or ever reviewed his surgical

14  report?

15  A.   I didn't have access to it, and I didn't review it, no.

16  Q.   And you're saying when you look in the objective

17  abdominal, the area of the scars, that would be consistent

18  with him having three prior resections in that area?

19  A.   Yes.

20  Q.   When dermatofibrosarcoma are removed in that area, would

21  you agree that the surgeon has to remove tissue?

22  A.   Yes.

23  Q.   And then it says in 2014 at UIC with Dr. Warso -- do you

24  know who Dr. Warso is?

25  A.   Yes.

Morris - deposition

1112

1   Q.   And what's Dr. Warso's specialty?

2   A.   He's a surgical oncologist.

3   Q.   According to the note of August 30th, it says in 2014, at

4   UIC with Dr. Warso and Dr. Antony, he had a procedure done.

5   Is that your understanding?

6   A.   Yes.

7   Q.   What were your -- what were the objective findings that

8   were found on exam on August 30th that were pertinent to the

9   condition he came in with, Doctor?

10  A.   They're in the objective section listed as multiple scars

11  from previous surgeries, right flank incision with associated

12  contracture and concavity.  No arrhythmia or fluid collection,

13  and that there was no rebound tenderness, no guarding.  And

14  then there are skin donor sites that are listed.

15  Q.   And when it says contracture and cavity in the right flank

16  area, what does that mean?

17  A.   I take this to mean that there's -- scar has pulled

18  away -- pulled in a certain way, and it causes some contour

19  deformative -- deformity and asymmetry between the two sites

20  of the abdomen.

21  Q.   And did he present to you -- what was his pain level on

22  August 30th?  I see it's in the HPI section.

23  A.   Well, here, he says he endorses severe 10 out of 10 pain

24  intermittently; however, in the review of systems, it says he

25  denies abdominal pain.  So, I take this to mean that he

Morris - deposition

1113

1    sometimes has severe pain, but he wasn't having it at this

2    particular time during this visit, that it comes and goes.

3    Q.   Based on the history that was provided to you, the review

4    of medical records you may have done, the objective

5    examination, did you find out what the cause was of the pain

6    10 out of 10 when he did have it?

7    A.   No.

8    Q.   So, following the history and objective exam was on

9    August -- was an assessment ever made for Mr. Taylor on

10   August 30th?

11   A.   My assessment was that I didn't have any procedures or

12   treatment that I could personally offer him because I think

13   his complexity is beyond the scope of my usual practice.  And

14   I felt that it would be reasonable either to have him return

15   to the most recent treating surgeon or to somebody who has

16   similar levels of scope of practice and expertise in that.

17   Q.   And you've been -- you've used the term that he was --

18   the complexity was beyond your scope of practice.  Can you

19   just describe for us what made Mr. Taylor's condition with

20   his abdomen, his hernia, so complex?

21   A.   Well, I should tell you, probably 80 percent of my

22   practice is kids from the neck up, and so within that

23   20 percent of my practice, I do general plastic surgery.

24   Q.   Would you agree there was no policy or procedure at UIC

25   that you could consult to teach you how to treat Mr. Taylor,

Morris - deposition

1114

1    to your knowledge?

2    A.   No.   I think in a non-straightforward case like this, I

3    don't believe that there's any -- I would be surprised if

4    there was a large series of patients having his specific

5    constellation of findings that could tell any one person a

6    cookbook way of doing it.

7    Q.   And ultimately, was it your plan that Mr. Taylor would

8    need to be seen by an abdominal wall reconstructionist?

9    A.   Yes.

10    Q.   Would you agree, since you don't have -- know any of the

11    subsequent care as you sit here today, you do not have any

12    opinion on whether or not Mr. Taylor needs any future care?

13    A.   That's correct.

14    Q.   Would you agree you do not have any opinion on whether

15    or not Mr. Taylor needs any future surgical treatment for

16    his hernia?

17    A.   I agree.

18    Q.   Did Mr. Taylor tell you whether or not his current state

19    on August 30th caused him any trouble with any of his

20    activities of daily living?

21    A.   He didn't share this with me.

22    Q.   Would you agree, then, you do not have any opinion as to

23    whether or not in the future Mr. Taylor will have any pain or

24    suffering as a result of his conditions?

25    A.   I don't know.

Morris - deposition

1115

1  Q.  Since you don't know, you don't have an opinion; is that

2  true?

3  A.  That's true.

4  Q.  Understanding you and your resident charted his

5  medications that he was on for pain, did you make any

6  recommendations that his pain medications be changed?

7  A.  No.

8  Q.  As a part of your plan that he sees an abdominal wall

9  specialist, was there any defined time frame that needed to be

10  done by?  Did you put that in your note?

11  A.  No, I didn't put that in my note.

12  Q.  Would you agree that a physician, whether they be general

13  medicine, internal medicine, can never tell a surgeon that

14  they must perform surgery on somebody; that's up to the

15  surgeon to determine that?

16  A.  I agree with that.

17        MS. CUNDIFF:  And that concludes the reading of this

18  deposition.

19        THE COURT:  Thank you, counsel.  Call your next

20  witness.

21        MS. CIAMBRONE:  He's in the other room, your Honor.

22        THE COURT:  Good afternoon.  Raise your right hand.

23     (Witness sworn.)

24        THE WITNESS:  I do.

25        THE COURT:  All right.  Have a seat.

Reed - direct by Tengesdal

1116

1      Go ahead, counsel, whenever you're ready.

2           MR. TENGESDAL:  Thank you, your Honor.

3      ROBERT LAWRENCE REED, II, DEFENDANTS' WITNESS, DULY SWORN.

4                      DIRECT EXAMINATION

5  BY MR. TENGESDAL:

6  Q.  Good afternoon, Doctor.  Could you please introduce

7  yourself to the jury.

8  A.  Yes.  My name is Robert Lawrence Reed, II, M.D.

9  Q.  And my understanding, you just retired, congratulations,

10 is that right?

11 A.  Thank you.

12 Q.  Where do you currently live, Dr. Reed?

13 A.  In The Woodlands, Texas.

14 Q.  And what was your occupation until just recently?

15 A.  I was a general surgeon, actually general trauma surgical

16 critical care.

17 Q.  And I want to ask you a little bit about your education

18 and training, sir.  Can you tell us, where did you attend

19 medical school?

20 A.  The University of Virginia in Charlottesville.

21 Q.  And when did you complete your medical education?

22 A.  In 1976.

23 Q.  After medical school, Doctor, did you do an internship?

24 A.  Yes.

25 Q.  Where was that at?

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 184 of 234 PageID #:22474
Reed - direct by Tengesdal
1117

1  A.  I did an internship at the William Beaumont Army Medical

2  Center in El Paso, Texas.

3  Q.  And what was your internship at William Beaumont in

4  El Paso?

5  A.  It was a flexible internship; that is, I did surgery,

6  internal medicine, pediatrics, several specialties.

7  Q.  You said it was at an Army hospital?

8  A.  Yes.

9  Q.  And then after your internship, when was that completed?

10  A.  That was completed in 1977.  It was a one-year internship.

11  Q.  And then after your internship, did you do a residency?

12  A.  Yes.  I did a five-year residency in general surgery, also

13  at William Beaumont Army Medical Center.

14  Q.  And if you could please explain to the jury when you

15  completed your general surgery residency, what is the medical

16  specialty of general surgery?

17  A.  It's a field that covers surgery of a variety of body

18  parts.  Mostly it's the abdomen and its contents, but we also

19  do a lot of surgery in the chest and on extremities, you know,

20  taking out lipomas, various tumors, malignant and benign

21  tumors.  We do thoracic procedures like removing the

22  esophagus, sometimes some lung procedures.  It's very

23  general.

24  Q.  And as a general surgeon, would you have surgical

25  privileges at a hospital in order to perform these procedures?

Reed - direct by Tengesdal

1118

1   A.   Absolutely.

2   Q.   Did you do any medical training after you completed your

3   five-year general surgery residency?

4   A.   Yes.  I did a trauma research fellowship in Seattle,

5   Washington, the University of Washington, because I was

6   interested in going into academic surgery.

7   Q.   And what was the trauma surgery research fellowship?

8   What do you learn in that?

9   A.   That involved doing research studies, setting them up,

10  designing them, conducting them, and writing up the results,

11  publishing them.

12  Q.   And what is trauma medicine?

13  A.   Trauma medicine is the medicine of injury.  It's primarily

14  a surgical condition because injury requires surgical

15  treatment, you know, repairing wounds, vessels, muscles,

16  tissues, and treating the patient postoperatively so that

17  they can recover from the injuries and especially survive

18  injuries that would otherwise have been fatal.

19  Q.   And, Doctor, for how long did you practice as a general

20  and trauma surgeon before your retirement?

21  A.   Well, I stopped doing trauma in 2015.  The night call just

22  got too much at that age.  And then I did my last general

23  surgery case in December of 2021.

24  Q.   Do you know what board certification is?

25  A.   Yeah.

Reed - direct by Tengesdal

1119

1  Q.  Have you ever achieved board certification?

2  A.  Yes.

3  Q.  And can you tell us, what does it mean to be

4  board-certified?  What do you have to do?

5  A.  Well, you have to apply for the certification.  You have

6  to demonstrate your experience and training and that you've

7  completed those training -- fellowships or residencies.

8       And then you sit before a board after you've

9  submitted your application, who question you regarding your

10  experience and your knowledge.  And if you are successful,

11  you are then considered board-certified.

12  Q.  And what boards, I guess, were you ever certified in?

13  A.  I was certified by the American Board of Surgery and also

14  by the American Board for Critical Care Medicine.

15  Q.  And what is the American Board of Critical Care Medicine?

16  A.  It's a board consisting of the certification of

17  individuals to provide critical care, that is, people who are

18  in intensive care unit, where they need a lot of treatment for

19  respiratory, cardiac, other physiologic abnormalities that

20  need intensive treatment.

21       MR. TENGESDAL:  And I'd ask your Honor to have

22  admitted into evidence DX 0072-A, an updated curriculum vitae

23  of Dr. Reed.

24       THE COURT:  Any objection to the admission of

25  DX 0072-A?

1    MR. FITZGERALD:  No objection.

2    MR. DARKE:  No objection.

3    THE COURT:  It will be admitted without objection.

4    You may publish.

5        (Said exhibit admitted in evidence.)

6    BY MR. TENGESDAL:

7    Q.  Doctor, in your curriculum vitae, there's a section

8    called, "Academic Appointments."

9    A.  Yes.

10   Q.  And can you tell us, what do you list for the academic

11   appointments?  What does that mean, the topic?

12   A.  These are my teaching positions at various institutions.

13   It's in reverse chronologic order, ending with my most recent

14   teaching status.

15   Q.  Okay.  Teaching status, does that mean at a university

16   that you would teach doctors how to be doctors?

17   A.  Yes, or like my first one was the U.S. Army -- U.S. Army

18   Academy of Health Sciences, which wasn't an actual university,

19   but I was appointed as a clinical instructor because I had

20   some corpsmen and other individuals under my training, I think

21   some respiratory therapists and so forth.

22       And then you -- as you can see, the academic ladder,

23   I was recruited from one place to the next, but you move up

24   the ranks as well at each place.  Like I was initially

25   recruited as a assistant professor of surgery at the

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 188 of 234 PageID #:22478
Reed - direct by Tengesdal
1121

1    University of Texas Medical School at Houston, and then I was

2    promoted to an associate professor of surgery with tenure.

3           I was recruited to Duke University, where I was

4    appointed both as an associate professor of surgery as well as

5    associate professor of anesthesiology.

6           And then I was recruited to Loyola University Medical

7    Center here in the Chicago area, where I was a professor of

8    surgery with tenure.

9           And most recently, I was recruited to Indiana

10   University in 2009, where I was ranked a professor of surgery

11   with tenure.

12   Q.   And in your CV, it says that you're a fellow, American

13   College of Surgeons.  What is that organization?

14   A.   The American College of Surgeons is an organization of

15   clinical surgeons that seeks to maintain the quality of

16   surgical care by its members.

17          And, you know, you have to have recommendations and

18   criteria that will have to be met.  You have to be interviewed

19   by an august body of established members in order to achieve

20   that posting.

21   Q.   Okay.  And does your CV, does that also contain your

22   education, training, experience, research and the medical

23   literature publications that you have done, sir?

24   A.   Yes.  Yes, it does.

25   Q.   And have you contributed to the medical literature on the

Reed - direct by Tengesdal

1122

1    condition of hernias?

2    A.   Yes.

3    Q.   Tell us a little bit about that, just in general, if you

4    could.

5    A.   Well, there's so many publications, I'd have to look them

6    up, actually.  But, you know, I've described hernias that I've

7    encountered and repaired, and the other -- mostly abdominal

8    wall reconstructions was what I was doing in my -- for the end

9    of my general surgical career, where these patients with

10   massive hernias would be presented to me because the

11   physicians and surgeons who referred them didn't know how to

12   handle them.  And I established a practice of dealing with

13   them over the years and a reputation, so I started taking

14   care of a lot of those.

15   Q.   Okay.  And one of your publications is entitled,

16   "Abdominal Wall Defects:  Principles, Trends, Repair and

17   Reconstruction."

18   A.   Right.

19   Q.   What does that encompass, that publication?

20   A.   That just describes the field that I was entering or

21   developing of dealing with these massive abdominal wall

22   defects.  And the basic principles -- most of these all were

23   midline or ventral hernias; that is, up and down the middle

24   of the abdomen.  And a lot of it was because the patients had

25   become so overweight that the linea alba, which is this band

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 190 of 234 PageID #:22480
Reed - direct by Tengesdal
1123

1    of fiber -- fibrous tissue that runs down the midline, joins

2    the two rectus abdominis muscles together in the midline.

3    That gets spread out, stretched out as the weight is gained

4    because that's weaker than the muscles.

5         And as it thins out, it thins out enough that stuff

6    from inside starts to bulge through and herniate through that

7    defect.  And it gets to be very difficult for patients to deal

8    with, mostly because it's unsightly, but also it's just

9    awkward.

10        And so what I would do is an abdominal wall

11   reconstruction, which meant I wanted to -- I needed to

12   separate the muscles to free them up so I could move them

13   around.  And basically, I released the lateral edges of the

14   rectus abdominis muscles so they could advance toward the

15   midline and be joined back together again and routinely

16   reinforcing it with an underlay of some type of synthetic

17   material, mesh material that would not separate.

18   Q.   Okay.  And you said when you were at the University of

19   Indiana, you were doing mostly abdominal wall reconstructions?

20   A.   Yes.

21   Q.   Is that what you just described?

22   A.   Yes.

23   Q.   And what are some of the reasons that a patient would need

24   an abdominal wall reconstruction?

25   A.   Well, it was getting hard for them to live with this big

Reed - direct by Tengesdal

1124

1    hernia bulging out of their midline, and they obviously didn't

2    like it and didn't like the appearance, either.

3            So, some people consider it a cosmetic procedure;

4    but in reality, for these folks, it was fairly functional

5    for them to have it fixed.

6            MR. TENGESDAL:  Your Honor, I ask to move to qualify

7    Dr. Reed as an expert under Rule 702 in general surgery and

8    trauma surgery medical specialties.

9            THE COURT:  Any objection to the witness being

10   qualified in those two areas?

11           MR. FITZGERALD:  No objection.

12           MR. DARKE:  No objection, Judge.

13           THE COURT:  You may so inquire.  Go ahead, counsel.

14           MR. TENGESDAL:  Thank you.

15   BY MR. TENGESDAL:

16   Q.  Doctor, I want to switch topics off your CV and ask you

17   about your experience with hernias, not Mr. Taylor's in

18   particular.

19           But in general, can you tell us what has been your

20   experience as a general surgeon working on and fixing hernias?

21   A.  Well, it's -- you know, there's different kinds of

22   hernias.  The most common we fix are inguinal hernias or groin

23   hernias just because they're so common in society.

24           And there's various ways in which you can fix them;

25   and so you kind of learn each of the different ways, and

Reed - direct by Tengesdal
1125

1    different techniques, you know, can vary based upon the nature

2    of the hernia that you encounter at that time.

3            So, there's Shouldice repairs.  There's Richter's

4    repairs -- those are Richter's hernias.  There's Bassini

5    repairs.  There's all sorts of different repairs that have

6    been described in terms of what muscle layers you separate and

7    bring back together and how you reconstruct the inguinal

8    region so that herniation no longer happens.

9    Q.  You talked about midline being middle abdominal wall

10   reconstructions?

11   A.  Yes.

12   Q.  Mr. Taylor's hernia, have you looked at the records,

13   CT scans, et cetera, to evaluate that hernia?

14   A.  Yes.

15   Q.  Does Mr. Taylor have a midline abdominal wall hernia?

16   A.  No, he does not.

17   Q.  What type of hernia does Mr. Taylor have?

18   A.  It's a very unique hernia, one that I've actually not seen

19   any literature description of in the past.

20   Q.  And can you tell the jury, why is this hernia that

21   Mr. Taylor has unique and that you've never even seen anything

22   published on it before?

23   A.  Well, it's unique first of all because of its development.

24   It developed after surgery to excise a dermatofibrosarcoma

25   protuberance that required multiple operations to excise the

Reed - direct by Tengesdal

1126

1    iliac crest and bone, and extensive dissection of bone,

2    several different operations, along with radiation therapy to

3    try to get control of that tumor, which is a cancer.

4          It's, you know, a sarcoma, which they advance locally

5    in tissues.  They don't metastasize distantly like carcinomas.

6    So you have to excise all the involved tissue as best you can.

7    And sometimes it's very difficult to tell whether the tissue

8    is involved or not, and so you do a wider resection than is

9    apparent just to make sure that you get all the tumor.

10         And that was done ultimately very effectively.  The

11   tumor has not recurred.  Unfortunately, in doing that kind of

12   wide excision, a good amount of real estate in Mr. Taylor's

13   anterior abdominal wall on the right was removed.  And by

14   that, I mean the muscles that are there to contain the

15   abdominal contents were gone.

16         And the herniation then developed as a result of

17   that, because what you had left then was a thin layer of

18   tissue.  There was an initial tensor fascia lata flap that

19   had been rotated to cover the defect, but that's too thin.

20         It's not strong enough to withstand it because you'd

21   have the other abdominal muscles on the other side and part of

22   the right rectus still intact, and they are strong and

23   healthy.  And whenever they tense up, they're going to

24   increase the pressure of the abdomen on that side, which is

25   going to make things want to spurt out on the side of -- on

Reed - direct by Tengesdal

1127

1    the left side.

2         I guess I should do it this way for you guys.  I'm

3    looking at it from my perspective.

4         But yeah, the right side would be compressing, and

5    the left side would be bulging out because they couldn't

6    compress at the same time like would normally happen.

7    Q.   Okay.  And in order for you to come here and testify as an

8    expert, create your reports that you did in this case, did you

9    review materials?

10   A.   Well, I reviewed all the clinical materials, yes.

11   Q.   When you say clinical materials, do you mean the medical

12   records in the case?

13   A.   Right, right.

14   Q.   Did you review all the surgical records as well?

15   A.   Yes, yes.

16   Q.   Okay.  And the CT scans that were done in this case, the

17   actual films, did you review those?

18   A.   Yes, I did.

19   Q.   Okay.  What was the purpose why you wanted to review the

20   CT scans?

21   A.   Well, first of all, it's interesting; but it was also --

22   it's very illustrative of the fact that there's no muscle

23   there, and you have this big gap in the abdominal wall, and

24   the intestines are just escaping within their peritoneal

25   lining.  The peritoneal lining itself is also bulging out, so

Reed - direct by Tengesdal

1128

1    the abdominal cavity is now becoming outside of the abdominal

2    cavity.  It's an extraabdominal content.

3    Q.  And did you see the records postsurgery like from the

4    University of Chicago?

5    A.  Yes.

6    Q.  Did you see the CT scan postsurgery as well?

7    A.  Yes.

8    Q.  And did you review the depositions in the case?

9    A.  Yes.

10   Q.  Change gears, ask you a little bit about what you know

11   about Mr. Taylor's past medical history.

12          And I know you brought up the dermatofibrosarcoma.

13   Is that a cancer or a tumor?

14   A.  Yes, it's a cancer.  There's two basic types of cancer,

15   sarcomas and carcinomas.  Carcinomas are more common, and they

16   can spread distantly.  That is, they metastasize through to

17   other body areas through the bloodstream or otherwise.  And,

18   therefore, you have to try to control the metastatic diseases

19   as well, but that really requires excision and chemotherapy to

20   deal with the cancer cells that have gone elsewhere.

21          Sarcomas, on the other hand, are soft tissue tumors.

22   They're tumors of nonepithelial structures.  That is,

23   carcinomas come from epithelium; that is, lining cells, lining

24   cells of the skin, the intestine, the urinary tract.  All

25   those cells are epithelial, and they multiply frequently

Reed - direct by Tengesdal

1129

1  because we're constantly turning over those surface cells.

2  That kind of frequent replication leads to the potential for

3  a malignant cell to develop in replication and to develop a

4  carcinoma.

5        Sarcomas are slower because they're coming from soft

6  tissue, which don't -- they don't divide as frequently.  And

7  so they -- they grow slower, and they extend locally.  They

8  invade locally.  They don't spread through the bloodstream

9  like carcinomas do.

10  Q.  Did Mr. Taylor's sarcoma, from the records that you

11  reviewed, did it do that; did it expand locally?

12  A.  Yeah.  And it needed, I think, at least three or four

13  resections to finally get it all taken out.

14  Q.  When you do a resection, is that a surgical word for

15  removing tissue?

16  A.  Yes.

17  Q.  And just in general, why do you want to remove a sarcoma

18  tissue that's growing?

19  A.  Well, because it's going to keep growing until it gets to

20  a point where the patient can't survive because it's grown

21  into some organ or tissue that it shouldn't grow.  You know,

22  a sarcoma could grow into the aorta.  Nothing's going to

23  stop it.

24  Q.  As a result of these resections that were done in the

25  '90s for the dermatofibrosarcoma, did Mr. Taylor ever have

Reed - direct by Tengesdal

1130

1    to have radiation therapy?

2    A.   He did.

3    Q.   And I know you described for carcinomas chemotherapy.

4    For a sarcoma, why would -- why would a doctor say you need

5    radiation therapy?

6    A.   Well, it's a way of trying to kill those tumor cells,

7    keeping them from metastasizing and -- or keeping them from

8    dividing and multiplying.  It's a different technique, and

9    it works more effectively for a sarcoma than chemotherapy

10   would.

11   Q.   Okay.  As a result of the radiation treatment that was

12   delivered to Mr. Taylor, were there any side effects of the

13   radiation?

14   A.   Well, of course, that damages other tissues in the area

15   besides the sarcoma because you can't narrow the beam of

16   radiation to those cells that need it and avoid the cells

17   that don't need it.  The radiation has to go through tissues

18   to get to the sarcoma.

19   Q.   Okay.  As a surgeon, is there any significance in this

20   case, as it pertains to Mr. Taylor, about the radiation tissue

21   damage that he incurred?

22   A.   Well, that's tissue that's not as healthy as it normally

23   would be, and so when he starts to develop hernias, you know,

24   the tissue that was irradiated is going to be weaker and less

25   effective as well.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 198 of 234 PageID #:22488
Reed - direct by Tengesdal
1131

1  Q.  Okay.  And as a surgeon, general surgeon who does complex

2  abdominal wall reconstructions, does the fact that he has

3  radiation tissue damage -- what does that -- how does that

4  impact it?

5  A.  It just makes it more difficult to find healthy tissue

6  to cover the defect and prevent herniation from happening.

7  Q.  As part of your review, Dr. Reed, did you see the records

8  of the surgical oncologist, Dr. Michael Warso?

9  A.  Yes.

10       MR. TENGESDAL:  And, your Honor, if we could bring

11  up what was previously admitted as DX 232.

12       THE COURT:  Proceed.

13  BY MR. TENGESDAL:

14  Q.  Okay.  Dr. Reed, we can blow this up for you, but do you

15  recall reviewing a record of Dr. Michael Warso for Mr. Taylor

16  from October 17, 2013?

17  A.  Yes.

18  Q.  Okay.  And as part of Dr. Warso's examination, would he

19  do a physical examination?

20  A.  Yes.

21  Q.  And why would a surgical oncologist want to do a physical

22  examination of a patient?

23  A.  Well, if you're thinking that you're going to need to

24  operate on the patient, you want to make sure that he's

25  healthy and, you know, will likely survive the operation and

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 199 of 234 PageID #:22489
Reed - direct by Tengesdal
1132

1  that there's nothing else that you can detect, like, you know,

2  are there other masses or concerning areas that need to be

3  evaluated as well.

4  Q.  Okay.

5        MR. TENGESDAL:  And if we could highlight for

6  Dr. Reed the MRI of the right hip section.

7  BY MR. TENGESDAL:

8  Q.  And did Dr. Warso in that October 13th letter, 2013, did

9  he put in there that he had reviewed the MRI?

10  A.  Right.  It's -- yes.

11  Q.  Okay.  And can you tell us what is charted for the MRI of

12  Mr. Taylor's right hip?

13  A.  Well, it says, "There's a multilobulated large mass in the

14  right low quadrant" -- should be the right lower quadrant --

15  "extending from the proximal right inguinal canal

16  anteriorly" --

17        THE COURT:  All right.  Slow down.  Slow down.

18  There's a temptation when you read to go fast.  Please

19  maintain a pace so we can keep a record.

20        THE WITNESS:  Sorry.

21  BY THE WITNESS:

22  A.  So, "There's a multilobulated large mass in the right low

23  quadrant extending from the proximal right inguinal canal

24  anteriorly and laterally to involve the right iliac crest,

25  oblique abdominis muscle, gluteus muscle, as well as the

Reed - direct by Tengesdal

1133

1  iliopsoas anteriorly.  There is cystic and nodular components

2  of the mass with mostly rim enhancement."

3  BY MR. TENGESDAL:

4  Q.  As a surgeon, sir, can you tell us -- break it down for

5  us?  What does the MRI of the right hip -- what is it showing?

6  A.  It's showing that there's mass that's fairly extensive in

7  terms of its invasion of the surrounding tissues.

8  Q.  Okay.  And is -- when there's a mass present, as

9  demonstrated there, is that something that shouldn't be there?

10  A.  Right, yeah.  In fact, you know, usually, you can see that

11  this side, the right side doesn't look anywhere like the

12  normal left side.  And typically, we are fairly symmetrical in

13  our anatomy.

14         MR. TENGESDAL:  And if we can look at the plan

15  section.

16  BY MR. TENGESDAL:

17  Q.  As part of your review, Doctor, did you look at the plan

18  section?

19  A.  Yes.

20  Q.  Okay.  Given the size of the mass that you've just

21  described on the MRI findings, if that was taken out of a

22  patient, Dr. Warso was going to do surgery, what would be the

23  expectations of what would occur?

24  A.  Well, that he's going to have this big operation to take

25  out all of this mass, and that's going to leave a defect of --

1  where normal tissue used to be.  Then abnormal tissue

2  developed; and now the abnormal tissue has been taken away,

3  but so had the previously normal tissue because it was

4  overcome by the abnormal tissue.

5          I hope that makes sense.

6  Q.  Okay.  When you have a defect that you just described,

7  when you take that out, what happens as a result of the defect

8  left behind?

9  A.  Well, in this case, it was the abdominal wall that was --

10  the right-sided abdominal wall that was the biggest loss

11  because now you have no real anterior abdominal wall on the

12  right side all the way to the right edge of the right rectus

13  muscle to beyond the iliac crest, which was no longer there.

14          And so that means there's nothing that can contain

15  the viscera, that is, the abdominal contents.  It can't

16  contain them.  You just have skin over them and peritoneum,

17  which will resurface, but that's not as -- that's not going

18  to retain those organs like a muscle wall retains the organs.

19  Q.  Okay.  So, you have the defect.  The viscera comes out.

20  Just the abdominal wall is missing.  What does that

21  typically -- what would you call that?

22  A.  Herniation.

23  Q.  Okay.  And did Dr. Warso -- in October when he saw the

24  patient, did he tell him that it would be expected that he

25  was going to have a hernia that developed once he took out

Reed - direct by Tengesdal

1135

1   all the stuff?

2   A.  Yes, he did.

3   Q.  And was it an -- reasonable expectation, Dr. Warso knew

4   that by taking out all the stuff, he'd cause a defect, all the

5   stuff would pull out, and it's a hernia?

6   A.  Right.  But there, I think you're weighing things in the

7   balance.  If you don't do the operation, you won't get the

8   hernia; but then, of course, you've got a malignancy that's

9   not been contained and you can't contain any other way.

10  Q.  And if the malignancy isn't contained and it's a sarcoma,

11  is it going to continue to grow?

12  A.  Yes.

13  Q.  And if the mass is of that size, would it be pressing on

14  anything to produce pain for Mr. Taylor?

15  A.  It -- that's not too likely just because it's such a

16  slow-growing entity, but it could potentially grow into the

17  spinal cord or -- you know, and somehow or other stretch

18  nerves from its growth.

19          It's unknown exactly what would happen.  It's

20  certainly not a good thing.

21  Q.  Where Dr. Warso charts on October 13th that the resultant

22  hernia will be repaired and may require the insertion of a

23  prosthetic mesh, does that mean that it will be repaired

24  during the surgery to take out all the stuff?

25  A.  Well, he's saying that it's going to -- possibly could

Reed - direct by Tengesdal

1136

1   be what he meant.  You can also read it that he's going to

2   wait to see if the hernia develops before repairing it.

3   Q.  Okay.  And according to the note, it says, "After

4   discussion -- after discussing this with him," meaning

5   Mr. Taylor, "he understood and agreed."

6           Is that your understanding of what informed

7   consent is?

8   A.  Yes.

9   Q.  So, Mr. Taylor, as you said, was given the risk versus

10  the benefits; and according to the note, did he elect to

11  proceed with the surgery?

12  A.  Yes.

13  Q.  Where Dr. Warso charts that he is expected to have

14  permanent functional changes that would accompany the

15  resection, what does that mean?

16  A.  Well, that -- I mean, it's going to be -- if the hernia

17  is going to develop, it's going to be a big hernia just

18  because it's such a large space of not having an abdominal

19  wall.

20          And then there's also the potential issue about, you

21  know, what's missing from the bones of his right hip and the

22  muscles that have to be detached and so forth.  He may not be

23  able to use his right leg in the same way.  But that may not

24  be a critical issue, but it's a possibility.

25          MR. TENGESDAL:  Okay.  If we can have what's

Reed - direct by Tengesdal

1137

1    previously admitted into evidence DX 233 brought up, please.

2              THE COURT:  Proceed.

3    BY MR. TENGESDAL:

4    Q.  Doctor, did you have the occasion to see the operative

5    report of Dr. Warso?

6    A.  Yes.

7    Q.  Okay.  And what was the preoperative diagnosis of

8    Dr. Warso?

9    A.  A history of dermatofibrosarcoma protuberance with right

10   iliac crest mass.

11   Q.  When it says, "right iliac crest mass," is it the mass

12   covering up the iliac crest?

13   A.  Well, it's in and on the iliac crest, yes.

14   Q.  What do you mean by in?

15   A.  Well, invading into it.

16   Q.  Okay.

17   A.  You can't just take the mass off and have all the sarcoma

18   gone if it's invading into the bone.  That means you have to

19   cut the bone out with the sarcoma in it.

20   Q.  And what was Dr. Warso, when he went in to do surgery on

21   4-23-14, what was the procedure he was planning to do?

22   A.  Well, he describes it as a radical excision of the right

23   iliac crest masses, surrounding muscles, and bony resection.

24   So he took out muscle and bone that were involved with the

25   tumor.

Reed - direct by Tengesdal

1138

1    Q.  And was that consistent with what was found on the MRI and

2    the history of sarcomas?

3    A.  Yes.

4    Q.  Before we get too much into all of these medical terms

5    and anatomic locations, would it assist you in your testimony

6    to the jury to use visual aids to show where these areas are?

7    A.  Yes, that would.

8              MR. TENGESDAL:  Your Honor, permission if Dr. Reed

9    can come down and use the exhibits.

10             THE COURT:  Which exhibits?  The same ones as before?

11             MR. TENGESDAL:  No, these are for the hernia.  They

12   would be DX 388 -- or 338, sorry, for demonstrative purposes;

13   DX 336, demonstrative; DX 347, for demonstrative purposes.

14   And I believe it says JX 0026.  That's the CT scan.  DX 336,

15   which is a demonstrative.

16             THE COURT:  You already said that one, I think.

17             MR. DARKE:  Yep.

18             MR. TENGESDAL:  Sorry.

19             THE COURT:  Is that all of them?

20             MS. CUNDIFF:  337.

21             MR. TENGESDAL:  The last one I said should be 337.

22   I apologize.

23             THE COURT:  Is the JX 0026, is that also a

24   demonstrative, or is that something different?

25             MR. TENGESDAL:  That's the actual CT scan, your

Reed - direct by Tengesdal

1139

 1    Honor.  I don't think we're going to get to that today,

 2    though.

 3            THE COURT:  All right.  But if we're dealing with

 4    the exhibits, let's deal with them now.  I have DX 338, 336,

 5    347, 337 for demonstrative, and JX 0026 substantively.  Any

 6    objection to those exhibits?

 7            MR. FITZGERALD:  No objection.

 8            MR. DARKE:  No objection, Judge.

 9            THE COURT:  All right.  They'll be admitted as I just

10    described.  Go ahead, counsel.

11        (Said exhibits admitted in evidence.)

12    BY MR. TENGESDAL:

13    Q.  Could you come down, please.  If you could stand behind

14    here and talk into the microphone so everybody can hear you.

15    A.  Okay.

16            MS. CUNDIFF:  Your Honor, did you have DX 338?

17            THE COURT:  Yes.

18            MS. CUNDIFF:  Okay.

19    BY MR. TENGESDAL:

20    Q.  DX 338, Dr. Reed.

21    A.  Yes.

22    Q.  Can you tell us what this depicts?

23    A.  This is an anatomical drawing of the abdominal -- anterior

24    abdominal wall and the various muscles that are involved, and

25    this is normal anatomy.  And of course, the skin has been

Reed - direct by Tengesdal

1140

1    taken off.

2          And what we can see here is the midline, this is the

3    linea alba --

4          THE COURT:  Are you able to hear?

5          THE REPORTER:  No.

6          THE COURT:  How about we do a body mic if he's going

7    to be moving around in space, so that the court reporter can

8    make a record.  Counsel, why don't you help him out with that.

9    Make sure it's high on the lapel, high up on the lapel.

10         THE WITNESS:  On the lapel?

11         THE COURT:  Let's give it an old test.

12         THE WITNESS:  Okay.

13         THE COURT:  One, two, three, one, two, three.  Let me

14   hear you.

15         Is that okay?

16         It's not good.

17         It's on the lapel, as high as you can go, and make

18   sure it's on.

19         MR. DARKE:  Do you mind if I stand over here?

20         THE COURT:  You can stand wherever you need to.

21         MR. DARKE:  Thanks, Judge.

22         MR. TENGESDAL:  It's showing up red.

23         THE COURT:  It might be dead.  It will take me three

24   weeks to get government batteries.

25         That one, that's a hot mic.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 208 of 234 PageID #:22498
Reed - direct by Tengesdal
1141

1           THE WITNESS:  One, two, three.  One, two, three.

2           THE COURT:  All right.  That sounds great.

3           Sorry for the delay, everyone.

4           Counsel, if you could use one of the podiums in part

5    of your direct.  Go ahead.

6    BY THE WITNESS:

7    A.  So, this is an anatomical drawing of the front of the

8    human body.  The skin has been removed and the subcutaneous

9    fat, and so now we see the muscle layers underlying the skin.

10          And here, you can see this white stuff is what we

11   call fascia.  It's a tough connective tissue that wraps

12   muscle.  Fascia is important because muscles contract, and if

13   they didn't have a tight fascia holding them, there would be

14   no strength.  They'd just -- they'd just ball up, but they

15   wouldn't be pulling anything.  So, the fascia contains muscle

16   so that strength can be applied.

17          And so these are the rectus abdominis muscles on

18   either side of the linea alba --

19          THE COURT:  You're going just a little bit fast.

20   Okay?  So, I want you to talk about as fast as I am right

21   now, which is the pace that will allow everyone to hear what

22   you have to say.  Go.

23   BY THE WITNESS:

24   A.  Okay.  Sorry.  So, the linea alba is the white line, runs

25   down between the two rectus abdominis muscles on either side.

Reed - direct by Tengesdal

1142

1   The umbilicus, which used to be the umbilical cord, is right

2   in the middle.

3        And we can get umbilical hernias because there's

4   actually a defect in the muscle layer there when the umbilical

5   cord went through.  That doesn't repair after birth.

6        The rectus muscles are very strong normally, and

7   attaching to them are the oblique muscles.  Here, we see the

8   external oblique.  Underneath it, I think that's on another

9   picture we have, the internal oblique.  And then the rectus --

10  I'm sorry, the latissimus dorsa -- no, not the -- external

11  oblique, internal oblique, and transversalis muscle lie in

12  layers on either side of the rectus sheath.  And these give

13  strength to the lateral abdominal wall.

14       In Mr. Taylor's case, he had an excision of the bone

15  that's under here, the iliac crest, and he had the excision of

16  the external and internal obliques on the right side.  All the

17  way up to the edge of the right rectus muscle was taken.  So,

18  there, there was no muscle.  And yet you have the rest of the

19  abdomen surrounded by muscle.

20       So, when you stand, bend over, sit up, use these

21  muscles in any way, shape, or form, they're going to

22  contract; but this space can't contract, and so it just

23  stretches.  Everything bulges as a consequence of squeezing

24  from around it.

25  BY MR. TENGESDAL:

Reed - direct by Tengesdal

1143

1    Q.  If we could -- we're going to show DX 336 now.

2    A.  So --

3              MR. DARKE:  Objection.  Do we have a question?

4              THE COURT:  Excuse me?

5              MR. DARKE:  Is there a question?

6              THE COURT:  Why don't you pose a question.

7    BY MR. TENGESDAL:

8    Q.  Doctor, what we see here on this demonstrative, could you

9    please tell us what this shows?

10   A.  Yes.  This is an anterior/posterior radiograph, that is,

11   an x-ray of the front and -- front through the back of

12   Mr. John Taylor; and this was taken on the 31st of May 2016.

13             And here, you can see his skeleton, the bones and

14   so forth.  And you can see this -- these black items here on

15   the right side stretching across and, in fact, outside of the

16   normal skeletal body where this herniation has occurred.

17             This -- you can't see the muscles here because they

18   don't show up on x-rays.  They'll just be shadows.  But what

19   you can see is the gas in the intestine.  That's showing up

20   as black or gray, darker gray, just like the air around

21   Mr. Taylor is black.

22             And so all the bowel gas helps to illuminate the

23   bowel and show its location.  I think you can see some bowel

24   that's normal down here a little bit, but a lot of the bowel

25   is outside of the abdominal cavity herniating through that

Reed - direct by Tengesdal

1144

1    defect that was made in the anterior abdominal wall on the

2    right.

3    Q.  Next one.

4        Dr. Reed, DX 337, what does this depict?

5    A.  This is a drawing showing the pelvis in terms of its

6    skeleton and a few of the ligaments.  And this is a normal

7    pelvis.  There's been no surgery here, but you can see that

8    you have the anterior superior iliac spine of the ilium, that

9    is, the first part of the pelvis, and then there's this

10   ligament, the ilioinguinal ligament, that goes across.  And

11   then down in here, below that ligament, there's a little

12   space, and that's where you can get groin hernias from.

13       But in Mr. Taylor's situation, a lot of this bone was

14   removed in taking off that dermatofibrosarcoma because it was

15   growing on the inside lip of this pelvic bone.

16   Q.  Does anything attach to the iliac crest?

17   A.  Yeah, muscles do.  The muscles I showed on the previous

18   slide attach to this iliac crest.

19       So, you can see here we have both --

20   Q.  Oh, Doctor --

21   A.  I'm sorry.

22   Q.  DX 347, can you tell us what this depicts?

23   A.  This shows us both muscle and bone.  Here, we can see the

24   pelvis bone, and the muscles attaching to it.  You can see

25   how they attach to the rim of that pelvis bone.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 212 of 234 PageID #:22502
Reed - direct by Tengesdal
1145

1          Also, we see the two sides of the abdominal muscles

2     are shown at different depths.  The left side shows the more

3     superficial depth where the fascia is intact, and you can see

4     the external oblique muscle.  And here, you can see the fascia

5     has been taken off, and you can see the rectus abdominis

6     muscle itself.

7          This exists on the inside of that white fascial

8     sheath.  It's just that fascial sheath has been removed.  And

9     then we don't see the rectus -- the oblique muscle over here.

10    We see a shadow of it over here, where it -- actually, what

11    we're seeing, I think, is depicting the transversus abdominis

12    muscle, which is the deepest muscle on the anterior abdominal

13    wall.

14    Q.  Does that picture that you're referencing there, does that

15    depict the areas where Dr. Warso performed surgery?

16    A.  Yes.  He again performed surgery down here, taking a lot

17    of this bone out of the ilium, and also the anterior muscles

18    all the way up to the edge of this.  So, this whole area here

19    is gone from the anterior abdominal wall.

20    Q.  And when that area was gone from Dr. Warso removing, what

21    was the result?

22    A.  A hernia.

23    Q.  Okay.  And I have one more.

24          On this DX 339, can you show the area where the

25    muscles was removed for the hernia?

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 213 of 234 PageID #:22503
Reed - direct by Tengesdal
1146

1  A.  Well, yes.  Again, this is a drawing of the internal

2  structures of the body, and focusing on the abdominal

3  structures, we see the colon and the small intestine.  This

4  large intestine and small intestine are all normally tucked

5  into the abdominal cavity.  The pelvic area is down here, and

6  it's covered up because the intestines fill that area.

7         But again, in Dr. Warso's surgery, this bone was

8  removed; and so there was potential for herniation there, as

9  well as in front, there was nothing covering these intestines;

10  whereas, all of this area is covered by muscle on the left

11  side.  And so the right side is just forced out over time

12  because again, you have muscles on the left side that contract

13  and squeeze the abdominal cavity any time you sit up, bend

14  over.  You know, any time you tense those muscles, it's going

15  to cause pressure inside to increase, which is going to cause

16  the weak area to bulge out.

17  Q.  Thank you.  If you could return.

18  A.  Okay.  Do you want this back?

19  Q.  The hernia that Mr. Taylor developed, was that caused by

20  and as a result of Dr. Warso's surgery?

21  A.  Yes.

22  Q.  Do you know who Dr. Anuja Antony is?

23  A.  She's a plastic surgeon.

24  Q.  And do you know if Dr. Antony was assisting Dr. Warso to

25  take care of the hernia?

Reed - direct by Tengesdal

1147

1    A.   Yes.

2    Q.   And what did Dr. Antony do during Dr. Warso's April 23rd

3    surgery?

4    A.   She developed a -- what we call a tensor fascia lata flap,

5    that is -- it's a piece of skin and muscle from sort of the

6    back of the right thigh, and then rotated that to try to cover

7    the defect that was left after Dr. Warso's operation.

8    Q.   Was Dr. Antony's role then as the plastic surgeon doing

9    this tensor fascia lata flap to try to close that area that

10   was the defect when all the muscle was taken out?

11   A.   Right.

12   Q.   Was that successful?

13   A.   Ultimately, no.  And I believe it was because the tensor

14   fascia lata flap, while it's a good flap and viable and healed

15   very nicely, it wasn't large enough to cover the size of the

16   defect that had been created.

17   Q.   And how would you classify, over the course of your

18   career, the size of this defect that resulted from Dr. Warso's

19   surgery?

20   A.   Well, fortunately, I've never dealt with one quite this

21   size in that area.  I have dealt with very large hernias, but

22   they're in an area where I could reconstruct them because I

23   had muscle I could work with.

24        Here, you have a large defect, almost unheard of,

25   and you don't have any muscle to work with.

Reed - direct by Tengesdal

1148

1  Q.  And why is muscle important for someone such as you, who

2  does complex abdominal wall surgery, to be able to close it?

3  A.  Well, because muscle is what produces herniation if

4  there's a weak area.  It contracts.  You know, all of our

5  muscles contract as part of their function.  And when the

6  abdominal muscles contract, that compresses the space of the

7  abdominal cavity.

8       Normally, that doesn't produce anything; but if you

9  have a weak area in the groin, in the -- around the diaphragm,

10  you know, there's all sorts of areas where we can get hernias,

11  diaphragmatic hernias, inguinal hernias, and so forth, and

12  ventral hernias.

13       But then you have this unusual circumstance of a

14  right lower quadrant hernia that is -- happens because of

15  the absence of muscle in that area.

16  Q.  Okay.  And did you have the occasion to review the

17  April 25, 2014, CT?

18  A.  Yes.

19  Q.  Okay.  And did -- that was two days after Dr. Warso's

20  surgery.  Did that demonstrate any -- any findings on the

21  CT scan?

22  A.  I think that one started to show a little herniation on

23  it, yes.

24  Q.  Okay.

25       MR. TENGESDAL:  If we could bring up, then, what's

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 216 of 234 PageID #:22506
Reed - direct by Tengesdal
1149

1    previously been admitted DX 348.

2            THE COURT:  Go ahead.

3    BY MR. TENGESDAL:

4    Q.  Doctor, given the operation, the size and scope that

5    Dr. Warso did on April 23rd, would a follow-up visit typically

6    be scheduled?

7    A.  Sure.

8    Q.  And what would a follow-up visit be scheduled for for

9    Mr. Taylor?

10   A.  Well, you're looking to see if all the wounds are healing

11   well and that there's been no postoperative complications to

12   date.

13           MR. TENGESDAL:  And if we could highlight the

14   pathology section of this note.

15           THE WITNESS:  I'm not seeing anything on my screen.

16           MR. DARKE:  It's not showing up yet.

17           THE WITNESS:  Okay.

18   BY MR. TENGESDAL:

19   Q.  Let me ask you a question, Doctor.  Do you have it up now?

20   A.  Yes.

21   Q.  When you do a surgery such as Dr. Warso, are the tissues

22   submitted for pathology evaluation?

23   A.  Yes.

24   Q.  And can you explain what a pathology evaluation is?

25   A.  What the pathologist does is he takes the tissue that's

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 217 of 234 PageID #:22507
Reed - direct by Tengesdal
1150

1    been submitted.  It's preserved so that it can be sliced into

2    very thin slices.  It is then put on a microscopic slide with

3    stains that allow you to see the cellular anatomy in that

4    tissue.

5    Q.  And were the pathology results charted in Dr. Warso's

6    note of May 19th, 2014?

7    A.  Yes.

8    Q.  What were the pathology findings from that April 23rd

9    surgery?

10   A.  It shows the skin and underlying subcutaneous tissue, so

11   it had some scar formation and hemorrhage, necrosis, foreign

12   body giant cell reaction --

13          THE COURT:  Slow down.  When you read, you've got to

14   slow down.  Throw the flag.

15   BY THE WITNESS:

16   A.  Underlying subcutaneous -- he said subcutis, but I think

17   he means subcutaneous with scar formation, hemorrhage,

18   necrosis, foreign body giant cell reaction, and pigment

19   (hemosiderin) deposition.  Negative for residual viable tumor.

20   Underlying fully necrotic bone.  Skeletal muscle with

21   peripheral foreign body giant cell reaction.

22   BY MR. TENGESDAL:

23   Q.  When it says the pathology result of negative for residual

24   viable tumor, what does that mean?

25   A.  That means that they can't see any evidence of the bone

Reed - direct by Tengesdal

1151

1    cells that were tumorous before.

2    Q.  Underlying fully necrotic bone, can you explain to us what

3    that is?

4    A.  Well, yeah.  I mean, that bone is dead that is underlying.

5    And that's -- I suspect that's a result of the operation,

6    which causes those tissues that are being resected to lose

7    blood flow and die; or in this case, it could have been that

8    the bone was necrotic because of the tumor invasion.

9    Q.  When you have fully necrotic bone, is that something that

10   requires surgical intervention?

11   A.  No.  It's dead.  Nothing's going to happen except it's

12   going to get reabsorbed.

13   Q.  Okay.

14           MR. TENGESDAL:  And then if we could highlight the

15   plan section of this note.

16   BY MR. TENGESDAL:

17   Q.  The plan section, is that usually when the physician is

18   done, what they intend to do for the patient?

19   A.  Right.

20   Q.  What was Dr. Warso's plan when he saw the patient on

21   May 19th?

22   A.  Well, he says, "The pathology was reviewed with him,"

23   meaning Mr. Taylor.  "There was no evidence of tumor

24   recurrence.  The cause of the necrosis is not clear, but it

25   could be related to the previous RT," that is, radiation

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 219 of 234 PageID #:22509
Reed - direct by Tengesdal
1152

1    therapy, which he'd had before.

2         "He will continue his wound care and follow up with

3    plastic surgery.  The reports were forwarded to Dr. Obaisi.

4    RTC," or return to clinic, "two months.  She had time to ask

5    questions."  I think that's a transcriptionist error.  "He had

6    time to ask questions," I think is what was meant.

7    "Understood and agreed."

8    Q.  Did Dr. Warso, in his May 19th, 2014, visit, did he chart

9    anywhere that Mr. Taylor had this hernia defect?

10   A.  No, I didn't see that.

11        MR. TENGESDAL:  Your Honor, if we could please

12   admit -- it's already admitted, DX 236, bring that note up.

13        THE COURT:  DX 236.  Go ahead.

14   BY MR. TENGESDAL:

15   Q.  Doctor, we're showing you a note, DX 235.  It's the

16   plastic surgery note, June 3, 2014, of Dr. Antony.  Did you

17   have the opportunity to review this note?

18   A.  Yes.

19   Q.  And Dr. Antony, would that typically be, given her

20   operation on April 23rd, that she would also see the patient

21   in follow-up?

22   A.  Yes.

23   Q.  Did Dr. Antony -- I don't see it listed.  Did she ever

24   comment that there was a hernia present?

25        MR. TENGESDAL:  Let's highlight the plan.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 220 of 234 PageID #:22510
Reed - direct by Tengesdal
1153

1          THE COURT:  For the record, that's DX 236.

2          Go ahead.

3   BY THE WITNESS:

4   A.  She does not mention anything about a hernia.

5   BY MR. TENGESDAL:

6   Q.  Would Dr. Antony, since she works at UIC, electronic

7   medical record, have had access to the CT scan of April 25th

8   that showed the hernia?

9   A.  Potentially -- yeah, she should have had access to it.

10  That doesn't mean that she necessarily did access it.

11  Q.  Okay.  Dr. Antony, you testified it's your understanding

12  that she was -- her role in the April 23rd surgery was to try

13  to close the defect to prevent a hernia?

14  A.  Right.

15  Q.  Would you agree the hernia was existing as of June 3,

16  2014?

17  A.  Well, we saw it on the image, I think, yeah.

18  Q.  Okay.  Would Dr. Antony -- would she have any obligation

19  to put in her note that there was a hernia present?

20  A.  If she knew about it.

21  Q.  Would you agree if Dr. Antony doesn't put in the note

22  that there's a hernia present, that whoever gets the note

23  wouldn't be able to determine there's a hernia based on her

24  note?

25  A.  Right.

Reed - direct by Tengesdal

1154

1   Q.   And, Doctor, do you know who Dr. Obaisi is?

2   A.   I know his role, yes.

3   Q.   Okay.  And do you know where Dr. Obaisi worked?

4   A.   Well, he worked with the -- under Dr. Funk to -- he was

5   like a primary care physician to make sure that a patient

6   would get assigned to the specialist that would address the

7   concerns.

8   Q.   And you used the term "primary care specialist."  What is

9   that?

10  A.   That's like a family doctor or a regular general

11  physician.

12  Q.   Would a regular general physician, would they have

13  surgical knowledge?

14  A.   Well, they would have some idea of surgery, yes.  Usually

15  you have some training in medical school in that regard.

16  Q.   Would a general practitioner be able to perform surgery?

17  A.   Usually not.

18  Q.   Would you need surgical privileges at a hospital to do

19  surgery?

20  A.   Yes, you do.

21  Q.   Can a general practitioner like Dr. Obaisi rely on the

22  recommendations of specialists that he sends to take care of

23  the patient?

24  A.   Absolutely.

25  Q.   Can you tell us why?

Reed - direct by Tengesdal

1155

1    A.   Well, because he sent them for their expertise.  You know,

2    he's saying, "This is outside of my realm.  I don't really

3    know all the details of what need to be addressed in this

4    particular circumstance, but a specialist in that area can

5    give me more answers and more information in terms of how to

6    deal with the problem and help the patient."

7    Q.   As a surgeon, Doctor, how is the determination made that a

8    surgery can be performed on a patient?

9    A.   One, that there's an indication; that is, that there is a

10   condition that requires an operation, surgical operation in

11   order to deal with the condition.

12        And secondly, that it's safe and appropriate to do so

13   in that patient, that the patient doesn't have any underlying

14   conditions or diseases that would compromise the ability to do

15   a successful operation.

16        And third, that the patient fully understands the

17   nature of the proposed operation, has been able to ask

18   questions about it, and has given their consent for the

19   procedure to be performed.

20   Q.   The -- what you described, there needs to be an indication

21   for the surgery, would that be something that a surgeon could

22   determine based on their education, skill, training, and

23   experience?

24   A.   Yes.

25   Q.   Once a surgeon determines that they have the ability to --

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 223 of 234 PageID #:22513
Reed - direct by Tengesdal
1156

1    there's an indication, it's safe, they explained it to the

2    patient, what typically happens next with the surgeon?

3    A.  Well, they get informed consent from the patient, and they

4    schedule the operation.

5    Q.  When you say, "They schedule the operation," do you mean

6    the surgeon?

7    A.  The surgeon or his assistants, but, yeah, it's scheduled

8    on a time and date when he can perform it, he or she.

9    Q.  Okay.  Have you ever heard in your career that anyone

10   other than the surgeon seeing the patient can make the

11   determination that surgery is an option?

12   A.  Well, they may be able to make that determination, but

13   that's as far as their involvement would go if they're not a

14   surgeon.

15   Q.  But is it the surgeon that makes the determination whether

16   or not surgery can occur?

17   A.  Right.

18   Q.  Have you ever had the opportunity in your long career that

19   any general practitioner ever called you up and ordered you to

20   do a surgery that you were not comfortable doing?

21   A.  No.

22   Q.  Does that make any sense?

23   A.  No.

24   Q.  Do you have an understanding of how Mr. Taylor got from

25   Stateville to UIC?

Reed - direct by Tengesdal

1157

1    A.   You mean what transportation?

2    Q.   Yes.

3    A.   No, I don't.

4    Q.   Okay.  Do you know if Mr. Taylor was seen by surgeons at

5    UIC or if he was seen out at Stateville?

6    A.   I think he was seen at UIC.  All of the records have the

7    UIC logo on them.

8              MR. TENGESDAL:  If we could bring up, it's already

9    been admitted, DX 237.

10             THE COURT:  Go ahead.

11   BY MR. TENGESDAL:

12   Q.   Dr. Reed, this is a surgical oncology note of Dr. Warso

13   from 11-25-14?

14   A.   Right.

15   Q.   Did you review this?

16   A.   Yes.

17   Q.   Okay.  And did Mr. Taylor have any pain when he saw

18   Dr. Warso on November 25?

19   A.   It doesn't look like it.

20             Oh, yes, he does say, "He is still having some pain,"

21   but it doesn't describe where the pain is felt.  Presumably

22   it's in the iliac -- region of his previous resection.

23   Q.   Would pain still be viable that it could be coming from

24   the area of the previous resection, given that the surgery

25   was on April 23rd and this is now November 25th?

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 225 of 234 PageID #:22515
Reed - direct by Tengesdal
1158

1    A.  Well, you can have pain in the area, but I'm not sure it's

2    coming from the same -- of the same nature.  I'm not sure he

3    had pain initially with his DFS protuberance.

4             But his pain would be related to a post-surgical

5    condition.  And this far out, it's probably due to muscle

6    spasm or muscle -- the lack of, that is, stretching of

7    tissues.

8    Q.  And the stretching of tissues, would that be in the area

9    where the muscle was taken out by Dr. Warso?

10   A.  Right.

11   Q.  Did Dr. Warso ever, as a surgeon, prescribe a surgical

12   brace or binder for Mr. Taylor?

13   A.  I remember seeing that one was recommended.  I think one

14   was obtained.  I'm not sure it was used commonly or well.

15   Q.  Okay.  As a surgeon, can you tell us how you go about

16   prescribing a binder?

17   A.  Well, first I measure the patient to determine what size

18   binder the patient is going to need because it's got to be

19   long enough and wide enough to contain the girth.

20            And then I explain to the patient how they're to

21   use it.  Typically, you have them lay the brace out or binder

22   out on a bed and then lie on the bed; and while they're lying

23   down comfortably and not straining, cinch up the binder around

24   them, and then roll off the bed instead of sitting up off the

25   bed, roll off the bed so that you can slide off the bed onto

Reed - direct by Tengesdal

1159

1    your feet before standing.

2           So, I explain all of that to them.

3    Q.  Do you explain and demonstrate to a patient how to

4    properly wear a binder?

5    A.  Yes.  I mean, I'll have them -- if they get it and come to

6    the clinic with it for the first time application, I'll walk

7    them through that whole process.

8    Q.  And are there different types of binders depending on the

9    different types of medical conditions?

10   A.  Sure.

11   Q.  You saw in the records the size of Mr. Taylor's hernia?

12   A.  Right.

13   Q.  The binder, would that be something you could get at,

14   like, a Walgreen's?

15   A.  No.  There's often -- these size binders are usually more

16   difficult to obtain, like, at a Walgreen's.  You may have to

17   go to some specialty store or order them from online or

18   otherwise.

19   Q.  As a surgeon, would you typically be the one to determine

20   what binder that he gets?

21   A.  Right.  And in fact, the office can actually order it for

22   them.

23          MR. TENGESDAL:  If we can look at the report, ROS,

24   report of systems section.

25   BY MR. TENGESDAL:

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 227 of 234 PageID #:22517
Reed - direct by Tengesdal
1160

1    Q.   Doctor, in this section, it indicates that Mr. Taylor,

2    "Has pain with defecation and some blood per rectum."  What is

3    the significance, if anything, of that?

4    A.   Well, obviously, that's a concern for any patient because

5    you want to make sure that they can defecate without pain.

6            And also, blood per rectum is a warning sign.  It can

7    be something as simple as a fissure or a hemorrhoid, or it

8    could be a sign of a cancer.  So, those are both significant

9    concerns that you want to follow up on.

10           However, in his particular case, I would also put as

11   a possible cause the fact that he -- his abdominal cavity

12   can't generate the kind of pressure that typically you do

13   when you have a bowel movement.  And so he's making himself

14   strain even further because nothing's happening as well as it

15   used to.

16   Q.   And can blood in the rectum, can that signify a

17   potentially dangerous condition?

18   A.   Right.  I mean that -- cancer, colorectal cancer a lot of

19   times is shown up by occult blood or nonoccult blood like

20   this.

21   Q.   Would a reasonably well-qualified physician, given those

22   findings, want to follow up on the blood per rectum finding?

23   A.   Absolutely.

24   Q.   And then it says, "New onset of urinary incontinence."

25   Can you tell us, what is urinary incontinence?

Reed - direct by Tengesdal

1161

1   A.  Well, that's when you urinate without meaning to.  That

2   is, you can't seem to hold your bladder capacity in and, you

3   know, urinate under your controlled circumstances.

4   Q.  When it says, "New onset," does urinary incontinence, does

5   that -- can that come on quickly, or is that something that

6   happens over time?

7   A.  It typically happens over time, but you can have episodic

8   episodes, you know, that they just all of a sudden happen.

9   But if they never happen again, you don't worry about it; but

10  if it happens over and over again, then you've got to take

11  care of it, see what's going on.

12  Q.  And is urinary incontinence what a reasonably

13  well-qualified physician, when they hear from Mr. Taylor

14  that he has the new onset of urinary incontinence, on

15  November 25th, is that something a physician should follow

16  up on?

17  A.  Yes.  Typically, you'd refer them to a urologist to do

18  further investigations and analysis.

19  Q.  And who do you typically refer a patient that has blood

20  per rectum?

21  A.  You want to have them see a colorectal surgeon and more

22  than likely schedule them for a colonoscopy so they can

23  ascertain where the source of the bleeding is coming from.

24          MR. TENGESDAL:  And then if we can highlight the

25  objective section for Dr. Reed.

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 229 of 234 PageID #:22519
Reed - direct by Tengesdal
1162

1    BY MR. TENGESDAL:

2    Q.   Doctor, do you see the section that starts with, "Abdomen

3    soft"?

4    A.   Yes.

5    Q.   What was charted there by Dr. Warso on November 25th?

6    A.   It says, "Abdomen soft.  No masses.  Large ventral hernia

7    in right lower quadrant/right groin in area of previous

8    resection."  I think that says, "Edema of flap on right flank.

9    Skin graft since well healed."

10           So, I think it's, "SC," for subcutaneous, "soft

11   mass" -- "soft tissue mass, right upper arm.  No masses

12   palpable in right leg."

13   Q.   Okay.  Would you agree this is the first time Dr. Warso

14   charts post-surgery the presence of a large ventral hernia?

15   A.   I think it was, yes.

16   Q.   Okay.  The presence by Dr. Warso charting of a large

17   ventral hernia in his right lower quadrant, right groin, /is

18   that something, given the size of the defect, that needs to

19   be tended to immediately?

20   A.   Well, it doesn't need immediate attention.  It's not going

21   to kill him right now, but it is something that needs to be

22   addressed because the odds are it will only get larger over

23   time unless something is done or can be done.

24   Q.   It says that the large ventral hernia was in the area of

25   previous resection.  What does that mean?

Reed - direct by Tengesdal

1163

A.   Resection is removal, that is, the cutting out of the bone

and the muscle that was done to get control of the -- his

tumor.

Q.   Would a physician who is general surgery boarded, surgical

oncology, would they be aware that a hernia could enlarge over

time?

A.   More than likely.  I mean, they have general surgery

residency before they go on into surgical oncology.

Q.   Okay.

        MR. TENGESDAL:  And if we can go down to the plan

section.

BY MR. TENGESDAL:

Q.   Doctor, what does it state about the hernia in the plan

section?

A.   Well, it says, "There's no evidence of recurrence," that

is, of the tumor he's talking about.  "The ventral hernia is

related to previous dissection and possibly the RT," that is

radiotherapy.  "The radiotherapy could also be related to his

new symptoms.  He will be referred to urology and colorectal

surgery for evaluation.  We will also get imaging of the right

leg and arm.  We will follow up with Dr. Obaisi.  Return to

clinic after imaging.  He had time to ask questions,

understood and agreed."

Q.   Consistent with Dr. Warso's charting of the blood per

rectum, did Dr. Warso, on November 25, refer the patient to

Reed - direct by Tengesdal

1164

1   colorectal surgery?

2   A.   Yes.

3   Q.   Consistent with Dr. Warso's charting on 11-25 of the

4   urinary symptoms, did he refer the patient to urology?

5   A.   Yes, he did.

6   Q.   Do you see anywhere that he referred the patient for the

7   hernia to general surgery?

8   A.   No.

9   Q.   Would it be reasonable that Dr. Warso wanted the blood per

10  rectum and urinary incontinence to be evaluated first?

11  A.   Yes.

12  Q.   Did this note convey to Dr. Obaisi that the patient would

13  be referred to both colorectal surgery and urology?

14  A.   Yes, it did.

15  Q.   Did Dr. Warso state in his plan what -- or I'm sorry, who

16  caused the surgery?

17  A.   No.

18  Q.   I'm sorry.  Who caused the hernia?

19  A.   Well, he says it's related to previous dissection and

20  possibly the radiotherapy.

21  Q.   And who was the previous dissector?

22  A.   Previous dissection?  That was his.

23  Q.   When you say his, was that his April 23rd note?

24  A.   Right.

25  Q.   When Dr. Warso puts in the plan that the radiation therapy

Reed - direct by Tengesdal

1165

1   could be the cause of his new symptoms, do you know what

2   symptoms he was referring to?

3   A.  Well, he's talking about the ventral hernia being possibly

4   related to the radiotherapy.

5       And, you know, I -- that's possible, I guess,

6   because radiotherapy kills tissue; and so any muscle tissue,

7   especially that flap, you know, would be at risk under

8   radiotherapy because it's trying to maintain its viability.

9       As a pedicle flap, it's not in the place it

10  normally is.  And so radio -- it might be more sensitive to

11  radiotherapy, and that flap could have died or at least

12  thinned out because of the radiation treatment.

13  Q.  Dr. Michael Warso is a surgical oncologist.  Is that

14  considered a medical specialist?

15  A.  It's a surgical specialty.

16  Q.  Okay.  And would Dr. Obaisi be able to reasonably rely

17  upon the surgical oncologist, Dr. Warso, stating to refer the

18  patient to urology and colorectal surgery?

19  A.  Yes.  I think that's fairly clear.

20  Q.  Did Dr. Warso anywhere in his note say that the referrals

21  to urology and colorectal surgery were urgent in -- matter?

22  A.  I didn't see anything about urgency.

23  Q.  Would you agree Dr. Warso, then, did not communicate to

24  Dr. Obaisi the -- any urgency to the referrals for colorectal

25  surgery or urology?

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 233 of 234 PageID #:22523
Reed - direct by Tengesdal
1166

1   A.  Right.

2   Q.  Would you agree Dr. Warso did not put in his 11-25 note

3   any time frame as to when he expected the patient to return

4   for either urology or colorectal surgery?

5   A.  Right.

6           THE COURT:  It's 5:00 o'clock.

7           Ladies and gentlemen, until the trial is over, you're

8   not to discuss the case with anyone, including your fellow

9   jurors, members of your family, people involved in the trial

10  or anyone else.  You are not to discuss the case in person,

11  online, or in any other way.  If anyone approaches you and

12  tries to talk to you about the case, do not tell your fellow

13  jurors, but advise me about it immediately.

14          Do not read or listen to any news reports of the

15  trial, and do not investigate it on your own.

16          Finally, remember to keep an open mind until all the

17  evidence has been presented, you receive my instructions on

18  the law, and you've heard the views of your fellow jurors

19  during final deliberations.

20          Normal start time tomorrow, so you'll be in your

21  seats listening to evidence at 9:30.

22          All rise for the jury.  Have a great evening.

23      (Jury exits courtroom.)

24          THE COURT:  You can step down, Doctor.

25          Jury out.  Door closed.  Anything to take up before

Case: 1:16-cv-03464 Document #: 555 Filed: 04/17/24 Page 234 of 234 PageID #:22524
Reed - direct by Tengesdal
1167

1     the evening recess?  Parties and attorneys at 9:15.

2          MR. DARKE:  Thank you, Judge.  Nothing for us.

3          MR. TENGESDAL:  Should I pass the dead one up?

4          THE COURT:  Yeah, we'll make sure we get some

5     batteries.  It won't take three weeks.  I'll find some

6     batteries.

7          Enjoy your recess, everyone.  See you tomorrow.

8     Court's in recess.

9          (Court adjourned, to reconvene 3/27/24 at 9:15 a.m.)

10

11                         CERTIFICATE

12        We certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    */s/Jennifer Costales*              *March 27, 2024*

16    _____          _____
      Jennifer Costales             Date
      Official Court Reporter

17

18    /s/Charles R. Zandi              *March 27, 2024*

19    _____          _____
      Charles R. Zandi              Date
20    Official Court Reporter

21

22

23

24

25