IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN E. TAYLOR, JR., | ) | Docket No. 16 CV 3464 |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| GHALIAH OBAISI, M.D., ARTHUR | ) | Chicago, Illinois |
| FUNK, M.D., LOUIS SHICKER, | ) | March 27, 2024 |
| M.D., TARRY WILLIAMS and RANDY | ) | 9:15 o'clock a.m. |
| PFISTER, | ) | |
| Defendants. | ) | |

VOLUME 6A
TRANSCRIPT OF PROCEEDINGS - Trial,
BEFORE THE HONORABLE JOHN ROBERT BLAKEY, and a Jury

APPEARANCES:

For the Plaintiff:     DUANE MORRIS LLP
                       BY:  MR. RICHARD P. DARKE
                            MS. ROSANNE CIAMBRONE
                       190 South LaSalle Street
                       Suite 3700
                       Chicago, Illinois 60603

For Defendants Ghaliah    CONNELLY KRAUSE LLC
Obaisi, M.D.and,          BY:  MR. ROBERT S. TENGESDAL
Arthur Funk, M.D.:             MS. CORINNE M. CUNDIFF
                          500 West Madison Street
                          Suite 3900
                          Chicago, Illinois 60661

For Defendants Louis      ILLINOIS ATTORNEY GENERAL'S OFFICE
Shicker, M.D., Tarry      BY:  MR. KEVIN J. FITZGERALD
Williams and Randy             MR. THOMAS PIETRYLA
Pfister:                  115 South LaSalle Street
                          28th Floor
                          Chicago, Illinois 60603

Also Present:  Mr. Kyle Dingus, paralegal

Laura LaCien, CSR, RMR, F/CRR
Official Court Reporter
219 South Dearborn Street, Room 1212
Chicago, Illinois 60604
(312) 408-5032

1   I N D E X

2                                          PAGE
    R. LAWRENCE REED,
3
    Direct Examination (Cont'd) By Mr. Tengesdal    1178
4

5

6

7

8                   INDEX OF EXHIBITS

9

10        Description                      Received

11        Exhibit No. JX-027                   1179

12        Exhibit No. JX-0030                  1182

13        Exhibit No. DX-239                   1188

14        Exhibit No. DX-241                   1192

15        Exhibit No. DX-243                   1206

16        Exhibit No. DX-244                   1208

17        Exhibit No. DX-245                   1211

18        Exhibit No. DX-246                   1214

19        Exhibit No. DX-255                   1254

20

21

22

23

24

25

1    (Proceedings heard in open court; jury out.)

2    COURTROOM DEPUTY:  The case before us is Case

3    Number 16 CV 3464, Taylor versus Wexford Health Source, Inc.

4    THE COURT:  Good morning, everybody.  Appearances

5    please.

6    MR. DARKE:  Rick Darke and Rosanne Ciambrone and

7    Kyle Dingus on behalf of Mr. Taylor who is also present.

8    MR. TENGESDAL:  Robert Tengesdal for the estate of

9    Dr. Obaisi and Dr. Arthur Funk.

10    MS. CUNDIFF:  Corinne Cundiff on behalf of the

11    estate of Dr. Obaisi and Dr. Arthur Funk.

12    MR. PIETRYLA:  Thomas Pietryla on behalf of

13    defendants Dr. Louis Shicker, Tarry Williams, and Randy

14    Pfister.

15    MR. FITZGERALD:  Kevin Fitzgerald on behalf of

16    defendants Randy Pfister, Tarry Williams, and Dr. Louis

17    Shicker.

18    THE COURT:  All right.  Are we missing somebody

19    party-wise, are they out today?

20    MR. FITZGERALD:  Dr. Shicker, yes, had his medical

21    procedure.

22    THE COURT:  Okay.  Great.  That's understood.

23    Microphone

24    MR. TENGESDAL:  Dr. Arthur Funk was supposed to be

25    here at 9:15, so.

1          MR. PIETRYLA:  He was here.

2          THE COURT:  Where is he?

3          MR. TENGESDAL:  Maybe he's in the washroom.

4          THE COURT:  Okay.  All right.  Anything to take up

5     before we bring in the jury?  We're still waiting on two

6     jurors and obviously they're not due to start for another ten

7     minutes or so.  Anything to take up?

8          MR. DARKE:  Not from the plaintiff, your Honor.

9          MS. CUNDIFF:  Your Honor, we're prepared to argue

10    the directed verdict if your Honor would like to do that this

11    morning as well.

12         THE COURT:  No.  I'm okay on that.  I figure

13    we'll -- we took it under advisement and we're going to -- my

14    expectation is, is that since we're well into defense case,

15    we finish defense case and send it to the jury and the Court

16    rule on it even after verdict.

17         So in order to preserve the -- our respect for the

18    jurors' sacrifice and their time, I'd like to not delay them

19    and allow the case to go forward and then the lawyers and all

20    of us can resolve that as part of the proceedings even after

21    a verdict.  Because I thought you also wanted to do a written

22    submission?

23         MS. CUNDIFF:  Which I do have and I can file.  I

24    just didn't know if your Honor really wanted it that way.  I

25    could do it either way.

1    THE COURT:  Well, I do but I also -- a written

2    submission wouldn't allow the other side to have a written

3    submission and I would rather you guys focus on getting the

4    trial done correctly and the jury instruction conference so

5    that's why -- I'm happy to allow that but not -- I think in

6    my discretion, I guess, I think it would be better to let

7    that run its course after we get the things done that we need

8    to do this week.  Is that okay?

9    MS. CUNDIFF:  That works.  Thank you, Judge.

10   THE COURT:  Okay.  Sounds good.  If you want to go

11   ahead and file that, you have leave to file that, but I don't

12   expect to a response until after so don't feel like you need

13   to spend all night doing that when I want you to work on

14   having the trial and the instruction conference squared away.

15   Anything else to take up before the jury comes in?

16   Okay.  What's our schedule like today?  Are you going to fill

17   the day or what's your thought?

18   MR. TENGESDAL:  Just one thing, your Honor.

19   Yesterday when Dr. Reed was doing demonstration, we weren't

20   able to load the CT.  We fixed that problem so we're going to

21   be doing that today.  Plaintiff has no objection.

22   THE COURT:  What are you talking about, an exhibit?

23   MR. DARKE:  It's a live CT, so.

24   MR. TENGESDAL:  It's a live CT.

25   THE COURT:  Oh, it's like a video?

1          MR. TENGESDAL:  Yeah.

2          THE COURT:  Oh, okay.

3          MR. TENGESDAL:  It's a video; but because of the

4     WiFi, it's so big it wasn't able to load.

5          THE COURT:  All right.  Well, has it got an exhibit

6     number?

7          MR. TENGESDAL:  We have -- it's going to be

8     JX-0027, JX-0030, and we have it available.  Mr. Darke may be

9     wanting to do a different one, so.

10          THE COURT:  All right.  Well, I don't expect any

11     objection to that.  Just make sure it's marked appropriately,

12     move it into evidence on the record in front of the jury.

13     And then when you want to publish it, we can do that just

14     like a photograph.  It will go right on there and I'll make

15     sure that's up for the jury.

16          MR. TENGESDAL:  Okay.  Since I had never done this

17     before with that, I didn't know if it was going to show up

18     live on the TV.

19          THE COURT:  I'm assuming there's no sound?

20          MR. TENGESDAL:  No sound.

21          THE COURT:  Okay.  Yeah.  It will -- just like a

22     picture, we can do video, sound, we can do the whole thing.

23     We used to have a giant screen that came down from here back

24     in the old days but now we don't have that anymore.

25          MR. TENGESDAL:  As far as witnesses, when we're

1  done with Dr. Reed, they did the deposition of Dr. Hussain.

2  I don't think they got the transcript yet, though, that we're

3  going to read it.

4  MS. CUNDIFF:  It's on its way.

5  MR. TENGESDAL:  Supposedly it's on its way.

6  THE COURT:  All right.  So there's going to be a --

7  this is the one that was done last night or --

8  MR. TENGESDAL:  Last night, yes.

9  THE COURT:  Is it a video or --

10  MR. TENGESDAL:  (Nodding).

11  MR. DARKE:  No, no.  It's just -- it's just

12  written.

13  THE COURT:  Okay.  And then the parties are going

14  to do designations and then publish it tomorrow sometime?

15  MR. DARKE:  No, that will be today.

16  MR. TENGESDAL:  After Dr. Reed, we only have Dr.

17  Hussain and I think that's going to be the end of our case.

18  THE COURT:  Okay.  Do you intend to put on a case?

19  MR. FITZGERALD:  No additional witnesses, no.

20  THE COURT:  Okay.  Do you intend to put on a

21  rebuttal based on your --

22  MR. DARKE:  Very short.

23  THE COURT:  -- understanding of what's going to

24  come?

25  MR. DARKE:  I didn't mean to cut you off.  Very

1  short, yep, maybe 20 minutes with John just to tie up some
2  loose ends.

3  THE COURT:  Okay.

4  MR. TENGESDAL:  And I think Dr. Reed should
5  be done -- I don't know how long Richard is going to take,
6  but I can't see myself going more than two hours.  So, you
7  know, hopefully during the lunch break, we would have the
8  deposition and -- but I just -- after lunch, if we don't have
9  that, we won't have a witness.

10  THE COURT:  Okay.  I can take an extra long lunch
11  break so you guys can do the designations and then we'll see
12  where we are.  One way to do it if there's an agreement is
13  let's say you don't have the transcript, we could put on the
14  rebuttal case and then give you leave to reopen your defense
15  case to put in the Hussain thing tomorrow if that becomes a
16  logistical issue.  How does that sound?

17  MR. TENGESDAL:  Yeah.  I just didn't -- I just
18  wanted to apprise the Court that --

19  THE COURT:  No.  I just want to use their time
20  rather than send them home.  I mean --

21  MR. TENGESDAL:  Right, yeah.

22  THE COURT:  -- so we can maximize their time.  If
23  we run short today, that's fine.  I'm trying to think.  It
24  depends how far we get today.  It doesn't sound like we'll
25  fill the day today, though, right?

1  |  MR. TENGESDAL:  I don't -- if he does his case, I

2  |  don't know how long he's going to be, but.

3  |  THE COURT:  All right.  Are the parties ready to do

4  |  an instruction conference or are you looking to do that in

5  |  the morning?  I can have the jury come in late tomorrow if

6  |  you want to do it that way.

7  |  MS. CIAMBRONE:  I think we should, your Honor.

8  |  I've been talking to opposing counsel.  We need to talk about

9  |  the jury instructions we agree on.  Neither side has filed

10  |  them with the court.  We can do that tonight.

11  |  THE COURT:  I thought we filed what you want --

12  |  MS. CUNDIFF:  We filed the list with our pretrial

13  |  order but not the instructions themselves.

14  |  THE COURT:  All right.  Is there something -- if

15  |  it -- if you listed it by number, then I have it if it's a

16  |  pattern.  If you're going to mess with the pattern or give me

17  |  non-pattern, then I'm not going to be ready to go then.  So

18  |  what's coming my way?

19  |  MS. CIAMBRONE:  Some of them are not strictly

20  |  pattern, your Honor.  And I can have them filed in a matter

21  |  of moments.  I can --

22  |  THE COURT:  Okay.  But I'm on trial right now

23  |  so -- I don't know why this -- everything is late.  Okay.  So

24  |  we're not going to be able to do a charge conference

25  |  tomorrow.  I actually have to read them and research them and

1  there's a lot of -- it doesn't look like I'm doing a lot but

2  I am.  All right.  So --

3          MR. TENGESDAL:  Your Honor instructed you were

4  giving to give us a packet of what you were using.

5          THE COURT:  Yeah.  But what happens with -- and I

6  thought I explained this at the pretrial conference.  You

7  guys give me all your stuff.  I look at all your stuff and I

8  combine it and make -- and then I give you a draft at the

9  charge conference.  I give you time to look at it and then

10  you go through it.

11          It's not like I give it to you and then you guys

12  give it back.  It's like you guys give it to me, I know what

13  you were looking for, what you're -- and then I put together

14  what's called a court packet, so.  All right.

15          MR. DARKE:  So sorry about that.  And at the

16  pretrial, we talked about it and I think we both got confused

17  on that issue because we raised it so we apologize about that

18  so we both held back because we didn't know what you wanted.

19          THE COURT:  Okay.

20          MS. CUNDIFF:  Your Honor, I also don't think that

21  there's substantial deviations from the pattern.  So if your

22  Honor wants to print based on numbers, I think it would be a

23  matter of just a couple words here and there.  We're not

24  talking about giant revisions to that pattern instruction.

25          THE COURT:  Well, how about this, we go and get all

1   the evidence in we can today.  And if we're not able to do

2   Hussain, you know, that's a short thing that we can put in

3   later.  Then I'll cut the jury in its entirety for tomorrow,

4   give them the entire day off, and then you guys come in in

5   the afternoon.  That way, I have tomorrow morning to go

6   through your stuff.  And when you come in for -- we do a

7   charge conference in the afternoon tomorrow.  And then we do

8   the final evidence, whether Hussain, if it's still an issue,

9   instructions conference, close, jury deliberates Friday, how

10  does that sound?  Is that on track?

11          MR. TENGESDAL:  Yeah.  That sounds good.

12          THE COURT:  Sound good?

13          MR. DARKE:  Yep.  Thank you.

14          THE COURT:  All right.  So that's what we'll do.

15          All right.  As soon as the last juror -- two jurors

16  get here, I'll retake the bench.  See you then.  Court's in

17  recess.

18      (Recess taken.)

19      (Proceedings heard in open court; jury in.)

20          THE COURT:  Good morning, everyone.  Please be

21  seated.  We're going to continue with the defense case.

22          Doctor, you're still under oath.  Counsel, whenever

23  you're ready.

24    R. LAWRENCE REED, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

25                  DIRECT EXAMINATION (Cont'd)

1    BY MR. TENGESDAL:

2    Q    Good morning.  Dr. Reed, I'd like to ask you some

3    questions about the defect that you were discussing yesterday

4    that's on the CT scan.  Would it help to assist to use the CT

5    scan?

6    A    Yes.

7    Q    Okay.

8         MR. TENGESDAL:  Your Honor, permission for the

9    witness to come down to use the computer.

10        MR. DARKE:  No objection.

11        THE COURT:  Yeah, go ahead.  Go ahead, Doctor.  Are

12   you -- is this an exhibit that's not in yet or --

13        MR. TENGESDAL:  We're going to look at JX-0027.

14   It's the 4-25-14 CT scan.  It's not been previously admitted.

15        THE COURT:  Any objection to the admission of

16   JX-0027?

17        MR. DARKE:  No, your Honor.

18        MR. FITZGERALD:  No objection.

19        THE COURT:  It will be admitted without objection.

20        (Exhibit No. JX-0027 received into evidence.)

21        THE COURT:  Go ahead, counsel.

22   BY MR. TENGESDAL:

23   Q    Doctor, can you pull up --

24        THE COURT:  All right.  Hang on right now.  Where

25   are you plugged in because the jury doesn't see anything

1    right now?  Is it on the --

2              THE WITNESS:  It's on my screen here.

3              THE COURT:  Okay.

4              MS. CUNDIFF:  It should be a picture of the CT.

5              THE COURT:  There we go.  That's PC HDMI.

6              THE WITNESS:  And you see my cursor moving?

7              THE COURT:  Everybody sees everything now.  There

8    you go.

9              THE WITNESS:  Okay.  So this is a computerized

10   tomography image, or images, that was obtained on April 24th

11   of 2014 and what we see here is Mr. Taylor lying down.  His

12   front is at the top of the images and his back is at the

13   bottom.  And this is now what we would call a cross section

14   of his body that is, you know, slicing through him.  And

15   we're going to scroll from top of him.  That is up here.

16   This is the heart.  This is his breastbone.  We're going to

17   scroll from that area down to his pelvis.

18             MR. DARKE:  If I could just ask the Court to ask

19   Dr. Reed to speak up a little bit because his back is to us.

20             THE COURT:  Yeah.

21             THE WITNESS:  I got the mic closer, is that okay?

22             THE COURT:  Yeah, the mic needs to be close and

23   then we should be able to hear you.  Thank you.

24             THE WITNESS:  Can you hear me now?

25             MR. DARKE:  Better.

1          THE COURT:  Yes, I can.  Keep your voice up.

2          THE WITNESS:  So now I'm scrolling down and we're

3    leaving the chest now and getting into the abdomen.  This big

4    gray thing is the liver.  The little bitty thing over here is

5    the spleen.  This is the aorta in the back.  And we're going

6    to be looking at the right side here.  These white things are

7    the ribs that we're slicing through as we go down the lower

8    part of the chest wall and the ribs are going to disappear as

9    we get on to the abdominal wall.  And here in the abdominal

10   wall, we see these muscles coming out.  These are the muscles

11   of the abdominal wall which contain -- normally contain the

12   abdominal contents.

13          Now here, you actually see, this is actually bowel.

14   The black stuff is air.  Just like around the patient, that's

15   black.  This is black inside his intestinal tract like in the

16   large bowel, for example.  And here you see bowel coming out

17   beyond the abdominal wall because it's lopping over it as

18   it's come through the hernia.  We don't see the hernia itself

19   right -- until right here.  We start to see the muscles now

20   have separated.  I'll go back up a little bit.  The muscles

21   are intact and then we see they're not intact.  They're not

22   together.  And the bowel is sneaking through.  And you can

23   see the bowel almost exploding out but it's just chronically

24   that way.  It's kind of always hanging out there just because

25   of the pressure differences between the pressure inside the

1    abdomen where muscle is normally around it versus outside in

2    this hole where there's just fatty tissue and it's not really

3    going to push back against the pressure from -- coming from

4    the abdomen.  So you see that there's a lot of bowel coming

5    out and how widely separated.  This is the actual defect that

6    has developed.  You know, it's pretty extensive.  10-plus

7    centimeter along in width.  And then as we come down back

8    toward the pelvis, we see the muscles have now met.  We still

9    have some bowel outside; but again, that's lopped over coming

10   from that one hole we saw coming through it.

11          So it shows that there is a defect.  The defect is

12   a sizable defect and it allows for bowel herniation coming

13   out.  Were there more other specific questions I should

14   address?

15          MR. TENGESDAL:  If we could have JX-0030, that's

16   the July 17, 2015, CT.

17          THE COURT:  That's not in evidence yet, correct?

18          MR. TENGESDAL:  Correct.

19          THE COURT:  Any objection to the admission of

20   JX-0030?

21          MR. DARKE:  No objection.

22          MR. FITZGERALD:  No objection.

23          THE COURT:  It will be admitted without objection.

24   You may publish.

25          (Exhibit No. JX-0030 received into evidence.)

1    BY MR. TENGESDAL:

2    Q    Dr. Reed, if you could just identify the CT and then --

3    A    All right.

4    Q    Go ahead.

5    A    So this is a CT of the abdomen just like the previous

6    one image I just showed you.  This is from July 17th of 2015

7    so several months of difference.

8    Q    Is there -- the defect that you just showed on the April

9    25th, is there any defect on this CT?  If so, can you show

10   us?

11   A    Yes, I'm scrolling down.  Here, we see bowel outside the

12   rib cage there and here's this larger mass extending beyond

13   the confines of the CT scan itself.  And again, it's going

14   through different -- defect here in the muscles.  This is

15   muscle, this is muscle and the bowel is exploding through

16   that into this wide defect that just has more bowel outside

17   of it than it did before and then it comes back together

18   again down in the pelvic region.  But the bowel is kind of

19   lopped over.

20   Q    Did the size of the defect change on the two CTs?

21   A    Not appreciably.  I mean, they're both in the 10- to

22   11-centimeter range.  And, of course, that can be affected by

23   the patient's breath, breathing.  You know, he's supposed to

24   be holding his breath during the CT but it's kind of hard

25   sometimes to do that.  So if the patient breathed or moved or

1  whatever, that could affect the small change in the

2  dimensions that you measure.  But in terms of functional

3  differences, no.  I think it's about the same size defect as

4  it was.

5  Q    Was there any change from the April 17th, 2015, CT as

6  opposed to the April 2014 one?

7  A    Not that I see.  Not that significant in terms of the

8  defect itself; right.

9  Q    Okay.

10        MR. TENGESDAL:  Thank you, sir.  That's all the

11  questions.

12        (Witness resumes stand.)

13        MR. TENGESDAL:  If we could bring up JT-060

14  previously admitted.

15        THE COURT:  Go ahead.

16  BY MR. TENGESDAL:

17  Q    And, Dr. Reed, yesterday do you recall we were talking

18  about Dr. Warso who had sent the patient to go see colorectal

19  surgery for the blood in the rectum?

20  A    Yes.

21  Q    Okay.  And as part of your review, did you look at the

22  February 9, 2015, colorectal surgery note?

23  A    Yes.

24        MR. TENGESDAL:  As soon as we pull it up, I'll ask

25  you some questions.

1         THE COURT:  This is JT-606?

2         MR. TENGESDAL:  060.

3         THE COURT:  060, gotcha.

4    BY MR. TENGESDAL:

5    Q    Dr. Reed, does the UIC note indicate that on February 9,

6    2016, that the patient went to colorectal surgery?

7    A    Yes.  He saw a Dr. Nordenstam.

8    Q    Okay.  Was the return visit, was that pursuant to Dr.

9    Warso's request to Dr. Obaisi?

10   A    Yes.

11        MR. TENGESDAL:  And if we could highlight the Chief

12   Complaint section.

13   BY MR. TENGESDAL:

14   Q    When Mr. Taylor presented on February 9, 2015, to

15   colorectal surgery, what was his chief complaint?

16   A    He was complaining of pain with defecation that is

17   during a bowel movement and blood in his stool as well as the

18   large right lower quadrant hernia.

19        MR. TENGESDAL:  Okay.  And if we could go to the

20   HPI section, please.

21   BY MR. TENGESDAL:

22   Q    Was a large hernia identified at colorectal surgery on

23   February 9th?

24   A    Yes.

25   Q    And what was the -- what was the identification of the

1  location?

2  A     He was -- it was noted to -- he had a large right lower

3  quadrant hernia and that that was still a problem and had had

4  pain with defecation and blood in his stool.

5  Q     And where it says that he was referred, Mr. Taylor, to

6  colorectal surgery for evaluation and colonoscopy, can you

7  tell us what a colonoscopy is?

8  A     Yes.  A colonoscopy is an examination of the inner

9  lining of the colon, or the large intestine.  It is conducted

10  by a -- with a large or long flexible tube that is inserted

11  progressively up the anal canal into the colon all the way to

12  the cecum and then withdrawn taking images of the entire

13  circumference of the inner lining of the colon on the way

14  back so that you can see if anything looks abnormal, such as

15  a source of bleeding or a neoplasm that is a potential cancer

16  or polyp, any strictures.  It's a very thorough examination

17  with direct visual inspection.

18  Q     Is a colonoscopy procedure done to evaluate blood from

19  the rectum?

20  A     Yes.

21         MR. TENGESDAL:  Okay.  And if we could bring up the

22  Gastrointestinal section under the Review of Systems.

23  BY MR. TENGESDAL:

24  Q     Was any additional findings in the gastrointestinal

25  section other than what you've discussed?

1  A    No.

2          MR. TENGESDAL:  Okay.  And if we can bring up the

3  Impression and Plan section.

4  BY MR. TENGESDAL:

5  Q    What was charted for the impression and plan of

6  Mr. Taylor on February 9th?

7  A    It says that this is a 52-year-old male with a history

8  of degenerative joint disease, recurrent dermatofibrosarcoma

9  protuberans of his right hip who was referred for

10 colonoscopy, which they've scheduled.  And also has a right

11 inguinal hernia.  It says that they will obtain a CT scan

12 of -- to evaluate his abdominal condition and possibly

13 consider a hernia repair.

14 Q    Okay.  And is a CT scan, is that what you just showed

15 us, would that show a hernia?

16 A    Yes.

17 Q    Okay.  And if this note was returned to Dr. Obaisi,

18 would it be the expectation that he would be the physician

19 who would send the patient back to UIC for the CT scan as

20 well as the colonoscopy?

21 A    Yes.

22 Q    Okay.  Was there any time frame put on the impression

23 and plan as to when they wanted the CT scan to be done?

24 A    It doesn't state here in this note.

25 Q    Okay.  Was there any time frame put on the impression

1    and plan as to when they want the referral to general surgery

2    to occur?

3    A    Not in this note.

4    Q    Okay.

5              MR. TENGESDAL:  If we can then bring up DX-239.

6    Ask that this be admitted into evidence, your Honor.

7              THE COURT:  Any objection to the admission of

8    DX-239?

9              MR. DARKE:  If we can just have a second to see

10   what it is.

11             THE COURT:  Sure.

12             MR. FITZGERALD:  No objection.

13        (Brief pause.)

14             MR. DARKE:  No objection.

15             THE COURT:  It will be admitted without objection.

16   You may publish.

17        (Exhibit No. DX-239 received into evidence.)

18             MR. TENGESDAL:  Thank you, your Honor.

19   BY MR. TENGESDAL:

20   Q    Do you recall Dr. Warso had referred -- wanted him also

21   to see urology?

22   A    Right.

23   Q    Okay.  Is this a urology note from May 27, 2015, Doctor?

24   A    Yes.

25   Q    And since we see this note that Mr. Taylor got back to

1  UIC for urology, would you agree that Dr. Obaisi had

2  facilitated the referral as requested by the specialist?

3  A    Yes.

4         MR. TENGESDAL:  And if we could highlight the

5  Associated Diagnoses section.

6  BY MR. TENGESDAL

7  Q    What is "charted for associated diagnoses," Doctor?

8  A    It's charted that the patient has scrotal or testicular

9  pain, hematuria -- that is blood in the urine -- that is

10  gross, that is visible to the eye; not microscopic hematuria.

11  Q    Do you know -- have you seen in your review of the

12  records what would be the cause of his scrotal or testicular

13  pain?

14  A    Well, he did have an inguinal hernia on the right, but

15  that was considered small and asymptomatic but it's potential

16  that that could have caused the scrotal or testicular pain.

17  Otherwise, it's not clear.

18  Q    Okay.

19         MR. TENGESDAL:  And if we can go to the HPI

20  section.

21  BY MR. TENGESDAL:

22  Q    Where it says that "Mr. Taylor's orchalgia is improved,"

23  what is orchalgia?

24  A    That is a Latin term for pain of the testes.

25  Q    I'm sorry.  I couldn't hear with the coughing.

 1   A    It is the Latin term for testicular pain.

 2   Q    Okay.  And do we know why -- was there any indication as

 3   to why his orchalgia had been improving?

 4   A    It's not clear.  There was no specific treatment applied

 5   that I know of other than the pain medications he had already

 6   been taking.

 7   Q    Does the note identify the urologist as to how long he

 8   had been complaining of the urinary frequency and nocturia?

 9   A    It happened about a month earlier.

10   Q    Okay.  And what is nocturia?

11   A    It is waking up at night to urinate.

12        MR. TENGESDAL:  And if we could go to the Plan

13   section.

14   BY MR. TENGESDAL:

15   Q    As a result of the urology recommendation on this date,

16   what was planned?

17   A    They planned to obtain a PSA, which is a

18   prostate-specific antigen test, a urinalysis and a urine

19   culture as well as standard clinical chemistry laboratory

20   tests.  CT scan, urogram -- that is looking at the urinary

21   tract with a CT scan -- to return to the clinic for a

22   cystoscopy and continue the Flomax to help his urine flow.

23   Q    And CT urogram, return to clinic for cystoscopy, what

24   are those tests?

25   A    Those are tests -- the urogram is to look at how urine

1    flows radiologically and how big the bladder is, whether

2    there's diverticulum of the bladder, things like that.  And

3    the cystoscopy is where a stiff or fixed medical tube with a

4    light and camera on the end of it is inserted through the

5    penis into the urethra into the bladder and then the whole

6    bladder wall, inner bladder wall lining can be inspected.

7    Q    The testing that was ordered by urology on this May

8    note, are those tests to help to identify Mr. Taylor's

9    complaints of the frequent urination?

10   A    Yes, directly so.

11   Q    Okay.  Was there any time frame put on there by the

12   specialist, the urologist as to when they wanted the testing

13   to be performed?

14   A    No.  It would be considered to be done as soon as it

15   could be scheduled.

16   Q    Okay.  And as far as scheduling, would this note go back

17   to Dr. Obaisi and then he would send the patient for these

18   tests?

19   A    Exactly.

20   Q    Okay.

21        MR. TENGESDAL:  And if we could -- we already did

22   that CT.  If we can bring up DX-241.  That's July 22, 2015,

23   note.  This is not admitted.  We ask that it be admitted into

24   evidence, your Honor.

25        THE COURT:  Any objection to the admission of

1    DX-241?

2              MR. DARKE:  Just one second, your Honor.

3              THE COURT:  DX-241 admitted without objection.  You

4    may publish.

5         (Exhibit No. DX-241 received into evidence.)

6              MR. DARKE:  For the record, no objection.

7    BY MR. TENGESDAL:

8    Q    And, Doctor, when you were down here, you were

9    demonstrating that he got that CT scan on July 17th, 2015?

10   A    Right.

11   Q    And pursuant to the notes we saw before, was that in

12   order that the general surgeon would have an updated CT prior

13   to evaluation?

14   A    Right.

15   Q    Okay.  July 22, 2015, did Mr. Taylor return to UIC to

16   see a general surgeon?

17   A    Yes.

18             MR. TENGESDAL:  If we could go down to the "Dear

19   Obaisi" section.

20   BY MR. TENGESDAL:

21   Q    Did Dr. Masrur, does it look like, did he write a note

22   to Dr. Obaisi?

23   A    Yes.

24   Q    And what did Dr. Masrur, the general surgeon, what did

25   he see the patient for?

1    A    He saw him for his right -- large right-sided ventral

2    hernia and the fact that he had had sarcoma in the past and

3    that he's now complaining of right-sided abdominal pain when

4    he is idle or ambulating, that is walking, and he's here

5    today to discuss a possible surgical treatment for his

6    condition.

7    Q    And in the next section there, did Dr. Masrur chart in

8    his note that he looked at the CT scan of July 17th?

9    A    Yes.

10   Q    And where Dr. Masrur charts that "compared to the CT of

11   the abdomen from 4-25-14, the hernia has become significantly

12   larger in volume with the neck measuring 11.2 centimeters."

13   Can you tell us what that means?

14   A    Well, he's saying I think two things here.  The hernia

15   itself is the herniated bowel.  That is, the intestines that

16   have gone through the abdominal wall and are now outside the

17   abdominal wall.  That is larger than it had been.  But the

18   neck is 11.2 centimeters which has not substantially changed

19   from the previous images.

20   Q    And when you used the term "the neck," is that what

21   you're identified on the CT scans as where the abdominal wall

22   is missing what you called the defect?

23   A    That is the defect, yes.

24   Q    Okay.  So the defect -- would the defect change in size?

25   A    Not really.

1    Q    Okay.  But what we're seeing is Dr. Masrur is

2    identifying that when he compares it to 4-25-14, was there a

3    change in how much stuff had been coming out?

4    A    Right, right.

5    Q    Okay.  And when additional matter comes out like that,

6    would that cause any pain?

7    A    It -- I doubt it.  I mean, it's a slow stretch, not a

8    rapid stretch.  You know, the body accommodates expansion

9    slowly as one gains weight.  It doesn't hurt.  But if you

10   have a sudden expansion, that stretches pain receptors and it

11   does hurt.

12   Q    And then, Doctor, what --

13             MR. TENGESDAL:  If we go to the Physical Exam

14   section, I want to ask you what is charted for the abdomen.

15   BY MR. TENGESDAL:

16   Q    Under the Gastrointestinal section, what does the doctor

17   chart?

18   A    He states that the patient complains of right-sided

19   abdominal pain and reports five to six soft stools a day.  He

20   denies nausea, vomiting, heartburn, regurgitation, yellow

21   jaundice, diarrhea or constipation.

22   Q    And then if we look at the Genital Urinary section, what

23   is charted there?

24   A    The patient denies difficult urination, pain or burning

25   with urination, blood in the urine, urgency, needing to

1  urinate frequently at night or inability to hold the urine.

2  Q    Where Dr. Masrur charts blood in the urine, is that

3  consistent with what was seen as to why he was referred to

4  colorectal surgery?

5  A    Well, he denies it at this point.  I think he had it

6  previously but now he's not having it.

7  Q    Okay.  Did he also deny the urinary symptoms?

8  A    Right.

9       MR. TENGESDAL:  Okay.  And then let's look at the

10  Assessment and Plan.

11  BY MR. TENGESDAL:

12  Q    Did Dr. Masrur come up with an assessment and plan when

13  he saw the patient on July 22nd?

14  A    Well, yes.  He wanted to have a lot of preoperative

15  stuff done, the clinical chemistry, the CT urogram, the

16  return for --

17       THE COURT REPORTER:  I'm sorry.  Slow down.

18       MR. TENGESDAL:  Slow down.

19       THE WITNESS:  He was seen in urology clinic by Dr.

20  Abern who requested a clinical chemistry tests, CT urogram,

21  and return to clinic for a cystoscopy and that those needed

22  to be addressed before they can proceed with the potential

23  hernia repair.

24  BY MR. TENGESDAL:

25  Q    Okay.

1  A    Then he says this is a big hernia.  It goes all the way

2  up from iliac bone to subcostal margin on the right side with

3  at 70 percent of the bowel contained in the hernia sac.  High

4  rate of recurrence.  I recommend the patient lose some weight

5  while he continues to complete colonoscopy and CT urogram.

6  Q    Okay.  The recommendation of the patient to lose some

7  weight while they continue to do the workup, what is

8  the -- why would a doctor such as a general surgeon recommend

9  that Mr. Taylor lose some weight?

10  A    Primarily so that there's less mass inside the abdominal

11  cavity.  A lot of fat is stored in the abdominal cavity.

12  It's stored in the omentum, which is this large apron that

13  hangs from the transverse colon down into the pelvis.  It's

14  like a big apron there.  And also, there's a lot of fat

15  that's stored in the leaves of the mesentery.  This fanfold

16  of blood supply that gives blood flow to the intestine, it

17  also expands with fatty tissue.  So if you can take all of

18  that fat out, then there's less mass or structured mass or

19  volume in the abdominal cavity so it might be easier to close

20  the lid on it since it wouldn't be as protuberant to deal

21  with.

22  Q    All right.  And when you say "close the lid on it," are

23  you talking about the defect that you saw?

24  A    Right, right.  Right now he has an open lid.  There's no

25  lid basically.

1    Q    And when Dr. Masrur charts in his assessment and plan

2    that these need to be addressed, meaning the colonoscopy and

3    the urology before we can proceed with the potential hernia

4    repair, if this note got to Dr. Obaisi, would it be Dr.

5    Obaisi telling him to make sure these lab tests are done

6    because we can't do anything with the hernia repair?

7    A    Right.

8    Q    Okay.  And was that Dr. Masrur's choice that he needed

9    the colonoscopy done and the urinalysis stuff done --

10   A    Right.

11   Q    -- before he even attempted surgery?

12   A    Right.  Because if there's something, for example, going

13   on in the colon that needs a surgical approach, you'd like to

14   do that at least at the same time, if not before, you take on

15   this impossible hernia repair.

16   Q    Okay.  And when he just puts a sentence that says "high

17   rate of recurrence," what does Dr. Masrur talking about in

18   his note?

19   A    That if you try to repair the hernia as it's been

20   attempted previously, it's not likely to stay that way.  It's

21   likely that the hernia will come back.

22   Q    Okay.  And then if we go a little lower down where Dr.

23   Masrur says "once the above are completed, I would like to

24   review his case with Dr. Giulianotti, chief of surgery," is

25   Dr. Masrur communicating that once all of his requests above

1    are done and he gets that back, then he's going to talk to

2    Dr. Giulianotti?

3    A     Right.

4    Q     Okay.  Did Dr. Masrur anywhere in his note communicate

5    to Dr. Obaisi a time frame of when he had expectations that

6    the colonoscopy and the urology stuff would be completed?

7    A     I'm not sure there was a -- I mean, he had the urology

8    clinic on May 25th, 2015, but I'm not sure that he set a time

9    on the other things that needed to be done.

10   Q     Did doctor -- let me ask you a more specific question.

11   Did Dr. Masrur in his assessment and plan on July 22nd say

12   when he wanted the CT urogram and cystoscopy to be done?

13   A     No.

14   Q     Did Dr. Masrur say when he wanted the colonoscopy to be

15   done so that he would have all of those things so that he

16   could then move forward with whether they do surgery and talk

17   to Dr. Giulianotti?

18   A     It doesn't say when the colonoscopy needed to be done.

19   Just that it does need to be done.

20   Q     And the last thing on this note I'd like to ask you

21   about, when he says he might need pre-op progressive -- I

22   believe that's pneumoperitoneum to create a space in the

23   bowel at the moment of repair, what -- what is that in

24   English?

25   A     Well, pneumoperitoneum is the insufflation of air into

1    the peritoneal cavity.  Normally, there's no air in the

2    peritoneal cavity.  But the purpose of producing a

3    pneumoperitoneum is to stretch the peritoneal cavity to

4    expand its volume and that -- what he's thinking is that you

5    have this large amount of bowel that is chronically out of

6    the abdominal cavity and you need to make enough room for it

7    to fit back into the abdominal cavity and the

8    pneumoperitoneum would help to do that.

9              And by saying it's a pre-op progressive

10   pneumoperitoneum, it sounds like it needs to do done in

11   stages, that is, insufflate with some air initially and then

12   have him go around with that kind of air in there and then

13   redo it over and over again until you finally get sufficient

14   expansion to accommodate the bowel that needs to be put back

15   in.

16   Q    Okay.  So was it Dr. Masrur on July 22nd, his thought

17   that he was going to do this pre-op progressive

18   pneumoperitoneum to create a space for when he does the

19   surgery?

20   A    Right.

21   Q    And the space, is that to move all the 70 percent back

22   into the abdominal cavity?

23   A    Right.

24   Q    Okay.

25   A    Because over time since the bowel has exited the

1  abdominal cavity, the peritoneum is naturally going to

2  collapse, the muscles are going to kind of tighten -- you

3  know, come back together because every time you stand or sit,

4  or whatever, those muscles are contracting.  And it's

5  ultimately going to restrict this space in the peritoneum but

6  you need to expand that back up in order to get things back

7  in.

8  Q    As of this note, did Dr. Masrur have a definitive plan

9  of when he wanted to do surgery on Mr. Taylor?

10  A    No.

11  Q    Okay.  Did Dr. Masrur indicate in his note that he

12  needed to discuss the case with the chief of general surgery?

13  A    Yes, he did.

14  Q    If he needed to discuss the case with Dr. Giulianotti

15  once all of the above that we discussed were done, would you

16  agree that as of July 22, 2015, UIC general surgery did not

17  have a plan for surgery definitive date?

18  A    No.  They were working on getting a plan but --

19            MR. DARKE:  Objection, foundation --

20            THE COURT:  Hang on.  Hang on a second.  Hang on a

21  second.

22            MR. DARKE:  It's objection leading, foundation

23  facts not in evidence.

24            THE COURT:  Sustained as to leading.  Rephrase.

25            MR. TENGESDAL:  Okay.

1    BY MR. TENGESDAL:

2    Q    July 22, 2015, based on your testimony today on the

3    note, was there any plan communicated to Dr. Obaisi that UIC

4    general surgery were ready to go, bring the patient back on a

5    given date for surgery?

6    A    No.

7         MR. TENGESDAL:  And then if we could look at the

8    Medication section.

9    BY MR. TENGESDAL:

10   Q    Was -- were these the medications that were conveyed to

11   Dr. Masrur that Mr. Taylor was on?

12   A    Yes.

13   Q    Are any of the medications listed pain medicines?

14   A    Yes, several are.

15   Q    Which ones?

16   A    Well, the acetaminophen with codeine, that's Tylenol

17   Number 3 as a pain medication, the amitriptyline can help

18   with pain control.  Gabapentin, or Neurontin, is a pain

19   medication.  And Tramadol, Ultram, is a pain medication.

20   Q    Did Dr. Masrur in his note identify that Mr. Taylor was

21   complaining that he was getting inadequate pain control?

22   A    Let me see.  Yes.  He says he currently complains of

23   right-sided abdominal pain when he's idle or ambulating.

24   Q    Okay.  When it says "he currently complains of

25   right-sided abdominal pain when he's idle or ambulating,"

1   what does idle mean?

2   A    Idle means doing nothing.

3   Q    Okay.  And when it says "ambulating," does that mean

4   he's walking?

5   A    Yes.

6   Q    Okay.  As -- after Dr. Masrur saw him, did you see

7   anything in the note where he changed the pain medication?

8   A    I don't believe any changes were made to his

9   medications.

10  Q    Okay.  Given the size of the defect you've seen, the 70

11  percent of the bowel out, his complaints of pain, are those

12  consistent with what you would expect?

13  A    It would be a chronic condition, but nothing acute.

14  Q    Okay.  But would those be a condition that can cause

15  pain?

16  A    Yes.

17  Q    Would the pain from the condition, would it be

18  appropriate to give Tylenol Number 3 and Tramadol?

19  A    Sure.

20  Q    As a result of Mr. Taylor's pain, did you see anywhere

21  where the UIC general surgeon wanted to admit the patient?

22  A    No.

23  Q    Did Dr. Masrur identify anything in his note indicating

24  that there was any issue with a loss of domain?

25  A    Well, I mean, in a sense that's what he's addressing

1    because the pneumoperitoneum is providing an opportunity to

2    reduce the herniation back into the abdominal cavity and that

3    you wouldn't be able to do that easily without stretching the

4    abdominal wall to a point where it could accept that

5    herniation back in.

6    Q    Okay.  Doctor, are you familiar with the concept of loss

7    of domain?

8    A    Yes.

9    Q    Can you tell the jury what is loss of domain?

10   A    Well, it's a concept that is used in describing a

11   situation where organs or tissues that are normally in one

12   place move or are moved to another place.  In this

13   circumstance, the intestinal tract normally lives inside the

14   abdominal cavity.  That's its domain.

15          Because of the fact that there's a large defect in

16   the abdominal wall, it is possible for the intestines to move

17   out or get pushed out of the abdominal cavity.  Every time

18   Mr. Taylor, you know, contracts the abdominal muscles, it's

19   going to cause a squeezing action on the abdominal contents

20   pushing the intestines out.

21          And over time, in this case most of the intestines

22   are now outside of the abdominal cavity, not in their normal

23   domain.  I like it to an analogy of a bunch of sheep in a

24   fenced-off pasture where they normally graze.  If somebody

25   leaves the gate open, the sheep escape, they have left their

1    domain and gone outside of the gate and that's what's

2    happened here.

3    Q    Was the gate opened, as you say, for the sheep when the

4    surgery of Dr. Warso occurred?

5    A    No.  That's what opened the gate.

6    Q    Okay.  I thought that's what I said.  Was the gate

7    opened when the surgery occurred?

8    A    Yeah, yeah.  It wasn't open before but it was open

9    after; yes.

10   Q    Okay.  So the loss domain -- we saw 70 percent of the

11   intestines out by July 17th, 2015, CT.  Had the loss of

12   domain already occurred by that date, that CT?

13   A    Well, yes.  It was developing over time.  But yeah, it

14   progressively increased.

15   Q    Okay.  And during the time where it progressively

16   increased from the surgery date of Dr. Warso April 23rd to

17   that CT on September 17th, 2015, had Dr. Warso sent the

18   patient to see a general surgeon yet?

19   A    Yes.

20   Q    And did he see the general surgeon then on July 22nd

21   after he got the CT?

22   A    Yes.

23   Q    Okay.  Did he see a general surgery prior to the 7-17,

24   2015, CT?

25   A    Yes.

1    Q    Who did he see?

2    A    What's that?

3    Q    Who did he see?

4    A    I can't recall.

5    Q    Okay.  Do you -- are you considering Dr. Warso to be a

6    general surgeon?

7    A    Yes.

8    Q    Okay.  Did Dr. Warso ever perform hernia surgery on the

9    patient?

10   A    Well, he with his initial resection had help in

11   repairing the defect by Dr. Anuja I think her name is.

12   Q    And is Dr. Masrur on July 22nd, 2015, identifying by

13   saying he wants to do the pre-op progressive

14   pneumoperitoneum, that he has to increase the size to get the

15   materials, the bowel back in?

16   A    Yes.

17        MR. TENGESDAL:  If we can -- excuse me, your

18   Honor -- DX-243 admit into evidence.  I don't believe it's

19   previously been admitted.

20        THE COURT:  Any objection to the admission of

21   DX-243?

22        MR. DARKE:  No objection, your Honor.

23        MR. FITZGERALD:  No objection.

24        THE COURT:  It will be admitted without objection.

25   You may publish.

1          (Exhibit No. DX-243 received into evidence.)

2     BY MR. TENGESDAL:

3     Q     Did Mr. Taylor receive a colonoscopy?

4     A     Yes.

5     Q     What was the date?

6     A     It looks like it was August 20th of 2015.

7     Q     And was this part one of two of what Dr. Masrur, the

8     general surgeon wanted before he moved forward with surgical

9     planning?

10    A     Yes.

11    Q     Okay.  So that was accomplished.  And can you tell us --

12          MR. TENGESDAL:  Go to the Result section.  Final

13    Diagnosis is fine.

14    BY MR. TENGESDAL:

15    Q     Doctor, as a physician, are you able to interpret

16    colonoscopy reports?

17    A     Yes.  I've both given them and had them.

18    Q     Okay.  We'll talk about you -- let's talk about your

19    ability to interpret.

20          THE COURT:  Let's talk about the former; not the

21    latter.

22    BY MR. TENGESDAL:

23    Q     Okay.  And what was the diagnosis, can you tell us what

24    these three A, B, C mean?

25    A     Yeah.  The first diagnosis was of the cecum, that is the

1    first part of the large intestine on the right side.  And

2    there -- tubular adenoma with erosion was seen.  That is, an

3    adenoma is a benign polipoid tumor that -- it says erosion.

4    It sounds like some of the adenoma itself had some bleeding

5    on the surface of it and they had excised that.

6         And then at the ileocecal valve, which is where the

7    small intestine goes into the large intestine, they saw --

8    they biopsied that area and there was a -- there was evidence

9    of increased chronic inflammation in the lamina propria,

10   which is the middle layer of the lining, but there was no

11   adenoma.  That is, the adenoma that they'd seen in the cecum,

12   there wasn't one at the ileocecal valve.  And then they did

13   an endoscopic biopsy at the rectum which also showed a

14   similar tubular adenoma.

15   Q    Doctor, would any of these findings on the colonoscopy

16   prevent general surgery from moving forward?  Anything here

17   need to be addressed?

18   A    No.  These all are benign conditions.  There was no

19   malignancy that seeded to be addressed.

20   Q    Okay.  And would you agree if Mr. Taylor got back for

21   this coloscopy on August 20th, it would have been through the

22   facilitation of Dr. Obaisi returning him?

23   A    Yes.

24        MR. TENGESDAL:  Okay.  If we can now go to DX-244.

25   It's -- I don't believe this has been admitted.

 1              THE COURT:  Any objection to the admission of

 2      DX-244?

 3              MR. FITZGERALD:  No objection.

 4              MR. DARKE:  No objection, your Honor.

 5              THE COURT:  It will be admitted without objection.

 6          (Exhibit No. DX-244 received into evidence.)

 7              THE COURT:  You may publish.

 8      BY MR. TENGESDAL:

 9      Q    All right.  Remember part two, Dr. Masrur, general

10      surgeon, wanted was for urology procedures to be done?

11      A    Yes.

12      Q    Did Mr. Taylor go to urology on September 30, 2015?

13      A    Yes.

14      Q    Okay.  And what was the purpose of this visit?

15      A    He had had a complaint of hematuria.  That is blood in

16      the urine.

17      Q    Okay.  If Mr. Taylor returned to urology as prescribed

18      by Dr. Masrur, the general surgeon, would you agree Dr.

19      Obaisi had facilitated part two of what he wanted?

20      A    Yes.

21      Q    Okay.  And under the History of Present Illness -- if we

22      bring that up -- what is the urologist charting as far as

23      anything related to the urinary system?

24      A    Well, he's saying that since the resection of his tumor

25      in April of 2014, he's been complaining of urinary frequency

1   and nocturia.  He reports a good urinary stream.  He reports

2   gross hematuria -- that is blood in the urine -- and dysuria,

3   pain, with urination one month ago.

4   Q    Okay.

5        MR. TENGESDAL:  And then if we could go to the

6   Summary section.  It's right there under Impression and Plan.

7   BY MR. TENGESDAL:

8   Q    First under Impression and Plan, what was the diagnosis

9   by urology?

10  A    Well, that he had scrotal or testicular pain, gross

11  hematuria, and that's why he was -- that's what they had

12  determined.

13  Q    Okay.  And you recall there were tests that were ordered

14  earlier by urology in May -- the PSA, urine culture, CT

15  urogram -- were those charted, the findings in this note?

16  A    Well, he had a PSA of 0.6 and his urine culture was

17  negative and the CT urogram was negative.

18  Q    Okay.  So those three tests have been completed.  And

19  what does negative mean?

20  A    It means there were no abnormal findings.

21  Q    Okay.  And what is the plan?

22  A    The plan is to return to the clinic for cystoscopy the

23  following week.

24  Q    What's a cystoscopy?

25  A    Cystoscopy is that procedure as I've described earlier

1   where a long metal tube is inserted into the urethra and that

2   allows visualization of the inner lining of the bladder.

3   Q    Okay.  And if Mr. Taylor went back to Stateville and on

4   September 30, 2015, Dr. Funk looked at the note to say return

5   to clinic for cystoscopy next week, would it be your

6   expectation that Dr. Funk would facilitate that?

7   A    Yes.

8   Q    Okay.  And if Mr. Taylor returned to urology, asks seven

9   days later for the cystoscopy, would that be consistent with

10  urology's request?

11  A    Yes.

12          MR. TENGESDAL:  Okay.  If we could look at DX-245.

13  Never admitted.  Ask that it be admitted.

14          THE COURT:  Any objection to the admission of the

15  DX-255?

16          MR. DARKE:  I believe that's 245.  No objection.

17          MR. FITZGERALD:  No objection.

18          THE COURT:  Is it 245, counsel?

19          MR. TENGESDAL:  Yes, 245.

20          THE COURT:  Any objection to the admission of

21  DX-245?

22          MR. DARKE:  No, your Honor.

23          MR. FITZGERALD:  No, your Honor.

24          THE COURT:  It will be admitted without objection.

25  Go ahead.

1          (Exhibit No. DX-245 received into evidence.)

2    BY MR. TENGESDAL:

3    Q    And, Doctor, what does this note indicate?

4    A    This is the results of the cystoscopy that was performed

5    on Mr. Taylor.

6    Q    And what is the date?

7    A    October 7th, 2015.

8    Q    Was Mr. Taylor returned to urology to have the

9    cystoscopy as ordered one week later?

10   A    What's that?

11   Q    Was Mr. Taylor returned to urology as ordered one week

12   later?

13   A    Yes.

14   Q    Okay.  And then with this procedure done, was that all

15   the prerequisites that Dr. Masrur was asking to be done

16   before he sees the patient?

17   A    I believe so.

18        MR. TENGESDAL:  If we could bring up JT-068.

19   Previously admitted.

20        THE COURT:  Go ahead.

21   BY MR. TENGESDAL:

22   Q    All right.  Doctor, do you see this general surgery note

23   dated October 14, 2015, by Dr. Masrur?

24   A    Yes.

25   Q    Okay.  Was the patient, Mr. Taylor, sent back

1   facilitated by Dr. Obaisi to see the general surgeon Dr.

2   Masrur now that all of his prerequisites had been completed?

3   A    Yes.

4   Q    And did Dr. Masrur see the patient one week after that

5   final procedure the cystoscopy was done?

6   A    Yes.  He sees him on October 14th of 2015.

7        MR. TENGESDAL:  And then if we could blow up the

8   section "Dear Dr. Obaisi" there.

9   BY MR. TENGESDAL:

10  Q    Do you see that?

11  A    Yes.

12  Q    Okay.  Did Mr. Taylor complain of any pain when he saw

13  the patient?

14  A    He currently complains of right-sided abdominal pain

15  when he is idle or ambulating.

16  Q    Okay.  Had that changed since the prior July 22nd

17  physician?

18  A    Sounds like the same complaints he had before.

19  Q    Okay.  And did Dr. Masrur review the CT scan once again?

20  A    Yes.

21  Q    Did Mr. Taylor complain that since July 22nd -- now

22  we're in the middle of October -- that his pain was getting

23  worse or severe?

24  A    I don't -- I don't see.  I don't see that anywhere --

25  anywhere where it says his pain was worse than before.

1       MR. TENGESDAL:  If we can highlight the Medication

2    section.

3    BY MR. TENGESDAL:

4    Q    Doctor, any of these medications that are charted

5    prescribed to address pain?

6    A    Yes.  The Tylenol with Codeine Number 3, amitriptyline

7    to a degree, Neurontin, Tramadol.

8    Q    Would Tylenol Number 3, Neurontin, Tramadol, would those

9    be medications that would be effective to alleviate the pain

10   as described by Mr. Taylor?

11   A    They're pretty strong medications.

12   Q    Would they be consistent with what a physician would

13   prescribe for a condition that Mr. Taylor had?

14   A    It would be consistent for any kind of chronic pain.

15       MR. TENGESDAL:  If we could go to Physical Exam

16   section.

17   BY MR. TENGESDAL:

18   Q    Did Dr. Masrur do a physical exam on October 14th of the

19   abdomen?

20   A    Yes.

21   Q    And what did he chart?

22   A    He charted that the abdomen showed was soft and was not

23   tender, there was no distention, there was good peristalsis

24   and that there was a large right-sided ventral hernia

25   containing pretty much 70 percent of his bowel.

1  Q    Did Dr. Masrur on July 22nd chart essentially that he

2  had 70 percent of his bowel out?

3  A    That's what it appeared to be to him.

4  Q    Okay.

5           MR. TENGESDAL:  If we go to Assessment and Plan.

6  Your Honor, can we take a moment to find the assessment and

7  plan?

8           THE COURT:  What are you looking for?

9           MR. TENGESDAL:  The -- this note apparently -- this

10 exhibit doesn't have the assessment and plan on it.  It ends

11 at the physical exam.

12          THE COURT:  All right.

13          MR. TENGESDAL:  Thank you.

14          THE COURT:  Jury monitor off.  Go ahead.  Find what

15 you need.

16          MR. DARKE:  Try DX-246.

17          MR. TENGESDAL:  Your Honor, I ask that DX-246 be

18 admitted into evidence.

19          THE COURT:  Any objection to the admission of

20 DX-246?

21          MR. DARKE:  No objection.

22          MR. FITZGERALD:  No objection.

23          THE COURT:  It will be admitted without objection.

24     (Exhibit No. DX-246 received into evidence.)

25          THE COURT:  You may publish.

1  BY MR. TENGESDAL:

2  Q    Doctor, do you see the assessment and plan on this

3  October 14th, 2014, visit?

4  A    Yes.

5  Q    And was there any recommendations that Mr. Taylor lose

6  weight?

7  A    Yes.  He recommended that the patient should lose weight

8  at least 20 to 25 pounds.

9  Q    Okay.  And when he says the hernias have a high rate of

10  recurrence, is that the same charting that you saw before,

11  he's advising Mr. Taylor of the high rate of recurrence?

12  A    Yes.  He says this are hernias that have a high rate of

13  recurrence?

14  Q    Okay.  And then what does he -- Dr. Masrur chart for

15  what he wants to do with Dr. Giulianotti?

16  A    He wants to review the case with Dr. Giulianotti who is

17  a chief of surgery in order to determine whether or not the

18  patient is a candidate for surgery.

19  Q    When a surgeon such as Dr. Masrur says this on October

20  14th that he wants to talk to chief of surgery to determine

21  whether he's a candidate for surgery, has any determination

22  on surgery been made yet?

23  A    No.

24  Q    Okay.  And once this patient is very symptomatic and

25  would like to have hernia fixed, is that -- would that be

1    something that Mr. Taylor would have said about his hernia

2    that Dr. Masrur learned?

3              MR. DARKE:  Objection.

4              THE COURT:  Basis?

5              MR. DARKE:  Leading and facts not in evidence.

6              MR. TENGESDAL:  I'll withdraw the question, your

7    Honor.

8              MR. DARKE:  Thank you.

9              THE COURT:  Question withdrawn.  Pose a question.

10   BY MR. TENGESDAL:

11   Q    In the Assessment and Plan section, do you see anywhere

12   where Dr. Masrur says that the patient was returned to me,

13   I'm the wrong surgeon?

14   A    No.

15   Q    Okay.  In fact, did Dr. Masrur say on July 22nd once you

16   get the urology, colorectal stuff done, come back to see me?

17   A    Right.

18   Q    Okay.  If Dr. Obaisi received this note saying that he

19   wants to discuss the case with Dr. Giulianotti, would Dr.

20   Obaisi interpret it to mean that they're ready to go, we've

21   got a surgery date planned?

22             MR. DARKE:  Objection.

23             THE COURT:  Sustained as to form.

24             MR. TENGESDAL:  Okay.

25   BY MR. TENGESDAL:

1    Q    Is there anything in this note indicating that there is

2    going to be a definitive date for surgery?

3    A    No.

4    Q    Did Dr. Masrur here in any way confirm a date as to when

5    he expected to talk to Dr. Giulianotti to see whether he's a

6    candidate for surgery?

7    A    There's no date set for that discussion.

8    Q    Okay.  Is there any date set with Dr. Masrur saying get

9    him back in a month or two, I will have done this by then?

10   A    No.

11        MR. TENGESDAL:  If we could pull up then what's

12   been previously admitted as JX-069.

13        THE COURT:  Go ahead.

14   BY MR. TENGESDAL:

15   Q    Doctor, what do we have here, what date, and who is this

16   by?

17   A    This is a note from January 15th of 2016 by Dr. David

18   Morris who is a plastic surgeon.

19   Q    Okay.

20        MR. TENGESDAL:  If we could go to the Plan section.

21   BY MR. TENGESDAL:

22   Q    What does Dr. Morris chart for his plan on January 15th,

23   2016?

24   A    Well, it includes in this plan what he's done, which is

25   to review the CT and review the consult notes.  His

1    recommendation is that the patient would follow up with

2    general surgery to discuss with them a possible hernia

3    repair; and that if a repair is planned, plastic surgery

4    would be available to assist as needed.

5    Q    Okay.  And when the plastic surgeon says "assist as

6    needed," would the plastic surgeon be the primary service or

7    secondary?

8    A    It sounds like he would be the secondary surgeon.

9    Q    Okay.  And when he says "follow up with general

10   surgery," would general surgery then be the physicians, they

11   would make the determination whether they want to go forward

12   with the repair?

13   A    Right.

14   Q    Okay.  Does Dr. Morris anywhere in here say I don't know

15   why you sent the patient to me, I'm the wrong doctor?

16   A    No.

17   Q    Would you agree Dr. Obaisi had facilitated to get the

18   patient to see a plastic surgeon regarding their availability

19   to assist?

20   A    Yes.

21   Q    Did Dr. Morris, when he sent this note, would he be

22   indicating to Dr. Obaisi to get the patient back with general

23   surgery?

24   A    Yes.

25             MR. TENGESDAL:  And if we could bring up what's

1    previously been admitted as DX-248.

2              THE COURT:  Go ahead.

3    BY MR. TENGESDAL:

4    Q    Doctor, do you see the general surgery note from

5    February 17th, 2016?

6    A    Yes.

7    Q    And who is the doctor?

8    A    Dr. Masrur.

9    Q    Okay.  Would -- if Mr. Taylor got back to see Dr.

10   Masrur, general surgery, would Dr. Obaisi had facilitated Dr.

11   Morris' prior note?

12   A    Yes.

13             MR. TENGESDAL:  If we could highlight the HPI

14   section.

15   BY MR. TENGESDAL:

16   Q    In the History of Present Illness, HPI section, is there

17   any indication on how Mr. Taylor is doing?

18   A    He says that overall, the patient is doing well without

19   any signs of infection and pain under good control.  He

20   reports minimal nausea and vomiting.  In the interval, he has

21   been seen in CRS clinic for benign tubular adenoma -- I think

22   CRS stands for colorectal surgery -- for benign tubular

23   adenoma times two, status post removal.  Repeat colonoscopy

24   in three to five years as recommended with -- as needed

25   follow up and he's also being seen by plastics to defer to

1    general surgery for intervention.

2    Q    Okay.  So previously we saw that he had some pain when

3    he saw Dr. Masrur?

4    A    Right.

5    Q    And now on February 17th, 2016, Mr. Taylor, did he

6    report to Dr. Masrur that he was -- his pain was under good

7    control?

8    A    Yes.

9    Q    Is there any indication in this note that as of February

10   17th, 2016, Mr. Taylor was in such severe pain that it

11   prevented him from sleeping at night?

12   A    There's nothing noting that.

13   Q    Okay.  Is there any indication that when Mr. Taylor came

14   in to see Dr. Masrur on February 17th, 2016, that he said my

15   pain is so severe, not only can't I sleep but I can't do any

16   of my activities?

17   A    There's no note stating that.

18   Q    Okay.  And when he says that Dr. Masrur, he was being

19   seen in plastics who defer to general surgery for

20   intervention, what does that mean?

21   A    Well, that means that general surgery would be the

22   primary surgeons should an operation actually be scheduled

23   and that plastics might be available for helping out, if

24   needed.

25          MR. TENGESDAL:  If we could go to the Assessment

1   and Plan section of this note.

2   BY MR. TENGESDAL:

3   Q    Does Dr. Masrur chart that there's still at least 70

4   percent of the bowel contained in the hernia sac?

5   A    Yes.

6   Q    Okay.  Despite the 70 percent of bowel in the hernia sac

7   on February 17th, 2016, pain was under control?

8              MR. DARKE:  Objection, leading.

9              THE COURT:  Sustained as to form.  Don't lead.

10             MR. TENGESDAL:  Okay.

11  BY MR. TENGESDAL:

12  Q    Doctor, did we see in the -- if you want to see the

13  Subjective section.  Did Mr. -- what did Mr. Taylor report

14  for his pain?

15  A    Well, his chief complaint was ventral hernia and he's a

16  53-year-old male who underwent --

17             THE COURT REPORTER:  I'm sorry.

18  BY MR. TENGESDAL

19  Q    Just, Doctor, what did he chart for pain?

20  A    Oh.  Overall the patient is doing well without any signs

21  of infection and pain under good control.

22  Q    Okay.  Was pain under good control as reported by the

23  patient to Dr. Masrur on February 17th even though he still

24  had 70 percent of his bowel in his hernia sac?

25  A    Yes.

1    Q    Okay.  Is there any indication that -- in the assessment

2    and plan that Dr. Masrur has done what he has communicated he

3    was going to do and talked to Dr. Giulianotti?

4    A    No.  That still looks like it's going to be -- that

5    discussion is going to occur in the future.

6    Q    Okay.  And when the notes says "the patient was given

7    time to ask questions which were answered to his

8    satisfaction, he expressed understanding and agreement with

9    the plan," what does that mean?

10   A    That means that Dr. Masrur explained his findings to

11   Mr. Taylor and that -- in such a way that Mr. Taylor

12   understood them and agreed with the plan.

13   Q    Did Mr. Taylor agree with Dr. Masrur's plan?

14   A    Yes.

15   Q    Anywhere in the assessment and plan does Dr. Masrur give

16   a time frame to someone such as Dr. Obaisi to know when he's

17   going to talk to Dr. Giulianotti, the head of surgery?

18   A    No.

19   Q    Does assessment and plan, does Dr. Masrur communicate

20   that he wants the patient back by a certain time period?

21   A    No.

22   Q    Okay.  Does Dr. Masrur anywhere on February 17th, 2016,

23   state that, you know, I don't know why he came to me, I'm the

24   wrong surgeon?

25   A    No.

1    Q    Okay.  Doctor, is there anything about Mr. Taylor's

2    hernia defect that you showed us on the CT and we've seen in

3    the records out of the ordinary?

4    A    Well, yes.  It's -- it's a very abnormal defect.

5    Q    Okay.  Slowly, if you could tell us why it's an abnormal

6    defect.

7    A    Well, I mean, in my experience, I believe this is the

8    only such hernia I've seen like that.  The fact that it's on

9    the lateral aspect of the abdomen, that there's missing

10   abdominal muscle in that area which cannot be replaced by

11   other muscle and there's -- it caused a large eventration and

12   herniation of the bowel from the abdominal cavity.  It's not

13   an emergency condition.  It's a chronic condition that

14   evolved over time.  He's not at risk of incarceration,

15   strangulation or obstruction other than the fact that

16   obstruction can occur in a patient who has had previous

17   abdominal surgery but is not routinely a consequence of

18   previous surgery.  But it's also unusual in the fact that I

19   can't think of any surgical solution that would effectively

20   repair the abdominal wall to prevent further herniation.

21   Q    And when you say you can't think of a surgical solution,

22   could you tell us what is it about this hernia and the defect

23   that lends to your opinion that you can't think of a surgical

24   solution?

25   A    Well, primarily because it's an abnormal hernia on the

1  side, that is, where the muscles are -- have been detached

2  from the bone and a large chunk of the muscles of the right

3  side of his abdominal wall have been removed basically from

4  the lateral edge of his right rectus abdominis muscle all the

5  way to what's remaining of his iliac bone, there's no muscle

6  there to contain the abdominal contents and that's very

7  unusual.  I mean, like I say, I've never seen it and I've

8  treated hundreds of patients with large hernias so it's not a

9  hernia that anybody is really prepared to fix that I would

10  know of.

11  Q    Would the determining factors be its location on the

12  side and the fact that Dr. Warso had removed all the muscles?

13          MR. DARKE:  Objection.  Asked and answered.

14  Cumulative.

15          THE WITNESS:  Yeah.

16          THE COURT:  Hang on second.  Sustained as to asked

17  and answered.  Pose a question.

18          MR. TENGESDAL:  Okay.

19  BY MR. TENGESDAL:

20  Q    Can modern medicine fix all conditions?

21  A    Of course not.

22  Q    Can modern medicine, as we sit here at the time frame

23  when Mr. Taylor was being examined by these UIC physicians,

24  can modern medicine come up with a strip of new muscle to sew

25  in?

1  A    I've never heard of any laboratory that's been in the

2  process of trying to cultivate muscle cells.

3  Q    Okay.  Is there any difficulty with closing the defect?

4  A    Well, yes.  Because the defect is so large, you'd have a

5  hard time closing one edge up against the other edge.  You

6  know, you can try to shrink it by attaching the rib cage to

7  the pelvis which, you know, that doesn't reach very well.

8  You can't get from this lateral edge of muscle all the way to

9  the near midline by pulling the back around to the midline or

10  the midline down to the back.  You just can't approximate it

11  with the existing muscle remaining in the abdominal wall.

12  Q    Dr. Reed, is it your opinion that Mr. Taylor's hernia

13  defect for the reasons you stated is an operation that could

14  not be performed at this time frame?

15  A    Right.  I mean, we have the evidence, the obvious

16  evidence that it's been attempted multiple times by several

17  qualified and well trained surgeons and they've been able

18  to -- unable to solve the problem.  It keeps recurring

19  because the techniques they applied aren't adequate for this

20  kind of massive hernia for which we have no techniques.

21  Q    Okay.  How many years were you working doing just

22  abdominal wall reconstructions?

23  A    Probably a dozen years or more, maybe -- I mean,

24  certainly I fixed hernias my entire career as a surgeon.

25  Most of them inguinal hernias, midline hernias, things like

1    that.  But the abdominal wall reconstruction, I started

2    taking on after I stopped doing trauma surgery and that was

3    2015, so.

4    Q    Can you explain then to the jury how if you can't figure

5    out a solution, UIC surgeons can't figure out a solution, how

6    is Dr. Obaisi a general practitioner going to pick up the

7    phone, call UIC surgeons and tell them the solution, how is

8    that going to happen?

9    A    That's not -- that's not rational.  I mean, there is no

10   solution.  Dr. Obaisi can't cook up a solution.  He could

11   Google it all he wants.  He's not going to find a solution.

12            MR. TENGESDAL:  If we can bring up what's been

13   previously been admitted as JX-072.

14            THE COURT:  Go ahead.

15   BY MR. TENGESDAL:

16   Q    Okay.  Doctor, what date is this note?

17   A    I'm not seeing it on my screen.

18   Q    Okay.

19   A    Okay.  This is May 2nd of 2016.

20   Q    What service?

21   A    If looks like it's general surgery.

22   Q    And who is the physician?

23   A    Dr. Giulianotti, assisted by his physician's assistant.

24   Q    Okay.  Did Dr. Obaisi facilitate getting the patient now

25   back to general surgery at UIC to see the head of the

1  department, Dr. Giulianotti?

2  A    Yes.

3          MR. TENGESDAL:  And if we could blow up that first

4  addendum paragraph.  I'll give you just a second to read

5  this, Doctor, before I ask you questions.

6          (Brief pause.)

7          THE WITNESS:  Yes.

8  BY MR. TENGESDAL:

9  Q    All right.  Where Dr. Giulianotti charts that he was

10  seen and evaluated in the past by general surgery, but due to

11  the extent of the hernia referred, is that consistent with

12  what we saw with Dr. Masrur's notes?

13  A    Yes.

14  Q    Okay.  And was Mr. Taylor there to discuss a possible

15  surgical treatment for his condition?

16  A    Yes.

17  Q    All right.  What was Mr. Taylor's pain when he went to

18  see Dr. Giulianotti now on May 2nd, 2016?

19  A    He says that the pain is sporadic and has progressively

20  worsened over time.

21  Q    Okay.  And can you define for us "sporadic"?

22  A    Intermittent.  That is, it comes and goes.

23  Q    And then where was the pain located according to Dr.

24  Giulianotti?

25  A    It says that the pain radiates to his back and around

1    his side.

2    Q    And can you explain for us where that would be, would

3    that be in the lumbar spine area?

4    A    Yes.  And as I recall, he had some spinal problems on

5    the imaging that could be related to that pain but I don't

6    know for sure.

7    Q    Okay.  So based on the note of where the pain is, you

8    don't know whether it's coming from the lower back or the

9    hernia?

10   A    Well, it's unlikely that the hernia would cause pain in

11   the back.

12   Q    Okay.  And can you tell us anatomically why?

13   A    Well, the hernia is in the anterior of the abdominal

14   wall.  The muscles would be affected there.  They might be

15   stretched by the herniation or continued in and out, the

16   herniation.  But that's going to give him pain on the

17   anterior and possibly the lateral aspect of his abdomen, not

18   in the back.

19            MR. TENGESDAL:  If we go to the Impression and Plan

20   section.

21   BY MR. TENGESDAL:

22   Q    And does Dr. Giulianotti chart the location of the

23   hernia?

24   A    Yes.

25   Q    And is the location any different than where we saw it

1    previously charted?

2    A    No.

3    Q    And does Dr. Giulianotti chart how much of the bowel is

4    in the hernia sac?

5    A    Yes.

6    Q    Okay.  Does Dr. Giulianotti ever have a discussion with

7    Mr. Taylor on May 2nd as to the rate of recurrence?

8    A    Let's see.  Yeah.  There's a -- he said there's a high

9    rate of recurrence as well as a possible abdominal

10   compartment syndrome as a result of the repair.

11   Q    And, Doctor, have you ever published on abdominal

12   compartment syndrome?

13   A    Yes.

14   Q    Are you familiar with abdominal compartment syndrome?

15   A    Yes.

16   Q    Can you explain to us what abdominal compartment

17   syndrome is?

18   A    Well, it's -- there are other parts of the body that

19   develop compartment syndromes and these are parts of the body

20   that are limited typically by fascia or muscle so that they

21   can't expand inside that compartment.  And with it -- in the

22   case of the abdomen, if you get swelling of the intestine or

23   a lot of fluid like ascites, or whatever, in the abdomen and

24   especially if it occurs over a rapid period of time, the

25   pressure increases to such a point that blood flow to the

1    tissues in the abdominal cavity -- in this case, the

2    intestine -- it gets cut down and you can actually have

3    intestinal necrosis, perforation and so forth as a result of

4    the lack of blood flow.

5    Q    Okay.  Is that a surgical risk?

6    A    Yeah.  It's a risk because it's an emergency

7    life-threatening condition.

8    Q    Okay.  And when you say "life-threatening condition,"

9    can abdominal compartment syndrome result in death?

10   A    If it's not attended to promptly and appropriately.

11   Q    Okay.  Did the chief of surgery identify the risks of

12   doing surgery on Mr. Taylor?

13   A    Yes.

14   Q    Did he chart that in his notes so that other physicians

15   could see that?

16   A    Yes.  He says risks and complications including, but not

17   limited to, bleeding, post-operative infection, scarring,

18   bowel resection, and conversion to an open procedure were

19   discussed with the patient.

20   Q    Okay.  And does the note indicate that Mr. Taylor agreed

21   with the plan?

22   A    Yes.  He says the patient verbalized understanding --

23            THE COURT REPORTER:  I'm sorry.  Please slow down.

24            THE COURT:  Please when you read, you have to go

25   slower --

1          THE WITNESS:  Sorry.

2          THE COURT:  -- so the court reporter can write

3     things down.

4          THE WITNESS:  I'm sorry.

5          THE COURT:  I really don't like to interrupt people

6     but you really have to slow down when you read.  Go ahead.

7          THE WITNESS:  He said the patient verbalized

8     understanding and agreement with plan and possible risks

9     associated with surgery.

10    BY MR. TENGESDAL:

11    Q    And then up above where Dr. Giulianotti says "we would

12    like the patient to follow up with plastic surgery to discuss

13    the possibility of a muscle flap," what's a muscle flap?

14    A    A muscle flap is similar to what was already performed

15    from the tensor lata fascia flap and the anterior lateral

16    flap where you detach a muscle in the -- in the -- nearby

17    vicinity from some other part, typically from the upper thigh

18    or the flank or the back, you detach that muscle from its

19    normal position and then rotate it on its blood supply and

20    put it in a different position where it can grow and

21    potentially function in this case as a means to prevent

22    reherniation.

23    Q    Okay.  And when you say "previously was attempted," was

24    that Dr. Antony during Dr. Warso's surgery?

25    A    Yes.

1    Q    Now how did that muscle flap work?

2    A    Well, it didn't work too well at preventing herniation.

3    Q    Okay.  Would plastic surgery, if this surgery was

4    attempted, would they be the primary or secondary surgeon?

5    A    They'd be the secondary surgeon.

6    Q    Okay.  Who would be attempting the surgery, general

7    surgery or plastic surgery?

8    A    General surgery would reduce the herniation and

9    potentially do what they could to close the hernia defect but

10   they would need plastic surgery's attempt to help close it

11   further with the rotation of a flap.

12   Q    Okay.  Do you see anywhere on May 2nd, 2016, where Dr.

13   Giulianotti says ready to go, got a plan, bring him back for

14   surgery?

15   A    No.

16   Q    Do you see anywhere where Dr. Giulianotti is saying,

17   trying to figure it out, Dr. Obaisi, Mr. General

18   Practitioner, are you available for a consult?

19   A    No.

20   Q    Does Dr. Giulianotti state in there a particular date

21   when he would like the patient to be seen by plastic surgery?

22   A    No.

23   Q    Does Dr. Giulianotti state that this is an urgent

24   surgical procedure that he needs to do?

25   A    No.

1  Q    Is Dr. Giulianotti ready to go or does he want to

2  involve another specialty service to see if they can assist?

3  A    Well, he wants to have plastic surgery evaluate the

4  patient as well.

5         MR. TENGESDAL:  And then if we can -- previously

6  been admitted JT-075.

7         THE COURT:  Go ahead.

8  BY MR. TENGESDAL:

9  Q    Do you recall Dr. Giulianotti just gave a note that

10  would go back to Obaisi saying get him to plastic surgery?

11  A    Right.

12  Q    So Dr. Obaisi get him to plastic surgery?

13  A    Yes.

14  Q    Okay.  And was plastic surgery seen on May 17th, 2016?

15  A    Yes.

16  Q    And who did he see?

17  A    He saw Dr. Mimis Cohen.

18  Q    Do you have any understanding who Dr. Cohen is?

19  A    He's a plastic surgeon, I think.

20  Q    At what facility?

21  A    At the University of Illinois, UIC.

22         MR. TENGESDAL:  And if we could highlight the HPI

23  section.

24  BY MR. TENGESDAL:

25  Q    What does -- does Dr. Cohen chart anywhere regarding the

1  general surgery referral?

2  A    Yes.  He says he was recently seen in general surgery

3  clinic and referred to plastics clinic for additional

4  evaluation to do in conjunction with general surgery.

5  Q    Okay.  And when he sees Dr. Cohen now on May 17, 2016,

6  that was 15 days after he saw the general surgeon?

7  A    I believe so, yes.

8  Q    Okay.  And how was Mr. Taylor's pain now on May 17th,

9  2016?

10  A    It says he reports occasional pain radiates to his back

11  and around his side.

12  Q    Okay.  And what's your understanding of occasional pain?

13  A    Well, it's pain that's not constant but every now and

14  then he feels the pain.

15  Q    Okay.  Is there any qualification to the pain such as

16  mild, moderate, or severe?

17  A    No.

18  Q    Do you see any indication that when he comes into

19  plastic surgery on May 17th that he tells Dr. Cohen I got

20  severe pain, I cry myself to sleep, I have no functional

21  activities?

22  A    I don't see that in this note.

23  Q    Okay.  When it says "an additional evaluation in

24  conjunction with general surgery," what's your understanding

25  of that?

1    A     Well, it's -- they're trying to work out could we do
2    this as a two-team approach, that is general surgery to be
3    the primary team that would reduce the herniation and put the
4    bowel back into the abdominal cavity and then have plastics
5    help with the closure of the abdominal cavity hopefully to
6    provide enough muscle to span the defect.
7    Q     Okay.  When you say "working on a team approach," based
8    on the notes we've seen so far, are multiple surgeons trying
9    to figure out a solution to this problem?
10   A     Yes.  It's just not a one-surgeon or one-specialty job.
11   Q     Okay.  Do you see any indication that the surgeons are
12   saying "nothing we can do for you, please stop showing up"?
13   A     No.  They haven't said that yet.
14   Q     Okay.  Have the -- has the surgeons communicated what
15   their plan is interdepartmentally at UIC, conveyed that to
16   Dr. Obaisi?
17   A     Yes.
18   Q     Has Dr. Obaisi then facilitated their wishes and got the
19   patient back to see different specialists?
20   A     Yes.
21   Q     Okay.  So Dr. Cohen, when he gets done seeing him on May
22   17th, what does he want to do for the plan?
23   A     Well, he wants to get CT scan with IV contrast of the
24   abdomen and pelvis and he wants to coordinate with Dr.
25   Giulianotti for the timing after the CT is done.  Presumably,

1  he's talking about timing of an operation.  And that they

2  also need approval from insurance.

3  Q    Okay.  And in order to do a two-person operation, would

4  you need to coordinate so that if it's possible, both people

5  show up on the same day?

6  A    Right, because you don't want to have it scheduled on a

7  date when the other team is already operating and won't be

8  available.

9  Q    Okay.  And is Dr. Cohen saying we need to coordinate for

10  timing after the CT is done after he looks at the CT?

11  A    Right.

12  Q    Okay.  Anything in this note indicate that as of May

13  17th, 2016, Dr. Cohen says, you know what, I got it, I don't

14  need you, Dr. Giulianotti, I'm going to do this myself?

15  A    No.

16  Q    Anything in the notes stating that Dr. Cohen is saying

17  let's -- let's get him on the books for next month?

18  A    No.

19  Q    Does Dr. Cohen, why does he want to see the CT?

20  A    Just to get a lay of the land that is determined where

21  and how big the defect is and what he would need to bring to

22  the table in order to close that defect.  In other words, if

23  he's going to use some kind of rotational flap, where might

24  be the rest source of that flap and how would he work to get

25  it.

1     MR. TENGESDAL:  Okay.  If we can bring up JT-114

2  already admitted.

3          THE COURT:  Go ahead.

4          MR. TENGESDAL:  Or actually it might be 11A.  It's

5  not my handwriting.  Sorry.  Is that 11A?

6          THE COURT:  11A is in.  Are you doing that one?

7          MR. TENGESDAL:  Yeah.  Maybe that's what it is.

8          THE COURT:  JT-11A.  Go ahead.

9  BY MR. TENGESDAL:

10 Q    All right.  Doctor, does this look like a CT scan was

11 done two weeks later?

12 A    Yes.  It was done on the 31st of May 2016.

13 Q    So when Dr. Cohen sends it back to Obaisi and says want

14 a CT scan, did he get the CT scan?

15 A    It looks like he did.

16 Q    Okay.  And if we look at the Impression section, does

17 this indicate the size that's in the hernia sac?

18 A    Yes.

19 Q    What does it indicate?

20 A    It says "very large right lateral abdominal wall hernia

21 containing the majority of bowel.  This hernia extends

22 anterior to the right thigh where there are post-surgical

23 changes and no evidence for tumor recurrence."

24 Q    Okay.  And do you recall previously we saw CT scans that

25 said 70 percent of the bowel in the hernia sac?

1    A    Right.

2    Q    Did this CT measure the percentage in the hernia sac?

3    A    No, other than it seems to be more than 50 percent

4    because it's the majority.

5         MR. TENGESDAL:  If we could take that down and put

6    up JT-077 already admitted.

7         THE COURT:  Go ahead.

8    BY MR. TENGESDAL

9    Q    All right.  So Dr. Cohen's wishes are accomplished, he

10   got the CT scan.  Did Dr. Obaisi get him back to see Dr.

11   Cohen?

12   A    Yes.

13   Q    What date did he see Dr. Cohen?

14   A    This note is from July 26th, 2016.

15        MR. TENGESDAL:  Okay.  If we could highlight the

16   subjective component.

17   BY MR. TENGESDAL:

18   Q    All right.  Doctor, why was -- what did he put down was

19   why he was evaluating Mr. Taylor on this date, Dr. Cohen?

20   A    Well, he says the patient returns to clinic today for

21   evaluation of large right lumbar hernia.  Patient has been

22   seen and evaluated by general surgery, colorectal and

23   urology.  Patient states he has weakness in his right leg,

24   requires crutches with ambulation resulting in frequent

25   falling and wheelchair for long distances.  Patient complains

1   of vague symptoms of occasional constipation, discomfort with

2   shouting.

3   Q    Okay.  Why would a patient that has the large defect and

4   hernia have discomfort with shouting?

5   A    I suspect that when you shout, you tense up your

6   abdominal muscles in order to generate more volume coming out

7   of your lungs and through your vocal cords and that

8   compression of the abdominal muscles is going to cause the

9   herniation to be forced out further which will stretch

10  tissues and cause pain.

11  Q    If you stopped shouting, would you stop increasing the

12  intra-abdominal pressure?

13  A    It sounds like a good cure.

14  Q    Is that a hard cure?  Do you got to get a pill for that?

15          THE COURT:  Sustained.  Pose a question.

16          MR. DARKE:  Thank you.

17          MR. TENGESDAL:  If we go to the Objective section.

18  BY MR. TENGESDAL:

19  Q    Does Dr. Cohen in the Objective section, does he chart

20  that he did any exam as far as looking for evidence of

21  strangulation or obstruction?

22  A    Right.  He saw no evidence of strangulation or

23  obstruction.

24  Q    Okay.  And how would you do an exam to test for evidence

25  of strangulation or obstruction?

1  A     Well, strangulation, the patient would be in severe

2  pain, would look very ill.  An obstruction patient would

3  have, you know, no bowel movements and he'd be vomiting with

4  a distended abdomen and he had none of those signs.

5             MR. TENGESDAL:  And if we could go to the Plan

6  section, please.

7  BY MR. TENGESDAL:

8  Q     What does Dr. Cohen chart for the plan?

9  A     Plan for combined right lumbar hernia repair with

10  general surgery, Dr. Giulianotti and Dr. Cohen.  General

11  surgery, primary service, awaiting insurance and scheduling.

12  Q     Okay.  Does -- did Dr. Cohen in the plan section, did he

13  indicate who would be the primary service?

14  A     The general surgery.

15  Q     Okay.  In order for Dr. Cohen to participate in the

16  surgery, would he also need Dr. Giulianotti to participate in

17  this surgery?

18  A     Well, yes, because they're primary.

19  Q     Okay.  And by "primary," what would he be doing

20  differently than Dr. Cohen?

21  A     Well, Dr. Giulianotti would be reducing the hernia --

22  that is, dissecting things out -- and getting the intestines

23  back into the abdominal cavity and then trying to close what

24  he can of the defect with Dr. Cohen coming in to assist with

25  closure of the defect through whatever he can do by

1    rearranging muscle flaps to get that coverage.

2    Q    Okay.  Has there been any dates set by Dr. Giulianotti

3    yet that he is willing, ready and able to go to do the

4    surgery?

5    A    No.

6    Q    Have you seen any indication yet going through all these

7    notes that when asked by a specialist at UIC to do either a

8    consult, diagnostic testing, laboratory testing, surgical

9    evaluation that Dr. Obaisi didn't follow the specialist's

10   recommendation?

11   A    No.  They were all followed up.

12   Q    Okay.  Have you seen any notes so far where any of the

13   surgeons have asked to have a conference with Dr. Obaisi to

14   discuss his thoughts?

15   A    I haven't seen any of that.

16   Q    Okay.  Do you have an opinion as to whether or not the

17   surgical services at UIC as of this date in July 2016 were

18   continuing to evaluate the propriety of doing surgery?

19   A    Yes.

20   Q    And what's your opinion?

21   A    Well, they were trying to find a solution being seen by

22   multiple specialists in order to treat a condition that, for

23   all intents and purposes, is unfixable.

24        MR. TENGESDAL:  Your Honor, if we can bring up

25   JT-085 already admitted.

1    THE COURT:  Go ahead.

2    BY MR. TENGESDAL:

3    Q    Doctor, where is this note from?

4    A    This is from the University of Illinois, Chicago.

5    Q    And what service?

6    A    General surgery.

7    Q    What date?

8    A    January 9th of 2017.

9    Q    And who is the surgeon?

10   A    Yes.

11   Q    Who is the surgeon?

12   A    Oh, who is -- Dr. Giulianotti.

13   Q    Okay.  So after Dr. Cohen puts in his input that --

14   about surgery, did Dr. Obaisi get the patient back to see Dr.

15   Giulianotti?

16   A    That he's what?

17   Q    Did Dr. Obaisi get the patient back to see the chief of

18   surgery, Dr. Giulianotti?

19   A    Yes, he did.

20        MR. TENGESDAL:  And what do we have in the

21   Impression and Plan section, could we highlight that please?

22   BY MR. TENGESDAL:

23   Q    Did the doctor discuss with the patient his review on

24   the date, Dr. Giulianotti?

25   A    Yes.

1  Q    What did he tell Mr. Taylor?

2  A    Well, he said that they discussed that there was a high

3  rate of recurrence as well as a chance of an abdominal

4  compartment syndrome secondary to the repair.  And that he

5  discussed with the patient after significantly reviewing his

6  documentation and an interdisciplinary discussion.  We feel

7  that there is a significant surgical risk due to the loss of

8  domain of the patient's abdominal wall and that there are

9  very limited surgical options that are available with no

10  guarantee of resolving the problem.

11  Q    Okay.  "Significantly reviewing his documentation," Dr.

12  Giulianotti charts.  What does that mean to you as a surgeon?

13  A    That means he's looked through the chart and seen all of

14  the records that deal with his condition to be able to assess

15  it effectively.

16  Q    Okay.  And then it says that they had an

17  interdisciplinary discussion based on the review of

18  documentation.  What does that mean as a surgeon?

19  A    Well, he's talking about discussion between himself and

20  the plastic surgeon, Dr. Ellis, to work out a plan if they

21  can come together with one.

22  Q    Okay.  And when he says that there's a significant

23  surgical risk due to loss of domain of the patient's

24  abdominal wall, is that what you've discussed today during

25  Dr. Warso's surgery, they took out all of the abdominal wall?

1  A     Right.

2  Q     And that abdominal wall was lost, the domain was lost

3  when Dr. Warso did the surgery?

4  A     Well, that's when the loss of domain started.  It

5  progressed over time but, you know, that's where the gate was

6  left open and all the bowels could spill out.

7  Q     Okay.  And has anybody indicated to surgeons prior to

8  Dr. Giulianotti that they were ready, willing and able to

9  tackle this problem?

10 A     No.

11 Q     And when he says there's very limited surgical options

12 that are available, do you have any reason to disagree with

13 that?

14 A     No.

15 Q     When Dr. Giulianotti had a surgery, he says there's no

16 guarantee of resolving the problem.  What does that mean?

17 A     Well, then -- there's -- he can't claim that this is

18 going to fix the problem.  It's been attempted several times

19 before.  It's still a very challenging problem to fix and,

20 you know, this is such an unusual circumstance, there's no

21 training for how ever you would fix such a thing and this is

22 all -- trying to put together the pieces and knowledge and

23 experience they've had in order to come up with a solution

24 and it's hard to do that for such an unusual circumstance.

25 Q     Okay.  But has the UIC surgeons been attempting to do it

1  up until this date?

2  A     Yes.

3  Q     And have they communicated their wishes to Dr. Obaisi

4  and asked him to continue to return the patient back?

5  A     Yes.

6  Q     Where it says there was a significant discussion with

7  the patient and, due to the patient's symptoms, we offered

8  him a secondary consultation with plastic surgeon Dr. Ellis

9  for consideration of a free flap, do you recall reviewing

10  that?

11  A     Yes.

12  Q     And the secondary consultation, is that to a different

13  plastic surgeon from Dr. Cohen then?

14  A     Yes.

15  Q     When we see -- it says "if the plastic surgeon does not

16  think that a free flap is possible and there is no surgical

17  intervention and conservative management is recommended," how

18  do you interpret that, Doctor?

19  A     Just that if there is no plan that is likely to succeed,

20  then we shouldn't proceed with an operation because that

21  would be a contraindication.  And conservative management

22  basically means non-operative management.  Trying to do

23  whatever we can to make his symptoms better, that would

24  involve probably wearing a brace, especially when upright,

25  and, you know, trying to -- and losing weight so that there's

1  less content within the abdominal cavity.

2  Q    Okay.  Have you seen since Dr. Warso created the gap

3  where any surgeon has indicated anything other than there's a

4  high rate of recurrence?

5  A    No.  They've all held to that line, that this is a

6  challenging hernia condition and its solution is not

7  immediately obvious because it is so unusual.

8  Q    Okay.  Since the time of the defect that was created in

9  the hernia by Dr. Warso's surgery up until this note January

10 9, 2017, was there ever a time where Mr. Taylor was a

11 candidate for surgery?

12 A    No.

13 Q    Was this hernia ever fixable due to the size of the

14 defect?

15 A    No.

16 Q    Does Dr. Giulianotti say that if it can be done, then

17 general surgery is agreeable to assist with the repair?

18 A    Yeah.

19      MR. TENGESDAL:  If we can go to the next note then,

20 which is JT-395.

21      THE COURT:  Go ahead.  Is that in evidence,

22 counsel?

23      MR. TENGESDAL:  It says I have it already admitted

24 JT-395.  It's March 2nd, 2017.

25      MR. DARKE:  It's admitted, Judge.

1      THE COURT:  Okay.  Go ahead.

2  BY MR. TENGESDAL:

3  Q    Okay.  We just saw Dr. Giulianotti said January 9, 2017,

4  send -- Dr. Obaisi, send the patient to see Dr. Ellis, right?

5  A    Yes.

6  Q    Did the patient get back to see Dr. Ellis as Dr.

7  Giulianotti asked Dr. Obaisi to do?

8  A    Yes.

9  Q    And did he -- did Dr. Ellis write a note on March 2nd,

10  2017?

11  A    Yes.

12      MR. TENGESDAL:  If we can go to Page 2.

13  BY MR. TENGESDAL:

14  Q    Did Mr. Taylor complain of any pain to Dr. Ellis?

15  A    Yes.  He says --

16  Q    What did he complain of?

17  A    He says the patient endorses intermittent abdominal

18  pain, may be sharp or dull, and aggravated by Valsalva,

19  coughing, sneezing, bearing down.  Endorses intermittent

20  nausea with sensation of fullness, endorses alternating

21  diarrhea and constipation, endorses incontinence and believes

22  it is related to hernia, though had diagnosis of benign

23  prosthetic hypertrophy, BPH.

24  Q    And when -- what is intermittent abdominal pain, can you

25  define that for us?

1   A    It comes and goes.  It's pain in the abdomen that comes

2   and goes.

3   Q    Aggravated by Valsalva, coughing, sneezing, bearing

4   down, can you explain to us how that would irritate the pain?

5   A    Well, those are all conditions that cause the abdominal

6   muscles to contract and increase the pressure within the

7   abdomen, which in this situation is going to force the

8   viscera further out into the hernia sac.

9          MR. TENGESDAL:  Okay.  If we go to the Assessment

10  section.

11  BY MR. TENGESDAL:

12  Q    What was Dr. Ellis' assessment?

13  A    He says that this is a patient with complex ventral

14  hernia through muscles of the abdominal -- developed muscles

15  of the abdominal wall appear intact, though displaced.  That

16  with closure of hernia, may suffer from significant

17  comorbidities, including loss of domain.  Patient counseled

18  regarding risk of loss of domain.  And if procedure

19  performed, may require respiratory support with risk of

20  intubation as well as surgical restoration of hernia.

21  Q    So when Dr. Ellis says "with closure of the hernia may

22  suffer from significant comorbidities including loss of

23  domain," is he identifying a risk there?

24  A    Yes.

25  Q    And can you explain what he's -- he's trying to convey

1  there?

2  A    Well, what he's saying is if we put all of these

3  intestines that are now outside the abdominal cavity and

4  place them in the abdominal cavity, it may not fit and that

5  would potentially produce a compartment syndrome which would

6  threaten intestinal viability, the intestines could die, and

7  that could be a serious post-operative complication.

8  Q    And when he states that "if the procedure is performed,

9  may require respiratory support with risk of intubation,"

10  what does that mean?

11  A    Well, that means that if they do this procedure, it

12  would be very -- potentially very difficult for Mr. Taylor to

13  breathe because when you take a breath, your diaphragm

14  contracts which pushes down on the abdominal contents.  And

15  since the abdominal contents in his case would be all packed

16  in there under high pressure, that's going to fight with his

17  ability to take a deep breath and he may not be able to

18  breathe adequately and would have to go on a mechanical

19  ventilator which actually pushes air into the lungs to expand

20  them.

21  Q    Okay.  And can you just then describe what is a

22  mechanical ventilator?

23  A    That's a -- people call it a respirator but it's a

24  machine that blows air into the windpipe to inflate the lungs

25  and then relaxes to let the lung come back -- and lungs

1   exhale.  And so it pushes air in and lets air come out to

2   breathe for the patient because they can't breathe on their

3   own.

4   Q    Would a risk of surgery then on Mr. Taylor be that he

5   might not ever be able to breathe on his own again?

6   A    It's hard to say, but certainly from the -- at the

7   initial outset, you would expect, anticipate that after the

8   operation it might be hard to get him off of the ventilator

9   that he's on during the operation.  You know, they may have

10  to continue mechanical ventilation until his condition

11  improves to the point where he could be extubated and breathe

12  on his own but there's no guarantee that that would happen

13  especially if his intra-abdominal pressures are extremely

14  high.  And, of course, you don't want them to be extremely

15  high because that would also knock off blood flow to the

16  intestine and cause a severe surgical emergency to get out --

17  prevent dead bowel from happening or take out dead bowel that

18  occurs.

19  Q    Compartment syndrome, loss of respiratory support, are

20  those significant risks?

21  A    Very high.

22  Q    Okay.  Do you have an opinion in this case as to whether

23  the risks/benefit ratio favored or disfavored surgery?

24  A    In this case, the risk is higher than the benefit.  He's

25  actually living with this hernia in place.  It's not causing

1  any significant functional disorder.  If he were to lose

2  weight and wear a brace constantly while he's upright that's

3  properly fitted to himself, that would be a non-operative way

4  of managing it.  That's always reversible.  If for some

5  reason he starts to have too much pressure on his abdomen and

6  he has a brace on, well, he can just take the brace off and

7  let the bowels herniate out again.  But I would certainly try

8  that first before putting him through a major operation which

9  may or may not be possible.

10  Q    As a surgeon managing this condition, would you be the

11  individual determining what type of brace he would use?

12  A    Yes.

13  Q    Would you determine the size?

14  A    Yes.

15  Q    How would you go about fitting the patient?

16  A    What I have done in my experience, my practice, is I

17  have the patient -- we order the brace for the patient based

18  upon the patient's dimensions -- you know, height, length of

19  the abdominal cavity and so forth -- have the patient come

20  into the clinic, lay down on the examination table with the

21  brace on the table before he lays down and then put the brace

22  on and tighten the straps as they need to be tightened to

23  make -- to get the level of support and security that the

24  patient requires and then have the patient go through those

25  activities themselves until we're satisfied that they know

1    how to apply it properly.  And then have the patient roll off

2    the table and, you know, flip -- you know, sit up.

3              THE COURT:  Counsel, could I see you at sidebar

4    real quick?

5              THE WITNESS:  I'm sorry?

6              THE COURT:  Hold on one second.

7         (Proceedings heard at sidebar.)

8              THE COURT:  Am I mistaken?  Did we already cover

9    this?

10             MR. DARKE:  I believe that we did but very briefly,

11   it was just --

12             THE COURT:  Well, I remember him going through this

13   before.  Is this something new or is this repetitive?

14             MR. TENGESDAL:  It's the foundation for my next

15   question --

16             THE COURT:  All right.

17             MR. TENGESDAL:  -- as to the fact that no surgeon

18   ever ordered this and instructed how to wear it.

19             THE COURT:  Okay.  What he's testifying to right

20   now is cumulative.  I want you to pose a question.  Okay?

21             MR. DARKE:  Thank you, Judge.

22             MR. TENGESDAL:  Very good.

23        (End of sidebar.)

24             THE COURT:  Okay.  Counsel, pose a question.

25   BY MR. TENGESDAL:

1  Q    Doctor, up in Dr. Ellis' note here, have you seen that

2  any surgeon has prescribed the brace, ordered a brace, fitted

3  a brace, and instructed Mr. Taylor on how to wear it?

4  A    I haven't seen that.

5  Q    Okay.  And what was Dr. Ellis' plan on this visit, March

6  2nd?

7  A    He's going to consider reconstruction of the abdominal

8  wall using Strattice material likely in conjunction with

9  general surgery and further surgical plan is pending and is

10 going to discuss with the patient when he returns in two

11 weeks.

12 Q    Okay.  First question, does Dr. Ellis state that he's

13 ready to go, he has a surgical plan?

14 A    No.  He's going to consider it.

15 Q    Okay.  And when he says he wants to see the patient in

16 two weeks, is that instructing Dr. Obaisi that he wants to

17 think about it, bring him back, and then he'll talk to

18 Mr. Taylor?

19 A    Yes.

20        MR. TENGESDAL:  If we can bring up the next note

21 then, your Honor, that would be JX-073.

22        THE COURT:  Go ahead.

23        MR. TENGESDAL:  That's not it.

24        MR. DARKE:  No.  That's not it.

25        MS. CUNDIFF:  What's the date?

1      MR. TENGESDAL:  March 16th.  DX-255.

2           THE COURT:  Is that in?

3           MR. DARKE:  No objection, Judge.

4           MR. FITZGERALD:  No objection.

5           THE COURT:  DX-255 admitted without objection.  You

6    may publish.

7           (Exhibit No. DX-255 received into evidence.)

8    BY MR. TENGESDAL:

9    Q    March 2nd.  Now this is March 16th.  Did Dr. Obaisi

10   return the patient as Dr. Ellis instructed?

11   A    Yes.

12          MR. TENGESDAL:  And if we could highlight the Plan

13   section.

14   BY MR. TENGESDAL:

15   Q    Doctor, did you have an opportunity to review Dr. Ellis'

16   note with his addendum on March 18th?

17   A    Yes.

18   Q    Okay.  When Dr. Ellis saw the patient and he says "there

19   is no well documented role for intervention," what does that

20   mean to you as a surgeon?

21   A    That means that there's no -- nothing that he can find

22   in any documentation -- that is, references, reading

23   material, you know, medical references -- for surgery in this

24   circumstance.

25   Q    Would this note be conveying to any physician that read

1  it that there's -- essentially there's nothing that can be

2  done?

3  A    Well, he's saying there's nothing he can do.  He has no

4  personal experience in it and I think it's likely given all

5  the other surgeons he's been seen by that they haven't come

6  up with a solution either.  I don't think this hernia has a

7  solution.

8  Q    Okay.

9  A    That is, an operative solution.

10 Q    Where Dr. Ellis charts "I recommend non-surgical

11 management with a TLSO brace to keep his abdomen more stably

12 contained," tell us what that means?

13 A    That means that he recommends that Mr. Taylor wear a

14 brace, that is, a TLSO -- that is thoracic lumbosacral --

15 brace that keeps his abdomen contained.  It would be applied,

16 like I say, lying down so that it could contain it

17 appropriately and then have him roll on his side and sit and

18 then stand up while it contains it with the brace.

19 Q    Prior to March 16th, 2017, have you seen any surgeon at

20 UIC that recommended non-surgical management with any type of

21 brace?

22 A    No.  I haven't seen it up until here.

23 Q    Okay.  Would this be the first time that anybody at

24 Stateville would be advised that a brace may be of

25 assistance?

1   A    Right.

2   Q    And a TLSO brace, would that be something that a surgeon

3   like Dr. Ellis would be familiar with?

4   A    Yes.

5   Q    And would that be fitted the same way you just described

6   how you fit braces?

7   A    Yes.

8   Q    Would it be expected that a surgeon would show the

9   patient how to wear, how to properly fit the TSLO (sic)

10  brace?

11  A    Yes, although it could possibly be done by a physical

12  therapist as well.

13  Q    Okay.  Do you see anywhere on Dr. Ellis' note where he

14  states that they want to keep looking into this problem to

15  have the patient returned?

16  A    No.

17  Q    Okay.  And then are you familiar with -- did you read

18  the surgical records of Dr. Dumanian?

19  A    Yes.

20  Q    Did Dr. Dumanian perform surgery on Mr. Taylor?

21  A    Yes, he did.

22  Q    Okay.  Can you tell us what type of procedure Dr.

23  Dumanian -- strike the question first.

24       Before Dr. Dumanian performed surgery, did he do

25  any evaluation?

1    A    I think he reviewed the previous records.

2    Q    Okay.  Did Dr. Dumanian review any of the imaging?

3    A    I'd have to double check his notes.  He probably did.

4    Q    Okay.  Would it be standard custom and practice to

5    review records?

6    A    Absolutely.

7    Q    Okay.  The pain -- let me ask you this question:  The

8    pain that Mr. Taylor was expressing in these records, is

9    there any way to manage that other than oral pain

10   medications?

11   A    No, unless you can correct the underlying cause of the

12   pain which in this case was not possible.

13   Q    Could -- would a lumbar epidural help hernia pain?

14   A    That would be difficult because a lumbar usually

15   controls pain at a lower level and, you know, this pain was

16   probably felt all the way up to the top of his abdominal wall

17   so that would have to be a thoracic epidural, if anything,

18   which are riskier than lumbar epidurals.

19            MR. TENGESDAL:  Okay.  If we could bring up

20   DX-256A, previously been admitted.

21            THE COURT:  Go ahead.

22   BY MR. TENGESDAL:

23   Q    Doctor, would Dr. Dumanian's note of December 13, 2017,

24   refresh your memory as to what he did when he saw the

25   patient?

1  A    I don't have anything up other than a seal on my screen.

2        THE COURT:  256A, is that in?

3        MR. DARKE:  Yes, your Honor.

4        THE COURT:  Okay.  Go ahead.

5        THE WITNESS:  Okay.

6  BY MR. TENGESDAL:

7  Q    Doctor, would reviewing the note help you to refresh

8  your memory as to what Dr. Dumanian did?

9  A    Yes.

10  Q    Does doctor --

11        MR. TENGESDAL:  Can you bring it up just a little

12  bit?

13        MS. CUNDIFF:  What's that?

14        MR. TENGESDAL:  Your Honor, if we could have a

15  quick sidebar.

16        THE COURT:  Yeah, sure.

17     (Proceedings heard at sidebar.)

18        MR. TENGESDAL:  You got the wrong exhibit?

19        MR. DARKE:  Does this -- no, no, no.  This document

20  is in as 256 and then it was redacted so we need to replace

21  the 256 with 256A because they redacted out the --

22        THE COURT:  Yeah.  This was part of the big batch

23  that was put in on March 25th and I don't see 256 in but I do

24  see 256A in.  This one, the markings say they don't have the

25  A.  Is this the right one?

1          MS. CUNDIFF:  Yes.

2          MR. TENGESDAL:  It's the right one.  It's redacted.

3          THE COURT:  All right.  Well, can you -- if you can

4    confirm it's redacted, just make sure that the -- we have a

5    corrected version for the deliberations so the jury knows

6    what they're getting later.  Okay.

7          MR. DARKE:  Thank you, Judge.  Sorry about that.

8          THE COURT:  Anything else at sidebar?  Okay.  Cool.

9       (End of sidebar.)

10         THE COURT:  Okay, counsel.  Go ahead.

11         MR. TENGESDAL:  Thank you.

12   BY MR. TENGESDAL:

13   Q    If you see at the bottom of the blow-up section where

14   Dr. Dumanian says "I will need to find a CT scan with the

15   help of Dr. Ellis from UIC.  Depending on what I see, I will

16   make a final determination about the wisdom of trying to

17   reconstruct this abdominal wall or not."

18         Would it be standard practice before trying to

19   perform this operation to review a CT?

20   A    Absolutely.

21   Q    And why would that be?

22   A    No.  It gives you a roadmap of what needs to be repaired

23   and that allows you to determine how your operation is going

24   to proceed, what you're going to need to do.

25   Q    Okay.  Would you agree -- strike the question.  As of

1  December 13th, 2017, does it indicate that Dr. Dumanian needs

2  the CT before he can make a determination?

3  A    Yes.

4  Q    Did Dr. Dumanian in this note ever indicate when he

5  wants the patient to come back?

6  A    He's just waiting for the CT scan, I guess.

7  Q    Okay.  Did Dr. Dumanian state anywhere his expectation

8  as to timing as to when he would get the CT back?

9  A    I don't see it in this note.

10           MR. TENGESDAL:  If we could bring up DX-257,

11  previously admitted.

12           THE COURT:  Is that 257 or 257A?

13           MR. TENGESDAL:  I have 257 on here, the surgical

14  report.

15           MS. CUNDIFF:  257.

16           THE COURT:  I have 257A in evidence.  Is that the

17  one you're referring to?

18           MR. TENGESDAL:  Yeah.  If there's an A, then 257A.

19           THE COURT:  All right.  257A, go ahead.  Already in

20  evidence.

21           MS. CUNDIFF:  I don't have that one.  Bob, I don't

22  have 257A.  I only have 257.

23           Your Honor, can you take it down from the jury for

24  me for one second?

25           THE COURT:  Yeah, sure.

1    (Counsel conferring.)

2         THE COURT:  I also have a note 257A is in evidence.

3    Do we have both in evidence, on behalf of the plaintiff?

4         MR. DARKE:  I believe it's just 257A in but I'm not

5    seeing any -- and unfortunately, I'm not seeing the

6    redactions.

7         THE COURT:  My notes reflect both, but maybe I got

8    it wrong.

9         MR. TENGESDAL:  I can ask questions without the

10   document.

11        THE COURT:  Okay.

12        MR. DARKE:  Thanks, counsel.

13   BY MR. TENGESDAL:

14   Q    Do you recall that Dr. Dumanian did surgery?

15   A    Yes.

16   Q    And do you recall what Dr. Dumanian did, the procedure?

17   A    He tried to repair the defect.

18   Q    Okay.  And the defect, had it changed at all from the

19   size of the defect?

20   A    Not that you could state substantially.

21   Q    Okay.  Have you ever heard the term Strattice mesh?

22   A    Yes.  I've used it.

23   Q    Okay.  What is Strattice mesh?

24   A    It is a biologic mesh.  It comes from the dermis of pigs

25   where it's treated so that the pig antigens are removed and

1    all that remains is the collagen matrix that is a part of

2    that layer of the skin and this is placed in such a way that

3    the body grows into it and replaces all the pig collagen with

4    the human collagen and becomes a part of that layer of tissue

5    so it's like a new piece of fascia wherever you need to cover

6    that defect.

7    Q    Okay.  Was Dr. Dumanian able to close the natural tissue

8    where the defect was?

9    A    Yes.  He closed that with the Strattice and, you know,

10   that for a time contained things.

11   Q    Was he able to close the defect with the natural tissue

12   of the body?

13   A    Well, he to use a Strattice to intervene or to

14   interleave in that regard.  It was kind of like a patch.

15   Q    Okay.  If Dr. Dumanian charts in his notes that it may

16   not be possible to do a reconstruction, have you told us

17   already why it may not be possible?

18   A    Well, yes.  To the extent that the muscles of the

19   abdominal wall cannot be closed together on the right side of

20   his abdomen because they're gone, you only have part -- most

21   of the rectus on the right side but nothing else all the way

22   to the bone, the level of the iliac bone and that holds --

23   base is not covered by muscle and Strattice is not muscle.

24   It's just a layer of fascia.

25   Q    Okay.  During the surgical procedure that Dr. Dumanian

1    did, he charted lysed adhesions.  What does that mean?

2    A    Adhesions or these flimsy layers of scar tissue that can

3    form in the abdominal cavity especially when there's been

4    prior surgery that cause the bowels to stick to each other

5    and -- but they could be a cause of obstruction and

6    strangulation, torsion and so you lyse the adhesions to

7    hopefully avoid those conditions.  But you have to be careful

8    because the intestines could be very tightly adherent to each

9    other and in cutting the adhesions between them, you might

10   actually cut the intestine.

11   Q    Was cutting the intestines a preoperative risk of Dr.

12   Dumanian's surgery?

13   A    Yes, yes.

14   Q    Did he have the adhesions because of the prior abdominal

15   surgeries?

16   A    Yes.

17   Q    Okay.  And during Dr. Dumanian's surgical procedure, was

18   there any opening of the bowel?

19   A    Yes.  There was a small enterotomy.

20   Q    What's an enterotomy?

21   A    It's a hole in the bowel.

22   Q    Okay.  And what happened when Dr. Dumanian put a hole in

23   the bowel?

24   A    He had Dr. Mueller come in, general surgeon, who

25   performed a small bowel resection and repair.

1    Q    Okay.  And was the repair by Dr. Mueller successful?

2    A    Yes.

3          MR. TENGESDAL:  And then if we could bring up

4    DX-261, already admitted.

5          THE COURT:  Go ahead.

6    BY MR. TENGESDAL:

7    Q    Doctor, showing you DX-261, it's a plastic surgery note

8    of August 30, 2019, of Dr. Morris.

9          MR. TENGESDAL:  And if we could go blow up the

10   Attending Attestation section -- or HPI.  I'm sorry.

11   BY MR. TENGESDAL:

12   Q    If Dr. Dumanian performed surgery in May of 2018 and

13   this is a note from October 2019, would you agree it's about

14   a year and a half later?

15   A    Yes.

16   Q    What did Mr. Taylor state his pain was a year and a half

17   after surgery?

18   A    Let's see.  He says he endorses severe ten out of ten

19   pain intermittently.  There's no obstructive symptoms, no

20   nausea, vomiting, constipation, obstipation.  It's not clear

21   from this note what the pain is due to but that he has pain.

22   Q    Okay.  Did they chart in the HPI section that he had the

23   surgery performed?

24   A    Yes.

25   Q    And does it chart who performed the surgery?

1    A    With -- well, it's at Northwestern.  May of 2018.

2    Q    And is ten out ten pain, is that severe?

3    A    That's as high as the scale goes.

4    Q    Okay.  Intermittently, does that mean it comes and goes?

5    A    Yes.

6    Q    In the notes that we've reviewed previously, did you

7    ever see where Mr. Taylor endorsed severe ten out of ten

8    pain?

9    A    I don't recall that.

10        MR. TENGESDAL:  If we could go to the Addendum

11   section, please, and highlight that.

12   BY MR. TENGESDAL:

13   Q    Doctor, what was Dr. Morris' recommendation after he saw

14   the patient?

15   A    He says given his complex anatomy, further

16   reconstruction is outside the scope of my practice.  I feel

17   that he would be best served with return visit to

18   Northwestern where his last operation was done or by a

19   surgeon who has similar expertise in that field.

20   Q    If Dr. Dumanian did not wish to see Mr. Taylor again as

21   a patient, is there anything that requires Mr. Dumanian to do

22   that?

23   A    Not really.  I mean, he was doing otherwise well

24   post-operatively other than his pain tolerance issues.

25   Q    Okay.  When this note was communicated to Stateville,

1    Dr. Obaisi had already passed away by this time.  If Dr.

2    Dumanian didn't want to see the patient, did Dr. Morris give

3    any indication of who could see the patient?

4    A    No, he did not.

5    Q    Does he say a surgeon who has similar expertise in that

6    field, what does that mean?

7    A    That means a surgeon who might handle abdominal wall

8    hernias that are significant.

9    Q    Would ten out of ten severe pain, would -- can that be

10   managed with Tramadol and Tylenol Number 3 as well?

11   A    Potentially.  Of course, you have to be concerned that

12   the patient by this time has developed tolerance, that is,

13   those medications don't affect him as they would to a person

14   who has not been exposed to those medications.

15           MR. TENGESDAL:  If we can bring up DX-262A

16   previously admitted.

17           THE COURT:  Are you going to a new area, counsel?

18           MR. TENGESDAL:  I am, your Honor.

19           THE COURT:  Ladies and gentlemen, we're going to

20   take our lunch break.  We've been sitting for over two hours.

21   Remember my normal reminder regarding the duties of jury duty

22   including not discussing the case or investigating it on your

23   own.  We will have you back in your seats listening to

24   evidence at 1:00 p.m.  all rise for the jury.  Enjoy your

25   lunch.

1     (Proceedings heard in open court; jury out.)

2          THE COURT:  You can step down, Doctor.  Thank you.

3          THE WITNESS:  Thanks.

4          THE COURT:  Jury out.  Door closed.  Anything to

5     take up before -- before the break?

6          MR. DARKE:  No, your Honor.

7          THE COURT:  I saw you got a gift.  Is that what I

8     thought it was?

9          MS. CUNDIFF:  Yes.  We have the deposition from

10    last night that I will give a copy to plaintiff's counsel.

11    We can review over lunch.

12         THE COURT:  All right.  You guys got an hour and 15

13    for lunch so you get to eat and then you get to enjoy going

14    through your designations.

15         All right.  I'll see the parties and everyone

16    around 1:00 o'clock.  Enjoy your lunch.  Court's in recess.

17         (Lunch recess taken at 11:45 a.m.)

18

19              C E R T I F I C A T E

20         I hereby certify that the foregoing is a complete, true,

21    and accurate transcript of the proceedings had in the

22    above-entitled matter before the Honorable John Robert Blakey

23    at Chicago, Illinois, on March 27, 2024.

24

25    /s/*Laura LaCien*              March 27, 2024
      Official Court Reporter            DATE

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

```
3  JOHN E. TAYLOR, JR.,              )
                      Plaintiff,    )   Docket No. 16 CV 3464
4                                    )
          v.                         )
5                                    )
   GHALIAH OBAISI, M.D., ARTHUR      )   Chicago, Illinois
6  FUNK, M.D., LOUIS SHICKER,        )   March 27, 2024
   M.D., TARRY WILLIAMS AND RANDY    )   1:02 p.m.
7  PFISTER,                          )
                      Defendants.    )
8
```

Volume 6B
9        TRANSCRIPT OF PROCEEDINGS - Trial
     BEFORE THE HONORABLE JOHN ROBERT BLAKEY, and a Jury

```
10
     APPEARANCES:
11   For the Plaintiff:        DUANE MORRIS LLP
                               BY:  MR. RICHARD P. DARKE
12                                  MS. ROSANNE CIAMBRONE
                               190 South LaSalle Street
13                             Suite 3700
                               Chicago, Illinois 60603
14
     For Defendants Ghaliah    CONNELLY KRAUSE LLC
15   Obaisi, M.D. and          BY:  MR. ROBERT S. TENGESDAL
     Arthur Funk, M.D.:             MS. CORINNE M. CUNDIFF
16                             500 West Madison Street
                               Suite 3900
17                             Chicago, Illinois 60661

18   For Defendants Louis      ILLINOIS ATTORNEY GENERAL'S OFFICE
     Shicker, M.D., Tarry      BY:  MR. KEVIN J. FITZGERALD
19   Williams and Randy             MR. THOMAS PIETRYLA
     Pfister:                  115 South LaSalle Street
20                             28th Floor
                               Chicago, Illinois 60603
21
     Also Present:        Mr. Kyle Dingus, paralegal
22
     Court Reporter:      ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
23                        Official Court Reporter
                          United States District Court
24                        219 South Dearborn Street, Room 1432
                          Chicago, Illinois 60604
25                        312.408.7782
                          Elia_Carrion@ilnd.uscourts.gov
```

1

<u>I N D E X</u>

2
<u>PAGE</u>

<u>ROBERT LAWRENCE REED</u>
3  Direct Examination (Resumed) by Mr. Tengesdal  1271
  Cross-Examination by Mr. Darke  1273
4  Redirect Examination by Mr. Tengesdal  1318
  Recross-Examination by Mr. Darke  1323

5
<u>MUSTAFA HUSSAIN</u>
6  Direct Examination by Ms. Cundiff  1325

7  <u>JOHN E. TAYLOR, JR.</u>
  Direct Examination by Mr. Darke  1341
8  Cross-Examination by Mr. Tengesdal  1346

9

10

E X H I B I T S

11

12    Exhibit  Page

13     Exhibit No. JX34  1283

14     Exhibit No. JX39  1286

15     Exhibit No. JT007  1290

16     Exhibit No. DX297  1292

17     Exhibit No. DX301  1304

18     Exhibit No. DX303  1307

19     Exhibit No. JX001A  1322

20     Exhibit Nos. DX266, DX267, and  1325

21    DX316A

22     Exhibit No. JT-239A  1345

23

24

25

1  (Proceedings heard in open court.)

2          THE COURT:  Please be seated.

3          Have the parties had an opportunity to go through the

4  deposition?

5          MR. DARKE:  Yes, sir.

6          MS. CUNDIFF:  Yes, Your Honor.

7          THE COURT:  What's the current -- anything for me to

8  resolve?

9          MS. CUNDIFF:  Yeah, there's no objections to

10  anything.  So I'm just having colored copies printed and

11  brought over, and then we'll be ready to go as soon as this is

12  done.

13          THE COURT:  Okay.  And then after that goes into

14  evidence, are you going to be resting at that point?

15          MR. TENGESDAL:  Yes.

16          MS. CUNDIFF:  Yes, Your Honor.

17          THE COURT:  All right.  So have the witness retake

18  the stand.  And you did not complete your direct, correct?

19          MR. TENGESDAL:  15 minutes, tops.

20          THE COURT:  Okay, great.

21          All right.  If you could retake the stand, and go get

22  the jury.

23    (Pause in the proceedings.)

24    (Jury in at 1:05 p.m.)

25          THE COURT:  Good afternoon, everyone.  Please be

1    seated.

2           Continue with the defense case.  Counsel, whenever

3    you're ready.

4           MR. TENGESDAL:  Thank you, Your Honor.

5           Please -- Kyle, if we could please pull up what's

6    previously been admitted as DX270.

7           THE COURT:  Are you sure you're plugged in?

8           MR. PIETRYLA:  It's me, Your Honor.

9           THE COURT:  Oh, defense.

10          DX270.  Go ahead.

11          MR. TENGESDAL:  If we could blow up the top portion.

12     ROBERT LAWRENCE REED, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

13                 DIRECT EXAMINATION (resumed)

14   BY MR. TENGESDAL:

15   Q.  Dr. Reed, are you aware that Mr. Taylor was returned to

16   see Dr. Dumanian in January of 2023?

17   A.  Yes.

18   Q.  And do you recall reviewing this -- this note regarding

19   the evaluation by Dr. Dumanian?

20   A.  Yes.

21   Q.  Okay.  And it looks like Dr. Henze on January 20 -- or

22   January 6, 2023, was referring Mr. Taylor for follow-up and

23   evaluation for hernia?

24   A.  Yes.

25   Q.  Did Dr. Dumanian's hernia surgery work the first time?

1   A.   No.

2   Q.   Is that the second time now that the hernia surgery

3   failed?

4   A.   Yes.

5   Q.   Okay.

6        MR. TENGESDAL:  And if we could go -- go down,

7   please.  And the center section.

8   BY MR. TENGESDAL:

9   Q.   Under findings, can you tell us what does it say for -- in

10  the findings there?

11  A.   It says "RLQ," which means right lower quadrant, "hernia

12  cannot be repaired."

13  Q.   And then recommendations/plans?

14  A.   "No indication for any reconstruction."  That's all

15  capitalized.

16  Q.   Okay.  And, Doctor, I have a question:  Have you seen any

17  indication that any action or inaction by Dr. Obaisi caused or

18  contributed to any harm or injury to Mr. Taylor?

19  A.   Not at all.

20       MR. TENGESDAL:  Okay.  That's actually all I have.

21       THE WITNESS:  Okay.

22       THE COURT:  Any cross by the codefendant?

23       MR. FITZGERALD:  No.

24       THE COURT:  Go ahead, Counsel.

25       MR. DARKE:  Thank you, Judge.

1    CROSS-EXAMINATION

2  BY MR. DARKE:

3  Q.  Dr. Reed, good afternoon.  My name is Rick Darke.  I'm one

4  of the attorneys for Mr. Taylor.  I'm going to come over here.

5       Can you explain to us what Dr. Obaisi's educational

6  history was?  Do you know?

7  A.  I'm trying to recall it.  No, I don't recall --

8       COURT REPORTER:  Can you speak into the mic?

9       THE WITNESS:  I'm sorry.

10 BY THE WITNESS:

11 A.  I don't recall his educational training.

12 BY MR. DARKE:

13 Q.  Okay.  Well, he was a medical doctor, right?

14 A.  Yes.

15 Q.  And he was a -- do you know if -- he went to undergrad,

16 obviously?

17 A.  Yes.

18 Q.  Okay.  So he was an educated man?

19 A.  Yes.

20 Q.  And then, do you know he -- whether or not he was a doctor

21 of internal medicine or not?

22 A.  You asked whether he had specialty training?  I -- I -- I

23 think he did, but I'm not sure.

24 Q.  Okay.  Do you know what a doctor of internal medicine is?

25 A.  Yes.

1  Q.  And tell us what a doctor of internal medicine is.

2  A.  That's an internist we call them.  You know, they train in

3  general medicine, you know, as opposed to subspecialty

4  designations such as neurology or gastroenterology.  But

5  internal medicine is sort of like to nonsurgical disciplines

6  what general surgery is to surgical disciplines.

7  Q.  And so they help treat and manage and consult with all --

8  the whole physical symptoms and maladies and --

9  A.  Right.

10  Q.  -- whatnot of a patient, right?

11  A.  Right.

12  Q.  And then he would --

13        THE COURT:  Hold on one second.

14        Doctor, you're going to have to wait for the question

15  to finish before you answer, because in normal conversations

16  people talk over each other all the time.  This is not a

17  normal conversation, because we have to write everything down.

18  So please wait for the question to complete before you answer.

19        Go ahead.

20  BY MR. DARKE:

21  Q.  Sorry about that, Doctor.

22        And so he treats the -- all of the diseases and

23  maladies and whatnot that Mr. Taylor would have, correct?

24  A.  Yes, or any patient that he would have seen.

25  Q.  Okay.  And he's expected to exercise independent medical

1    judgment when doing so, correct?

2    A.  Yes.

3    Q.  And you would expect Dr. Obaisi, when he receives

4    medical records from UIC or elsewhere, to review those records

5    before then treating Mr. Taylor and other inmates, right?

6    A.  Yes.

7    Q.  And then he can form his own opinions about what to do and

8    what not to do, correct?

9    A.  Yes.

10   Q.  He's not just rubber-stamp -- a rubber-stamping doctor,

11   correct?  He has to exercise independent medical judgment?

12   A.  Right.

13   Q.  And then the doctors at UIC, we spoke about quite a few of

14   them.

15           Dr. Warso, what -- what field is Dr. Warso in?

16   A.  He's an oncologist.

17   Q.  A surgical on- --

18   A.  A surgical oncologist, yes.

19   Q.  And then Dr. Masrur, what does Dr. Masrur do?

20   A.  I believe he was a plastic surgeon.

21   Q.  And then Dr. Giulianotti, what field is Dr. Giulianotti --

22   A.  General surgeon.

23   Q.  And they're competent, educated, qualified --

24   A.  Yes.

25   Q.  -- doctors --

1    A.  Yes.

2    Q.  -- correct?

3    A.  Yes.

4            THE COURT:  All right.  Let me interrupt again.  Both

5    of you have to let the other one finish speaking before you

6    speak.  This is not a normal conversation.  This is court

7    testimony, and the court reporter -- all the court reporters

8    have had difficulty with this case because of the manner in

9    which people have proceeded.

10           Please wait for the question to finish before you

11   answer.  Please wait for the answer to finish before you pose

12   a question.  I do not like interrupting.  Please don't make me

13   do it again.

14           Go ahead.

15           MR. DARKE:  We'll get our cadence down in a second.

16   So I pause at the end of my sentences sometimes, so just give

17   me a second to finish the question.

18   BY MR. DARKE:

19   Q.  And so with respect to -- you've testified quite a bit

20   about Mr. Taylor and his hernia and some of his pain

21   medications.

22           You're not familiar with the physical limitations or

23   nonlimitations of Mr. Taylor before the 2014 surgery, correct?

24   A.  I'm sorry; before the what?

25   Q.  2014 surgery.

1   A.   I'm -- I do not recall any limitations before that

2   surgery.

3   Q.   And you're really not familiar with the limitations

4   Mr. Taylor had or didn't have after, from 2014 to 2018.  Fair?

5   A.   I -- I don't recall specific limitations, so...

6   Q.   And you're also not familiar with whether or not he did or

7   didn't have any limitations after the 2018 surgery from

8   Dr. Dumanian, correct?

9   A.   I don't recall limitations, but they may have not been

10  specifically addressed given that he does have this massive

11  thing he's got to carry around with him on his body, and that

12  has -- has to have some impediment to normal activities.

13  Q.   And so I want to go back to Dr. Obaisi for a second.

14       In medical school, I assume that doctors learn about

15  hernia, correct?

16  A.   Yes.

17  Q.   It's a basic medical practitioner knowledge?

18  A.   Yes.

19  Q.   Same thing with colonoscopy; doctors such as Dr. Obaisi

20  and Dr. Funk, they know what a colonoscopy -- colonoscopy is,

21  correct?

22  A.   Yes.

23  Q.   It's basic medical stuff?

24  A.   Yes.

25  Q.   What about urology and cystoscopies?

1   A.  Yes.

2   Q.  So they learn about that.  So Dr. Obaisi would've

3   understood what a colonoscopy was, what a cystoscope was, and

4   what a hernia was, correct?

5   A.  Yes.

6   Q.  They -- okay.

7           MR. DARKE:  Kyle, can you put up DX232?

8   BY MR. DARKE:

9   Q.  Doctor, this is an October 17, 23 -- 2013 medical record

10  from Dr. Warso that you spoke with Mr. Tengesdal about

11  yesterday.

12          THE COURT:  DX232 already in evidence.  Go ahead.

13          MR. DARKE:  There you go.  Kyle, can you go down to

14  page 2?

15  BY MR. DARKE:

16  Q.  And you and Mr. Tengesdal talked about Dr. Warso's note

17  that he's going to do the surgery; there's certain things

18  going to be removed and --

19          THE COURT:  And slow down, slow down.

20          MR. DARKE:  Sorry, Judge.

21  BY MR. DARKE:

22  Q.  And it says:  "This will also require" -- I'm sorry;

23  that's not it.

24          And then it says:  "The resultant hernia will be

25  repaired and may require the insertion of a prosthetic mesh."

1    MR. DARKE:  I'm not so sure about Kyle's highlighting

2  skills there.

3    THE COURT:  Don't throw Kyle under the bus now.

4    MR. DARKE:  What's going on there?

5    THE COURT:  He saved your you know what.

6    MR. DARKE:  Thank you, Kyle.

7  BY MR. DARKE:

8  Q.  So let me ask the question again, Doctor.

9    So Dr. Warso charted and spoke to Mr. Taylor about

10  the fact that Dr. Warso said:  "The resultant hernia will be

11  repaired and may require the insertion of a prosthetic mesh."

12    You see that?

13  A.  Yes.

14  Q.  And then you and Mr. Tengesdal talked about the fact that

15  Mr. Taylor consented to the surgery, correct?

16  A.  Yes.

17  Q.  And Mr. Taylor consented to the fact that the resultant

18  hernia will be repaired, correct?

19  A.  Yes.

20  Q.  And you and Mr. Tengesdal were talking yesterday, too,

21  about Dr. Warso's referral for Mr. Taylor to get a

22  colonoscopy.  Do you remember that?

23  A.  Yes.

24  Q.  And do you remember why he was referred for a colonoscopy?

25  A.  He was having some blood pass per rectum.

1  Q.  And blood in the rectum can be symptom of a lot of things,

2  right?

3  A.  Yes.

4  Q.  Hemorrhoids, a tear somewhere, IBD, inflammatory bowel

5  disease, right?

6  A.  Right.

7  Q.  Diverticulitis?

8  A.  Yes.

9  Q.  And also colon cancer?

10  A.  Yes.

11  Q.  And colon cancer, obviously, can be very serious and lead

12  to death?

13  A.  Yes.

14  Q.  And so you want to get a colonoscopy in order to ensure

15  that Mr. Taylor does not have colon cancer.  Fair?

16  A.  Correct.

17  Q.  And as you know, colon cancer, it spreads probably slowly.

18  Fair?

19  A.  I'm sorry; Say that again.

20  Q.  Is it a fast-spreading cancer?

21  A.  Not typically.

22  Q.  Right.  And so you get a colonoscopy in order to make sure

23  that you don't have cancer; and the earlier you get that

24  colonoscopy, the better to ensure that there's no colon

25  cancer, right?

1   A.   That's correct.

2   Q.   So you don't want to wait to get the colonoscopy done?

3   A.   Right.

4   Q.   And that's something that all medical doctors are probably

5   taught in medical school?

6   A.   Yes.

7   Q.   So Dr. Obaisi would've known?

8   A.   I'm sorry; say what?

9   Q.   So Dr. Obaisi would've known that?

10  A.   Yes.

11  Q.   Dr. Funk would've known that?

12  A.   Yes.

13  Q.   We're going to have you look at a couple of CT scans in a

14  couple of minutes.

15         What -- what is the purpose of a CT scan?

16  A.   It allows an -- an evaluation of the inner tissues and

17  organs and structures, one that cannot be obtained from a

18  simple physical examination by itself.

19  Q.   Okay.  And then prior to a surgery to repair a hernia of

20  any sort, you want to get a CT scan.  Is that right?

21  A.   That's correct.

22  Q.   Approximately how long before the surgery would you want

23  to have that CT scan done?

24  A.   Well, within a week or two or three.  It -- there's --

25  it's not an emergency situation.  You want to do a thorough

1  evaluation before you proceed with the operation.

2  Q.  But if you're a year out from the last CT scan, you'd want

3  to order a new one?

4  A.  Yes.

5  Q.  They're -- how long is the efficacy, so to say, of a CT

6  scan for a surgery related to a hernia?

7  A.  I'd -- I'd say a week -- weeks or months, but no more than

8  two or three months, I would think.

9  Q.  Okay.  Same thing with an MRI?

10  A.  Yes.

11  Q.  Same time frame, two to three months?

12  A.  Roughly.

13  Q.  Doctor, we're going to have you -- Corrine's been kind

14  enough to let me use her computer for you to come down and

15  show the jurors the 2016 CT scan, same way you did for

16  Mr. Tengesdal, and then the 2020.  Okay?

17  A.  Okay.  Want me to come down now?

18  Q.  Yes, sir.

19       MR. DARKE:  Your Honor, we're going to --

20       THE COURT:  You're going to use HDMI1 there?

21       MR. DARKE:  Yes, we're going to move to admit JX -- I

22  believe it's JX34.

23       THE COURT:  Any objection to the admission of JX34?

24       MR. TENGESDAL:  No, Your Honor.

25       MR. FITZGERALD:  No.

1    THE COURT:  Admitted without objection.

2    You may publish.

3  (Exhibit No. JX34 received into evidence.)

4  BY MR. DARKE:

5  Q.  Doctor, if you could show the jurors, like you did with

6  the prior two CT scans, the progression of this May 2016 CT?

7  A.  Sure.  So this looks like a CT scan from May 31, 2016.

8  And so, again, I'm coming from the top of the abdomen.  This

9  is the lower part of the chest.  You see the heart, and now

10  the liver.  And the abdominal wall up to here was intact.  But

11  now we're seeing --

12    COURT REPORTER:  You need to speak into the mic,

13  please.

14    THE WITNESS:  I'm sorry.

15  BY MR. DARKE:

16  Q.  Thank you, Doctor.

17  A.  The abdominal wall is intact here, but not at this point.

18  We're seeing that there has been herniation outside of the

19  abdominal wall.  And we actually start to see the defect here.

20  This cut where this muscle here is the right rectus muscle,

21  that is not as wide as the left rectus on the other side, so

22  that tells us that some of that rectus muscle was removed.

23    And we also see just a trace of the oblique muscles

24  down here.  And now here's the remainder of the pelvis on the

25  right.  So that's the size of the defect.  And through that

1  defect, all of these intestines are moving out into the hernia

2  sac.

3  Q.  Okay.  And then as you testified with Mr. Tengesdal, as

4  the years progressed, more and more of the hernia sac was

5  filled with Mr. Taylor's intestines and bowel and viscera,

6  correct?

7  A.  Yes, that was the pathway of least resistance.

8  Q.  And what does viscera mean?

9  A.  Viscera means intestines, bowels.  The stuff that's inside

10  the abdomen.  It also includes the omentum.

11  Q.  I'm sorry; the last one?

12  A.  The omentum.

13  Q.  What is the omentum?

14  A.  That's a fatty apron --

15          COURT REPORTER:  I can't hear you.

16          THE WITNESS:  I'm sorry.

17  BY THE WITNESS:

18  A.  That's the fatty apron that I described earlier that hangs

19  down from the colon, overlies the -- the small intestine.  So

20  it's -- it is attached to the colon.  So as the colon goes

21  out, it's going to go out as well.

22  BY MR. DARKE:

23  Q.  Okay.

24          MR. DARKE:  Corrine, if we could have the --

25  thank you, Doctor.  One more, so don't go anywhere.

1    THE WITNESS:  Okay.

2    MR. DARKE:  Your Honor, we're going to move to

3    admit --

4    THE COURT:  Counsel, you're going to need to find a

5    mic too.  At some point I'm going to -- you're not getting

6    picked up either.  I don't know what's going on with that.

7    That should be working.

8    MR. DARKE:  Yeah, sorry about that.

9    THE COURT:  Just stay on a mic.  At some point I'm

10   going to have to get a ref whistle.

11   MR. DARKE:  Sorry, Judge.  I've got this...

12   THE COURT:  I know you got that one, and I don't know

13   why it's not working.  We charged them last night.  So I can

14   tell it's not picking up.

15   MR. DARKE:  Okay.  Just for the record, we're doing

16   now JX39, which is a 2/14/2020 CT scan.

17   BY MR. DARKE:

18   Q.  Doctor, if you could do the same thing for us and explain

19   how this CT scan shows Mr. Taylor's abdominal area.

20   THE COURT:  Was JX39 already in evidence?

21   MR. DARKE:  No, Your Honor.  I'm sorry; we move to

22   admit --

23   THE COURT:  Any objection to the admission of JX39?

24   MR. TENGESDAL:  No, Your Honor.

25   MR. FITZGERALD:  No.

1      THE COURT:  Admitted without objection.

2      You may publish.

3    (Exhibit No. JX39 received into evidence.)

4  BY THE WITNESS:

5  A.  So there are two images here.  There's an

6  anterior/posterior view, which is not truly a CT scan.  And

7  then this other image on my right, which is a CT scan.

8      Do you want me to evaluate both or --

9  BY MR. DARKE:

10  Q.  Just the one on the right-hand side, Doctor.  Just like

11  you did with the last --

12  A.  Okay.  So here, this one starts down in the pelvis.  Okay,

13  here, we can see the pelvic bones and the -- the femur.  And

14  then now we're inside the abdomen.  This is -- this gray area

15  here is bladder.

16  Q.  Okay.

17  A.  And the -- the -- the rectum is coming in here.  As we're

18  going up, we can see the anterior abdominal wall.  Again,

19  there's a defect here.  This is the edge of the right rectus

20  muscle that's smaller because part of it's been removed.  And

21  the pelvis.  And you can see that there's just this gap where

22  there is no muscle wall.  And the intestines are spilling

23  through the gap into the hernia sac.

24  Q.  Okay.  Thank you, Doctor.

25  A.  Uh-huh.

1  Q.  You can go back to the...

2       MR. DARKE:  Your Honor, if we could have one second

3  for Corrine to move her computer.

4       THE COURT:  Sure.

5  BY MR. DARKE:

6  Q.  Doctor, I want to talk to you about a few of your

7  discussions with Mr. Tengesdal regarding the timeline of

8  treatment that Mr. Taylor received.  Okay?

9  A.  Okay.

10 Q.  And you recall that Dr. Warso referred Mr. Taylor to --

11 for a colonoscopy and a urology exam in November 2014, right?

12 A.  Yes.

13 Q.  Okay.  And do you recall when the colonoscopy and urology

14 exams were done?

15 A.  I didn't memorize the dates.  I'd have to look at the

16 record.

17 Q.  Okay.  So they were ordered in November 2014 by Dr. Warso.

18       MR. DARKE:  Kyle, if you could put up DX243, which

19 has already been admitted, Your Honor.

20       THE COURT:  Go ahead.

21 BY MR. DARKE:

22 Q.  And this is a report that you and Mr. Tengesdal went over.

23 It's dated August 2015.  Do you see that?

24 A.  Right.

25 Q.  And Dr. Warso ordered it in November 2014, but he did not

1  have the colonoscopy until almost a year later in August 2015,

2  right?

3  A.  Right.

4  Q.  And at the time that Dr. Warso had examined Mr. Taylor in

5  2014, he identified that Mr. Taylor wanted -- should've gotten

6  a colonoscopy-urology exam and that he had a hernia, correct?

7  A.  Right.

8  Q.  And he wanted the urology exam and the colonoscopy to be

9  done before the hernia, correct?

10  A.  Before?

11  Q.  Before the hernia repair was --

12  A.  Okay.

13  Q.  -- done, correct?

14  A.  Okay.

15  Q.  And those were precursors to Mr. Taylor having the hernia

16  surgery, according to your testimony, right?

17  A.  Well, that's what happened, yes.

18  Q.  Okay.  And so Dr. Warso ordered the colonoscopy in

19  November 2014.  Didn't happen until August 2015, almost a year

20  later, right?

21  A.  Right.

22  Q.  The same thing with the cystoscopy, right?  It was ordered

23  in November 2014.

24          Do you know when the cystoscopy was done?

25  A.  I did not memorize the dates.

1        MR. DARKE:  Kyle, if you could put up DX245.

2   BY MR. DARKE:

3   Q.  And this shows, Doctor, does it not, that the cystoscopy

4   was not done until October 2015?

5   A.  Yes.

6   Q.  Almost a year after Dr. Warso ordered it, correct?

7   A.  Right.

8        MR. DARKE:  Kyle, if you could go to --

9   BY MR. DARKE:

10  Q.  And those are the two areas where Dr. Obaisi and, in fact,

11  Dr. Funk as well, they would have had training in medical

12  school on the importance of colonoscopy and cystoscopy,

13  correct?

14  A.  Yes, yes.

15  Q.  So they would have known what those were even if they

16  don't understand how to do a reconstruction of an abdominal

17  wall hernia, right?

18  A.  Right.

19  Q.  And so even if there was an --

20       MR. DARKE:  Strike that.

21       So, Kyle, if you could go to JT007.

22       And this has also been admitted, Your Honor.

23       THE COURT:  07?

24       MR. DARKE:  Unless I --

25       THE COURT:  You sure that's in, or you sure that's

1  the right number?

2      MR. DARKE:  Yeah, that's why I hesitated a second.

3  Let me have one second.

4    (Counsel conferring.)

5      MR. DARKE:  This has not been admitted yet,

6  Your Honor.  I apologize.

7      THE COURT:  Okay.  Well, we need to know that.

8      So any objection to the admission of JT07?

9      MR. TENGESDAL:  No, Your Honor.

10      MR. FITZGERALD:  No objection.

11      THE COURT:  And without objection, you may publish.

12    (Exhibit No. JT007 received into evidence.)

13  BY MR. DARKE:

14  Q.  And if you could go -- Dr. Reed, this is a 29 -- 2015

15  surgery consult with Dr. Nordenstam that you discussed with

16  Mr. Tengesdal.  Do you recall that?

17  A.  Yes.

18  Q.  And this is where Dr. Nordenstam, he orders --

19      MR. DARKE:  Can you go down to the plan section,

20  Kyle, and blow that out for Dr. Reed?  Pop that out.  Thanks.

21  BY MR. DARKE:

22  Q.  So Dr. Nordenstam orders here:  "Will be referred for

23  colonoscopy, will schedule.  Also with right inguinal hernia.

24  Will obtain CT scan."

25      So Dr. Nordenstam is ordering a CT in February,

1    right?

2    A.   Right.

3    Q.   And then "refer to general surgery for possible hernia

4    repair," correct?

5    A.   Right.

6         MR. DARKE:  Kyle, if you could go to DX297.

7    BY MR. DARKE:

8    Q.   So, Doctor, as we saw a couple of times now, Dr. Warso

9    ordered the colonoscopy and the urology exam in November 2014.

10   And now we have a referral that's ordered in February 2015.

11        MR. DARKE:  And if you could go to --

12        THE COURT:  Is DX297 in evidence?

13        MR. DARKE:  Your Honor -- take that down.  Kyle,

14   that's not what I was looking for.

15        Yeah, that -- that is the -- not in evidence, Judge.

16        THE COURT:  Yeah, okay.

17        MR. DARKE:  This is DX297.

18        THE COURT:  Yeah, I mean, I don't make up the Rules

19   of Procedure.  Please follow them, though.  Okay?

20        MR. DARKE:  Yes, Judge.

21        THE COURT:  DX297.  Any objection?

22        MR. TENGESDAL:  No, Your Honor.

23        MR. FITZGERALD:  No.

24        THE COURT:  DX297 will be admitted without objection.

25   You may publish.

1    (Exhibit No. DX297 received into evidence.)

2         MR. DARKE:  Put up that, Kyle.

3         Thanks, Judge.  Sorry about that.

4    BY MR. DARKE:

5    Q.  So now, Dr. Reed, this is in July.  You see the middle

6    part here of this IDOC medical record?

7    A.  I'm sorry; what?

8    Q.  See this section of the IDOC medical record?

9         THE COURT:  If you want to direct him to the portion

10   of the exhibit you're referring to.

11   BY THE WITNESS:

12   A.  Yeah, I'm not sure --

13        MR. DARKE:  It popped out right now so the doctor can

14   take a look at it.

15   BY MR. DARKE:

16   Q.  And so this is a note from Dr. Masrur who's a general

17   surgeon at UIC, correct?

18   A.  Right.

19   Q.  And this is in July 2015, correct?

20   A.  Yes.  Uh-huh.

21   Q.  And the doctor writes here in recommendations and plans:

22   "Patient needs previous planned procedures"?

23   A.  Oh, yes.  Uh-huh.

24   Q.  "Colonoscopy, colorectal, CT urogram, cystoscopy that was

25   ordered by urology.  After these have been completed and

1  returned" -- I'm sorry -- "after these have been completed,

2  return to see myself and Dr. Dumanian to plan for possible

3  repair."  Correct?

4  A.  Yes.

5  Q.  As of July 2015, after Dr. Warso ordered these, it still

6  had not been ordered and they still had not been done, right?

7  A.  Right.

8        MR. DARKE:  If we could go now, Kyle...

9  BY MR. DARKE:

10  Q.  And, Doctor --

11        MR. DARKE:  Strike that.

12        And go back up a little bit.

13  BY MR. DARKE:

14  Q.  And then, Doctor, do you understand the progress of how

15  these notes -- these IDOC medical records work?

16  A.  I'm not sure what you mean.

17  Q.  So at the very top is a section that's filled out by

18  Dr. Obaisi.  Do you understand that?

19  A.  Right.

20  Q.  And then he signs it and dates it, right?

21  A.  Right.

22  Q.  And then the middle section, that's filled out by the IDOC

23  doctor.  Is that your understanding?

24  A.  I understand.

25  Q.  I'm sorry; I misspoke.

1           The middle part's filled out by the UIC --

2    A.  Right.

3    Q.  -- medical doctors, correct?

4    A.  Right.

5    Q.  And then the bottom is then filled out again by

6    Dr. Obaisi, right?

7    A.  Gotcha.  Yes.

8    Q.  And then Dr. Obaisi here in July 2015, he signs after

9    Dr. Masrur tells him, you haven't ordered the colonoscopy; you

10   haven't ordered the urology exam or the cystoscope exam.  You

11   gotta do it, right?

12   A.  Right.

13   Q.  So that was from November to July nothing had been done,

14   right?

15   A.  Right.

16           MR. DARKE:  Kyle, if you could go to -- I'd like to

17   go to DX241.

18           This has been admitted into evidence, Your Honor.

19           THE COURT:  DX241?

20           MR. DARKE:  Yes, sir.

21           THE COURT:  I have 241B.  Is that the one?

22           MR. DARKE:  Yes, Your Honor.

23           THE COURT:  Well, that's different.  So is it DX241

24   or DX241B?

25           MR. DARKE:  Your Honor, it's 241 that we have, and

1  we're going to move to admit that into evidence.

2          THE COURT:  I'm sorry; what?

3          MR. DARKE:  We're going to change the -- we're going

4  to move to admit DX241 into evidence.

5          THE COURT:  All right.  Any objection to the

6  admission of DX241?

7          MR. TENGESDAL:  Can you identify what it is?

8          THE COURT:  Yeah, why don't you guys confer.

9     (Counsel conferring.)

10         MR. DARKE:  This is a 7 -- July 2015 surgery note

11 from Dr. Masrur.  We have it as admitted, but we'll gladly do

12 it again.

13         THE COURT:  I have a 241A, I have a 241B, a -- the

14 241 is not jumping out.  What do you -- opposing counsel, do

15 you have that in evidence?

16         MS. CUNDIFF:  I believe the 241A and B might be

17 JT241A and B.  This is DX241.

18         MR. DARKE:  Yeah.  I'm sorry, Judge.

19         THE COURT:  Okay.  All right.  So this one's DX241?

20         MR. DARKE:  Yes.

21         MR. TENGESDAL:  Yes, Your Honor.

22         THE COURT:  All right.  Whether it's in or not, any

23 objection to it?

24         MR. TENGESDAL:  No.

25         MR. FITZGERALD:  No.

1    THE COURT:  All right.  That'll clear it up --

2        MR. DARKE:  Sorry about that.

3        THE COURT:  -- if it wasn't before.

4  BY MR. DARKE:

5  Q.  So, Dr. Reed, this is a July 2015 surgery note that you

6  and Mr. Tengesdal reviewed.  And this is Dr. Masrur.  And you

7  and Mr. Tengesdal talked about Dr. Masrur's note in the middle

8  where it says:  "The hernia begins all around the" --

9  et cetera.

10        MR. DARKE:  If Kyle could blow out the findings.

11  BY MR. DARKE:

12  Q.  And then see where it starts "the hernia begins"?

13  A.  Yes.

14  Q.  And then you agree that Dr. Masrur compared the CT from

15  the earlier 2014 CT, right?

16  A.  Right.

17  Q.  And then it's his medical judgment -- or her medical

18  judgment -- that the hernia has become significantly larger in

19  volume, correct?

20  A.  In volume, yes.

21  Q.  And then -- and you explain what that meant, that more of

22  the viscera, more of his intestines had come out, right?

23  A.  Yes.

24  Q.  And then Dr. Masrur also charted that there's -- and you

25  and Mr. Tengesdal talked about this -- an increase in the

1    actual defect from 10 centimeters to 11.2.

2         Do you remember that?

3    A.   Yes.

4    Q.   And you said that's roughly the same, right?

5    A.   Yes.  I mean, it's less than an inch for sure.

6    Q.   But it has gotten bigger, correct?

7    A.   Well, the -- the problem with comparing those images is

8    you have to know that you're exactly at the same place on the

9    body when -- when the scanner goes up and down.  And while

10   they are measured, in terms of the sequence of slices from the

11   CT, they're not exactly the same, because the patient may be a

12   little bit higher or lower on the table and, therefore, it

13   seems to be at a different distance.

14        You know, a difference between 11.2 versus -- what

15   was the other measurement?

16   Q.   10?

17   A.   10.  Even?

18   Q.   Yes, sir.

19   A.   Yeah, so you're talking a little over a centimeter.  So

20   about half an inch.

21   Q.   And Dr. Masrur's a -- a highly qualified general surgeon.

22   We talked about it earlier?

23   A.   Right.  Yeah.

24   Q.   And Dr. Masrur looked at the CT scan and then exercised

25   his independent judgment to say more viscera is coming out --

1  A.  Right.

2  Q.  -- and it's a bigger defect, right?

3  A.  I'm not sure he's saying there's a bigger defect per say.

4  He's just saying that that's the -- that's the neck -- that

5  measures the neck.  There is more stuff that's out of the

6  abdominal cavity now.

7          MR. DARKE:  And so now if we can go back, Kyle, to --

8  to DX246, which has been admitted, Your Honor.

9          THE COURT:  Yeah.  Go ahead.

10          MR. DARKE:  I say that -- I'm hesitant to say it

11  but...

12  BY MR. DARKE:

13  Q.  This is DX246.  This is an October 2015 note that you and

14  Mr. Tengesdal went over.

15  A.  Yes.

16  Q.  And this is now Mr. Taylor has been returned to general

17  surgery from May 2016 that we just talked about a couple

18  minutes, right -- or, I'm sorry, from July, right?

19  A.  Right.

20          MR. DARKE:  And if you go to the second page, Kyle,

21  where it talks about Mr. Taylor's symptoms.

22  BY MR. DARKE:

23  Q.  And so while Kyle's --

24          MR. DARKE:  No, the next page.  Sorry.  There you go.

25  BY MR. DARKE:

1  Q.  Doctor, what does it mean to be symptomatic when you have

2  a hernia like Mr. Taylor's?  What are the symptoms that are --

3  A.  A symptom is something that gives you some feelings of

4  discomfort or uneasiness or whatever.  They're -- they're the

5  complaints the patient presents with.  You know, what is this

6  condition doing to the patient that makes him feel different

7  from normal?

8  Q.  What are the common complaints of somebody with a hernia

9  like Mr. Taylor's?

10  A.  Well, they -- they go anywhere from no systems at all,

11  you know, but with a big hernia like that, you would have

12  probably symptoms of feeling like, you know, I've got this big

13  heavy mass on the side of me that is kind of awkward to live

14  with, and I have trouble getting around, you know.  But --

15  Q.  What else?

16  A.  Hmm?

17  Q.  What other symptoms?

18  A.  He might have some pain here and there, but he'd have to

19  describe where it is and how often he feels it, how severe it

20  is in terms of its -- its, you know, severity score.

21  Q.  So hernia pain can be severe?

22  A.  Well, they can.  Some do; some are, especially if they're

23  incarcerated.

24  Q.  What other symptoms of a hernia such as Mr. Taylor's?

25  A.  Well, these are symptoms are a bulge, and if they get

1  incarcerated or strangulated, they can give severe pain.

2  Q.  What else?

3  A.  Some discomfort, just not feeling right.  But, otherwise,

4  I mean, they -- they don't give you fevers or chills.  They

5  don't give you nausea or vomiting unless they become

6  obstructed.

7  Q.  So nausea is a symptom, right?

8  A.  Can be.

9  Q.  Vomiting's a system -- a symptom?

10  A.  If the hernia is obstructed.  If it's being pinched off,

11  if the bowels are blocked somehow --

12  Q.  Only --

13  A.  -- then you get those symptoms.

14  Q.  Sorry.

15         Are you telling us that nausea and vomiting only

16  occur if there's obstruction?

17  A.  Yes.

18  Q.  Vomiting and nausea only occur if it's strangulated?

19  A.  Well, yes, for a hernia.  I mean, you could have nausea

20  and vomiting from a nonhernia patient.  You know, you get an

21  upper gastrointestinal viral infection, you get nausea and

22  vomiting, but you don't have a hernia.  Nausea and vomiting is

23  symptoms of the gastrointestinal track having some problems.

24  Q.  So if Mr. Taylor complained of nausea and vomiting and he

25  had this massive hernia, it's your testimony that he had a

1  strangulated and/or obstructed hernia?

2  A.  No, not necessarily.

3  Q.  Okay.  But he had those symptoms?

4  A.  He had symptoms, but who's to say it's not

5  gastroenteritis.  I mean, if the hernia can be reduced to some

6  degree, then that doesn't indicate incarceration or

7  strangulation.

8  Q.  And then here, Dr. Masrur charts in October 2015 "patient

9  is very symptomatic."

10  A.  Right.

11  Q.  Do you see that?

12       And doctors -- what does that mean to a physician

13  such as yourself, "very symptomatic"?

14  A.  Well, he doesn't say which specific symptoms Mr. Taylor

15  had.  But I would assume that he has symptoms where this thing

16  is just uncomfortable to live with because he has this big

17  mass that's hanging off of his side.

18       MR. DARKE:  Kyle, if you could go back up to the

19  other symptoms.

20  BY MR. DARKE:

21  Q.  And then here it says:  "Gastrointestinal:  He denies

22  nausea, vomiting, heartburn, regurgitation, yellow jaundice,

23  diarrhea, and constipation."  Right?

24  A.  Right.

25  Q.  So it's not a gastrointestinal issue?

1  A.  I'm sorry?

2  Q.  So Mr. Taylor's intermittent nausea and vomiting is not a

3  gastrointestinal issue, according to this chart?

4  A.  Well --

5  Q.  Correct?

6  A.  -- here it's saying that at the time of this examination

7  Mr. Taylor was denying those symptoms.  He didn't have nausea,

8  vomiting, heartburn, regurgitation, yellow jaundice, diarrhea,

9  or constipation.

10  Q.  So just slow down a little bit sometimes so the

11  court reporter can make sure she gets that when you're

12  reading.

13  A.  Sorry.

14  Q.  It's okay.

15        And here, this is "review of symptoms, specific to

16  gastrointestinal."  Correct?

17  A.  Right.

18  Q.  And then next one, what is that word GENIT?

19  A.  Genital urinary.

20  Q.  And that is -- that's for -- and that says:  "The patient

21  denies difficulty with urination, pain, or burning with

22  urination."

23        That was the whole urology cystoscope process that we

24  went through already?

25  A.  Well, yes, but at this point, he's not having any

1  hematuria.

2  Q.  Okay.  So at this point in time, Dr. Masrur can work with

3  Dr. Giulianotti at UIC to chart out a plan to perform a

4  potential hernia surgery on Mr. Taylor, right?

5  A.  Potentially.

6         MR. DARKE:  And if you go down to -- I think we're on

7  the same chart.

8         MR. DINGUS:  Uh-huh.

9         MR. DARKE:  And if you go down to the plan.  You're

10  going to flesh that out for Dr. Reed and me.

11  BY MR. DARKE:

12  Q.  And then here -- and you went over this with

13  Mr. Tengesdal -- Dr. Masrur says:  "I will review this case

14  with Dr. Giulianotti, chief of surgery, to determine with him

15  whether patient is a candidate for surgery."  Right?

16  A.  Yes.

17  Q.  And so the doctor is instructing Dr. Obaisi to set up a

18  time for Mr. Taylor to go see Dr. Giulianotti, right?

19  A.  Yes.

20  Q.  And Dr. Giulianotti has to examine John before they can

21  coordinate each other and do the surgery, right?

22  A.  Right.

23         MR. DARKE:  So, Kyle, can you go to -- and this has

24  not been admitted, to my knowledge, DX301.

25         THE COURT:  Any objection to the admission of DX301?

1    MR. TENGESDAL:  No, Your Honor.

2    MR. FITZGERALD:  No objection.

3    THE COURT:  Be admitted without objection.  Go ahead.

4    (Exhibit No. DX301 received into evidence.)

5  BY MR. DARKE:

6  Q.  Doctor, you reviewed this during your review of the

7  medical records in this case before you formed your opinions,

8  right?

9  A.  Yes.

10    MR. DARKE:  And if you go down to the second middle

11  section, Kyle, that's dated 10/14/15.

12  BY MR. DARKE:

13  Q.  It says:  "Recommendations and plans."  Do you see that?

14  A.  Yes.

15  Q.  So they're asking for Mr. Taylor to lose 20 pounds, right?

16  A.  Yes.

17  Q.  As you know, Mr. Taylor lost the 20 pounds, right?

18  A.  Right.

19  Q.  And then it says:  "To -- to return to see Dr. Pier

20  Giulianotti in two months after the 20-pound weight loss."

21  Right?

22  A.  Yes.

23  Q.  Okay.  So Dr. Obaisi is to return Mr. Taylor to see

24  Dr. Giulianotti, right?

25  A.  Right.

1  Q.  Not Dr. Morris in plastics or some other doctor?  He's --

2  A.  Right.

3  Q.  -- instructing him to see Dr. Giulianotti?

4  A.  Right.

5  Q.  Incidentally, do you know what Dr. Morris's specialty is?

6  A.  Dr. Morris?

7  Q.  Yes.

8  A.  No.

9  Q.  Dr. Morris is a plastic surgeon.  Do you recall that?

10  A.  Oh, right, yeah.

11  Q.  And do you recall what type of plastic surgery he does?

12  A.  Cosmetic.

13  Q.  And do you recall who his clients are?

14  A.  Not offhand.

15  Q.  Dr. Morris is a pediatric plastic surgeon from the neck

16  up.

17  A.  Right.

18  Q.  There's no reason that you can imagine --

19        MR. DARKE:  Strike that.

20  BY MR. DARKE:

21  Q.  There's no reason for him to review Mr. Taylor who is

22  clearly not pediatric and clearly doesn't have a neck up

23  plastic surgery issue, right?

24  A.  Well, it's not as specific as you would like in terms of

25  what plastic surgeons to be involved in this case.  Although

1  with his training, he has had plastic surgery experience with

2  adults.  It's just not his current specialty by

3  subspecializing in pediatric plastic surgery.

4  Q.  But he doesn't have reconstructive right wall ventral

5  hernia plastic surgery experience?

6  A.  I wouldn't think so.

7  Q.  He's a pediatric surgeon, right?

8  A.  Right.

9       MR. DARKE:  So if you could go, Kyle, to -- can you

10  go to 217 -- I'm sorry; if you can go to DX248.

11       THE COURT:  What was the number?

12       MR. DARKE:  DX248.

13       THE COURT:  That's in evidence.  Go ahead.

14  BY MR. DARKE:

15  Q.  So we just reviewed the referral in October where

16  Dr. Obaisi was instructed to send Mr. Taylor to

17  Dr. Giulianotti, right?

18  A.  Yes.

19  Q.  And if -- in this February 2016 note, he's seen by Dr. --

20  he's sent to Dr. Masrur, not Dr. Giulianotti, right?

21  A.  Right.

22  Q.  So so far we have five months, Dr. Obaisi has not sent

23  Mr. Taylor to see Dr. Giulianotti.  He sent him to Dr. Morris

24  who does pediatrics plastics, and he sent him back to

25  Dr. Masrur, right?

1  A.  Right.

2         MR. DARKE:  Now, Kyle, if you can go to DX303, which

3  has not been admitted.

4         THE COURT:  DX303.  Any objection?

5         MR. TENGESDAL:  No, Your Honor.

6         MR. FITZGERALD:  No objection.

7         THE COURT:  Go ahead.  Admitted without objection.

8     (Exhibit No. DX303 received into evidence.)

9  BY MR. DARKE:

10  Q.  Doctor, this is an IDOC medical record that you would've

11  reviewed in the course of tendering your opinions.  And same

12  process as before, in the middle section is February 17, 2016.

13  That's filled out by Dr. Masrur at UIC.

14         Do you see that?

15  A.  Yes.

16  Q.  And then Dr. Masrur writes, like he had written before:

17  "Needs to see Pier Giulianotti," underlined once.  Right?

18  A.  Yes.

19  Q.  So he's focusing Dr. Obaisi on Pier Giulianotti again,

20  correct?

21  A.  Yes.

22  Q.  And then he says:  "For follow-up" -- I can't read that

23  word.

24         MR. DINGUS:  "For -- further."

25  BY MR. DARKE:

1  Q.  "For follow-up and further surgical" --

2  A.  Consultation.

3  Q.  -- "consultation."

4        So this is the at least second time that Dr. Masrur's

5  ordered Dr. Obaisi to send Mr. Taylor to Dr. Giulianotti so

6  they can follow up on what they had talked about back in

7  July 2015, right?

8  A.  Okay.

9  Q.  So this is an -- almost -- you know, we're coming up --

10  upon a year when Dr. Masrur wanted this process to take place,

11  right?

12  A.  Right.

13        MR. DARKE:  So now if you can go to DX304, which has

14  been admitted.

15  BY MR. DARKE:

16  Q.  This is the same type of note, Doctor.  You did not

17  discuss this with Mr. Tengesdal.  And this is, in the very

18  middle section, again a note from UIC.  This one now is two

19  months or so after the last note.  This says April 20, 2016.

20        MS. CIAMBRONE:  May.  Oh.

21  BY MR. DARKE:

22  Q.  And this writes --

23        MS. CIAMBRONE:  May -- April.  I'm sorry; April.

24        MR. DARKE:  I'm sorry.  I believe this says April 20,

25  2016.

1  BY MR. DARKE:

2  Q.  And this is a note from UIC.  "Patient has large hernia."

3       What does SP stand for?

4  A.  I'm sorry; status post.

5  Q.  Status post.

6  A.  Following, yeah.

7  Q.  And then it says -- there's an exclamation -- I'm sorry --

8  there's an asterisk:  "Needs to see Dr. Pier Giulianotti,"

9  underlined multiple times, and then exclamation point, right?

10  A.  Yes.

11  Q.  And it appears that Dr. Masrur is frustrated because this

12  is now the fourth or fifth time that he's asked Dr. Obaisi to

13  send Mr. Taylor to Dr. Pier Giulianotti, right?

14  A.  Okay.

15  Q.  Would you agree that exclamation point and asterisk is --

16  is clearly a sign of Dr. Masrur trying to get Dr. Obaisi's

17  attention?

18  A.  Right.

19  Q.  And this says:  "Please do not," underlined twice,

20  "schedule in Dr. Masrur clinic."  Right?

21  A.  Right.

22  Q.  This is now -- what is this, October, November, December,

23  January, February, March, April -- six months after the

24  original referral, correct?

25  A.  Yes.

1  Q.  And then this is -- the next sentence I think is

2  interesting.  There's a -- there's another asterisk, and it

3  says:  "Needs abdominal binder for support."

4        What is that?

5  A.  That's what I talked about earlier, a brace, an abdominal

6  binder.  They're called -- the -- by both terms.  But that's

7  something to help retain and compress the herniation to keep

8  it from getting larger.

9  Q.  Okay.  And Dr. Masrur with his training would understand

10 what the brace is?

11 A.  Yes.

12 Q.  And Dr. Obaisi, he'd still understand what a brace is,

13 too, wouldn't he?

14 A.  I would think so.

15 Q.  And so when Dr. Masrur says, "John needs an abdominal

16 binder support, Dr. Obaisi would understand what that means,

17 right?

18 A.  I would assume so.

19 Q.  This is in middle -- this is in April 2016 that that order

20 is directed to Dr. Obaisi, right?

21 A.  Right.

22       MR. DARKE:  I want to go, Kyle, to -- I want to go to

23 the May 2, 2016, Dr. Giulianotti follow-up.

24 BY MR. DARKE:

25 Q.  So, Doctor, I'm going to show you the medical record where

1  John Taylor was finally sent to Dr. Giulianotti.  Okay?

2  A.  Okay.

3  Q.  And then we talked earlier --

4        THE COURT:  Okay.  What's the --

5        MR. DARKE:  I'm sorry, Judge.

6        THE COURT:  For the record.

7        MR. DARKE:  This is in evidence as DX249.

8        THE COURT:  Okay.  Go ahead.

9  BY MR. DARKE:

10  Q.  We talked earlier that Dr. Giulianotti, Dr. Cohen,

11  Dr. Masrur, they are qualified, talented physicians.  Fair?

12  A.  Yes.

13  Q.  They know what they're doing, right?

14  A.  Right.

15  Q.  They know what they're doing in their specialties?

16  A.  Yes.

17        MR. DARKE:  Kyle, can you go to the page where we

18  talk about -- where it talks about where Dr. Giulianotti

19  explains the process that he is considering for John's hernia?

20  BY MR. DARKE:

21  Q.  In the very -- the -- the second from last sentence, it

22  says:  "We discussed in great detail with the patient," who is

23  John -- I'm sorry -- Mr. Taylor, "that his symptoms may not

24  resolve with surgery, but there's a chance for some

25  improvement."

1           You see that?

2    A.   Yes.

3    Q.   So Dr. Giulianotti explained to Mr. Taylor that there is a

4    chance for improving his quality of life, right?

5    A.   Yes.

6    Q.   Decreasing the pain that Mr. Taylor's experiencing, right?

7    A.   Potentially.

8    Q.   Potentially decreasing intermittent vomiting, right?

9    A.   Yes.

10   Q.   A chance of decreasing the other symptoms that he's been

11   experiencing since, I think, summer of 2015, right?

12   A.   Possibly, yes.

13   Q.   Dr. Giulianotti didn't say here that surgery wasn't going

14   to work and help John alleviate those pains and --

15   A.   I'm sorry; say that again.

16   Q.   Dr. Giulianotti doesn't say that the surgery will -- won't

17   be effective to alleviate those potential pains and symptoms

18   for John, right?

19   A.   You've got a couple of negatives in that sentence.

20   Q.   Sorry about that.

21          THE COURT:  Yeah, why don't you rephrase the

22   question.  Keep your voice up.

23   BY MR. DARKE:

24   Q.   Sorry about that, Doctor.

25          Dr. Giulianotti is not saying at this time that

1  John's not a candidate for surgery.  He's saying, might be

2  able to do the surgery --

3  A.  Right.

4  Q.  -- and it could -- and it could improve the quality of

5  your life, right?

6  A.  There's a potential it could work.

7  Q.  Another CT scan is ordered.  Do you recall that?

8  A.  Yes.

9  Q.  So this is now the -- at least the second CT scan since

10  John's April 2014 surgery, right?

11  A.  Right.

12  Q.  And had they -- and this now is a year later, so those

13  only -- CT scans are really only good for about six months,

14  you said?

15  A.  It -- it depends on what's going on, but time -- over time

16  things can change.

17  Q.  So in John's case, you'd agree, six-month time frame for

18  these CT scans?

19  A.  I'm sorry?

20  Q.  Six-month time frame for these CT scans for Mr. Taylor's

21  hernia?

22  A.  That's reasonable.

23  Q.  So every time they go over six months, they got to order

24  another CT scan which takes time, right?

25  A.  Assuming they're going to do something with the results

1 that's different what -- than what they've done before.

2 Q. And you'd assume that the doctors would order a CT scan

3 only if they're actually going to review the results and then

4 chart some medical thing for John?

5 A. Right. Yeah. Although, if I -- if I could say something

6 here. If -- if it wasn't something they could fix in earlier

7 CT scans, the odds are it's not going to look better on

8 subsequent CT scans, so the ability to actually fix it then is

9 even potentially worse.

10 Q. Okay. Now, did you review Dr. Dumanian's deposition

11 testimony in the course of rendering your opinions?

12 A. Yes.

13 Q. And you agreed, as we talked about at your deposition,

14 that his determination that pain, bowel structure, and quality

15 of life are three reasons to do a hernia surgery on someone

16 like Mr. Taylor, right?

17 A. That was his indications, yes.

18 Q. Okay. And then you also agreed and we also talked about,

19 if a surgery is done, such as the one that Dr. Dumanian did in

20 2018, that whether or not it was a success was a determinate

21 by John whether or not his quality of life had been improved,

22 right?

23 A. Right.

24 Q. So it's a patient-focused determination as to what is or

25 wasn't -- what isn't successful, right?

1  A.  Right.

2  Q.  So if his quality of life had improved, then that's a

3  successful surgery to John, correct?

4  A.  Right, right.

5  Q.  Did you also review Dr. Ellis's deposition?

6  A.  Yes.

7  Q.  And Dr. Marco Ellis, he was one of the plastic surgeons

8  that evaluated John in 2017.  Do you recall that?

9  A.  Yes.

10  Q.  Do you remember reading where Dr. Ellis said that he was

11  comfortable performing surgery for John's hernia in 2014 when

12  the defect was about 10 centimeters?

13  A.  Right.

14  Q.  But after he reviewed the CT scan -- right? --

15  A.  Yes.

16  Q.  -- he said, "too much of the viscera is out now, too much

17  loss of domain.  I -- I don't feel comfortable doing it."

18  Correct?

19  A.  Right.

20  Q.  So he testified under oath that he could've done the

21  surgery in 2014, correct?

22  A.  He thinks he could've, yes.

23  Q.  Three years later, he said he can't do it, correct?

24  A.  Right.  But that was not because the defect itself was

25  larger.  It's just because the amount of herniated viscera had

1   expanded.

2   Q.  Which happened over time?

3   A.  Right.

4   Q.  And then you and Mr. Tengesdal talked about Dr. Ellis's

5   order that Mr. Taylor get a nonsurgical management with a TLSO

6   brace.

7           Is that the same thing we talked about with respect

8   to Dr. Masrur?

9   A.  Yes.

10  Q.  And so that was in March of 2017 that Dr. Ellis ordered

11  it.  Dr. Masrur had already ordered it back in 2016

12  time frame --

13  A.  Right.

14  Q.  -- right?

15  A.  Right.

16  Q.  And you don't know when Dr. Obaisi, if ever, got that

17  brace for Mr. Taylor, do you?

18  A.  I don't know.

19  Q.  And you would agree that that brace should have been

20  ordered quickly?

21  A.  Right.  He'd like to apply it while it could still do some

22  potential good.

23  Q.  And Dr. Obaisi --

24          MR. DARKE:  Well, thank you.

25          May I consult with my cocounsel?

1    THE COURT:  Yes, of course.

2  (Counsel conferring.)

3  BY MR. DARKE:

4  Q.  Doctor, we have a few more questions for you.

5    You've been acting as an expert witness for about

6  three decades now?

7  A.  I'm sorry; what?

8  Q.  You've been acting as an expert witness since the 1990s,

9  right?

10  A.  Yeah.  Roughly, yes.

11  Q.  So about three decades?

12  A.  Yes.

13  Q.  And how many -- you've had multiple cases with

14  Mr. Tengesdal's law firm, right?

15  A.  Yes.

16  Q.  At least three, as we --

17  A.  I think so.

18  Q.  At least in 2019, you had worked on three for

19  Mr. Tengesdal's firm?

20  A.  Right.

21  Q.  You are not a specialist in plastic surgery, correct?

22  A.  No.

23  Q.  Just general surgery?

24  A.  Right.

25    MR. DARKE:  Sorry, Judge; I'm just checking my notes.

1  BY MR. DARKE:

2  Q.  Doctor, did you review the grievances that Mr. Taylor had

3  filed and lodged with the -- with Stateville and the wardens?

4  A.  I -- I believe I did.

5  Q.  Okay.  And --

6  A.  I reviewed all that was sent to me.

7  Q.  Did you take any of the grievances into account when you

8  were determining your opinions in this case?

9  A.  I was really looking more at the ability to anatomically

10  repair what was considered the cause of his grievances.

11  Q.  And you would agree that Mr. Taylor's complaints of pain

12  are important to determining whether or not -- whether the

13  doctors should or shouldn't perform their hernia surgery,

14  right?

15  A.  Pain is one of the issues involved, yes.

16        MR. DARKE:  I have no further questions, Judge.

17        THE COURT:  Redirect.

18                    REDIRECT EXAMINATION

19  BY MR. TENGESDAL:

20  Q.  Doctor, if UIC wanted the patient to be seen by

21  Dr. Giulianotti, when they were contacted, did they have the

22  ability to look in their electronic medical record that we've

23  gone over?

24  A.  The -- the -- they could look into what?

25  Q.  Could UIC -- that -- you saw the electronic

1  medical record, right?

2  A.  Yes.

3  Q.  Could UIC look at their -- pull up their electronic

4  medical record to see who Mr. Taylor was seen by?

5  A.  At UIC, yes.

6  Q.  Okay.  So if the site scheduler at the prison calls up UIC

7  to request the date for surgery, would the surgery department

8  provide that date so they know to have a doctor there to see

9  Mr. Taylor?

10  A.  You mean have him seen on the date of the scheduled

11  surgery when the doctor hasn't seen him to schedule the

12  surgery?

13  Q.  No.

14  A.  Oh.

15  Q.  Listen to the question, okay?

16  A.  Okay.

17  Q.  If UIC is contacted to have a date for Mr. Taylor to come

18  back, can they --

19  A.  Right.

20  Q.  -- pull up their records to see Mr. Taylor's care?

21  A.  Yes.

22        MR. DARKE:  Objection.  Vague.  Confusing.

23        THE COURT:  If he understands -- do you understand

24  the question?

25        THE WITNESS:  I think so, yes.

1          THE COURT:  Okay.  Go ahead and answer it.

2     BY THE WITNESS:

3     A.  Yes, they could see the previous records.

4     BY MR. TENGESDAL:

5     Q.  Okay.  And if UIC general surgery wanted Dr. Giulianotti

6     to see them, when they were contacted for an appointment,

7     would UIC then pick up Dr. Giulianotti's schedule to see when

8     he's available?

9          MR. DARKE:  Objection.  Foundation.  Leading.

10    BY THE WITNESS:

11    A.  Yes.

12         THE COURT:  Hang on a second.

13         Overruled as to leading; overruled as to foundation.

14    Go ahead.  Answer will stand.

15    BY THE WITNESS:

16    A.  Yes.

17    BY MR. TENGESDAL:

18    Q.  Okay.  When Mr. Taylor returned to see UIC general

19    surgeon, did he do so on the date that was provided to come to

20    their clinic?

21    A.  I -- I -- I think that was true, yes.

22    Q.  Okay.  Now I want to switch gears and ask you some

23    questions about the binder.

24         MR. TENGESDAL:  If we could pull up DX304, previously

25    admitted.

1     THE COURT:  Go ahead.

2  BY MR. TENGESDAL:

3  Q.  Doctor, do you know who in that middle section

4  Myriam Davis is?

5  A.  No, I don't.

6  Q.  Okay.  It says:  "Need abdominal binder for support."

7       Does it state anywhere in there who is to get the

8  abdominal binder?

9  A.  No, it doesn't.

10 Q.  Does it state anywhere in there that the surgeon at UIC

11 has ordered the abdominal binder yet?

12 A.  No.

13 Q.  Does it instruct in there that Dr. Obaisi is supposed to

14 get the abdominal binder?

15 A.  I'm not sure that that's stating that.

16 Q.  Okay.

17      MR. TENGESDAL:  And then if we could pull up JX001A.

18 Never previously admitted.

19      THE COURT:  Any objection to the admission of JX1A?

20      MR. TENGESDAL:  001, and it's page 14.  So we're just

21 going to admit the one page.

22      THE COURT:  Okay.  Any objection to JX1A, page 1?

23      MR. DARKE:  If we could just see it real quickly,

24 Judge.  I'm sorry; I just don't know what it is.

25      THE COURT:  No, that's okay.  You're entitled to see

1  exhibits before they go in.

2       MR. DARKE:  Sorry about that.

3     (Pause in the proceedings.)

4       MR. DARKE:  Fine.  No objection, Your Honor.  Sorry.

5       MR. FITZGERALD:  No objection.

6       THE COURT:  JX1A, page 1, admitted without objection.

7  You may publish it.

8     (Exhibit No. JX001A received into evidence.)

9  BY MR. TENGESDAL:

10 Q.  Doctor, do you see the -- the title on there, it says:

11 "Receipt for medical item"?

12 A.  Yes.

13 Q.  And you see where it says:  "I, Taylor, J."?

14 A.  Yes.

15 Q.  And do you see the signature down there for offender?

16 A.  Yes.

17 Q.  What date did Mr. Taylor sign this?

18 A.  Looks like 10/26/16.

19 Q.  And what did Mr. Taylor sign for that he received?

20 A.  An abdominal binder and a scrotal support.

21      MR. TENGESDAL:  Thank you, Doctor.  That's all I

22 have.

23      THE COURT:  Any additional inquiry from codefendant?

24      MR. FITZGERALD:  No.

25      THE COURT:  Any additional cross?

1           MR. DARKE:  Yes, sir.

2                    RECROSS-EXAMINATION

3    BY MR. DARKE:

4    Q.  Dr. Reed, do you know whether or not that binder ever fit

5    Mr. Taylor?

6    A.  I don't know.

7    Q.  And you testified at length that it has to be fitted a

8    certain way and that it was important to make sure that it

9    fit, correct?

10   A.  That's ideal.

11   Q.  And do you know whether or not this had metal in this

12   binder?

13   A.  I don't know.

14          MR. DARKE:  Thank you.  I have no further questions.

15          THE COURT:  Any additional inquiry?

16          MR. TENGESDAL:  Nothing, Your Honor.

17          THE COURT:  Any additional inquiry?

18          MR. FITZGERALD:  No.

19          THE COURT:  Thank you, Doctor.

20          THE WITNESS:  Thank you.

21          THE COURT:  You can step down.

22          Call your next witness.

23          MS. CUNDIFF:  Your Honor, at this time we are going

24   to read the evidence deposition of Dr. Mustafa Hussain into

25   the record.

1   THE COURT:  What's the date from it?

2   MS. CUNDIFF:  March 26, 2024.

3   MR. TENGESDAL:  Your Honor, if I could go get the

4   reader.  I believe he's out there.

5   THE COURT:  Yeah.

6   Ladies and gentlemen, a deposition is the sworn

7   testimony of a witness taken before trial.  The witness is

8   placed under oath to tell the truth, and lawyers for each

9   party may ask questions.  The questions and the answers are

10  recorded.

11  The deposition of Dr. Hussain, which was taken on

12  26 March 2024 is about to be presented to you.  Deposition

13  testimony is entitled to the same consideration and is to be

14  judged, insofar as possible, in the same way as if the witness

15  had been present to testify.  Do not place any significance on

16  the behavior or tone of voice of any person who's reading the

17  questions or answers.

18  (Audio interruption.)

19  THE COURT:  Hot mic.

20  (Pause in the proceedings.)

21  MS. CUNDIFF:  Your Honor, before we start reading the

22  deposition, I'd like to have a couple exhibits admitted into

23  evidence.  We're not going to show them to the jury, but they

24  are discussed in the deposition that we'd like to have

25  admitted.

1    THE COURT:  You want to admit them but not publish

2    them?

3    MS. CUNDIFF:  Yes, Your Honor.  We'll send them back.

4    THE COURT:  Okay.  List the exhibits for the record.

5    MS. CUNDIFF:  It is DX266, DX267, and DX316A.

6    THE COURT:  And none of those have been previously

7    admitted, correct?

8    MS. CUNDIFF:  Correct.

9    THE COURT:  Any objection by any party to the

10   admission of those three exhibits?

11   MR. DARKE:  Not the plaintiff.

12   MR. FITZGERALD:  No objection.

13   THE COURT:  It'll be admitted without objection.

14   (Exhibit Nos. DX266, DX267, and DX316A received into

15   evidence.)

16   THE COURT:  Go ahead, Counsel.

17   MUSTAFA HUSSAIN, DEFENDANT'S WITNESS, VIA DEPOSITION

18                 DIRECT EXAMINATION

19   BY MS. CUNDIFF:

20   Q.  Good afternoon, Dr. Hussain.  My name is Corinne Cundiff,

21   and I represent the defendants, the Estate of Dr. Obaisi and

22   Dr. Arthur Funk in this matter.

23        Could you please introduce yourself to the jury by

24   stating and spelling your full name?

25   A.  I am Dr. Mustafa, M-U-S-T-A-F-A; Hussain, H-U-S-S-A-I-N.

1   Q.  I'd like to start today by discussing your education.

2       Where did you go to undergraduate school?

3   A.  University of Rochester.

4   Q.  What was your major?

5   A.  Biochemistry and religious studies.

6   Q.  What year did you graduate with your undergraduate degree?

7   A.  1999.

8   Q.  Did you then go on to medical school?

9   A.  Yes.

10  Q.  Where did you go to medical school?

11  A.  New York University.

12  Q.  What years were you in medical school at New York

13  University?

14  A.  1999 to 2003.

15  Q.  After you completed medical school, did you go on to do a

16  residency?

17  A.  I did.

18  Q.  Where did you do your residency at?

19  A.  New York University medical center.

20  Q.  What was the specialty of your residency?

21  A.  General surgery.

22  Q.  What year did you finish?

23  A.  2010.

24  Q.  After you completed your residency, what did you do next?

25  A.  I did a one-year fellowship in minimally invasive surgery

1   at Cornell University and Columbia University.

2   Q.  Doctor, are you board certified?

3   A.  Yes.

4   Q.  In what specialty?

5   A.  General surgery.

6   Q.  Are you licensed to practice medicine?

7   A.  Yes.

8   Q.  Are you just licensed in Illinois or any other states?

9   A.  Active license in Illinois and a deferred license in the

10   State of New York.

11   Q.  Where are you currently practicing?

12   A.  Illinois.

13   Q.  What institution?

14   A.  The University of Chicago.

15   Q.  What is your title at the University of Chicago?

16   A.  I am an associate professor of surgery.

17   Q.  Do you specialize in any particular type of surgery?

18   A.  I am a general surgeon with a focus in minimally invasive

19   surgery of the abdominal wall, bariatrics, and upper

20   gastrointestinal tract.

21   Q.  As an associate professor, do you have any teaching

22   responsibilities?

23   A.  I do.

24   Q.  What do you teach?

25   A.  I teach general surgery to surgical residents, as well as

1  medical students.

2  Q.  How long have you been on staff at the University of

3  Chicago?

4  A.  Since 2011.  So coming up on 13 years, I believe.

5  Q.  Do you hold privileges at any other hospital?

6  A.  I do not.

7  Q.  Do you recall seeing the plaintiff in this case,

8  John Taylor, for consultation back in 2020?

9  A.  I do.

10  Q.  Do you have any independent recollection of the treatment

11  that you provided to Mr. Taylor?

12  A.  Could you clarify "independent"?

13  Q.  Outside of your medical notes.

14  A.  No.

15  Q.  Doctor, would it assist your testimony today for me to put

16  your notes on the screen so that you can see them?

17  A.  Yeah, sure.

18  Q.  Doctor, I'm going to show you what has previously been

19  admitted into evidence as Exhibit DX264.

20       Are you able to see that?

21  A.  Yes.

22  Q.  Do you recognize this?

23  A.  Yes.

24  Q.  What is this note that we're looking at?

25  A.  This is a consultation note from a clinic visit.

1  Q.  In looking at this first page of your note there, can you

2  tell the jury the date of your first visit with Mr. Taylor?

3  A.  January 15, 2020.

4  Q.  Is it your custom and practice to take a medical history

5  from new patients?

6  A.  Yes.

7  Q.  And did you take a history from Mr. Taylor?

8  A.  Yes.

9  Q.  Is that history then documented under the history of

10  present illness section in your note?

11  A.  Yes.

12  Q.  What did you learn about Mr. Taylor's previous medical

13  history that was relevant to your visit with him on

14  January 15, 2020?

15  A.  I learned that he had a resection of a tumor several

16  years ago, decades ago, actually, and that required at least

17  two operations, and then he needed to have some reconstructive

18  work done as a sequela of that initial tumor surgery.

19  Q.  Are you aware of Mr. Taylor's hernia repair surgery that

20  was performed at Northwestern in 2018?

21  A.  Yes.

22  Q.  And is that also noted here in the history of present

23  illness section?

24  A.  Yes.

25  Q.  Is it your understanding that Mr. Taylor was there to see

1  you on January 15, 2020, as a result of the painful

2  nonreducible hernia?

3  A.  Yes.

4  Q.  And when you note in your record here that his hernia is

5  in the right lower quadrant extending to the right flank, can

6  you describe to the jury where on the body you are referring

7  to?

8  A.  So the right lower quadrant refers to the portion of the

9  belly that is to the right side of the patient and also below

10 the level of the navel.  So if you think of the abdomen or

11 belly in four different areas, you sort of use the navel, or

12 the belly button, as the center point, and then you have each

13 quadrant around that.  So the right lower quadrant would be

14 the right site -- side sort of underneath the navel.

15 Q.  In looking at your note here, what did Mr. Taylor report

16 to you about the hernia that brought him in to see you?

17 A.  That it had been getting larger; he had been experiencing

18 pain at that site.

19 Q.  Did you perform a physical examination of Mr. Taylor?

20 A.  I did.

21 Q.  And if we go to page 3 of your note, is that the physical

22 exam noted there on the page?

23 A.  It is.

24 Q.  According to what you documented, what significant

25 findings did you note about Mr. Taylor's physical exam?

1  A.  The notation was made of the right lower quadrant hernia

2  or deformity that was extending was quite large and it was

3  extending into the flank, which is sort of wrapping around the

4  right side, and it was somewhat tender to deep palpation.

5  Q.  After completing your physical exam, did you arrive at an

6  assessment and plan for Mr. Taylor?

7  A.  I did.

8  Q.  What was your assessment and plan as of January 15, 2020?

9  A.  That he had what appeared to be a right-sided, right lower

10  quadrant hernia, and after multiple prior surgeries and an

11  order to make a surgical plan, if this could be corrected, we

12  would need to see imaging.

13  Q.  What was the purpose for ordering the CT for Mr. Taylor?

14  A.  The CT would give greater detail about the size, location,

15  and extent of the hernia and whether or not it could be

16  repaired.

17  Q.  You also note a follow-up with Dr. Lee.  Who is Dr. Lee?

18  A.  Dr. Lee is a plastic and reconstructive surgeon at the

19  University of Chicago.

20  Q.  Is that Dr. Raphael Lee?

21  A.  Yes.

22  Q.  And did you, in fact, order the CT for Mr. Taylor?

23  A.  I believe I did.

24  Q.  I'm going to show you what has been marked as

25  Exhibit DX267.  Do you recognize this document?

1  A.  Yes.

2  Q.  What is this document that we're looking at?

3  A.  This is the report of the CT scan that was ordered on

4  Mr. Taylor.

5  Q.  And the date of the CT scan was 2/14 of 2020, correct?

6  A.  Correct.

7  Q.  Would it have been your custom and practice to review the

8  report or the actual imaging itself?

9  A.  It is my custom and practice to review both the imaging

10  and the report.

11  Q.  If we go to page 2 of this document, can you explain to

12  the jury what the findings were under the soft tissue portion

13  of this report?

14  A.  The report states that there's a large right-sided ventral

15  hernia.  Ventral refers to the right -- the front side of a

16  person's body and is containing small and large intestine.

17  And the small and large intestines do not appear to be blocked

18  or obstructed, which can happen with hernia sometimes.  A

19  hernia defect, which is the size or the width of the hernia is

20  14 1/2 centimeters, which is about 6 inches or so.

21  Q.  Can you explain the difference between the measurements

22  noted for the hernia defect versus the hernia sac?

23  A.  So the hernia defect is the portion of the abdominal wall

24  or muscle that's essentially no longer there.  And the hernia

25  sac is what protrudes out of the defect.

1    Q.   Did you then see Mr. Taylor on the same day, February 14,

2    2020, for a follow-up?

3    A.   I don't recall if it was that same day, but I did see him

4    again for follow-up.

5    Q.   I'm going to show you what has been marked as

6    Exhibit DX266.  Can you see that document?

7    A.   Yes.

8    Q.   And do you recognize this if we go down to page 2?

9    A.   Yes, I recognize this page.

10   Q.   And is this your progress note from your visit with

11   Mr. Taylor on February 14th of 2020?

12   A.   Yes.

13   Q.   Did you perform another physical exam on Mr. Taylor?

14   A.   Yes.

15   Q.   It looks like in the middle of page 2 here there's a

16   diagram or a drawing.  Do you see that?

17   A.   Yes.

18   Q.   Can you explain for the jury what this is indicating or

19   showing in your records?

20   A.   This is a cartoon representation of my physical findings,

21   and so there's a cartoon of a male torso, and the circle with

22   the No. 1 on it shows the area of the hernia.

23   Q.   And you documented "large eventration," correct?

24   A.   Correct.

25   Q.   What is an eventration?

1  A.  Eventration is a medical term for ballooning out.

2  Q.  You noted a large eventration.  Can you explain the

3  difference, if there is any, between an eventration and a

4  hernia?

5  A.  So there can be.  A hernia generally is a hole with the

6  defined borders within the musculature of the abdominal wall.

7  And eventration, in the way I've used it, sort of implies that

8  there are not defined borders of muscle in this particular

9  situation.

10  Q.  After you performed your physical exam, did you again

11  create an assessment and plan for Mr. Taylor?

12  A.  I did.

13  Q.  And what did you note for your plan?

14  A.  I discussed that after examining him again, as well as

15  reviewing the images that were obtained, that minimally

16  invasive approach, which is why he was referred to me, was not

17  feasible.  And then I had a discussion with Dr. Lee, who was

18  the plastic and reconstructive surgeon who referred the

19  patient to me and who did not feel a complex flap surgery

20  would be possible and, therefore, we recommended a nonsurgical

21  approach to this problem.

22  Q.  At this point on February 14, 2020, did you refer

23  Mr. Taylor to any other surgeon for another opinion?

24  A.  I don't think so.  I don't recall.  I don't think so.

25  Q.  If you had referred Mr. Taylor to another surgeon, would

1    you have documented that in your notes?

2    A.   I would have.

3    Q.   I'm going to show you the last document, which is

4    previously marked as Exhibit DX316A.

5         Are you able to see this, Doctor?

6    A.   Yes.

7    Q.   In looking at the center section, is that your signature?

8    A.   Yes.

9    Q.   Do you have any understanding as to what this document is

10   used for?

11   A.   Yes.  So this is a way for us to quickly communicate back

12   to the facility that Mr. Taylor came from about my impression

13   and my recommendations from our clinic visits.

14   Q.   Under the middle section, the report of referral, can you

15   testify to what is written in the assessment section there?

16   A.   Yes.  I basically assessed that he had a large abdominal

17   wall defect and there was no incarceration.  Incarceration

18   referring to the bowel that could be trapped within the

19   hernia.  There were no signs or suggestion of that.  And there

20   is no surgical approach that was available within a minimally

21   invasive fashion.

22   Q.   Then under recommendation and plans, you indicated:

23   "Mr. Taylor should continue to wear supportive garment."

24   Correct?

25   A.   Correct.

1  Q.  What is a supportive garment?

2  A.  It's basically an external, almost like girdle, if you

3  will, that will hold in the ballooning out that was referred

4  to earlier.

5  Q.  As you documented, Mr. Taylor was to continue to wear a

6  supportive garment.

7           Was it your understanding that Mr. Taylor was wearing

8  one at some point before you saw him in 2020?

9  A.  I believe so, but I honestly don't recall at this moment.

10 Q.  Second line of the recommendation and plans section, can

11 you read what that states?

12 A.  I believe it says to -- oh, I think it's attempt to lose

13 weight and no heavy lifting.

14 Q.  Is it your understanding that this document, then, those

15 recommendations are given to Mr. Taylor's physicians at the

16 correctional facility?

17 A.  I believe that is the purpose of this document.

18 Q.  Let me go to the top for you.  Sorry about that.  So this

19 says it's dated 2/14/20.  It's a visit of John Taylor.  It

20 says "outpatient encounter," and then it says the provider is

21 you, Dr. Hussain, correct?

22 A.  Correct.

23 Q.  Do you recognize this document now?

24 A.  Yes.

25 Q.  Then when you consult with a patient such as Mr. Taylor,

1  do you discuss with him the pain and symptoms that he's

2  feeling at the time because of whatever reason he's come to

3  see you?

4  A.  Yes.

5  Q.  And does the nursing staff ask Mr. Taylor about his pain

6  at the time in order to put it in his chart?

7  A.  They should, yes.

8  Q.  And it says:  "Pain assessment:  No pain."  Is that what's

9  charted here?

10  A.  Yeah.

11  Q.  So at the time that Mr. Taylor visited you, it's indicated

12  in DX266 that he was not experiencing pain.  Is that what this

13  tells us?

14  A.  Yes.

15  Q.  I'm showing you, Doctor, DX262.  I believe counsel showed

16  this to you.  This is an 11/1/2019 visit of Mr. Taylor to the

17  University of Chicago.  Do you recognize this medical record?

18  A.  Not this particular record.

19  Q.  Do you recognize this as a University of Chicago

20  medical record?

21  A.  Yes.

22  Q.  And this is a medical record for John Taylor?

23  A.  Yes.

24  Q.  Doctor, when you saw Mr. Taylor in I think it was 2020,

25  did you review the U of C medical records for Mr. Taylor in

1  order to acclimate yourself to Mr. Taylor's conditions?

2  A.  That would be my usual practice.

3  Q.  And you would review the medical records from U of C, in

4  particular Raphael Lee who had seen him earlier regarding the

5  same hernia?

6  A.  Yes.

7  Q.  This document says:  "Gastrointestinal, positive for

8  abdominal pain, negative for constipation, diarrhea, nausea,

9  and vomiting."  Correct?

10  A.  Yes.

11  Q.  Thank you, Doctor.  That's all the questions I have.

12       THE COURT:  Thank you.  Any additional testimony or

13  evidence?

14       MR. TENGESDAL:  Not from the defense, Your Honor.

15       THE COURT:  Do you rest?

16       MR. TENGESDAL:  We rest, Your Honor.

17       THE COURT:  Any testimony or evidence from the

18  codefendants?

19       MR. FITZGERALD:  No.  We would rest.

20       THE COURT:  Any rebuttal case?

21       MR. DARKE:  Yes, Your Honor.  Your Honor, if we could

22  have a sidebar real quick.

23       THE COURT:  Yeah, sure.

24    (Proceedings heard at sidebar on the record.)

25       THE COURT:  Excuse me.  We're at sidebar.  Go ahead.

1    MR. DARKE:  We're going to call Mr. Taylor, but I

2  can't bring him up to the stand.

3    THE COURT:  All right.  So we'll take a short recess,

4  and then we'll have him take the stand after that.

5    How long do you think the testimony will be, because

6  I want to give the jurors an idea of what our schedule is,

7  including what we think tomorrow and the next day is like.

8    MR. DARKE:  20 minutes.

9    THE COURT:  20 minutes?

10   MR. DARKE:  Yeah.

11   THE COURT:  Okay.  Well, so maybe five minutes.

12 Okay.  Thanks.

13   MR. DARKE:  Thank you, Judge.

14  (Sidebar ended.)

15   THE COURT:  Ladies and gentlemen, we're going to take

16 our short afternoon break right now.  Let me give you an idea

17 of what I expect our schedule to be like.  When you come back

18 we'll have about a half hour of evidence and then you're done

19 for the day because all the evidence will be completed.

20   We're going to handle legal stuff tomorrow.  We're

21 going to have a full day tomorrow, but you will not.  You will

22 not be here tomorrow.  And then on Friday morning it's closing

23 argument, final instructions, and deliberations and the case

24 is yours.

25   So that's what I think our schedule's gonna be like.

So we're going to take a short break, you'll come back, half
hour or so, you'll be done for the day, and then I will see
you at our normal time on Friday, not tomorrow.

Okay. All rise for the jury.

(Jury out at 2:27 p.m.)

THE COURT: Jury out, door closed. Let's take
advantage of it as a bathroom break.

(A recess was had from 2:27 p.m. to 2:41 p.m.)

1    (Proceedings in open court.  Jury out).

2         THE COURT:  You guys want to collect everybody.

3         Can we have the witness on the stand.

4         MR. DARKE:  If I can have the IDOC folks back here

5    instead of up there by John?

6         THE COURT:  You can be by the front row.  Thank you

7    so much.

8         MR. DARKE:  Thank you.

9         THE COURT:  Are we ready for the jury?

10        MR. DARKE:  Yes, Your Honor.

11        THE COURT:  All right.  Go get the jury.

12   (Jury in)

13        THE COURT:  Have a seat everybody.

14        We are going to continue with the plaintiff's

15   rebuttal case.

16        Counsel, go ahead, call your witness.

17        MR. DARKE:  Plaintiff calls John Taylor in rebuttal.

18        THE COURT:  Sir, you are still under oath.

19        Counsel, whenever you are ready.

20      JOHN E. TAYLOR, JR., PLAINTIFF HEREIN, PREVIOUSLY SWORN

21                    DIRECT EXAMINATION

22   BY MR. DARKE:

23   Q.  Good afternoon, John.

24   A.  Good afternoon.

25   Q.  So I'm just going to ask you a few questions.

1  　　　　There has been some testimony that you listened to

2  regarding the concept of you being immunocompromised.  Do you

3  recall that?

4  A.  Yes, sir.

5  Q.  Do you recall ever being diagnosed as being

6  immunocompromised?

7  A.  No one has ever diagnosed me as being immunocompromised.

8  Q.  You testified earlier about your visits with Dr. Obaisi in

9  the infirmary in Stateville.  Do you recall that?

10  A.  Yes, sir.

11  Q.  And when you would have your meetings and consultations

12  with Dr. Obaisi, do you recall whether or not he ever

13  physically examined you during those meet-ups?

14  A.  Never.

15  Q.  There has been a fair amount of discussion about pain that

16  you may -- the pain after the 2018 surgery that Dr. Dumanian

17  performed.  Can you tell us your quality of life after the

18  surgery with respect to pain as compared to before that 2018

19  surgery that Dr. Dumanian did?

20  A.  My quality of life have been improved significantly since

21  the operation that Dr. Dumanian performed in 2018.  I could

22  not do the exercises that I was able to do after the -- before

23  the surgery.  In the cell I can hold onto the bed and do -- I

24  had gotten up to like 900 squats a hundred percent.  I

25  couldn't do that prior to the surgery.

1   I could -- prior to the surgery, every time I would

2   even shave, it would shake so bad sometimes, it hurt so bad

3   just to even shave, to stand long periods of time, I couldn't

4   stand prior to the surgery.  I was confined to a wheelchair.

5   It would hurt to even try to push myself in the wheelchair.

6   I had all the normal symptoms of a hernia prior to

7   the surgery.  And like I said earlier to the lawyer, that I

8   even shouting -- and I should have qualified, shouting,

9   sometimes I would preach at the prison at our Christian

10  service.  I could not preach some Sundays because it was too

11  painful to preach, raise my voice.  I'm a Baptist preacher,

12  so, you know, Baptist preachers are very theatric.  So I

13  couldn't do that prior to the surgery, but after the surgery I

14  was able to resume that.

15  I am a tutor, a writing tutor at the prison, and I

16  help a lot of fellows.  And so a lot of them, I'm on the low

17  level gallery, 2 gallery, they might be on 10 gallery, and

18  they'll scream down, ask me some questions, and I had to shout

19  back up to them to respond.  I couldn't do that prior to the

20  surgery.

21  Q.  Thank you, Mr. Taylor.

22  There was some testimony regarding a binder that you

23  signed for.

24  MR. DARKE:  And if Kyle can put up JX-001A.

25  I don't know if I need that.  Forget that, Kyle.

1  BY MR. DARKE:

2  Q.  Do you recall the binder you first received with respect

3  to the hernia?

4  A.  Yes, sir.

5  Q.  And tell me about that binder.

6  A.  That binder was useless.  It didn't fit.  It wasn't

7  fitted.  In fact, I wore it to a consultation with Dr. Lee,

8  and he said it was doing more harm than it was doing good.  So

9  it was useless.

10  Q.  And you received -- did you receive binders after that

11  one?

12  A.  Yes, sir.

13  Q.  And how did those binders fit?

14  A.  The binders that I received afterwards more -- they

15  addressed -- they helped reduce the pain and help keep it,

16  kept it from shaking so bad.

17  Q.  Do you recall the grievance process that you engaged in?

18  A.  Yes, sir.

19  Q.  And do you recall some testimony from Dr. Tata regarding

20  whether or not you filed grievances with respect to the pain

21  clinic and the intermittent pain you had felt?

22  A.  Yes, sir.

23       MR. DARKE:  Your Honor, this is not admitted.  This

24  is JT-239, which is a grievance that has been redacted.

25       THE COURT:  JT-239, any objection to its admission?

1    MR. DARKE:  I'm sorry, Judge, 239A.

2    THE COURT:  239A.

3    MR. TENGESDAL:  No objection.

4    MR. FITZGERALD:  No objection.

5    THE COURT:  239A will be admitted without objection.

6    You may publish.

7    MR. DARKE:  Thank you, Your Honor.

8    (Exhibit No. JT-239A was received in evidence.)

9    BY MR. DARKE:

10   Q.  Mr. Taylor, is that your handwriting?

11   A.  Yes, it is.

12   Q.  Is that your signature on there?

13   A.  Yes.

14   Q.  And is this a grievance that you prepared?

15   A.  Yes.

16   Q.  And when was this prepared?

17   A.  October 21st, 2015.

18   Q.  And what are you complaining about here?  Take your time.

19   A.  The doctor requested for the grievant to return in 30 days

20   for the epidural injection.  And I was complaining about in

21   this grievance how as of October the 21st that I had not

22   returned to the pain clinic for the injection for the chronic

23   pain that I was experiencing.

24   MR. DARKE:  I have no more questions, Your Honor.

25   Thank you, Mr. Taylor.

1    THE COURT:  Cross-examination.

2                   CROSS-EXAMINATION

3   BY MR. TENGESDAL:

4   Q.  Mr. Taylor, is it true that you have no medical education

5   or training?

6   A.  That's correct.

7   Q.  Do you know what the ICD-10 codes are?

8   A.  No, I don't.

9   Q.  Do you know if ICD-10 codes are diagnostic codes for

10  diseases, diagnoses?

11  A.  No, I didn't know that.

12  Q.  Do you know if immunocompromised is even an ICD-10 code?

13  A.  I don't know that.

14  Q.  Do you know if immunocompromised is a diagnosis or if it's

15  a side effect of your cancer?

16  A.  I don't know that.

17  Q.  Okay.  What are the clinical indications to be diagnosed

18  as immunocompromised?

19          MR. DARKE:  Objection, badgering.

20          THE COURT:  I think he's just established he doesn't

21  know the answer to that, counsel.  Do you want to lay a

22  foundation or explore it another way?

23  BY MR. TENGESDAL:

24  Q.  Mr. Taylor, would you agree you do not know what the

25  clinical indications are for immunocompromised?

1  A.  I don't know.

2  Q.  But you do agree you've had three cancer surgeries

3  including radiation for one?

4  A.  Yes, 25 years ago, yes.

5  Q.  You're not denying that you had had cancer, are you?

6  A.  No, I'm not.

7  Q.  You're not denying Dr. Warso took out a very large mass

8  from you on April 23rd, 2014, are you?

9  A.  No, I'm not.

10  Q.  When you said Dr. Obaisi never examined you, what time

11  frame are you alleging that?

12  A.  All the time frame that I was denied the pain clinic,

13  those years I was denied the pain clinic.  He didn't -- he

14  never examined me.  He just followed the referral.

15  Q.  So every note where Dr. Obaisi had an objective section

16  and a physical exam on his note was falsified?

17  A.  Dr. Obaisi never examined me for pain clinic.

18  Q.  Sir --

19         THE COURT:  Answer the question that was asked.

20  That's not what he asked you.

21         Ask the question again.

22  BY MR. TENGESDAL:

23  Q.  Sir, are you telling me that every time Dr. Obaisi charted

24  in his note O for objective and a physical exam, that he was

25  creating a false, fraudulent, fictitious entry?

1    A.    I don't know.  I can't answer that.  I just -- I don't

2    know.

3    Q.    So in 2012, four years before your lawsuit against Dr.

4    Obaisi, he was contemplating the future four years and he was

5    creating fictitious notes?

6    A.    I can't -- I cannot answer that question.

7    Q.    You're telling us you had such significant relief after

8    Dr. Dumanian's surgery, yet in October 2019, you reported to

9    one of your UIC surgeons you had 10 out of 10 severe pain,

10   right?

11   A.    That day, yes.

12   Q.    And the only time you're shouting is when you are Baptist

13   preaching?

14   A.    No.

15   Q.    Has your physicians told you that if you shout you get

16   pain?

17   A.    One of them told me about that was the side effects of the

18   hernia.

19   Q.    Okay.  And you continue to shout and inflict pain upon

20   yourself?

21   A.    I was trying not to.

22   Q.    But you continued to do it, shouting and inflicting pain

23   on yourself?

24            MR. DARKE:  Objection, argumentative, badgering.

25   BY THE WITNESS:

1  A.  No.

2       THE COURT:  Hang on a second.

3       Asked and answered.  Sustained.

4  BY MR. TENGESDAL:

5  Q.  You said the binder that you received was useless and not

6  fitted, right?

7  A.  Yes.

8  Q.  Would you agree that none of your surgeons fitted you for

9  a brace?

10  A.  Yes.

11  Q.  Would you agree none of your surgeons informed you or Dr.

12  Obaisi the specific make, model, size of the brace?

13  A.  No.

14  Q.  Did you ever see a note as you've been sitting here all

15  trial where it stated that you complained to a surgeon that

16  the binder was, as you said, useless and not fitted?

17  A.  Ask me that question again, please, sir.

18  Q.  Sure.  Did you ever see a note where the surgeon charted

19  that Mr. John Taylor is here today, and he's complaining that

20  the binder he has is useless and not fitted properly?

21  A.  No, sir.

22  Q.  So when you went to see your surgeons, you never told them

23  that?

24  A.  I don't recall, sir.

25  Q.  So if your binder is useless, not fitted properly, not

1   working, it never dawned on you to perhaps tell your surgeon,

2   who could help you with a proper binder?

3   A.  Yes, I guess that's why I got one from Dr. Ellis, I mean a

4   recommendation from Dr. Ellis.

5   Q.  And that was in March 16, 2017?

6   A.  Yes, sir.

7          MR. TENGESDAL:  And Exhibit 239A, the grievance that

8   was just admitted, if we could bring that up.

9          THE COURT:  Who has got it?

10          MR. DARKE:  Kyle, can you help them.

11          THE COURT:  Kyle, if you can bring up 239A, JT.

12          There you go, counsel.  Whenever you are ready.

13          MR. TENGESDAL:  Thank you, Your Honor.

14   BY MR. TENGESDAL:

15   Q.  You completed this grievance, and this would be the same

16   procedure, go to your counselor?

17   A.  Yes, sir.

18   Q.  Okay.  You understood in October 2015 that it was not your

19   counselor at Stateville, but Dr. Obaisi that would complete

20   the referral for you to go back to UIC?

21   A.  Yes, sir.

22   Q.  Okay.  Have you seen, ever seen any evidence that a

23   counselor scheduled you for any of your visits at UIC?

24   A.  No, sir.

25   Q.  Okay.  So you just persist year after year after year

1  filing grievances to people who can't do anything about

2  getting you medical treatment, is that right?

3          MR. DARKE:  Objection.

4  BY THE WITNESS:

5  A.  No, sir.

6          THE COURT:  Overruled.  He can answer.

7          Go ahead.

8  BY THE WITNESS:

9  A.  No, sir.

10  BY MR. TENGESDAL:

11  Q.  You just told me they never got you medical treatment, the

12  counselors because they can't, right?

13  A.  The procedures changed.  I cannot recall the year, but the

14  procedures changed that now the grievances stopped going

15  directly to the counselor.  The grievance went directly to the

16  medical department, and someone from the medical department

17  responded to the grievance.

18          They consult sometimes with the providers, and then

19  they relay that information to the grievance officer.  So some

20  of those grievances went to medical instead of the counselor.

21  Q.  But they would go to the healthcare unit administrator,

22  right?

23  A.  It would vary.  Sometimes to DON, director of nursing.

24  Q.  Okay.  Well, you understand that it's the medical

25  director, Dr. Obaisi, is the one that completes the referral?

1  A.  Yes, sir.

2  Q.  And all you had to do was go see Dr. Obaisi.  As you

3  testified, he would always greet you with a smile and ask you,

4  "Hey, John, what can I do for you?"  All you had to do was go

5  see him instead of filling out a grievance, right?

6          MR. DARKE:  Objection.

7          THE COURT:  The answer will stand if he answered.

8          Do you understand the question?

9       THE WITNESS:  Yes.

10          THE COURT:  Okay.  Go ahead, answer.

11 BY THE WITNESS:

12 A.  Yeah, I did talk to Dr. Obaisi.

13 BY MR. TENGESDAL:

14 Q.  Okay.  And that's how, if you want to go see a specialist,

15 that's how it's done, you talk to Obaisi, the medical

16 director?

17 A.  Yes, sir.

18 Q.  All right.  And you're doing so well after your surgery

19 that you ask to go see Dr. Lee at University of Chicago in

20 2019?

21 A.  Yes, sir.

22 Q.  Seeking surgery for your hernia that had returned?

23 A.  Yes, sir.

24 Q.  And you told Dr. Lee that you had pain from your hernia?

25 A.  Yes, sir.

1   Q.  And then when Dr. Lee said, "I can't do nothing about it,

2   why don't you go see Dr. Hussain at University of Chicago,"

3   you were sent to see Dr. Hussain?

4   A.  That's not how it worked.

5   Q.  Okay.  Well, how did you get to Dr. Hussain?  Did you

6   drive there yourself?

7   A.  Dr. Lee said that Dr. Hussain does laparoscopic surgery,

8   and he might be able to do it that way, by a minimally

9   invasive surgery.  That's why he sent me to Dr. Hussain.

10  Q.  And Dr. Hussain did a CT scan of you?

11  A.  Yes, sir.

12  Q.  Dr. Hussain met with you, looked at the CT scan and said:

13  Can't help you.

14  A.  Yes, sir.

15  Q.  And then you saw Dr. Gottlieb, another doctor at

16  University of Chicago, with the sole purpose of getting

17  another hernia surgery, right?

18  A.  Not actually right.  I was hoping to see Dr. Lee, but he

19  had retired and referred me to Dr. Gottlieb.  That's why I saw

20  Dr. Gottlieb.

21  Q.  But you didn't see Dr. Gottlieb because your toe hurted.

22  You went to see him because your hernia hurted, which is what

23  you reported to Dr. Gottlieb?

24  A.  Yes, sir.

25  Q.  And you didn't go see Dr. Gottlieb to do toe surgery.  You

1   wanted hernia surgery?

2           MR. DARKE:  Objection, argumentative, badgering.

3           THE COURT:  Asked and answered.

4           And I can't believe I'm saying this, can you guys

5   move away from the microphones just a touch.

6           MR. TENGESDAL:  I wanted to end on a high note.

7           THE COURT:  It's like Bizarro World.  I've been

8   asking you guys to get near mics the whole time, and then at

9   the end you are blowing it away, both of you guys.  Just an

10  inch or two more.  You are going to blow out the court

11  reporter's ears.

12          Okay.  Go ahead, counsel, pose a question.

13          MR. TENGESDAL:  I have no questions.  I'm done, Your

14  Honor.  Thank you.

15          THE COURT:  You are done?  Okay.

16          Any additional inquiry from the co-defendant?

17          MR. FITZGERALD:  No, no cross.

18          THE COURT:  Any additional?

19          MR. DARKE:  I have no further questions.

20          THE COURT:  Let me talk to you guys at sidebar.

21     (Proceedings at sidebar on the record)

22          THE COURT:  All right.  We're at sidebar.

23          I just want to clarify something because it has

24  significance not only for this case, but possibly others.  The

25  position that I've gleaned from the evidence and the argument

1   is that the plaintiff's position is that the 2018 procedure by

2   Dr. Dumanian remedied the constitutional violation, at least

3   from that point forward, is that fair to say?

4           MR. DARKE:  Well --

5           THE COURT:  Because there is another lawsuit where he

6   filed and he said that based on the time frame right

7   afterwards.  So I'm trying to figure out if this is in fact

8   the position he's taken, and he's taken an inconsistent

9   position in other lawsuits, whether or not that's a judicial

10  admission or estoppel.

11          MR. DARKE:  So our position is that he received that

12  surgery and that remedied the delay that was from the

13  defendants.  But his pain continued, even though the hernia --

14  and the hernia wasn't perfectly fixed, so he still has pain,

15  so I think there is still damages.

16          And I'm not familiar with the other lawsuit, so I

17  can't answer anything beyond what I just said.

18          THE COURT:  What I'm trying to say, I thought you

19  said that the procedure remedied it.  Are you saying it didn't

20  remedy it because he still has pain and still has a

21  constitutional violation going forward?  I don't understand

22  how both those things can be true.  Maybe I'm misunderstanding

23  it.

24          MR. DARKE:  So maybe I am.  So the constitutional

25  violations, it was --

1          THE COURT:  Are you aware of the other case?

2          MR. DARKE:  I'm aware that there was another case,

3    but I've never seen it or talked to John about it.

4          THE COURT:  Okay.

5          Are you guys aware of the other case?

6          MR. TENGESDAL:  I have another one with you.  It's

7    the ADA one.  So I don't -- you said they're as long as your

8    arm, so I don't know.

9          THE COURT:  I'm not the only one in the building with

10   them.

11         MR. TENGESDAL:  I do know of one other one.

12         THE COURT:  But I'm just trying to figure out, you

13   know, despite or depending on what happens in this case,

14   obviously you can't take inconsistent positions in two

15   different cases, so I'm just trying to figure out what the

16   position in this case is --

17         MR. DARKE:  Right.

18         THE COURT:  -- so if there is an effect on other

19   matters, that I don't misconstrue it.

20         So what is the position in this case?

21         MR. DARKE:  My position has been that the surgery

22   remedied or -- I don't know if "remedy" is the right word, but

23   ended the constitutional violations.  But because they didn't

24   obtain the surgery earlier, which made it harder to repair and

25   we argue couldn't repair it fully, he still lives with some

1 pain post-2018.

2 THE COURT: Right.

3 MR. DARKE: And so I still believe he's entitled to

4 those damages.

5 THE COURT: Okay. So the theory of what I'll call

6 the post-2018 matter would be predicated upon liability in

7 this case. So, for example, if he lost this case, then the

8 other case would be dismissed subject to summary judgment or

9 dismissal.

10 MR. DARKE: I don't know.

11 THE COURT: Well, if you are saying the subsequent

12 cases are a new area of damages for the same delay, so if he

13 loses his argument that there is delay here, then that other

14 case would be summarily dismissed, right, because it's

15 predicated on the same set of facts?

16 MR. DARKE: I can't answer that. I don't know what

17 the other case is.

18 THE COURT: Okay. All right.

19 MR. DARKE: I mean, I can review it tonight.

20 THE COURT: No. We'll deal with that case at the

21 time. But at least, at least what I needed to know is your

22 theory in this case. That other one is not predicated on some

23 actions or inactions after 2018. It's simply the ongoing pain

24 alleged from things that happened in this case essentially in

25 the pre-2018, pre-Dumanian surgery, correct?

1    MR. DARKE:  So is it based on the hernia repair?

2    THE COURT:  Well, if it's an independent violation,

3  then it's independent.  But to a degree, a case is predicated

4  on the same actions here, the alleged delay, and it's simply

5  seeking additional damages post-2018, then that case would

6  stand or fall based on this one, correct?

7    MR. DARKE:  Based on what you just said, even though

8  I haven't read anything, that would sound probably right.

9    THE COURT:  Okay.  And obviously the other case is

10  going to have an independent complete analysis.

11    All right.  Anything else we need to address before I

12  cut the jury for the day?

13    MR. DARKE:  Not from us.

14    MR. TENGESDAL:  No, Your Honor.

15    THE COURT:  Okay.

16    MR. DARKE:  Thank you, Judge.

17    (End of proceedings heard at sidebar)

18    THE COURT:  On behalf of the plaintiff, do you rest

19  in rebuttal?

20    MR. DARKE:  We do.

21    THE COURT:  Ladies and gentlemen, you are done for

22  the day.  You are not here tomorrow.  And on Friday, 9:30, you

23  will hear closing arguments, final instructions on the law and

24  then the case is yours for deliberation.

25    I want to thank you for your service.  It's not over

1    yet, but I want to thank you in advance.

2            Remember, as always, until the trial is over, you are

3    not to discuss the case with anyone, including your fellow

4    jurors, members of your family, people involved in the trial

5    or anyone else, you are not to discuss the case in person,

6    online or in any other way.

7            If anyone approaches you, tries to talk to you about

8    the case, do not tell your fellow jurors, but advise me about

9    it immediately.

10           Do not read or listen to any news reports of the

11   trial and do not investigate it on your own.

12           Finally, remember to keep an open mind until all the

13   evidence has been presented, which it has, you've received my

14   instructions on the law, which you'll get on Friday morning,

15   and you've heard the views of your fellow jurors during final

16   deliberations, which will be on Friday.

17           Enjoy your day off.  I'll see you Friday.

18     (Jury out)

19           THE COURT:  All right.  Jury out.  Door closed.

20           You can take the plaintiff down from the stand.

21     (Witness excused)

22           THE COURT:  All right.  A couple housekeeping things

23   before we're done.  You guys, we are going to do the charge

24   conference tomorrow at 2:00 o'clock.  I have the IDOC writ for

25   1:30 so that we make sure he's here on time.

1          That's in case you don't want to waive your presence.

2   It's all law stuff.  I figured you want to be here.

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Any instructions that you have not

5   submitted, can you get them to me by 5:00 o'clock today?

6          MR. DARKE:  Yes, Your Honor.

7          MS. CIAMBRONE:  Yes, Your Honor.

8          THE COURT:  Okay.  If you give it to me after that,

9   it's just I'm not going to be able to incorporate it into the

10  process.

11         And I explained this at the charge conference, but

12  let me try to do it again to make sure everyone is clear.

13         What I'll do is I'll take the submissions of the

14  parties, both sides, and I will consider them, and based on

15  that and my review of the law, I create a new document called

16  the Court's instructions.  I give those to the parties

17  tomorrow.  You go through them.  And then when you guys tell

18  me you are ready, I'll come out and I'll go through the

19  instructions one by one.  All you say is "Objection" or "No

20  objection."

21         So I'll go, "Court's instruction 1."

22         "Objection.  No objection.  No objection."

23         If there is an objection, I write down the thing.  I

24  put a note to the side.  I go 1 to 50.  And when we're done,

25  I'll go back to the ones that had an objection.

1      If an instruction to Court's instruction 1, "No

2  objection.  No objection.  No objection," we'll never talk

3  about it again.  It's in the packet.

4      We'll go through the ones that have objections.  And

5  everyone who has an objection, I'll say, "State your

6  objection."

7      You may not incorporate by reference some other

8  filing or vaguely make a reference to some case.  You've got

9  to give me a cite.  And if you have language, you have to

10  quote it.

11      And the reason I do that is I will actually use the

12  transcript, because half the time I'm saying, "Yeah, that

13  sounds like a great idea."  And I'll use the draft transcript

14  and I'll cut and paste that in there.  So don't start

15  paraphrasing something, because that's not preserving

16  anything, okay.

17      Once I rule on all the objections I will ask the

18  parties, each one:  Is there any instructions I didn't give

19  that you think need to be in the packet?  Same to you, same to

20  you.

21      Then we'll go over the verdict form.  Any problems

22  with the verdict form?  Any problems with the verdict form?

23  Any problems with the verdict form?

24      Once we have that done, that will be closed.  You

25  will know what the instructions are.  And when I have a clean

1  copy, we will email it to you.  So if you wanted to put it in

2  your PowerPoint, I don't know what you guys are doing for

3  close, then you can do so.

4        In preparation for Friday morning, if you guys have

5  PowerPoints, you have to exchange them at 9:00 o'clock on

6  Friday.  I know they're going to change at the last minute.

7  That's always how it goes.  But I have to resolve any problems

8  with the PowerPoints before closing arguments.

9        Also, I give most of the instructions before you

10 argue.

11        MR. DARKE:  Okay.

12        THE COURT:  Okay.  So I go the last three, like, you

13 know, try to deliberate and all that stuff at the end, I do

14 that at the end so you are actually bookends.  So instead of

15 saying "as the Judge will tell you," "as the Judge did tell

16 you."  That way I do all the unpacking on all the instructions

17 before you argue, and they're not hearing the elements for the

18 first time when you are going through that.

19        MR. TENGESDAL:  Good.

20        THE COURT:  I had a judge do that once when I was a

21 trial lawyer, and I loved it.  And now that I'm

22 Dr. Frankenstein, I can do whatever I want.  So that's the way

23 I do it.

24        Any questions about the process?

25        MR. DARKE:  No, sir.

1    MR. TENGESDAL:  No.

2    THE COURT:  Okay.  The other thing that we're going

3  to do on Friday is we're going to have a laptop, and it has to

4  have all of the exhibits that are admitted into evidence,

5  okay.  If there is -- we'll have hopefully, if you guys can

6  meet and confer, and this is something we will sort out

7  tomorrow, you guys have to tell me what is in evidence, and I

8  know that's been a moving target a little bit, and what

9  versions there are.  I mean, you should see my notes.

10   You all have to make sure that the laptop contains

11  all the exhibits and does not contain anything that is not

12  admissible.  You cannot delegate that to your co-counsel or

13  anyone else.  I will ask each of you individually as an

14  officer of the Court:  Have you reviewed it and is it, in

15  fact, the appropriate things that go back?

16   Now, some things that are admitted into evidence

17  don't go back.  That's fine.  We can talk about that.  But

18  nothing goes back that was not admitted into evidence.  And I

19  can tell you horror stories about the wrong laptop and this

20  and that and some evidence from another unrelated case went

21  back and it became a problem.

22   So I'm going to -- and that's not going to be an easy

23  thing to do.  So it's probably something we want to work out

24  tomorrow so they're not scrambling and having the jury

25  delayed, because we want to get them instructed and closed so

1    they can deliberate on time.

2         And if there is a physical exhibit, I mean, I don't

3    think -- generally demonstratives don't go back.  But, you

4    know, if you guys feel differently, I have an open mind on

5    that.  If there is no disagreement, then I can sort that out.

6         Anything else to address before the break from either

7    side?

8         MR. DARKE:  I want to talk about the process.  So

9    we're not -- so for the laptop and the exhibits, counsel and I

10   are to get together and have a laptop that we're going to then

11   give to the jurors with the exhibits?

12        THE COURT:  That's the way it normally is done, yes.

13        MR. DARKE:  Not a flash drive that you give the --

14        THE COURT:  Well, if you have it all in a flash

15   drive, then we have to make sure we have a blank laptop that

16   we can use.  But we have to make sure everything is compatible

17   and they can open it.  And I don't know what programs are in

18   your flash drive, so we have to make literally what I'll call,

19   unfortunately, an idiot-proof way, a set of instructions, like

20   this is how you click on this icon, that kind of thing.

21        So if you guys don't give me a laptop and want to use

22   another one, then that's something we're going to sort out

23   tomorrow, which means you all have to figure out what the

24   exhibits are today or tomorrow morning.

25        MR. DARKE:  We'll work with counsel.  We've done that

1 | before, so I know our IT can give us a clean laptop that will

2 | have nothing on it.  They can't access anything.

3 | THE COURT:  That's usually better, because some of

4 | ours have security measures, the Court ones, that make other

5 | programs go bananas.  And there is a reason for that, because

6 | the Chinese government tried to hack our system a few years

7 | back, so now we've got all kinds of countermeasures and top

8 | secret nonsense on there.

9 | So I would recommend you guys sort of confer on a

10 | laptop.  And we'll give it back to you when we're done.  But

11 | that's my recommendation.

12 | Okay.  Any other questions?

13 | MS. CIAMBRONE:  I have a question.  For the jury

14 | instructions, Your Honor, do you want them to go to your order

15 | email or do you want us to --

16 | THE COURT:  The proposed order inbox would be great.

17 | MS. CIAMBRONE:  Okay.

18 | THE COURT:  We'll pull them off.  Make sure in the

19 | header, we get more than a hundred a day, so make sure that

20 | the header says which one, that it's you guys so we know to

21 | pull it out of the pile.

22 | MR. DARKE:  Thank you, Judge.

23 | MS. CIAMBRONE:  Thank you.

24 | THE COURT:  Anything else?

25 | MR. FITZGERALD:  No.  I just want to seek some

1    clarity on the Rule 50 motions.  We were not planning on

2    written submissions.  We're going to argue it orally.  Will

3    there be any opportunity to do that before the jury hears

4    closing arguments or --

5         THE COURT:  Well, what I was going to do, I thought

6    everyone was going to renew their motion at the close of all

7    the evidence, I was going to take that under advisement and

8    have the parties, if they want, to reserve argument.

9         We can take the verdict, go all the way 'til then.

10   And the reason I'm thinking this sequence, because it respects

11   the jury's sacrifice.  If there is a motion made and I take it

12   under advisement, either at the close of the case in chief or

13   at the close of all the evidence, nothing prevents me from

14   ruling on it either way after the jury's verdict.

15        So I was going to make that an issue for us

16   afterwards because I know at least one party wants to do a

17   written submission.  You are not obligated to do so.  They

18   need an obligation to be able to respond.  And given the fact

19   that they've got to prepare for the close, they've got to

20   prepare for the charge conference, they've got to go through

21   the exhibits, I don't want them writing a brief tonight when

22   the jury would be better served by doing that at a later time.

23        For example, if the jury comes back for the

24   defendant, I can grant or deny -- or the plaintiff, I can

25   grant or deny the motion.  And same thing, if it comes back

1 for you, it would be mooted if it came back for you, but, you

2 know, nothing prevents me from making whatever ruling we want.

3       If you want to orally argue it at a later point in

4 time, I'll make sure people -- I will give everybody the

5 chance to say whatever they need to, whether it's in writing

6 or orally. It's just a question of when.

7       Is that agreeable?

8       MR. DARKE: Yes, Your Honor.

9       MR. FITZGERALD: Yes.

10       MS. CUNDIFF: Your Honor, so mine is ready to file.

11 But if you want me to wait, I will wait.

12       THE COURT: You can file it if you want.

13       MS. CUNDIFF: Okay.

14       THE COURT: But I'm not going to expect a response

15 until after Friday.

16       Okay. Anything else from any party?

17       MR. FITZGERALD: Just if it's okay if we waive our

18 clients' appearance for tomorrow because they --

19       THE COURT: Do you guys want to waive your

20 appearance?

21       DEFENDANT WILLIAMS: Yes.

22       THE COURT: All right. On the record and by

23 agreement of the parties, other than the plaintiff, the rest

24 of the parties are not required to be here tomorrow for the

25 charge conference. It's a bunch of law stuff. The people who

1   usually come usually regret it.

2        DEFENDANT WILLIAMS:  Thank you, Your Honor.

3        THE COURT:  Okay.  Anything else from any party?

4        MR. DARKE:  No, Your Honor.

5        MR. TENGESDAL:  No.  Thank you.

6        THE COURT:  All right.  Great.  See you all tomorrow.

7   Court is in recess.

8      (Adjournment 3:17 p.m. until 2:00 o'clock p.m., March 28,

9        2024.)

10                          CERTIFICATE

11        I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13  */s/ Elia E. Carrión*        *28th day of March, 2024*

14  *Elia E. Carrión*                    *Date*
    *Official Court Reporter*

15

16  */s/ Jennifer Costales*       *28th day of March, 2024*

17  *Jennifer Costales*                  *Date*
    *Official Court Reporter*

18

19

20

21

22

23

24

25