UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN E. TAYLOR, JR.,<br><br>Plaintiff,<br><br>vs.<br><br>WEXFORD HEALTH SOURCES, INC., et al.,<br><br>Defendants. | **Case No. 16-cv-03464**<br><br>Honorable John Robert Blakey |

# PLAINTIFF'S RESPONSE TO DEFENDANTS ARTHUR FUNK M.D. AND GHALIAH OBAISI AS THE ADMINISTRATOR FOR THE ESTATE OF SALEH OBAISI M.D.'S MOTIONS FOR DIRECTED VERDICT

**JOHN E. TAYLOR, JR.**

By: /s/ *Richard P. Darke*

Richard P. Darke
Rosanne Ciambrone
Duane Morris LLP
190 S. LaSalle St. – Suite 3700
Chicago, IL 60603
312-499-6700
rpdarke@duanemorris.com
rciambrone@duanemorris.com

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...........................................................................................................1

II. THE RULE 50(a) STANDARD .......................................................................................1

III. DRS. FUNK AND OBAISI'S RULE 50(a) MOTION MUST BE DENIED ....................3

    A. The Evidence Supports a Finding of Deliberate Indifference ............................... 3

    B. Defendants' Actions Were Deliberately Indifferent ............................................... 4

        1. There Was Sufficient Evidence To Support A Claim Against Defendants On Mr. Taylor's Hernia Claim................................................................... 6

        2. There Was Sufficient Evidence to Support a Verdict on Mr. Taylor's Claim Relating to his Neck and Back Pain............................................... 10

    C. The Actions of Drs. Funk and Obaisi Caused Mr. Taylor Harm........................... 11

    D. Mr. Taylor's Claim for Punitive Damages Against Dr. Funk is Supported by the Record ........................................................................................................ 15

IV. CONCLUSION................................................................................................................16

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................2

*Bogathy v. Union Pacific R.R.*, 2020 U.S. Dist. LEXIS 14812 (N.D. Ill. Jan 24, 2020) ...........................................................................................................................12

*BP Amoco Chem. Co. v. Flint Hills Resources, LLC*, 697 F. Supp. 2d 1001 (N.D. Ill. 2010) ..............................................................................................................................12

*Gil v. Reed*, 381 F.3d 649 (7th Cir. 2004) ....................................................................................3

*Goodloe v. Sood*, 947 F.3d 1026 (7th Cir. 2020) .........................................................................3

*Hendrickson v. Cooper*, 589 F.3d 887 (7th Cir. 2009) ............................................................2, 14

*Hunter v. Mueske*, 73 F.4th 561 (7th Cir. 2023) ........................................................................12

*J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020) ....................................................................2

*Jones v.Simek*, 193 F.3d 485 (7th Cir. 1999) ...............................................................................3

*Kyles v. Beaugard*, No. 15-cv-8895, 2023 U.S. Dist. LEXIS 143261 (N.D. Ill. Aug. 16, 2023) ............................................................................................................ 1-2, 6

*Perez v. Fenoglio*, 792 F.3d 768 (7th Cir. 2015) ...................................................................... 3-4

*Petites v. Carter*, 836 F.3d 722 ...............................................................................................3, 11

*Rodesky v. Pfister*, No. 15-cv-1002, 2023 WL 145057 (C.D. Ill. Feb. 2, 2023) ............................1

*Wilder v. Wexford Health Sources, Inc.*, No. 11 C 4109, 2015 U.S. Dist. LEXIS 60407 (N.D. Ill. May 8, 2015) ...................................................................................................3

*Wilson v. Wexford*, 932 F.3d 513 (7th Cir. 2019) ........................................................................3

*Woodward v. Correctional Medical Svcs. of Illinois, Inc.,* 368 F.3d 917 (7th Cir. 2004) ..............................................................................................................................2

**Rules**

Rule 50 ................................................................................................................................. 1-3, 6

Plaintiff, John E. Taylor, Jr., ("Plaintiff" or "Taylor") files this response to Defendants Arthur Funk, M.D. and Ghaliah Obaisi as the Administrator for the Estate of Saleh Obaisi M.D.'s ("Defendants") motion for a directed verdict ("Motion") as follows:

## I. INTRODUCTION

The Court should deny the Motion. The Motion does not satisfy any of the necessary requirements for a judgment as a matter of law under Rule 50. The Plaintiff proved the necessary elements of his claims against the Defendants. There was ample evidence to send the case to the jury. The evidence shows Drs. Funk and Obaisi were deliberately indifferent to Mr. Taylor's medical needs and exhibited callous disregard for his medical conditions despite having both the knowledge and skill to assist Mr. Taylor and (i) alleviate the prolonged and unnecessary pain that he endured from 2014 through May 2018, while his hernia indisputably worsened and he suffered unnecessary pain as more and more of his bowels (*i.e.* viscera) left his abdomen, and (ii) (with respect to Dr. Obaisi only) alleviate the prolonged and unnecessary pain he suffered from 2012 through 2017 by failing to return Mr. Taylor for epidural injections to treat his back and neck pain.

## II. THE RULE 50(a) STANDARD

Pursuant to Rule 50(a), if a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may grant judgment as a matter of law against that party on that issue. FED. R. CIV. P. 50(a). The standard is the same whether a motion is brought under Rule 50(a) (before a verdict) or 50(b) (after a verdict). Only if no rational jury could have found for the non-movant may a court disturb the jury's verdict. *Kyles v. Beaugard*, No. 15-cv-8895, 2023 U.S. Dist. LEXIS 143261, *20 (N.D. Ill. Aug. 16, 2023) (Rule 50(a) motion denied; jury verdict awarding prisoner plaintiff compensatory and punitive damages on Eighth Amendment claim upheld); *see also Rodesky v. Pfister*, No. 15-cv-1002, 2023 WL 145057, at *3 (C.D. Ill. Feb. 2,

2023) (Rule 50 motion denied; jury was entitled to rely on testimony from prisoner plaintiff that he was in pain in delay of medical treatment claim and court would not assess his credibility).

"The law affords great respect to jury verdicts." *J.K.J. v. Polk County*, 960 F.3d 367, 378 (7th Cir. 2020) (Rule 50 and 59 motions denied; jury verdict awarding compensatory and punitive damages to prisoner on Eight and Fourteenth Amendment and *Monell* claims was upheld). A Rule 50 motion may be granted *only* when the record demonstrates "no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party. [The court is] obliged to leave the judgment undisturbed unless the moving party can show that no rational jury could have brought in a verdict against him." *Woodward v. Correctional Medical Svcs. of Illinois, Inc.,* 368 F.3d 917, 926 (7th Cir. 2004) (Rule 50 motion denied; jury verdict awarding compensatory and punitive damages to prisoner on Eight Amendment claim upheld). Rule 50 imposes a high bar and a jury verdict must not be set aside lightly. *Kyles*, 2023 U.S. Dist. LEXIS 143261, at *20; *see also Hendrickson v. Cooper*, 589 F.3d 887, 891 (7th Cir. 2009) (overturning a jury verdict is an "uphill battle" because of high standard under Rule 50; Rule 50 motion denied and jury verdict to prisoner affirmed by trial court and on appeal).

"The district court must give the nonmovant the benefit of every inference while refraining from weighing for itself the credibility of evidence and testimony." *Kyles*, 2023 U.S. Dist. LEXIS 143261, at *20. Even though "[t]he court looks at the entire trial, it must disregard all evidence favorable to the movant that the jury is not required to believe." *Id.* "The question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "The court may grant judgment as a matter of law only when there can be but one reasonable conclusion as to the verdict." *Id*.

In the present case, Drs. Funk and Obaisi do not meet this high standard. They simply ask the Court to take the matter away from the jury based on a limited and one-sided view of the evidence. There is no basis to do so.[1]

## III. DRS. FUNK AND OBAISI'S RULE 50(a) MOTION MUST BE DENIED

To state an Eighth Amendment Claim based on deficient medical care, the Plaintiff must allege an objectively serious medical condition and an official's deliberate indifference to that condition. *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015).

### A. The Evidence Supports a Finding of Deliberate Indifference

The facts before the jury evidence deliberate indifference. Deliberate indifference is subjective; the defendant must act or fail to act despite knowledge of a substantial risk of harm. This may be shown through indirect evidence and inference. Deliberate indifference can be shown in multiple ways, including evidence of a refusal to follow the advice of a specialist, persisting in a course of treatment known to be ineffective, inexplicable delay, or, among others, engaging in a course of treatment below the requisite standard of care. *Gil v. Reed*, 381 F.3d 649, 633 (7th Cir. 2004); *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020); *Wilder v. Wexford Health Sources, Inc.*, No. 11 C 4109, 2015 U.S. Dist. LEXIS 60407, *18-19 (N.D. Ill. May 8, 2015); *Jones v.Simek*, 193 F.3d 485, 490 (7th Cir. 1999); *Petites v. Carter*, 836 F.3d 722, 729-730 (7th Cir. 2016; and *Wilson v. Wexford*, 932 F.3d 513 (7th Cir. 2019) (14 month delay for referring inmate for surgery; error to grant judgment as a matter of law); *Perez*, 792 F.3d at 778 (cited by Defendants) (dismissal of claim against prison doctor reversed; unexplained delays and failure to follow advice of specialist states a claim for deliberate indifference). That is precisely what occurred here. Drs.

---

[1] Because this is a Rule 50(a) motion that was presented at the close of Plaintiff's case, the argument in this brief is based on the evidence introduced during Plaintiff's case-in-chief. The evidence as it came in over the entire trial is fully assessed in Plaintiff's Responses to the Post-Trial Motions of Dr. Obaisi and Dr. Funk.

Funk and Obaisi persisted in a course of treatment over a course of years that was ineffective and caused Mr. Taylor to suffer needlessly. There is no evidence here that Drs. Funk and Obaisi's actions were based on any rational medical judgment or that they were following the UIC's specialists recommendations. As the evidence showed, the problem was that no one was making sure Mr. Taylor was receiving the care he needed.

**B.     Defendants' Actions Were Deliberately Indifferent**

The Defendants' Motion is inadequate. In the first section of the Motion, Defendants argue that there was no evidence that their medical decision making "was so far afield" to support a finding of deliberate indifference. (Dkt. #543 p. 2.) But in doing so, they ignore the myriad of ways deliberate indifference may be shown. And the evidence they cite is misleading and incomplete at best. In arguing that Mr. Taylor did not show deliberate indifference, Defendants point to testimony of Mr. Taylor on cross-examination where Mr. Taylor testifies that he did not see any report from UIC surgeons to Dr. Obaisi that would indicate Dr. Obaisi was not doing anything for pain management. (Dkt. #543 p.3.) They bizarrely characterize this testimony as Mr. Taylor's "admission" that Dr. Obaisi's management of his pain medication was done appropriately. (Dkt. #543 p.3.) And then, with no citation to the record, Defendants' claim that "Dr. Obaisi's management of [Mr. Taylor's] pain medication (his main role as Plaintiff's primary provider) was done appropriately." (*Id.*)[2]

Each of these assertions is contradicted by the evidence introduced at trial. First, the evidence indicated that Dr. Obaisi was the medical director for Stateville from around 2012 until his passing in 2017. (Tr. 835:1-4.) As medical director, Dr. Obaisi was responsible for direct

---

[2] The Motion lumps Mr. Taylor's claims for his hernia and his neck and back pain together in this argument and does not distinguish between the two. However, there was no claim against Dr. Funk arising out of the neck and back pain that was before the jury.

4

patient care, which included not only taking care of the inmates at the infirmary at Stateville but also referring inmates out to specialty providers. (Tr. 837:5-14.) Dr. Obaisi provided Mr. Taylor's medical care at Stateville (Tr. 909:4-6.) Dr. Obaisi was Mr. Taylor's regular treating physician and it was his role to stay up on Mr. Taylor's continuing need for medical care. (Tr. 907:2-6; 909:4-6; JT 102 (Funk letter advising Mr. Taylor that "decision for treatment is made by Dr. Obaisi who is managing your care").) Dr. Obaisi had the authority to refer inmates to specialty care physicians at UIC and for pain management. (Tr. 851:1-852:5.) Dr. Obaisi's role was *not* limited to Mr. Taylor's pain.

Second, nothing in the record indicates that Mr. Taylor's pain was being controlled. Mr. Taylor testified as to his pain. (Tr. 122:14-123:6; 127:11-13;128:19-129:6; 148:3-11, 18-23;150:15-24; 157:19-22; 174:21-175:17.) Mr. Taylor's medical records reflect Mr. Taylor's pain. *See* JT 066, 7/22/15 Surgery Note ("He currently complains of right sided abdominal pain when he is idle or ambulating."); DX 0246 10/14/15 General Surgery Note p.3 ("Patient is very symptomatic and would like to have hernia fixed.") JT 072, 5/2/16 General Surgery Consult ("He currently complains of continued right sided abdominal pain when he is idle or ambulating. … He states that the pain is sporadic and has progressively worsened over time. He states that pain radiates to his back and around his side. He has intermittent nausea and vomiting."); JT 085, 1/9/17 Surgery Note ("He currently complains of continued right sided abdominal pain when he is idle or ambulating that he feels is worsening since he was last evaluated. He states that the pain is sporadic and has progressively worsened over time. He states that pain radiates to his back and around his side. He has intermittent nausea and vomiting."). And Mr. Taylor's grievances corroborate his pain. *See* Hernia: JT 242A; JT 245B; JT 247B; JT 249B; JT 252B; JT 264A; JT 356; JT 365A; Back and Neck Pain: JT 188A; JT 197A; JT 225A; JT 354B; JT 222; JT225A; JT231A; JT 239A;

5

JT251A.[3]

### 1. There Was Sufficient Evidence To Support A Claim Against Defendants On Mr. Taylor's Hernia Claim

Contrary to Defendants' assertions, Mr. Taylor did present evidence that Drs. Funk and Obaisi failed to take reasonable measures to provide treatment for Mr. Taylor's hernia. While Defendants argue that Mr. Taylor had to show that "Defendant(s) knew his actions were likely to be ineffective or that such actions were clearly in appropriate" (Dkt. #543 p. 4), they ignore the numerous ways in which deliberate indifference may be shown. (*Supra* ¶ 3.) They argue three points: (i) Drs. Funk and Obaisi were merely following the recommendations of the surgeons at UIC, (ii) that Dr. Gutowski testified that UIC never communicated a precise date on which Plaintiff should return for hernia surgery, and (iii) that "no surgeon from UIC ever gave Dr. Obaisi or Dr. Funk an indication that surgery was a possibility." But the evidence does not support these conclusions.

First, there is evidence that the surgeons at UIC thought surgery was a possibility:

- Mr. Taylor did not see Dr. Giulianotti until May of 2016 (seven months after Dr. Masrur ordered the consultation). Even then, Dr. Giulianotti believed there was a chance for improvement regarding Mr. Taylor's hernia. (DX 249 ("chance for some improvement", may be able to do surgery). Mr. Taylor testified that Dr. Giulianotti told him he could not promise to get him to 100% but that he could maybe get him 70% to 80% better. (Tr. 157:19-158:1.)

- Dr. Ellis testified that he was comfortable performing surgery for John's hernia in 2014 but by 2017, there was too much visceral out and the loss of domain too great. (Tr. 551:25-552:13.)

---

[3] Defendants argue that one question on cross examination of Mr. Taylor in which counsel asks Mr. Taylor, "Your opinion is when you wrote your grievance letters, that they weren't timely in telling you what's going on with you, that's essentially why you're here?", to which Mr. Taylor responds, "Yes. That's why we are here." (Dkt. #543 p. 3 (citing Tr. 263:3-6) somehow limits Mr. Taylor's claim. Four lines and one question out of virtually thousands of pages of testimony taken out of context does not define Mr. Taylor's claim. As *Kyles* instructed, on a Rule 50 motion, the court looks at the entire trial. 2023 U.S. Dist. LEXIS 143261, at *20.

- In July 2016, Dr. Cohen with UIC's plastic surgery department was ready to perform the necessary plastic surgery to assist with a potential reconstruction. (DX 307, Medical Special Services Referral and Report signed by Dr. Obaisi ("seen with Dr. Cohen (plan for combined surgery with Dr. Giulianotti. f/u with Dr. Giulianotti office for scheduling of surgery); JT 077 7/26/16 General Surgery Note from Dr. Cohen ("Plan for combined R lumbar hernia repair with General Surgery Dr. Giulianotti and Dr. Cohen; general surgery primary service; awaiting insurance and scheduling"); (Tr. 944:20-25 (Cohen) ("I told him that I will be willing to participate in the reconstruction after Giulianotti takes care of the hernia."). Dr. Gutowski (Plaintiff's expert) testified that Exhibit JT 77 indicated the plan for UIC specialists was to fix Mr. Taylor's hernia with the general surgeon and the UIC physicians were just awaiting scheduling. (Tr. 397:1-8, 10-24.)

- While Defendants argue without citation to the record that Dr. Cohen never planned on doing the surgery (Dtk. # 543 p.4), Dr. Cohen's testimony is inconsistent with his actual medical records and the manner in which all of the treating physicians at the time interpreted them. (Tr. 941:17-942:3, 942:20-944:19.) Moreover, Dr. Giulianotti never says that he would not do the surgery, and in the end, he testifies "I told him [Dr. Giulianotti] that I will be willing to participate in the reconstruction after Giulianotti takes care of the hernia.". (Tr. 943:20-944:25.)

- UIC was preparing for Mr. Taylor's surgery as of September 2016 shortly after Dr. Cohen's consultation and receipt of the 2016 CT Scan:

    > [L]arge ventral hernia, will require extensive reconstruction w/ conjunction w/ gen surgery. Will need to coordinate w/ gen surg for OR after CT. Per the site, <u>the pt has an appointment w/ plastics on 9/20/16 for pre-admission testing</u>." "<u>authorization for pre-admission testing w/ plastics at UIC</u>".

    (DX 308 (emphasis added).) Dr. Funk admittedly testified that OR means operating room and pre-admission testing necessarily meant UIC was preparing for surgery for Mr. Taylor. (Tr. 894:17-895:4.)

Thus, there was evidence presented to the jury that the surgeons at UIC were considering and prepared to perform Mr. Taylor's surgery.

Second, the record was replete with instances where Drs. Funk and Obaisi were not following the recommendations of the UIC specialists. (Dkt. # 543 p. 5.) Mr. Taylor was not sent back to see doctors or have tests as requested:

- In November 2014, Dr. Warso from UIC recommended Mr. Taylor receive a colonoscopy because of rectal bleeding, and a cystoscopy. Dr. Warso did not identify when precisely the procedures were to be completed. Both procedures were

7

- to be performed <u>before</u> the physicians at UIC would consult with Mr. Taylor for possible surgical repair of his hernia. (DX 237 ("We will follow up with Dr. Obaisi").)

- As of July of 2015, eight months after these were ordered by Dr. Warso, neither procedure had been scheduled. Dr. Masrur with UIC's plastic surgery department noticed the delay and ordered the procedures. (DX 297 (Masrur notes "previous planned procedures, "after these have been completed return to see myself and Dr. Giulianotti to plan for possible hernia repair." (signed by Dr. Obaisi)); (DX 241, UIC General Surgery Note addressed to Dr. Obaisi (both needed before you can proceed with hernia repair).

- The medical records, which Dr. Obaisi received (Tr. 863:5-11; 84:12-22), show that Dr. Obaisi was aware of Mr. Taylor's medical care and the UIC physician recommendations, yet he failed to facilitate the procedures between November 2014 and July 2015. Dr. Funk was aware of Mr. Taylor's medical conditions and medical history including his hernia. (Tr. 868-869, 871:2-6; 875:7-9; 902:22-903: JT 101, JT 121-A, JT 117.)

- From April 2014 when a CT Scan first identified Mr. Taylor's hernia to July 2015, Mr. Taylor's hernia grew larger in volume (the defect worsened) and more and more of his viscera migrated from his abdominal cavity into his hernia sac. (DX 241.) In other words, Mr. Taylor's hernia got worse over time. (Tr. 383:22-384:21; Tr. 506:8-13 (Dr. Dumanian with Northwestern testified the natural progression of hernias is to grow bigger, and it was more likely than not that Taylor's hernia enlarged over time).)

- Mr. Taylor finally received the colonoscopy on August 20, 2015 and the cystoscopy on October 7, 2015. (DX 245, 334.)

- After this unnecessary delay, in October 2015, Dr. Masrur ordered that Mr. Taylor see Dr. Giulianotti in order for him to assess Mr. Taylor for potential hernia surgery and to then consult about the same with Dr. Masrur. Despite this, Mr. Taylor was returned three times to the wrong clinic at UIC. (DX 303, 2/17/16 (signed by Dr. Obaisi; Masrur charts Taylor needs to see Giulianotti (one underline)); DX 304 April 2016 (signed by Dr. Obaisi; underlined three times, needs to see Giulianotti, don't send back to Masrur clinic); JT 0071, 4/20/16 Surgery Note ("He has huge hernia post oncological resection of iliac band and needs the chief of general surgery to see him. this is the third time he comes back to see the incorrect surgeon ….").)

- Mr. Taylor finally saw Dr. Giulianotti in May of 2016, seven months after Dr. Masrur ordered the consultation. Even then after years of delay, Dr. Giulianotti believed there was a chance for improvement regarding Mr. Taylor's hernia. (DX 249 ("chance for some improvement", may be able to do surgery).) Mr. Taylor testified that Dr. Giulianotti told him he could not promise to get him to 100% but that he could maybe get him 70% to 80% better. (Tr. 157:19-158:1.)

8

- Dr. Ellis testified that he was comfortable performing surgery for John's hernia in 2014 but in March of 2017, however, he was of the opinion that too much viscera had moved out of John's abdominal cavity and the loss of domain was too great for Dr. Ellis to perform the surgery—the delay had made any surgical intervention more difficult. (Tr. 551:25-552:13.)

- In July 2016, Dr. Cohen with UIC's plastic surgery department was ready to perform the necessary plastic surgery to assist with a potential reconstruction. (DX 307, Medical Special Services Referral and Report signed by Dr. Obaisi ("seen with Dr. Cohen (plan for combined surgery with Dr. Giulianotti f/u with Dr. Giulianotti office for scheduling of surgery); JT 077 7/26/16 General Surgery Note from Dr. Cohen ("Plan for combined R lumbar hernia repair with General Surgery Dr. Giulianotti and Dr. Cohen; general surgery primary service; awaiting insurance and scheduling").) Dr. Gutowski (Plaintiff's expert) testified that Exhibit JT 77 indicated the plan for UIC specialists was to fix Mr. Taylor's hernia with the general surgeon and the UIC physicians were awaiting scheduling. (Tr. 397:1-8, 10-24.)

- UIC planned for surgery as of September 2016 shortly after Dr. Cohen's consultation and receipt of the 2016 CT Scan:

    > [L]arge ventral hernia, will require extensive reconstruction w/ conjunction w/ gen surgery. Will need to coordinate w/ gen surg for OR after CT. Per the site, the pt has an appointment w/ plastics on 9/20/16 for pre-admission testing." "authorization for pre-admission testing w/ plastics at UIC".

    (DX 308 (emphasis added).) Dr. Funk admittedly testified that OR means operating room and pre-admission testing necessarily meant UIC was preparing for surgery for Mr. Taylor. (Tr. 894:17-895:4.)

- Dr. Obaisi did not, however, send Mr. Taylor to UIC in September for surgery with Dr. Cohen. In fact, Mr. Taylor was not sent back to UIC to see Dr. Giulianotti until January 9, 2017, nearly six months later. (DX 309) According to Dr. Gutowski, "that's a very long period of time if surgery was being planned and here we are months later into this and nothing happened and now he's seeing yet another doctor." (Tr. 398:20-399:1 (emphasis added).)

- Dr. Giulianotti asked Dr. Ellis from UIC's plastic surgery department to evaluate Mr. Taylor to assist with possible surgical intervention. Dr. Ellis testified that he would have been comfortable performing surgery for John's hernia in 2014. In March 2017; however, he was of the opinion that too much viscera had moved out of his abdominal cavity and there was too much loss of domain for Dr. Ellis to perform the surgery−the delay had made any surgical intervention too difficult. (Tr. 551:25-552:13.)

There is no basis to enter a directed verdict in favor of Drs. Funk and Obaisi on Mr. Taylor's hernia claim.

### 2. There Was Sufficient Evidence to Support a Verdict on Mr. Taylor's Claim Relating to his Neck and Back Pain

Defendants also claim there is not enough evidence to support a verdict in favor of Dr. Obaisi on Mr. Taylor's claim relating to his back and neck pain. (Dkt. #543 p.5.) Defendants cite to a limited portion of Dr. Candido's testimony where he states that he does not know isolated facts and give an inaccurate summary of Dr. Candido's opinions without citation. (Dkt. #543 p. 5-6.) Dr. Candido testified that he reviewed Mr. Taylor's medical records and relied on them in forming his opinions. (Tr. 588:15-589:24.) Dr. Candido testified that he was aware that Mr. Taylor was complaining of pain through the materials he reviewed (medical records and grievances) during the intervals between epidurals. (Tr. 626:25-627:5; 643:19-21; 664:1-8; 646:15-18.) He testified as to the relief epidurals provide generally. (Tr. 610:17- 23 (expect 40 to 60% relief from pain)); 623:15-20 (expect average of 3 to 4 months of relief).) Specifically, Dr. Candido testified about the pain relief that Mr. Taylor received from the epidurals based upon his medical records, and why the epidurals at the intervals he received were not sufficient. (Tr. 612:1-14; 617:16-20; 618:14-21; 623:5-22; 624:23-625:11; 626:3-10.) Dr. Candido testified that the appropriate approach for Mr. Taylor's pain was interventional therapies and that Mr. Taylor's care was deficient. (Tr. 650:7-653:5.)

And the evidence shows that Dr. Obaisi was deliberately indifferent to Mr. Taylor's neck and back pain. Dr. Obaisi was in charge of Mr. Taylor's medical care, which would include his neck and back pain, and referring inmates for specialty care. (Tr. 835:1-4; 837:5-14; 907:2-6; 909:4-6; JT102.) The evidence indicates Dr. Obaisi received Taylor's medical records from UIC and that he met with Taylor when he returned from visits to UIC. (Tr. 82:13-83:17; 862:11-16;

10

863:5-11; 84:12-22.) Mr. Taylor's medical records reflect that he was in pain and that he was to return for follow-up epidural injections within a specific time frame; the medical records indicate how much relief Mr. Taylor received from the injections; they show that he was not returned on a timely basis in accordance with the recommendations of the UIC pain clinic. (*See* JT 41A; JT 94 (return in one month for LESI); JT 84; DX 286; DX 275; JT 61 (return in 2 months for CESI); JT 70 (return in 1-2 moths; last CESI 6-8 months, 60% relief); JT 76 (pain worsening, decreased length of relief); JT 088A; JT 89 (LESI 3-4 months 70% relief).) Mr. Taylor spoke to Dr. Obaisi about his pain and need for epidural injections that he was not receiving, and his grievances corroborated this. (JT 188A; JT 197A; JT 225A; JT 354B; Tr. 204:21-23.) That Mr. Taylor suffered pain and was not returned to the pain clinic was supported by Mr. Taylor's testimony and the numerous grievances he filed corroborating that pain. (JT 222; JT 225A; JT 231A (supposed to be seen in two months); JT 239A (was supposed to return in 30 days); JT 251A (supposed to return in one or two months); Tr. 198:23-200:8 (Mr. Taylor was in pain and would receive 70 to 80% relief for three to six months from the epidural injections).)

Thus, the evidence is that Dr. Obaisi was responsible for Mr. Taylor's care, knew of Mr. Taylor's neck and back pain; knew of the specialists recommendation for his care that were not followed; and that the care Mr. Taylor received was deficient. The evidence supports a verdict against Dr. Obaisi for deliberate indifference to Mr. Taylor's neck and back pain.

### C. The Actions of Drs. Funk and Obaisi Caused Mr. Taylor Harm

The Defendants argue that Mr. Taylor did not show that as a result of their actions, Mr. Taylor suffered harm. Mr. Taylor must (and did) show that the Defendant's actions or inaction resulted in a delay in his treatment and that the delay (and/or the failure to treat him) exacerbated the injury or unnecessarily prolonged pain. *See, e.g., Petties*, 836 F.3d at 729-731 (outlining ways in which deliberate indifference may be shown and numerous inferences that can be drawn from

the facts); Dkt. #547 p. 30 (corresponding jury instruction). While the Defendants cite to *Hunter v. Mueske*, 73 F.4th 561 (7th Cir. 2023), this Court rejected the notion that "proximate cause" was required. (Tr. 1432-1438.) And even *Hunter* notes that causation in section 1983 claims is a question best left for a jury. 73 F.4th at 568.

With respect to Mr. Taylor's hernia, the Defendants argue that the conclusions of Mr. Taylor's expert, Dr. Gutowski, were speculative. (Dkt. #543 p. 6-8.) However, there were no objections to the portions of the testimony cited to by Defendants when it was presented. The case cited by Obaisi in support of his argument that Dr. Gutowski's testimony was insufficient was an order that was entered on a motion to bar plaintiff's expert. *Bogathy v. Union Pacific R.R.*, 2020 U.S. Dist. LEXIS 14812 (N.D. Ill. Jan 24, 2020). It does not bear on the admission of opinion testimony without objection at trial. *See, BP Amoco Chem. Co. v. Flint Hills Resources, LLC*, 697 F. Supp. 2d 1001, 1022, 1034 (N.D. Ill. 2010) (motion for new trial should not be granted on the issue where party fails to object at trial; weight to be given to expert opinion is up to the jury; failure to object to witnesses qualifications during testimony waived objection).

Moreover, Defendants ignore all the opinions Dr. Gutowski rendered:

- Dr. Gutowski testified that the four-year delay in getting Mr. Taylor surgery for his hernia was not acceptable and fell below the applicable standards of medical care. (Tr. 370:13-16.) He further testified that:

  [Taylor] suffered a great deal from this prolonged delay. The delay may have contributed to the final surgery that he had, making it more difficult to repair the hernia and potentially could have contributed to the hernia somewhat recurring after the repair. Had that delay not happened, the surgery most likely would have been easier, the recurrence of the hernia would have been less likely, and he would not have had as much loss of quality of life and suffer-age as he did.

  (Tr. 370:20-371:2.)

- Dr. Gutowski opined:

12

"[The] longer you wait, the harder it is, the more the patient suffers. Here we've gone beyond a year, which I think, in American healthcare system, I don't think anybody would stand for that." ."

(Tr. 386:10-17.)

- Dr. Gutowski testified that if a hernia is not timely treated, more intestines are going move into the hernia sac, that Mr. Taylor's CT scans showed his hernia worsened over time, which processes caused pain, discomfort, a loss of ability to do normal everyday things, nausea, vomiting, and makes any surgical repair more difficult. (Tr. 378:7-16; 383:20-385:11; JT 65.) Dr. Dumanian testified consistently. (Tr. 379:14-20.)

- Consistent with Dr. Dumanian, Dr. Gutowski testified that if the hernia is causing discomfort or pain and interfering with things the patient wishes to do, interfering with quality of life, then it is reasonable to fix it, and the correct thing would have been surgical hernia repair. (Tr. 379:14-20.)

- Mr. Taylor complained of pain when idle, when walking, and his symptoms were consistent with the delay in treatment of the hernia. Dr. Gutowski noted that at this point, given the time from when the hernia was first diagnosed, he would have expected something to have been done to fix the hernia, and the correct thing was a surgical hernia repair. (Ex. JT 66; Tr. 387:25-389:8.)

- Dr. Gutowski further testified that even if the UIC surgeons were not capable of performing the surgery, Mr. Taylor should have been given a second opinion. He testified "And this is where I think things kind of fall apart is that nobody takes charge or ownership of helping Mr. Taylor get through this. And he just keeps getting referred for the same thing over and over." (Tr. 389:9-389:19.)

- Dr. Gutowski gave the following opinion (Tr. 389:20-390:13):

    Q. And who, in your opinion, had the responsibility for undertaking that responsibility to get him to see a different doctor?

    A. My understanding is Mr. Taylor himself can't just go to a different doctor. It would be the doctor who is responsible for his healthcare in the institution.

    **Q. And do you recall who those are?**

    **A. Dr. Obaisi and Dr. Funk.**

    *See also* Tr. 464:2-22 (It was Dr. Obaisi's responsibility to make sure Mr. Taylor received the care he needed and to coordinate his care).

Defendants complain that Dr. Gutowski's testimony does not assist the jury—but that is an objection to the sufficiency of his expert opinion which was not made at trial, the time for which

has long passed. Dr. Gutowski did assist the jury. There was sufficient evidence to support a finding that Dr. Funk's and Dr. Obaisi's actions and failure to act caused Plaintiff's hernia to worsen, becoming more difficult to fix and subjected him to prolonged and unnecessary pain. A directed verdict is not warranted on Mr. Taylor's claim relating to his hernia.

With respect to Mr. Taylor's neck and back pain, the evidence shows that Mr. Taylor was not appropriately treated for his neck and back pain and that this subjected him to unnecessary and prolonged pain. Without citing to the record, Plaintiff argues that there was no witness that connected his pain to his neck and back pain and his failure to receive epidurals. (Dkt. #543 p. 9.) However, Dr. Candido testified that Mr. Taylor had degenerative disc disease of cervical and lumber spine. (Tr. 591:6-13; 596:21-600:13.) He testified that these conditions cause pain. He testified that Mr. Taylor received oral medication and epidural injections as part of a comprehensive program to manage that pain. (Tr. 603:11-23.) Mr. Taylor's medical records indicated that he suffered from neck and back pain and that he was being treated for that pain with epidural injections, which offered him relief from that pain. (*Supra* at p. 11.) There was no real dispute that Plaintiff suffered from and was treated for back and neck pain with oral and interventional pain management.[4] The only evidence was that the epidurals alleviated his neck and back pain.

The medical records alone indicate that Dr. Obaisi was not following the advice of specialists and was persisting in a course of treatment known to be ineffective and caused Mr. Taylor unnecessary pain. This is all that was necessary—proximate cause was not required (Tr.

---

[4] Defendants cite to *Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009), which actually affirmed the district court's denial of the defendant's motion for judgment as a matter of law. The court found that the plaintiff's testimony of the pain that he suffered when the defendant threw him to the ground was enough to show an Eighth Amendment violation.

14

1432-1438.) There is no basis for a directed verdict on Mr. Taylor's claim relating to his back and neck pain.

> **D. Mr. Taylor's Claim for Punitive Damages Against Dr. Funk is Supported by the Record**

Dr. Funk's sole argument in this respect is that he did not have enough involvement with Mr. Taylor to support punitive damages. (Dkt. #543 p. 10.) However, the jury heard that Dr. Funk was the regional medical director for Stateville and Dr. Obaisi's supervisor. (Tr. 834: 1-21.) He was aware of Mr. Taylor's medical conditions and history in 2014, 2015 and 2017. (Tr. 868-869; 871:2-6; 875:7-9; 902:22-903:6.) He received letters from Mr. Taylor and his sister. (JT 101 (10/10/14 letter from Funk to Taylor; JT 117 (9/24/14 Louise Taylor letter to Funk); JT 121A (8/30/15 letter from Taylor to Funk).) He discussed Mr. Taylor's condition with Dr. Obaisi. (Tr. 866:24-25.) He treated Mr. Taylor during a clinical visit in September 2015, and he saw Mr. Taylor several more times. (Tr. 905: 3-14; Tr. 864:6-18.) In mid-2017, Dr. Funk objected to Mr. Taylor's request to receive a second opinion as to whether he was a candidate for hernia surgery. In fact, Dr. Funk stipulated at trial that "Wexford Health Sources, Dr. Funk, and Dr. Obaisi objected to Mr. Taylor receiving a second opinion outside of UIC, taking the position that Mr. Taylor was not a viable candidate for surgery and had already received a qualified competent referral and examination at UIC." (Tr. 177:11-15.) Dr. Funk's demeanor at trial was combative, condescending and dismissive—which can never be fully reflected in a written transcript.[5] Dr. Funk knew of Mr. Taylor's plight, had the ability to intervene in his care at Stateville, and ignored Mr. Taylor, both

---

[5] For example, in one exchange with counsel for Plaintiff, Dr. Funk repeatedly responded to a question by accusing counsel from reading from the Wexford contract (and not answering the question), when counsel was simply asking a question. The Court had to tell Dr. Funk twice to answer the question. (Tr. 847:15-848:15.) In another exchange, Dr. Funk rudely told counsel for Plaintiff, "You're not doing so well." The jury had the right to assess and consider Dr. Funk's demeanor and consider it in the context of Dr. Funk communicating with and caring for prisoners such as Mr. Taylor. (Tr. 894:14.)

15

in person on two occasions and after reviewing his medical records. Dr. Funk was involved. He did nothing. And the jury's decision to hold Dr. Funk liable for his callous disregard of Mr. Taylor (as was evidenced by his own testimony and demeanor at trial) meets the requirements for punitive damages and then some. There is no basis for a directed verdict on punitive damages against Dr. Funk.

## IV.  CONCLUSION

The jury had ample evidence before it to support the verdict against Drs. Obaisi and Funk. The jury did its job: it looked at all of the evidence and judged the creditability of the witnesses. Its decision was proportionate to the actual harm Mr. Taylor suffered. Dr. Obaisi is not entitled to judgment as a matter of law.

**CERTIFICATE OF FILING/SERVICE**

The undersigned attorney certifies that on June 21, 2024, he/she caused the foregoing document to be filed electronically with the Clerk of the U.S. District Court, using the Court's CM/ECF system, which will send electronic notification to all parties who have appeared and registered as CM/ECF participants in this matter. Parties may access this filing through the Court's CM/ECF system.

/s/ *Richard P. Darke*